# TAB 4

DEC 19 1989

EPSTEIN BECKER & GREEN, P.C.
ATTORNEYS AT LAW
1227 25TH STREET, N.W.
WASHINGTON, D.C. 20037-1156†
(202) 861-0900
TELECOPIER: (202) 296-2882
DIRECT LINE

250 PARK AVENUE
NEW YORK, NEW YORK 10177-0077†
(212) 351-4500

1875 CENTURY PARK EAST
LOS ANGELES, CALIFORNIA 90067-2501
(213) 556-8861

SIX LANDMARK SQUARE
STAMFORD, CONNECTICUT 06901-2704†
(203) 348-3737

212 CARNEGIE CENTER
PRINCETON, NEW JERSEY 08540-6212
(609) 452-2445

27 SCHOOL STREET
BOSTON, MASSACHUSETTS 02108-4303
(617) 720-3555

† P.C. NEW YORK, WASHINGTON, D.C.
CONNECTICUT, VIRGINIA AND
TEXAS ONLY

FOUR EMBARCADERO
SAN FRANCISCO, CALIFORNIA 94111-5954
(415) 398-3500

12201 MERIT DRIVE
DALLAS, TEXAS 75251-2213†
(214) 490-3143

116 SOUTH MONROE STREET
TALLAHASSEE, FLORIDA 32301-1530
(904) 681-0596

2400 SOUTH DIXIE HIGHWAY, SUITE 100
MIAMI, FLORIDA 33133
(305) 856-1100

510 KING STREET, SUITE 301
ALEXANDRIA, VIRGINIA 22314-3132†
(703) 684-1204

December 19, 1989

VIA: HAND DELIVERY

Mr. Reginald Jones
Office of Personnel Management
Room 4351
1900 E Street N.W.
Washington, D.C.

Dear Mr. Jones:

This firm has represented a number of carriers who participate in the Federal Employees Health Benefits Program as well as the American Managed Care Review Association, an association of managed care plans including carriers which participate in the Federal Employees Health Benefits Program. Based on our experience, as well as discussions with clients regarding the Office of Personnel Management's rating policies, we have a few comments on the proposed rulemaking published in the October 20, 1989 Federal Register pertaining to revision of contract clauses and community rating practices under the Federal Employees Health Benefits Acquisition Regulation or FEHBAR.

## Community Rating: Accurate Pricing

First, we want to compliment OPM for the steps taken to date, and encourage OPM to continue its efforts, to modify the terms of the community rating contract so as to permit HMOs more flexibility to compete in the commercial market place. Some clarification would be useful on a few points, however, as the supplemental information preceding the FEHBAR and proposed Parts 1602 and 1615 do not seem entirely consistent or complete in some respects.

Please confirm that the following statements are correct:

1. The opportunity for a carrier to offer OPM the same price as is offered "similar sized subscriber groups" is merely an alternative way for pricing a community-rated contract and not a test to be applied to all community rated carriers to determine whether the FEHBP contract has been accurately priced.

2. A carrier may apply different community rating methodologies and, therefore, different rates, to similar sized groups as long as the criteria (used for determining which methodology is applied) is reasonable and consistently applied.

3. The opportunity for a carrier to offer OPM the same price as is offered "similar sized subscriber groups" can always be relied upon as a remedy by OPM and the carrier if, for instance, it is subsequently determined that a carrier's criteria was not reasonable or that a carrier had discounted the rates quoted to some of its commercial groups.

4. Carriers which apply different methodologies to different groups including the federal group are not required to seek approval for such criteria prior to the contract year during which the rate (determined according to such criteria) is applied. (Nevertheless, we would recommend that such prior approval be obtained or prior notice given, so as to avoid audit difficulties.)

5. Prior approval of a carrier's adjusted community rating methodology is required <u>if</u> it is to be applied to the federal group.

6. A carrier may use form SF-1412 if the federal group is smaller than 1500 subscribers only if the rating methodology to be applied does not involve the use of adjusted community rating. In other words, form SF-1412 may be used if the carrier intends to rate the federal group as it rates the similar sized groups (including any discounts) or if it rates the federal group using traditional community rating or community rating by class according to criteria that may not result in the same rate for the similar sized groups.

Three other comments are relevant to the subject of accurate pricing.

Section 1615.802(b)(1) states that "OPM may rely on a basic reasonableness test" for contracts involving less than 1500 FEHBP subscribers. What is this basic reasonableness test?

Section 1615.82(b)(2) authorizes OPM to obtain group specific demographic and utilization information for nonfederal groups.

This should be revised to clarify that such information may only be obtained if relevant to OPM's evaluation of a proposed rate or to the auditors' evaluation of the rate, and that such information is confidential and may not be disclosed to the public. For instance, group specific utilization information should not be relevant if the particular commercial group is not being rated using an adjusted community rating methodology.

The Certificate of Accurate Pricing for Community Rated Plans contains the following language at the end of the certification:

> ...and the FEHBP rates were developed in accordance with the requirements of 48 CFR Chapter 16 and the FEHBP contract.

It is not clear what this language adds to the language which precedes it. In fact, it seems to confuse and contradict the very specific language which precedes it. For instance, with this language it is not clear that a carrier can sign the certification if the carrier discounts groups smaller than the federal group and rates the federal group as it rates the similarly sized subscriber groups. However, such rating behavior appears acceptable under other language which appears in the proposed rules.

<u>Community Rating: The Experience Rate Remedy for Defective Pricing</u>

Some of our clients have indicated their interest in having the experience rating remedy for defective pricing reinserted in the FEHBAR. Such a remedy might be useful in those situations when OPM has, as a result of an audit, disapproved of the criteria used by a carrier to apply different but acceptable community rating methodologies but the auditors find no evidence that the criteria was not consistently applied and no evidence of discounting.

<u>Community Rating: Reconciliation - Recovery of Amounts due the Carrier</u>

At Section 1652.216-70(b)(3), OPM has proposed that during the reconciliation process if it appears the carrier should have charged OPM a higher premium for the contract period, the carrier "<u>may</u> include an adjustment to next year's PMPM computation to recover the difference..." Emphasis Added. Does this mean that the carrier may include an adjustment, or seek a one time payment of the amount due, or choose not to receive any payment? Please clarify whether the choice is the carrier's choice and exactly what such choices are.

We object to 1652.216-70(b)(6) in that it penalizes a carrier in its final year of participation in the FEHBP because it did not accurately anticipate seven months earlier (when the rates were filed with the Office of Personnel Management) what its community rate would be on January 1 of the final contract year. The reconciliation process should be applied to every carrier whether or not they intend to participate the following contract year.

Coordination of Benefits

Section 1652.204-71(a) pertaining to coordination of benefits requires carriers to coordinate, inter alia, the payment of medical and hospital costs under no fault automobile insurance policies. If a state refuses to allow coordination with no fault automobile insurance policies (in other words, the insured and/or the provider can receive duplicate payments), would OPM be willing to assert that this contractual provision requiring such coordination supersedes and preempts such a state law pursuant to 5 U.S.C. § 8902(m)(1)?

Section 1652.204-71(d) allows the carrier to collect for COB overpayments under the contract as long as the carrier meets certain preconditions. Does this provision apply to community rated carriers and experience rated carriers?

We hope that you will consider these comments useful and, should you have any questions about them, please do not hesitate to contact the undersigned.

Sincerely,

Karen Bonnie Eaton

Karen Bonnie Eaton

KBE/vw

# TAB 5

PARTNERS
National Health Plans

January 4, 1990

JAN 17 1990

Reginald M. Jones, Jr.
Assistant Director
Office of Retirement and Insurance Policy
Retirement and Insurance Group
Office of Personnel Management
P.O. Box 57
Washington, D.C. 20044

Dear Mr. Jones:

I am writing on behalf of PARTNERS National Health Plans, Inc., in regard to the proposed revisions to the community rating practices within the Federal Employees Health Benefits Program issued by OPM. PARTNERS contracts with OPM through a number of HMOs to provide health care to the federal employees. I just recently received a text of the proposal thus I have missed the December 19 deadline. However, I understand that OPM is still receiving comments past this date. My questions and comments are as follows:

1. Which benefits and rates will be used if the two similar sized groups have vastly different packages? Is the HMO to choose which option to offer and designate another similar group with that benefit package?

2. How will the riders (vision, drug, dental) that the similar size groups have or do not have effect the benefit offering to the FEHBP?

3. What will first year plans be required to offer for benefits and rates?

4. I am concerned over the possible effects of this methodology if the similar sized groups plus the FEHBP, differ greatly in utilization, price or demographics from the majority of the plan's other business, especially in a smaller HMO with a large federal employee population.

5. How will the similar sized groups methodology interact with other rating factors? (ie. industry loads; if the two closest groups are in a different class, which factor is used?)

6. If the contract is not renewed, the proposal states that neither the Government nor the Carrier is entitled to any adjustment (payable



7760 France Avenue South . Minneapolis, MN 55435 . (612) 897-1895

or receivable) for the difference between the estimated and actual rates. Why should the fact that the contract is not being renewed impact the rate reconciliation and settlement process?

7. It appears that OPM will move away from paying by contract (self or self and family) to per member per month (PMPM) capitation. How will the change to PMPM payments affect the different rating methodologies?

8. Do the COB reporting provisions apply only to experience rated plans?

9. What will be required for larger plans (1500 or more subscribers) in submitting additional pricing, utilization and demographic data?

10. Concerning advertising policies, under what circumstances will each of the penalties apply? Will OPM now have the right to review and approval all materials and not just those being distributed on federal sites (supplemental literature)?

11. What is the proposed effective date of the revisions?

If you have any questions or comments, I can be reached at (612) 897-2554. Thank you for your time.

Sincerely,

Jeff Schneewind
Government Programs Administrator

cc: Erling Hansen, GHAA
Ronald Hurst, AMCRA

# TAB 6

UNITED STATES
OFFICE OF PERSONNEL MANAGEMENT
WASHINGTON, D.C. 20415

OFFICE OF THE INSPECTOR GENERAL

In Reply Refer to: Your Reference:

JANUARY 2, 1990

MEMORANDUM FOR CURTIS J. SMITH
ASSOCIATE DIRECTOR
FOR RETIREMENT AND INSURANCE

FROM: PATRICK J. CONKLIN
INSPECTOR GENERAL (SES)

SUBJECT: FEHBAR Proposed Rulemaking

The proposed revisions to 48 CFR, Part 16 (Federal Employees Health Benefits Acquisition Regulations), for the most part, address the increasing diversity in community rating practices and limited negotiation resources. We believe that more pressing issues face the Program, but defer to the Retirement and Insurance Group as to the need for these regulatory revisions.

Our review of the proposed regulations focused primarily on OPM's responsibility for assuring that the FEHB Program is protected from fraud, waste, abuse, and mismanagement. We believe that, in some respects, these regulations will further complicate this already complex task. In this context, our attached comments suggest a number of technical changes and raise a number of issues which should be addressed before final regulations are published.

My staff and I are available if you want to discuss these comments.

Attachment

cc: Dona L. Wolf
Director of Policy

Comments on Proposed Revisions to 48 CFR, Part 16

Supplementary Information: This section indicates that the contract clauses have been redated to January 1990 to reflect the date they would become effective. Since these regulations will not be issued in final form until after January 1990, the clauses should be redated January 1991, which is more likely to be the effective date.

In the discussion on the Matrix, there is a reference to use of a proposed model contract for the contract year 1990. The model contract incorporates the proposed clauses and cannot be used until after the effective date of these FEHBAR revisions. Therefore, the date should be changed to 1991.

1602.170-6 Experience rate: The clause refers to "non-group specific" capitations, the meaning of which is unclear. We believe that the term "capitation" should encompass any capitation, rather than being limited to "non-groupo specific". Also, we recommend adding, after the word "capitation", the following: "(if a capitation rate has been specifically negotiated and set forth in the contract)".

1603.270-11 Similarly sized subscriber groups: We believe the definition of "similarly sized subscriber groups" is too narrow to adequately protect the Government's interests. First, limiting the definition to two groups might be adequate for groups over 1,500 subscribers, but is not sufficient for groups of less than 1,500. "Two similarly sized groups" is supposed to comport with the definition of "market price". While two groups over 1,500 plus the FEHB group would constitute at least 4,500 subscribers, and perhaps represent a significant portion of Plan's total enrollment and, consequently, a "market price", two smaller groups will not represent a significant portion of the Plan's business. Therefore, if the FEHBP is less than 1,500, it should be compared with all groups who are within some range, perhaps plus or minus 50 percent, of the FEHBP enrollment. For example, if the FEHBP group is 500, it should be compared with all employer groups who are within the range of 250 to 750 subscribers.

Second, "similarly sized subcriber groups" should not be limited to those which only renew during the effective period of the January rates. This provision encourages a "gaming", i.e., shifting the renewal dates of other groups. Once a community rate is set, the rate is stepped up in regular increments until the effective date of the next community rate. Therefore, the rate of any group can, or should, be traceable to the initial community rate.

The definition should encompass all groups renewing within a 12 month period of the FEHBP group, adjusted, in a consistent manner for all groups, to reflect any differences in time.

Third, the definition does not, but should, address the following circumstances:

- No other group has "substantially the same basic benefit package";
- Groups contract for periods longer than 12 months;

- The two groups closest in size to the FEHBP group use two different rating methods (i.e., which method should the FEHBP replicate?); and,
- The nearest group is so far distant from the FEHBP group that it is clearly not in the same economic areas.
- Large employers contract for different benefit packages for subgroups of employees.

Finally, RIG may want to reassess the use of the phrase "total subscriber enrollment" in the definition. The phrase may be subject to misinterpretation; referring to "total members" or "total number of contracts" may be clearer.

<u>1615.802 Policy</u>: The reference at the end of the paragraph (b)(1) should be FEHBAR 1602.170-<u>11</u> instead of "-10". The same reference error occurs at the end of paragraph (b)(3). Also in paragraph 3, substitute "shall" for "will normally" in the second sentence.

<u>1615.804-70 Certificate of accurate pricing for community rated plans</u>: The certificate is inconsistent with the defective pricing clause at 1652.215-70. The phrase "accurate and complete for the current year" should read: "accurate, complete, and current as of the date this certificate is executed." The phrase "for the current year" is redundant since the rate period is specified on the blank line where the "*" appears. Also, the word "current", as added, had a very specific and important meaning: that the signer certifies that the rates reflect all the information known to the signer <u>at the time the certificate is signed</u>. We believe the certificate is significantly weakened by excluding the word "current."

We note that the prior verison of this clause specified that: "The certification shall be signed by an official authorized to execute the contract." We believe this language should be carried forward in the revision.

There is a reference error within the body of the certificate: FEHBAR 1602.170-<u>10</u> should be "-11".

Finally, at the "*" at the end of the certificate, we recommend adding the following second senctence, which also appears in the Supplemental Representation for SF 1412: "The rate must be either the actual rate in effect for the current year or a quoted rate for the next year."

<u>1615.804-72 Rate reduction for defective pricing or defective cost or pricing data</u>: The clause would be clearer and more direct if it said that the referenced clause shall be inserted in all "community rated contracts" rather than "contracts based upon established market price."

<u>1652.215-70 Rate reduction for defective pricing or defective cost or pricing data</u>: In the first phrase of the contract clause beginning with "If any rate...", the words and hyphen which read: "... of defective data or information--" should be deleted. The two hyphens at the end of the clause should be replaced with a semicolon.

1652.215-71 Investment income: The clause has been modified to add that "maturity dates of investments usually should not exceed 1 year and under no circumstances should they exceed 3 years." We believe RIG should reassess this language in view of the new Letter of Credit regulations. The time periods appear to be unreasonable and excessive, and may be unnecessary.

Also, the clause states that: "Investment income lost as a result of unallowable, unallocable, or unreasonable charges against the contract shall be paid from the first day of the calendar year following the year in which the unallowable charge was made ...". This, in effect, allows a Plan to use Government funds for up to a year, without payment of interest. We believe that the clause should be modified so that it only applies when the unallowable or unallocable cost is not one that was previously questioned (and sustained) in an audit of the Plan; the Plan adequately complies with FAR requirements for accounting for unallowable costs; and, the cost is not one that the Plan "should have known" to be unallowable or unallocable.

1652.216-70 Accounting and price adjustments: The clause provides that "In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the estimated and the actual market price, PMPM capitation or revenue requirement." Here too, we do not believe that the Government's interests are adequately protected. The clause does not address the potential for a Plan to intentionally overcharge the Program prior to withdrawing from the Program. We believe the clause should only apply when the contract is not renewed "for the convenience of the Government", as defined elsewhere in the FAR.

1652.222-70 Notice of significant events: We believe "significant event" should be defined to explicitly include actions described in P.L. 100-654 (Debarment legislation). While such information may be reported as a result of (a)(4) or (12), we believe that it should be specifically listed.

1652.244-70 Subcontracts: The clause has been modified to require OPM approval of subcontracts only where the amount charged the Program exceeds 25 percent of the total cost of the subcontract. Many Blue Cross and Blue Shield Plans currently subcontract their work; the subcontracts involve millions of dollars. While the FEHBP share might be less than 25 percent of the toal cost, it can still be a substantial amount of money. We believe the clause should include a dollar limit which would apply even if the FEHBP share is less than 25 percent.

Also, we believe the clause should address situations in which Plans subcontract with affilitated companies or wholly owned subsidiaries. Again, millions of dollars can be involved in these subcontracts, and we believe that the Government's interests would be better protected if OPM approval were required above a specified threshhold.

# TAB 7

JUL - 3 1990

Proposed Regulations on Community Rating and Revision of Contract Clauses

Curtis J. Smith /s/ 7/2/90
Associate Director
for Retirement and Insurance

Patrick J. Conklin
Inspector General

On October 20, 1989, OPM issued a proposed regulation which, if adopted, would expand the community rating practices contained in the Federal Employees Health Benefits Acquisition Regulation (FEHBAR) to include community rating practices recognized by Public Law 100-517, The Health Maintenance Organization Amendments of 1988. The regulation also would set forth OPM's policy on defective community rating and would expand and clarify OPM's FEHB Program price negotiation policy. Final regulations were published on July 2, 1990. This memorandum addresses the comments made by your office in response to the proposed regulation.

__Supplementary Information__

__OIG comment:__
Because the model contract incorporates the proposed clauses and cannot be used until after the effective date of the FEHBAR revisions, the effective date of the clauses should be changed to 1991.

__RIG response:__
With the exception of the provisions on defective community rating, we have changed the effective date to January 1, 1991.

On January 11, 1989, OPM's Deputy Director authorized, for immediate implementation, a defective community rate resolution policy. The incorporation of the proposed defective pricing clause in 1990 allows us to formally recognize the Deputy Director's policy decision. It makes sense to have the FEHBAR provisions relating to defective pricing effective for the 1990 contract term.

**1602.170-6 Experience rate**

OIG comment:

The reference to "non-group specific" capitations is unclear; the term "capitation" should encompass any capitation. Also, recommend adding the following after the word "capitation": "(if a capitation rate has been specifically negotiated and set forth in the contract)."

RIG response:

It is our intent that the term "capitation" encompass any capitation within the parameters of the HMO legislation; however, capitations adjusted for the utilization of specific groups are not permitted by the HMO law. We have amended the regulation to state that actual paid claims include any actual or negotiated benefits payments made to providers of medical services for the provision of health care, such as capitation not adjusted for specific groups, per diems, and Diagnostic Related Group payments.

**1603.270-11 Similarly sized subscriber groups (SSSGs)**

OIG comment:

The definition of "similarly sized subscriber groups" (SSSGs) is too narrow to adequately protect the Government's interests. Limiting the definition to two groups might be adequate for groups over 1,500 subscribers, but is not sufficient to reflect the "market price" for groups of fewer than 1,500.

RIG response:

Our actuaries found that 80% of FEHBP enrollees are in community rated plans of more than 1,500 enrollees. We are interested in getting a reasonable rate for this large segment of enrollees and believe that two groups of a similar size in this category are sufficient for this purpose. For groups of fewer than 1,500 subscribers, it is our opinion that two SSSGs will enable us to capture adequate information on which to determine whether the proposed rate is based on the carrier's community rate.

OIG comment:

SSSGs should not be limited to those which renew only during the effective period of the January rates.

RIG response:

We agree that limiting the SSSGs to those that renew during the effective period of the January rates is too restrictive and have dropped that requirement. The regulation now requires that the SSSGs must have been renewed during the plan's budget (fiscal) year. Adjustments will be made for different renewal dates.

OIG comment:

The definition should address situations such as when no other group has substantially the same benefit package; when large employers contract for different benefit packages for subgroups of employees; when groups contract for periods longer than 12 months; when the two groups closest in size to the FEHB group use

two different rating methods; or, when the nearest group is so far distant from the FEHB group that it is clearly not in the same economic area.

RIG response:
We anticipate that the plans' systems of establishing rates will generally result in both SSSGs having the same methodology. In instances where this is not the case, OPM will review the methodologies used for the SSSGs and the criteria for selecting them in order to determine whether the methodology used for the FEHBP is appropriate. Also, OPM will negotiate benefits packages in a manner that should result in a number of groups having substantially the same benefits package. Each rate must be based on the overall capitation or its equivalent. The rate will be negotiated by OPM and the carrier during rate negotiations. If the SSSGs contract for more than 12 months, OPM will determine what adjustment to the rate is applicable for a 12-month period. For plans with fewer than 1,500 contracts that use the SF-1412, we will not ask for the data but will require that the plan maintain it in accordance with the records retention clause of the contract in the event that it is requested by OPM's actuaries and/or auditors. The answers to the above questions, as well as specific data related to prices offered to SSSGs and demographic and utilization characteristics of those groups, are lengthy and OPM needs the flexibility to adapt to changes in the insurance industry from year to year. Consequently, it is not appropriate to publish this information in regulation. Detailed information concerning rating procedures will be provided to the carriers in the rate instruction package for each contract period.

OIG comment:
Suggest replacing the phrase "total subscriber enrollment" with "total number of contracts."

RIG response:
We have adopted this suggestion.

**1615.802 Policy**

OIG comment:
Correct the references at the end of paragraphs (b)(1) and (b)(3) and change "will normally" to "shall" in paragraph (b)(3), requiring carriers to identify price adjustments and apply them to the FEHBP rate for the subsequent year if it is determined subsequently that different market prices were actually used for the SSSGs.

RIG response:
We have made the recommended changes.

**1615.804-70 Certificate of accurate pricing for community rated plans**

OIG comment:
The phrase "accurate and complete for the current year" should read: "accurate, complete, and current as of the date this certificate is executed." Also, add a requirement that the certificate be signed by an official authorized to execute the contract; correct the reference to SSSG; and add at the asterisk at the end of the certificate, "The rate must be either the actual rate in effect for the current year or a quoted rate for the next year."

RIG response:
We have made the technical changes suggested. However, we have not inserted the requirement that the certification be signed by an official authorized to execute the contract because it is an unnecessary limitation on the plans. The official with the knowledge needed to sign the pricing certificate may not be the contract official and may not be in the same geographic location.

**1615.804-72 Rate reduction for defective pricing or defective cost or pricing data**

OIG comment:
Substitute "community rated contracts" for "contracts based on established catalog or market price."

RIG response:
We have elected to use the more generic terminology in the introduction to all of the clauses relating to community rated contracts to be consistent with the FAR terminology where possible. The FEHBAR equates community rated contracts with contracts based upon established market price in the definition of community rate at 1602.170-2. Furthermore, the suggested change would require conforming changes to numerous provisions not addressed in this regulation.

**1652.215-70 Rate reduction for defective pricing or defective cost or pricing data**

OIG comment:
Make typographical changes for clarification.

RIG response:
We have made typographical changes to clarify the paragraph.

**1652.215-71 Investment Income**

OIG comment:
In view of the letter of credit regulations, the time periods appear to be unreasonable and excessive. Charging the carrier interest on unallowable charges should occur from the date of the charge, not from January 1 of the following year.

RIG response:
We have reevaluated the provision in paragraph (a) concerning carrier investments in maturities of 1 to 3 years' duration. In light of the establishment of letter of credit (LOC) procedures, carriers under LOC should be holding a minimum amount of funds outside of their letter of credit account. As these funds should remain liquid, the timeframes for maturity dates of investments are unnecessary. Therefore, we have deleted the provision concerning the duration of maturities.

We have, however, retained the timeframe for charging of interest on unallowable costs. The requirement that interest be paid on charges from the first day of the contract year following the year in which the charge was made was in recognition of the fact that it would be an unreasonable burden to large plans such as Blue Cross and Blue Shield to track the interest due on unallowable charges for all local plans. Charging interest from January 1 of the year following the unallowable charge reflects a compromise between our present regulation (which is based on standard government procurement policy whereby interest is charged from the contracting officer's final decision) and your position that interest be charged from the date of the erroneous charge. We think our position is more legally defensible.

1652.216-70 Accounting and price adjustments

OIG comment:
The provision states that neither the Government nor the carrier is entitled to any adjustment or claim for the difference between the estimated and the actual market price when a contract is not renewed. Because of the potential for a plan to intentionally overcharge the Program prior to withdrawing from it, the provision should apply only when the contract is not renewed for the convenience of the Government.

RIG response:
The argument for claims or adjustments in price when a contract is not renewed can be made by either party. For example, one respondent to the proposed rule wants to be able to bill the Government in the event of nonrenewal. Nevertheless, our past experience has been that, on termination, the carriers generally do not have adequate data available for us to make price adjustments. Further, in the event a plan goes out of business, there are no rates to reconcile. In our opinion, the most reasonable solution is for both the Government and the carrier to bear the risk of a carrier's termination. OPM continues to have recourse to debt collection agencies and the courts if the situation warrants.

1652.222-70 Notice of significant events

OIG comment:
Actions resulting in debarment under Public Law 100-654 should be included as significant events.

RIG response:
Since it is OPM, not the carriers, that is authorized to debar providers under Public Law 100-654, the carriers do not take any debarment actions. Notification will be from OPM to the carriers rather than the other way around.

1652.244-70 Subcontracts

OIG comment:
The clause has been modified to require OPM approval of subcontracts only where the amount charged the Program exceeds 25 percent of the total cost of the subcontract. The clause should include a dollar limit which would apply even if the FEHBP share is less than 25 percent.

RIG response:
The Subcontract clause requires OPM's approval of subcontracts where both the amount of the subcontract or modification charged to the FEHB Program exceeds $100,000 and the amount of the subcontract to be charged to the FEHBP exceeds 25 percent of the total cost of the subcontract. We believe that if 75% of the cost of a contract is chargeable to other lines of business, market forces and sound business practices will ensure that the price is reasonable; therefore, OPM does not need to review those subcontracts. We think our time is more wisely spent focusing on subcontracts of a significant dollar amount (over $100,000) in which we are a major purchaser.

OIG comment:
The clause should address situations in which plans subcontract with affiliated companies or wholly owned subsidiaries.

RIG response:
We prefer to continue our present policy of treating affiliated companies and wholly-owned subsidiaries as prime contractors and holding them to prime contractor standards, which are more stringent than subcontractor standards.

6/25/90 6/26/90 D. Farran 6/28/90 6/29/90

# TAB 8

| Citation | Found Document | Rank 1 of 1 | Database |
|---|---|---|---|
| 55 FR 27406-01 | | | FR |
| 1990 WL 334151 (F.R.) | | | |
| **(Cite as: 55 FR 27406)** | | | |

RULES and REGULATIONS

OFFICE OF PERSONNEL MANAGEMENT

48 CFR Parts 1602, 1615, 1616, 1622, 1632 and 1652

RIN 3206-AD78

Federal Employees Health Benefits Acquisition Regulation; Revision of Contract Clauses and Community Rating Practices

Monday, July 2, 1990

***27406** AGENCY: U.S. Office of Personnel Management.

ACTION: Final rulemaking.

SUMMARY: The Office of Personnel Management (OPM) is issuing a regulation which recognizes the increasing diversity in community rating practices within the insurance industry and, specifically, within the Federal Employees Health Benefits Program (FEHBP). The regulation also expands and clarifies OPM's FEHBP price negotiation policy. At the same time, OPM is taking the opportunity to amend some of the required contract clauses found in Section 1652 of the Federal Employees Health Benefits Acquisition Regulation (FEHBAR) to better reflect the specific needs of the FEHBP.

EFFECTIVE DATES: Sections effective January 1, 1990, and to be applied to the 1990 FEHB Program contracts: 1615.804-72, 1652.215-70, and 1652.216-70. All other sections effective August 1, 1990, and to be applied to the 1991 FEHB Program contracts.

FOR FURTHER INFORMATION CONTACT:Mary Ann Mercer, (202) 632-3772.

SUPPLEMENTARY INFORMATION: On October 20, 1989, OPM published proposed regulations (54 FR 43089) to recognize those portions of Public Law 100-517, The Health Maintenance Organization Amendments of 1988, which impact on the FEHBP. Public Law 100-517 expands the community rating methodology options available to Federally qualified health maintenance organizations, known as comprehensive medical plans (CMPs) in the FEHBP. Accordingly, OPM is modifying its regulations to recognize the increasing diversity in community rating practices. The regulation also expands and clarifies OPM's FEHBP price negotiation policy. In addition, the regulation amends required contract clauses found in Section 1652 of the FEHBAR to better reflect the specific needs of the FEHBP, to add a new Federal Acquisition Regulation (FAR) clause requiring carriers to maintain a drug-free workplace, and to delete unnecessary or inappropriate FAR clauses.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Insurance with Interpretive Guidelines." As reflected in 1652.203-70(a), it is OPM's policy to ensure that enrollees have reasonable expectations regarding health benefits plans and are not misled through a carrier's literature about the benefits of the carrier's own or another FEHB plan. While we agree that, overall, the current FEHBAR provides protection to enrollees, the present language standing alone may be open to misinterpretation. Therefore, we believ that additional criteria in the form of guidelines appropriate to insurance advertising in general (those produced by NAIC) and to the FEHBP in particular (those produced by OPM) are necessary. We believe such additional guidance will enhance the carriers' ability to comply with OPM's advertising policy as well a OPM's ability to assure carrier compliance. As OPM wants to address the more relevant and practical problems encountered most often in FEHB carrier advertising, the advertising clause has been changed to show that carriers should use the FEHB Supplemental Literature Guidelines as their primary source of guidance and should use the NAIC "Rules Governing Advertising of Accident an Sickness Insurance with Interpretive Guidelines" if additional guidance is needed.

Two commenters believe the NAIC "Rules Governing Advertising of Accident and Sickness Insurance with Interpretive Guidelines" are directed principally at individual insurance marketing practices and OPM should distinguish those NAIC guidelines which are irrelevant or impractical. The NAIC guidelines are applicable to group as ***27407** well as individual accident and sickness insurance. We believe the NAIC guidelines have practical application to the FEHBP; however, carriers may ask OPM for assistance when they are unsure of th relevancy or practicality of a particular guideline.

One commenter believes OPM is premature in incorporating the FEHB Supplemental Literature Guidelines reference, in view of the fact that the contract is subject to negotiation, and two commenters believe that OPM should publish the referenced guidelines in regulation. The NAIC and FEHB guidelines to be used b the carriers in preparing supplemental literature have been furnished to the carriers. The guidelines will be reevaluated and furnished to the carriers in advance of each negotiation period. Because reevaluation may result in minor changes, OPM believes that it would be inappropriate to publish them in regulation.

One commenter questioned whether carriers must adhere to the guidelines at FEHBAR 1603.702, which are not mentioned in the proposed regulation, in additio to the NAIC guidelines. The guidelines found at 1603.702 and the NAIC and FEHB guidelines contained in the clause at 1652.203-70 are not mutually exclusive. Each complements the others and must be adhered to by FEHBP carriers.

One community rated plan asked whether OPM will review and approve materials, including those being distributed on Federal sites. Agencies control contacts between employees and carriers and decide whether and how much contact there will be. While we encourage agencies to permit carriers to address groups of employees during open season on the structure of their plans' benefits, methods of obtaining services, and similar matters, an agency may permit the use of its facilities or services for the distribution only of officially authorized, carrier-supplied information on health benefits plans. (In this regard, agencie treat labor organization carriers in accordance with current policies on labor-

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

management relations in the Federal Service as specified in chapter 71 of title 5, United States Code.) Therefore, FEHB contracts are being negotiated to provide that carrier-supplied information distributed at federal facilities mus be approved in advance by OPM. For purposes of approval, fee-for-service carriers need submit only material intended for wide distribution (e.g., nationally or regionally); however, we reserve the option of reviewing locally distributed material. To ensure that other communications which identify a carrier's participation in the FEHB Program (e.g., radio/TV/newspaper advertising) are in compliance with FEHBAR 1603.70, carriers are advised to use the guidelines; however, carriers will not be required to get advance approval of material that is not distributed at Federal facilities.

Five respondents were concerned about the application of the penalites for, an due process in the event of, noncompliance with FEHB requirements (1652.203-70(b)). One respondent believes the penalties for noncompliance are too severe and that termination of the contract is not warranted for violations of advertising policy. We note OPM's obligation to enrollees to correct and prevent repetition of misleading, deceptive or unfair advertising. The regulatory penalties are listed and, except for the most egregious carrier actions, will be applied in graduated degrees of severity. If a carrier, after repeated offenses, continues to violate the regulatory requirements, action to terminate the plan may be warranted to protect the interests of Federal enrollees. Nevertheless, although due process is always assumed in FEHBP regulations, we have amended the provision to provide for notification and opportunity to respond. Further, in any case where OPM takes action to terminate a plan, the withdrawal of approval provisions of 5 CFR 890.24 apply.

OPM has also amended the requirement to insert the clause at 1652.203-70 in al subcontracts that exceed $25,000. The requirement now refers only to the carrier's contract with its underwriter, if any, and to contracts with subcontractors directly involved in the preparation or distribution of marketin material.

One respondent requested that OPM specify in the clause at 1652.204-71(c) the particular coordination of benefits guidelines and rules to be followed by FEHB carriers. Another respondent commented that the NAIC guidelines are subject to individual interpretation that will impede uniformity. We have changed the regulation so that it specifically states that in coordinating benefits, carriers must follow the order of precedence established by the Model Guideline for Coordination of Benefits (COB) promulgated by the NAIC. The order of precedence section of the NAIC guidelines is widely known in the insurance industry and has been referenced in the FEHB brochures for a number of years. Further, the COB contract clause has been based historically on the guidelines' order of precedence. OPM believes that the very specific nature of the order o precedence in the guidelines serves to standardize order of precedence determinations. Further, from the standpoint that OPM would have to modify the contract whenever the NAIC guidelines change, it is impractical to restate the guidelines in a contract clause. Attaching the guidelines' order of precedence to the contract as an appendix rather than explicitly restating them has the added advantage of providing OPM flexibility in negotiating effective dates.

One respondent believes that changes in the guidelines implemented after

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

January 1 of any given year should not be required earlier than the beginning o the following contract term. The clause now makes it clear that this is OPM's intent. When a change in the guidelines occurs, OPM will notify the carriers b letter and will negotiate the date they are to become effective.

Two commenters responded that the deficiencies in a plan's COB recoupment of overpayment procedures are more appropriately dealt with in an audit context than by the contracting officer's case-by-case review of allowable charges. We have clarified the section. OPM does not intend for the carriers to consult with the contracting officer on each unreimbursed COB overpayment in advance tc determine whether or not it is a properly chargeable benefit expense. Rather, carrier must be able to demonstrate allowability if, for instance, a COB overpayment is questioned during an audit.

A number of community rated carriers are concerned about the requirement for reporting COB savings, noting that under community rated contracts COB savings are not charged to specific accounts. OPM has clarified this requirement for community rated carriers so that they are not required to report COB savings bu must be able to demonstrate that they have a system in place for coordinating benefits for all groups and can provide appropriate overall COB statistics.

Provisions Relating Primarily to Community Rated Carriers

Several plans stated that they were uncertain whether the standard methods of community rating are still permitted. In order to avoid any misunderstanding, one plan suggested that OPM's regulation refer to existing Department of Health and Human Services (HHS) regulations on community rating. The standard methods of community rating, i.e., traditional community rating and ***27408** community rating by class, as well as the new concept of adjusted community rating, are acceptable rating methods for the FEHBP. The community rating methods of the FEHBP are consistent with, but not limited to, the requirements of HHS. While w have not referenced the HHS regulations, we will accommodate the community rating concepts contained therein to the extent possible consistent with the needs of the FEHBP.

One community rated plan questioned the use of the term "PMPM" (per member per month) in combination with the words "revenue requirement" in a definition of community rate (1602.170-2(a)) and believes that the revenue requirement should not be limited by PMPM calculations. In considering this and related comments, we have concluded that the term "revenue requirement" is ambiguous. Most plans base their rates on a per member per month capitation rate. However, there are some plans that use a standard set of two (or three) tiered rates, and adjust them for each group according to the group's demographics. Such a system is conceptually equivalent to the use of a capitation rate. The regulations now make it clear that such a system is acceptable to OPM.

One carrier suggested that OPM amend the definition of adjusted community rate (1602.170-2(b)) to state that it is a community rate that has been adjusted for the expected use of medical resources (rather than medical utilization) of the FEHBP group. We have made this change to recognize the broader, more explicit nature of permissible adjustments to the community rate.

The same carrier believes that the regulation should indicate that the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

prohibition on retroactive adjustments of the rate based on actual experience, utilization or cost applies only to group-specific adjustment factors, that is, the expected use of medical resources. The carrier agrees that subsequent changes to the adjustment made for the Federal group's expected use of medical resources based on actual experience, utilization or FEHBP cost should be forbidden, but believes that changes to the plan's estimated community rate should be allowed. The HMO law prohibits retroactive adjustments based on actual experience. OPM's regulation makes it clear that no upward adjustment i the rate is allowed on the basis of actual costs incurred, actual benefits provided, or actual size or composition of the FEHBP group (1652.216- 70(b)(5)) OPM will continue the policy of allowing an adjustment in the FEHBP rates if th actual community rates of the plan differ from the estimated community rates on which the proposed FEHBP rates were based.

Two carriers suggested that OPM clarify the term "benefit payment" in its description of "actual paid claims" under the definition of experience rate (1602.170-6). In view of the fact that capitation payments are not strictly benefit payments, OPM agrees with the carriers that the term should be more precise. The regulation now states that actual paid claims include any actual or negotiated benefits payments made to providers of medical services for the provision of health care.

A number of commenters expressed concern with the requirements for similarly sized subscriber groups (SSSGs) in 1602.170-11. Specifically, some believe tha limiting the definition to two groups is not sufficient for groups of fewer tha 1,500 subscribers because it does not represent a significant portion of the plan's total enrollment. The respondents believe that if the number of FEHBP subscribers is fewer than 1,500 the plan should be compared with all groups tha are within some range of the FEHBP enrollment. In this respect, we believe tha two SSSGs will enable us to capture sufficient information on which to determin whether the proposed rate is based on the carrier's community rate.

The commenters also believe that the SSSGs should not be limited to those whic renew in January or during the effective period of the January rate. We agree that limiting the SSSGs to those that renew in January or the effective period of the January rates is too restrictive and have dropped that requirement. OPM now requires that the SSSGs must have been renewed during the plan's fiscal year. The fiscal year is the time period for which the carrier's budget is established. Adjustments will be made for different renewal dates among the SSSGs' rates and the OPM rate to make them consistent.

Several respondents expressed the following concerns and requests for clarification of the term "substantially the same benefit package." They questioned whether the two groups closest in size to the FEHB group could use different rating methods. What the specific data requirements related to price offered to the SSSGs and the demographic and utilization characteristics of those groups will be. What happens when no other groups have substantially the same basic benefit package as the FEHB group, when the groups contract for periods longer than 12 months, and when the nearest group is so far distant fro the FEHB group that it is not the same economic area.

The two SSSGs may use different rating methodologies, However, OPM anticipates that the plans' systems of establishing rates will generally result in both

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

SSSGs having the same methodology. In instances where this is not the case, OP. will review the methodologies used for the SSSGs and the criteria for selecting them in order to determine whether the methodology used for the FEHBP is appropriate. Also, OPM will negotiate benefits packages in a manner that shoul result in a number of groups having substantially the same benefits package. Each rate must be based on the overall capitation or its equivalent. The rate will be negotiated by OPM and the carrier during rate negotiations. If the SSSG contract for more than 12 months, OPM will determine what adjustment to the rat is applicable for a 12-month period. For plans with fewer than 1,500 contracts we will not ask for the data but will require that the plan maintain it in accordance with the records retention clause of the contract in the event that it is requested by OPM's actuaries and/or auditors. The answers to the above questions, as well as specific data related to prices offered to SSSGs and demographic and utilization characteristics of those groups, are lengthy and OP: needs the flexibility to adapt to changes in the insurance industry from year t· year. Consequently, it is not appropriate to publish this information in regulation. Detailed information concerning rating procedures will be provided to the carriers in the rate instruction package for each contract period.

One respondent wanted to know whether the SSSGs' rates could be relied on as a remedy if it is later determined that a carrier's criteria were not reasonable or that a carrier had discounted the rates quoted to some of its commercial groups. Generally, the SSSGs' rates could be expected to be relied on as a remedy. However, we do not want to limit our options to the SSSGs' rates. The corrected FEHB rates would be negotiated based on the circumstances in each case.

The same respondent wanted to know whether carriers that apply different methodologies to different groups are required to seek approval for such criteria prior to the contract year during which the rate is applied. No preapproval will be required.

One carrier suggested that the phrase "total subscriber enrollment" be clarified to read "total number of ***27409** contracts" (1602.170-11). We have made this clarifying change. Two respondents believe that OPM should not limit the SSSGs to non-governmental units because governmental units are often the closest in size to the Federal group. OPM has reconsidered the exclusion of governmental groups from the SSSGs and has decided to allow comparison with governmental groups so long as those groups are community rated.

One commenter asked whether OPM would prohibit CMPs from using discounting and other methods of rating with groups other than a plan's SSSGs. OPM's primary objective is to obtain rates which are reasonable and equitable for the FEHBP group. In determining the FEHBP plans' rating, OPM will examine only the ratin of the plans' SSSGs. This does not in any way diminish the need for plan compliance with guidelines promulgated by the HHS. However, monitoring the plans' compliance with HHS laws and regulations rests with that agency.

One carrier believes that OPM is moving away from paying by contract (self or self and family) and asked how the change to per member per month payments will affect the different rating methologies. Since the PMPM capitation has always been used by OPM as a basis for the self and self and family contract rates, we question the carrier's comment. We believe that the regulation is clear in thi.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

regard.

One carrier believes OPM should allow for adjustments to the community rate based on an industry factor and that the SSSG requirement is inappropriate sinc the two similarly sized groups may have entirely different demographic factors and/or industry factors. OPM's experience has shown that backup data on industry factors is unreliable. Consequently, we do not recognize adjustments to the community rate based on this factor. Insofar as demographic factors are concerned, it appears that the commenter has misunderstood OPM's intent. OPM's community rating policies begin with the capitation. The carrier may adjust th capitation for demographic factors so long as the adjustment is consistent with approved community rating practices.

The commenter further suggests that OPM's proposed approach to base the community rate on a capitation that applies to a "combination of the subscriber groups" (1602.170-2) is arbitrary and may not comply with guidelines followed b Federally qualified HMOs nor with state filings made by many HMOs participating in FEHBP governing the HMO underwriting process. We do not agree that OPM's proposed approach to community rating is arbitrary. We have made every effort to be consistent with HHS guidelines. The "combination of subscriber groups" referred to in the definition can be interpreted to mean all groups that are community rated by the plan. The definition gives OPM flexibility in that it takes into consideration the fact that not all plans recognize all of the legitimate community rating practices available to Federally qualified HMOs.

One carrier suggested that OPM compare non-guaranteed to non-guaranteed accounts and guaranteed to guaranteed accounts when two SSSGs that meet the stated criteria do not exist. The carrier believes the comparison to non-governmental accounts of similar guarantee status and similar benefits that renew in a different month, with adjustments made for the later renewal date, would be advantageous. To accommodate the carrier's concerns, we have modified the regulation so that the two SSSGs may be any group that renews during the same fiscal year, with adjustments made for different renewal dates.

The same carrier believes the regulation should specify that premium rates among the three compared accounts be equal only under traditional community rating but that they must be comparable for all accounts under the other rating methods. OPM does not expect the rates to be equal even under traditional community rating. The Certificate of Accurate Pricing for Community Rated Plan (1615.804-70) requires that the FEHBP rates be developed in a manner consistent with (not equal to) the rating methodology and structure used to rate the carrier's SSSGs.

Another carrier believes it is inappropriate to collect utilization informatic on the comparison accounts from an organization using traditional community rating because the information has no bearing on the rates charged to the accounts. We agree with the carrier and do not expect to collect utilization data for traditional community rating.

One commenter requested clarification of the "basic reasonableness test" referred to in 1615.802(b)(1). This is an OPM test for reasonable price to determine which plans need further review. It is confidential information and is not appropriate for release outside OPM.

Two respondents raised questions about 1615.802, stating that at the time the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

FEHBP rate is submitted, appropriate information on the SSSGs would not be available. Three carriers believe the section is not specific enough about the nature of the data required and wanted to know what would be required for large plans in submitting additional pricing, utilization and demographic data.

For plans having 1,500 or more contracts at the time of the plan's proposal an for plans having fewer than 1,500 that do not use the SF-1412, OPM will request backup data that will support adjustments to the capitation rate or its equivalent. Data requested will be similar to that currently requested. Additional data needs will be determined once the methodologies employed by the plan become known. We will also require the data pertaining to SSSGs as soon a it becomes available. This would normally be toward the end of the contract term, after rate negotiations with the plan have been concluded. This data wil be analyzed when OPM's actuaries reconcile the plan's rates. Specifics about the exact nature of the data required will be sent to the plans in the rate instructions. For plans with fewer than 1,500 contracts that use the SF- 1412, we will not ask for the data, but will require that the plan maintain it in accordance with the records retention clause of the contract. OPM's actuaries and the audit staff will have the option of obtaining the data on request. We have modified 1615.802(b)(2) to reflect these changes.

One respondent wanted OPM to confirm that a carrier may use SF-1412 if the Federal group is smaller than 1,500 subscribers only if the rating methodology does not involve the use of adjusted community rating. Any plan whose FEHB group is smaller than 1,500 subscribers may use SF-1412, even if it uses adjusted community rating. As explained above, the carrier must retain the backup data.

In addition, we have changed 1615.802(b)(3) to require the carrier to identify necessary price adjustments when it is later determined that different market prices were actually used for the SSSGs, and to apply the adjustments against its FEHBP rates for the subsequent contract period(s). The proposed rule implied that the carrier might not be required to identify and apply price adjustments in some cases. Note also the substitution of the words "FEHBP rate for "community rate" in this section. This change has been made in response to a carrier's remark that the price adjustments pertain only to the FEHBP rates and not to the entire plan population.

One respondent suggested that an HMO be given discretion to waive the rate reduction in the following year when different market prices are ***27410** actuall used for the SSSGs and also recommended a waiver option if the rate the preceding year was too low for reasons other than underestimation. Another commenter asked whether the carrier might seek a one- time payment of the amoun due. While these options to resolve differences between the proposed market price and the actual market price are not specifically set out in regulation, they have always been and continue to be appropriate in certain circumstances a determined by OPM on a case-by-case basis.

One commenter believes that the steps necessary to experience rate the Federal group should be more fully explained. Rather than provide technical details in regulation, we think it is more appropriate to provide carriers with the necessary information in the rate instructions sent to FEHBP carriers at the time of negotiations for the contract period.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

55 FR 27406-01
**(Cite as: 55 FR 27406, *27410)**

Another commenter wanted confirmation that the opportunity for a carrier to offer OPM the same price as is offered SSSGs is merely an alternative way for pricing a community rated contract and not a test to be applied to all community rated carriers to determine whether the FEHBP contract has been accurately priced. OPM confirms this point. Nevertheless, it is our intent to obtain an "equivalent price" consistent with the regulation, not necessarily the "same price."

One respondent wanted assurance that group-specific demographic and utilization information for non-Federal groups will be requested only if relevant to OPM's evaluation of a proposed rate or to the auditors' evaluation of the rate and that such confidential information will not be disclosed to the public. The sole reason for OPM's requesting this information is to evaluate a proposed rate. OPM neither requests nor desires information that is irrelevant to this objective. However, any information submitted to OPM may be subject to public disclosure. Carriers must identify each item they believe is exempt from disclosure under the Freedom of Information Act (FOIA). They must also specify which exemption applies. OPM will decide on disclosure only when a request for information is made. In making that decision, OPM will consider the justification for non-disclosure that was submitted by the carrier. If OPM decides that any specific item of information that the carrier believes is exempt is not exempt from disclosure, OPM will so inform the carrier before it is disclosed.

For consistency with 1652.215-70, we have changed the phrase "accurate and complete for the current year" in the Certificate of Accurate Pricing for Community Rated Plans (1615.804-70) to "accurate, complete, and current as of the date this certificate is executed." We have also added at the asterisk at the bottom of the certificate the sentence, "The rate must be either the actual rate in effect for the current contract term or a quoted rate for the next contract term." And, in response to a comment that the references to 48 CFR Chapter 16 and the FEHBP contract at the end of the certificate contradict the specific language that precedes it, we have cited the references earlier in the certificate to make it clear that the requirements that follow are the requirements of 48 CFR Chapter 16 and the FEHBP contract.

One carrier believes that the proposed change to 1615.804-70 should not be adopted because the current certificate is adequate to accommodate the changes in rating methodologies permitted under the proposed rules. It is our opinion that the current certificate is not broad enough to meet OPM's needs in administering the FEHBP contracts. The proposed certificate will enhance OPM's ability to enforce the community rating policies of the FEHB Program.

One respondent suggested that OPM remove the words "to the best of my knowledge and belief" from the certificate and add a sentence reminding the carrier of the consequences of a false statement. OPM cannot expect carrier representatives to certify to data that is beyond their knowledge and belief at the time of certification. Furthermore, the consequences of making a false statement to an agency of the Federal government under 18 U.S.C. 1001 are well known to the FEHBP carriers, and a warning such as that suggested by the commenter is not warranted in this certification.

The same respondent wanted to know who determines whether to accept a rating

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works