## Section 8. Testimonials or Endorsements by Third Parties

A. Testimonials and endorsements used in advertisements must be genuine, represent the current opinion of the author, be applicable to the policy advertised and be accurately reproduced. The insurer, in using a testimonial or endorsement, makes as its own all of the statements contained therein, and the advertisement, including such statement, is subject to all the provisions of these rules. When a testimonial or endorsement is used more than one year after it was originally given, a confirmation must be obtained.

B. A person shall be deemed a "spokesperson" if the person making the testimonial or endorsement:

(1) Has a financial interest in the insurer or a related entity as a stockholder, director, officer, employee or otherwise; or

(2) Has been formed by the insurer, is owned or controlled by the insurer, its employees, or the person or persons who own or control the insurer; or

(3) Has any person in a policy-making position who is affiliated with the insurer in any of the above described capacities; or

(4) Is in any way directly or indirectly compensated for making a testimonial or endorsement.

C. The fact of a financial interest or the proprietary or representative capacity of a spokesperson shall be disclosed in an advertisement and shall be accomplished in the introductory portion of the testimonial or endorsement in the same form and with equal prominence thereto. If a spokesperson is directly or indirectly compensated for making a testimonial or endorsement, such fact shall be disclosed in the advertisement by language substantially as follows: "Paid Endorsement." The requirement of this disclosure may be fulfilled by use of the phrase "Paid Endorsement" or words of similar import in a type style and size at least equal to that used for the spokesperson's name or the body of the testimonial or endorsement whichever is larger. In the case of television or radio advertising, the required disclosure must be accomplished in the introductory portion of the advertisement and must be given prominence.

D. The disclosure requirements of this rule shall not apply where the sole financial interest or compensation of a spokesperson, for all testimonials or endorsements made on behalf of the insurer, consists of the payment of union scale wages required by union rules, and if the payment is actually for such scale for TV or radio performances.

E. An advertisement shall not state or imply that an insurer or an accident and sickness insurance policy has been approved or endorsed by any individual, group of individuals, society, association or other organizations, unless such is the fact, and unless any proprietary relationship between an organization and the insurer is disclosed. If the entity making the endorsement or testimonial has been formed by the insurer or is owned or controlled by the insurer or the person or persons who own or control the insurer, such fact shall be disclosed in the advertisement. If the insurer or an officer of the insurer formed or controls the association, or holds any policy-making position in the association, that fact must be disclosed.

F. When a testimonial refers to benefits received under an accident and sickness insurance policy, the specific claim data, including claim number, date of loss and other pertinent information shall be retained by the insurer for inspection for a period of four years or until the filing of the next regular report of examination of the insurer, whichever is the longer

period of time. The use of testimonials which do not correctly reflect the present practices of the insurer or which are not applicable to the policy or benefit being advertised is not permissible.

## Section 9. Use of Statistics

A. An advertisement relating to the dollar amounts of claims paid, the number of persons insured, or similar statistical information relating to any insurer or policy shall not use irrelevant facts, and shall not be used unless it accurately reflects all of the relevant facts. Such an advertisement shall not imply that such statistics are derived from the policy advertised unless such is the fact, and when applicable to other policies or plans shall specifically so state.

(1) An advertisement shall specifically identify the accident and sickness insurance policy to which statistics relate and where statistics are given which are applicable to a different policy, it must be stated clearly that the data do not relate to the policy being advertised.

(2) An advertisement using statistics which describe an insurer, such as assets, corporate structure, financial standing, age, product lines or relative position in the insurance business, may be irrelevant and, if used at all, must be used with extreme caution because of the potential for misleading the public. As a specific example, an advertisement for accident and sickness insurance which refers to the amount of life insurance which the company has in force or the amounts paid out in life insurance benefits is not permissible unless the advertisement clearly indicates the amount paid out for each line of insurance.

B. An advertisement shall not represent or imply that claim settlements by the insurer are "liberal" or "generous," or use words of similar import, or that claim settlements are or will be beyond the actual terms of the contract. An unusual amount paid for a unique claim for the policy advertised is misleading and shall not be used.

C. The source of any statistics used in an advertisement shall be identified in such advertisement.

## Section 10. Identification of Plan or Number of Policies

A. When a choice of the amount of benefits is referred to, an advertisement which is an invitation to contract shall disclose that the amount of benefits provided depends upon the plan selected and that the premium will vary with the amount of the benefits selected.

B. When an advertisement which is an invitation to contract refers to various benefits which may be contained in two or more policies, other than group master policies, the advertisement shall disclose that such benefits are provided only though a combination of such policies.

## Section 11. Disparaging Comparisons and Statements

An advertisement shall not directly or indirectly make unfair or incomplete comparisons of policies or benefits or comparisons of non-comparable policies of other insurers, and shall not disparage competitors, their policies, services or business methods, and shall not disparage or unfairly minimize competing methods of marketing insurance.

A. An advertisement shall not contain statements such as "no red tape" or "here is all you do to receive benefits."

Copyright NAIC 1989

B. Advertisements which state or imply that competing insurance coverages customarily contain certain exceptions, reductions or limitations not contained in the advertised policies are unacceptable unless such exceptions, reductions or limitations are contained in a substantial majority of such competing coverages.

C. Advertisements which state or imply that an insurer's premiums are lower or that its loss ratios are higher because its organizational structure differs from that of competing insurers are unacceptable.

Section 12. Jurisdictional Licensing and Status of Insurer

A. An advertisement which is intended to be seen or heard beyond the limits of the jurisdiction in which the insurer is licensed shall not imply licensing beyond those limits.

B. An advertisement shall not create the impression directly or indirectly that the insurer, its financial condition or status, or the payment of its claims, or the merits, desirability, or advisability of its policy forms or kinds or plans of insurance are approved, endorsed or accredited by any division or agency of this State or the United States Government.

C. An advertisement shall not imply that approval, endorsement or accreditation of policy forms or advertising has been granted by any division or agency of the state or federal government. "Approval" of either policy forms or advertising shall not be used by an insurer to imply or state that a governmental agency has endorsed or recommended the insurer, its policies, advertising or its financial condition.

Section 13. Identity of Insurer

A. The name of the actual insurer shall be stated in all of its advertisements. The form number or numbers of the policy advertised shall be stated in an advertisement which is an invitation to contract. An advertisement shall not use a trade name, any insurance group designation, name of the parent company of the insurer, name of a particular division of the insurer, service mark, slogan, symbol or other device which without disclosing the name of the actual insurer would have the capacity and tendency to mislead or deceive as to the true identity of the insurer.

B. No advertisement shall use any combination of words, symbols, or physical materials which by their content, phraseology, shape, color or other characteristics are so similar to combination of words, symbols or physical materials used by agencies of the federal government or of this State, or otherwise appear to be of such a nature that it tends to confuse or mislead prospective insureds into believing that the solicitation is in some manner connected with an agency of the municipal, state or federal government.

C. Advertisements, envelopes or stationery which employ words, letters, initials, symbols or other devices which are so similar to those used in governmental agencies or by other insurers are not permitted if they may lead the public to believe:

(1) That the advertised coverages are somehow provided by or are endorsed by such governmental agencies or such other insurers;

(2) That the advertiser is the same as, is connected with or is endorsed by such governmental agencies or such other insurers.

D. No advertisement shall use the name of a state or political subdivision thereof in a policy name or description.

E. No advertisement in the form of envelopes or stationery of any kind may use any name, service mark, slogan, symbol or any device in such a manner that implies that the insurer or the policy advertised, or that any agent who may call upon the consumer in response to the advertisement is connected with a governmental agency, such as the Social Security Administration.

F. No advertisement may incorporate the word "Medicare" in the title of the plan or policy being advertised unless, wherever it appears, said word is qualified by language differentiating it from Medicare. Such an advertisement, however, shall not use the phrase "[ ] Medicare Department of the [ ] Insurance Company," or language of similar import.

G. No advertisement may imply that the reader may lose a right or privilege or benefit under federal, state or local law if he fails to respond to the advertisement.

H. The use of letters, initials, or symbols of the corporate name or trademark that would have the tendency or capacity to mislead or deceive the public as to the true identity of the insurer is prohibited unless the true, correct and complete name of the insurer is in close conjunction and in the same size type as the letters, initials or symbols of the corporate name or trademark.

I. The use of the name of an agency or "[ ] Underwriters" or "[ ] Plan" in type, size and location so as to have the capacity and tendency to mislead or deceive as to the true identity of the insurer is prohibited.

J. The use of an address so as to mislead or deceive as to true identity of the insurer, its location or licensing status is prohibited.

K. No insurer may use, in the trade name of its insurance policy, any terminology or words so similar to the name of a governmental agency or governmental program as to have the tendency to confuse, deceive or mislead the prospective purchaser.

L. All advertisements used by agents, producers, brokers or solicitors of an insurer must have prior written approval of the insurer before they may be used.

M. An agent who makes contact with a consumer, as a result of acquiring that consumer's name from a lead-generating device, must disclose such fact in the initial contact with the consumer.

## Section 14. Group or Quasi-Group Implications

A. An advertisement of a particular policy shall not state or imply that prospective insureds become group or quasi-group members covered under a group policy and as such enjoy special rates or underwriting privileges, unless such is the fact.

B. This rule prohibits the solicitations of a particular class, such as governmental employees, by use of advertisements which state or imply that their occupational status entitles them to reduced rates on a group or other basis when, in fact, the policy being advertised is sold only on an individual basis at regular rates.

## Section 15. Introductory, Initial or Special Offers

A. (1) An advertisement of an individual policy shall not directly or by implication represent that a contract or combination of contracts is an introductory, initial or special offer, or

Copyright NAIC 1989

that applicants will receive substantial advantages not available at a later date, or that the offer is available only to a specified group of individuals, unless such is the fact. An advertisement shall not contain phrases describing an enrollment period as "special," "limited," or similar words or phrases when the insurer uses such enrollment periods as the usual method of advertising accident and sickness insurance.

(2) An enrollment period during which a particular insurance product may be purchased on an individual basis shall not be offered within this State unless there has been a lapse of not less than [insert number] months between the close of the immediately preceding enrollment period for the same product and the opening of the new enrollment period. The advertisement shall indicate the date by which the applicant must mail the application, which shall be not less than ten days and not more than forty days from the date that such enrollment period is advertised for the first time. This rule applies to all advertising media, i.e., mail, newspapers, radio, television, magazines and periodicals, by any one insurer. It is inapplicable to solicitations of employees or members of a particular group or association which otherwise would be eligible under specific provisions of the Insurance Code for group, blanket or franchise insurance. The phrase "any one insurer" includes all the affiliated companies of a group of insurance companies under common management or control.

NOTE: The number of months was left blank in this rule because several states currently permit six months, several states allow three months, and other states currently prohibit such periods of enrollment. Whether such enrollment periods should be permissible and the period of time between enrollment are items on which each state should make its own decision. Each state should modify the time limit in this guideline to comply with the rule adopted by the particular state.

(3) This rule prohibits any statement or implication to the effect that only a specific number of policies will be sold, or that a time is fixed for the discontinuance of the sale of the particular policy advertised because of special advantages available in the policy, unless such is the fact.

(4) The phrase "a particular insurance product" in Paragraph (2) of this section means an insurance policy which provides substantially different benefits than those contained in any other policy. Different terms of renewability; an increase or decrease in the dollar amounts of benefits; an increase or decrease in any elimination period or waiting period from those available during an enrollment period for another policy shall not be sufficient to constitute the product being offered as a different product eligible for concurrent or overlapping enrollment periods.

B. An advertisement shall not offer a policy which utilizes a reduced initial premium rate in a manner which overemphasizes the availability and the amount of the initial reduced premium. When an insurer charges an initial premium that differs in amount from the amount of the renewal premium payable on the same mode, the advertisement shall not display the amount of the reduced initial premium either more frequently or more prominently than the renewal premium, and both the initial reduced premium and the renewal premium must be stated in juxtaposition in each portion of the advertisement where the initial reduced premium appears.

NOTE: Some states prohibit a reduced initial premium. Section 15B does not imply that the states which prohibit such initial premium are not in conformity with the NAIC Rules. This item is indicated in the rule as an item to be decided on a state-by-state basis.

C. Special awards, such as a "safe drivers' award" shall not be used in connection with advertisements of accident and sickness insurance.

## Section 16. Statements About an Insurer

An advertisement shall not contain statements which are untrue in fact, or by implication misleading, with respect to the assets, corporate structure, financial standing, age or relative position of the insurer in the insurance business. An advertisement shall not contain a recommendation by any commercial rating system unless it clearly indicates the purpose of the recommendation and the limitations of the scope and extent of the recommendations.

## Section 17. Enforcement Procedures

A. Advertising File. Each insurer shall maintain at its home or principal office a complete file containing every printed, published or prepared advertisement of its individual policies and typical printed, published or prepared advertisements of its blanket, franchise and group policies hereafter disseminated in this or any other state, whether or not licensed in such other state, with a notation attached to each such advertisement which shall indicate the manner and extent of distribution and the form number of any policy advertised. Such file shall be subject to regular and periodical inspection by this Department. All such advertisements shall be maintained in said file for a period of either four years or until the filing of the next regular report on examination of the insurer, whichever is the longer period of time.

B. Certificate of Compliance. Each insurer required to file an Annual Statement which is now or which hereafter becomes subject to the provisions of these rules must file with this Department, with its annual statement, a certificate of compliance executed by an authorized officer of the insurer wherein it is stated that, to the best of his knowledge, information and belief, the advertisements which were disseminated by the insurer during the preceding statement year complied or were made to comply in all respects with the provisions of these rules and the insurance laws of this State as implemented and interpreted by these rules.

NOTE: Where the rules were adopted on other than January 1 of the year, the required certification that all advertisements used in the preceding annual statement year complied with these rules cannot be given. The respective insurance departments should consider remedying the problem in the Certificate of Compliance used for the calendar year in which the rules were adopted.

## Section 18. Severability Provision

If any section or portion of a section of these rules, or the applicability thereof to any person or circumstance is held invalid by a court, the remainder of the rules, or the applicability of such provision to other persons or circumstances, shall not be affected thereby.

## Section 19. Filing for Prior Review

The Commissioner may, at his discretion, require the filing with the Department, for review prior to use, of any accident and sickness insurance advertising material. Such advertising material must be filed by the insurer with the Department not less than thirty days prior to the date the insurer desires to use the advertisement.

Copyright NAIC 1989

Appendix

# INTERPRETIVE GUIDELINES FOR RULES GOVERNING ADVERTISEMENTS OF ACCIDENT AND SICKNESS INSURANCE

**Guideline 1.**

Disclosure is one of the principal objectives of these rules and this section states specifically that the rules shall assure "truthful and adequate disclosure of all material and relevant information." These rules specifically prohibit some previous advertising techniques.

**Guideline 2-A.**

These rules apply to any "advertisement" as that term is defined in Section 3, Subsections A, H, I and J unless otherwise specified in the rules.

These rules apply to group and blanket as well as individual accident and sickness insurance. Certain distinctions, however, are applicable to these categories. Among them is the level of conversance with insurance, a factor which is covered by Section 5A of the rules.

**Guideline 3-A.**

The scope of the term "advertisement" extends to the use of all media for communications to the general public, to the use of all media for communications to specific members of the general public, and to the use of all media for communications by agents, brokers, producers and solicitors.

**Guideline 3-L.**

In Section 3B, the language "except disability, waiver of premium and double indemnity benefits included in life insurance and annuity contracts" means except disability, waiver of premium and double indemnity benefits included in life insurance, endowment or annuity contracts or contracts supplemental thereto which contain only such provisions which: (1) provide additional benefits in case of death or dismemberment or loss of sight by accident or as (2) operate to safeguard such contracts against lapse or to give a special surrender value or special benefit or an annuity in the event that the insured or annuitant shall become totally and permanently disabled as defined by the contract or supplemental contract.

**Guideline 3-I.**

1. A "brief description of coverage" in an invitation to inquire must be limited to a brief description of the loss for which benefits are payable but may contain:

   (a) The dollar amount of benefits payable; and/or

   (b) The period of time during which benefits are payable.

2. An invitation to inquire may not refer to cost.

3. As with all accident and sickness insurance advertisements, an invitation to inquire must not:

   (a) Employ devices which are designed to create undue anxiety;

   (b) Exaggerate the value of the benefits available under the advertised policy;

(c) Otherwise violate the provisions of these rules.

## Guideline 4.

The rule permits the use of either of the following methods of disclosure:

1. The first method provides for the disclosure of exceptions, limitations, reductions and other restrictions conspicuously and in close conjunction with the statements to which such information relates. This may be accomplished by disclosure in the description of the related benefits or in a paragraph set out in close conjunction with the description of policy benefits.

2. The second method provides for the disclosure of exceptions, limitations, reductions and other restrictions not in conjunction with the provisions describing policy benefits but under appropriate captions of such prominence that the information shall not be minimized, rendered obscure or otherwise made to appear unimportant. The phrase "under appropriate captions" means that the title must be accurately descriptive of the captioned material. Appropriate captions include the following: "Exceptions," "Exclusions," "Conditions Not Covered," and "Exceptions and Reductions." The use of captions such as, or similar to, the following are not acceptable because they do not provide adequate notice of the significance of the material: "Extent of Coverage," "Only these Exclusions," or "Minimum Limitations."

In considering whether an advertisement complies with the disclosure requirements of this rule, the rule must be applied in conjunction with the form and content standards contained in Section 5.

## Guideline 5-A.

The rule must be applied in conjunction with Sections 1 and 4 of the rules. This rule refers specifically to "format and content" of the advertisement and the "overall" impression created by the advertisement. This involves factors such as, but not limited to, the size, color and prominence of type used to describe benefits. The word "format" means the arrangement of the text and the captions.

The rule requires distinctly different advertisements for publication in newspapers or magazines of general circulation as compared to scholarly, technical or business journals and newspapers. Where an advertisement consists of more than one piece of material, each piece of material must, independent of all other pieces of material, conform to the disclosure requirements of the rule.

## Guideline 5-B.

The rule prohibits the use of incomplete statements and words or phrases which have the tendency or capacity to mislead or deceive because of the reader's unfamiliarity with insurance terminology. Therefore, words, phrases and illustrations used in an advertisement must be clear and unambiguous and, if the advertisement uses insurance terminology, sufficient description of a word, phrase or illustration shall be provided by definition or description in the context of the advertisement. As implied in Guideline 5-A, distinctly different levels of comprehension of the subscribers of various publications may be anticipated.

## Guideline 6-A(1).

The following examples are illustrations of the prohibitions created by the rule:

1. An advertisement which describes any benefits that vary by age must disclose that fact.

Copyright NAIC 1989

2. An advertisement which uses a phrase such as "no age limit," if benefits or premiums vary by age or if age is an underwriting factor, must disclose that fact.

3. Advertisements, applications, requests for additional information and similar materials are unacceptable if they state or imply that the recipient has been individually selected to be offered insurance or has had his eligibility for such insurance individually determined in advance when the advertisement is directed to all persons in a group or to all persons whose names appear on a mailing list.

4. Advertisements which indicate that a particular coverage or policy is exclusively for "preferred risks" or a particular segment of the population or that a particular segment of the population are acceptable risks, when such distinctions are not maintained in the issuance of policies, are not acceptable.

5. Advertisements for group or franchise group plans which provide a common benefit or a common combination of benefits shall not imply that the insurance coverage is tailored or designed specifically for that group, unless such is the fact.

6. It is unacceptable to use terms such as "enroll" or "join" to imply group or blanket insurance coverage when such is not the fact.

7. Any advertisement which contains statements such as "anyone can apply," or "anyone can join," other than with respect to a guaranteed issue policy for which administrative procedures exist to assure that the policy is issued within a reasonable period of time after the application is received by the insurer.

8. An advertisement which states or implies immediate coverage of a policy is unacceptable unless suitable administrative procedures exist so that the policy is issued within fifteen working days after the application is received by the insurer.

9. Any advertisement which contains statements such as "here is all you do to apply," "simply" or "merely" to refer to the act of applying for a policy which is not a guaranteed issue policy is unacceptable unless it refers to the fact that the application is subject to acceptance or approval by the insurer.

10. Applications, request forms for additional information and similar related materials are unacceptable if they resemble paper currency, bonds, stock certificates, etc.; or use any name, service mark, slogan, symbol or any device in such a manner that implies that the insurer or the policy advertised is connected with a government agency, such as the Social Security Administration or the Department of Health and Human Services.

11. No advertisement shall employ devices which are designed to create undue fear or anxiety in the minds of those to whom they are directed. Unacceptable examples of such devices are:

    (a) The use of phrases such as "cancer kills somebody every two minutes" and "total number of accidents" without reference to the total population from which such statistics are drawn. (As an example of a permissible device, data prepared by the American Cancer Society are acceptable provided their source is noted and they are not overemphasized);

    (b) The use of phrases such as "the finest kind of treatment," implying that such treatment would be unavailable without insurance;

    (c) The reproduction of newspaper articles, etc., containing irrelevant facts and figures;

(d) The use of illustrations which unduly emphasize automobile accidents, cripples or persons confined in beds who are in obvious distress or receiving hospital or medical bills or persons being evicted from their homes due to their hospital bills;

(e) The use of phrases such as "financial disaster," "financial distress," "financial shock," or other phrases implying that financial ruin is likely without insurance, where used in an advertisement which comes within Section 6A(9) relating to policies covering specified illnesses or specified accidents only.

12. An advertisement which uses the word "plan" without identifying it as an accident and sickness insurance policy is not permissible.

13. An advertisement which implies in any manner that the prospective insured may realize a profit from obtaining hospital, medical or surgical insurance coverage is not permissible.

14. An advertisement shall not state or imply by word, phrase or illustration that the benefits being offered will supplement any other insurance policy, insurance-type concept or governmental plan if such is not the fact.

15. An advertisement of a hospital or other similar facility confinement benefit that makes reference to the benefit being paid directly to the policyholder is misleading unless, in making such a reference, the advertisement includes a statement that the benefits may be paid directly to the hospital or other health care facility if an assignment of benefits is made by the policyholder. An advertisement of medical and surgical expense benefits shall comply with this rule in regard to the disclosure of assignments of benefits to providers of services. Phrases such as "you collect," "you get paid," "pays you," or other words or phrases of similar import are acceptable so long as the advertisement indicates that it is payable to the insured or someone designated by the insured.

16. An advertisement which refers to "hospitalization for injury or sickness" omitting the word "covered" when the policy excludes certain sicknesses or injuries, or which refers to "whenever you are hospitalized" or "while you are confined in the hospital" omitting the phrase "for covered injury or sickness," if the policy excludes certain injuries or sickness is unacceptable. Continued reference to "covered injury or sickness" is not necessary where this fact has been prominently disclosed in the advertisement and where the description of sicknesses or injuries not covered are prominently set forth.

17. Advertisements which state that benefits are provided when "you go to the hospital" are unacceptable unless the advertisement clearly sets forth the extent of the coverage.

18. An advertisement which fails to disclose that the definition of "hospital" does not include a nursing home, convalescent home or extended care facility, as the case may be, is unacceptable.

19. An advertisement which fails to disclose any waiting or elimination periods for specific benefits is unacceptable.

20. An advertisement for a limited policy, or hospital indemnity policy, or a plan of insurance which covers only certain causes of loss (such as dread disease) or which covers only a certain type of loss (such as hospital confinement) is unacceptable if:

(a) The advertisement refers to a total benefit maximum limit payable under the policy in any headline, lead-in or caption without also in the same headline, lead-in or caption specifying the applicable daily limits and other internal limits;

Copyright NAIC 1989

(b) The advertisement states any total benefit limit without stating the periodic benefit payment, if any, and the length of time the periodic benefit would be payable to reach the total benefit limit:

(c) The advertisement prominently displays a total benefit limit which would not, as a general rule, be payable under an average claim.

21. Advertisements which emphasize total amounts payable under hospital, medical or surgical accident and sickness insurance coverage or other benefits in a policy, such as benefits for private duty nursing, are unacceptable unless the actual amounts payable per day for such indemnity or benefits are stated.

22. Examples of benefits payable under a policy shall not disclose only maximum benefits unless such maximum benefits are paid for loss from common and probable illnesses or accidents rather than exceptional or rare illnesses or accidents or periods of confinement for such exceptional or rare accidents or illnesses.

23. When a range of benefit levels is set forth in an advertisement, it must be made clear that the insured will receive only the benefit level written or printed in the policy selected and issued. Language which implies that the insured may select the benefit level at the time of filing claims is unacceptable.

24. Language which implies that the amount of benefits payable under a loss-of-time policy may be increased at the time of claim or disability according to the needs of the insured is unacceptable.

25. An advertisement for loss-of-time coverage which is an invitation to contract which sets forth a range of amounts of benefit levels is unacceptable unless it also states that eligibility for the benefits is based upon condition of health, income or other economic conditions, or other underwriting standards of the insurer if such is the fact.

26. The term "confining sickness" is an abbreviated expression and must be explained in an advertisement containing the term. Such an explanation might be as follows: "Benefits are payable for total disability due to confining sickness only so long as the insured is necessarily confined indoors." Captions such as "Lifetime Sickness Benefits" or "Five-Year Sickness Benefits" are incomplete if such benefits are subject to confinement requirements. When sickness benefits are subject to confinement requirements, captions such as "Lifetime House Confining Sickness Benefits" or "Five-Year House Confining Sickness Benefits" would be permissible.

27. Advertisements for policies whose premiums are modest because of their limited coverage or limited amount of benefits shall not describe premiums as "low," "low cost," "budget" or use qualifying words of similar import. This rule also prohibits the use of words such as "only" and "just" in conjunction with statements of premium amounts when used to imply a bargain.

28. Advertisements which state or imply that premiums will not be changed in the future are not acceptable unless the advertised policies so provide.

29. An advertisement which does not require the premium to accompany the application must not overemphasize that fact and must make the effective date of that coverage clear.

30. An advertisement which exaggerates the effects of statutorily mandated benefits or required policy provisions or which implies that such provisions are unique to the advertised policy is unacceptable. For example, the phrase, "Money Back Guarantee" is an exaggerated description of the "free look" right to examine the policy and is not acceptable.

31. An advertisement which implies that a common type of policy or a combination of common benefits is "new," "unique," "a bonus," "a breakthrough," or is otherwise unusual is unacceptable. Also, the addition of a novel method of premium payment to an otherwise common plan of insurance does not render it "new."

32. An advertisement which is an invitation to contract which fails to disclose the amount of any deductible and/or the percentage of any co-insurance factor is not acceptable.

33. An advertisement which fails to state clearly the type of insurance coverage being offered is not acceptable.

34. Language which states or implies that each member under a "family" contract is covered as to the maximum benefits advertised, where such is not the fact, is not acceptable.

35. The importance of diseases rarely or seldom found in the class of persons to whom the policy is offered shall not be exaggerated in an advertisement.

36. A television, radio, mail or newspaper advertisement or lead-generating device which is designed to produce leads either by use of a coupon a request to write or to call the company or a subsequent advertisement prior to contact must include information disclosing that an agent may contact the applicant if such is the fact.

37. Phrases or devices which unduly excite fear of dependence upon relatives or charity are unacceptable. Phrases or devices which imply that long sicknesses or hospital stays are common among the elderly are unacceptable.

Guideline 6-A(2).

This rule recognizes that certain words and phrases in advertising may have a tendency to mislead the public as to the extent of benefits under an advertised policy. Consequently, such terms (and those specified in the rule do not represent a comprehensive list but only examples) must be used with caution to avoid any tendency to exaggerate benefits and must not be used unless the statement is literally true in every instance. The use of the following phrases based on such terms or having the same effect must be similarly restricted: "pays hospital, surgical, etc., bills," "pays dollars to offset the cost of medical care," "safeguards your standard of living," "pays full coverage," "pays complete coverage," "pays for financial needs," "provides for replacement of your lost paycheck," "replaces income" or "emergency paycheck." Other phrases may or may not be acceptable depending upon the nature of the coverage being advertised. For example, the phrase "this policy will help to replace your income" is acceptable in advertising for loss-of-time coverage but is unacceptable in advertising for hospital confinement (including "hospital indemnity") coverage.

This rule also prohibits words or phrases which exaggerate the effect of benefit payments on the insured's general well-being, such as "worry-free savings plan," "guaranteed savings," "financial peace of mind," and "you will never have to worry about hospital bills again."



Copyright NAIC 1989

Guideline 6-A(4).

Negative features must be accurately set forth. Any limitation on benefits precluding preexisting conditions also must be restated under a caption concerning exclusions or limitations, notwithstanding that the preexisting condition exclusion has been disclosed elsewhere in the advertisement. (See Guideline 6-C for additional comments on preexisting conditions.)

Guideline 6-A(5).

This rule should be applied in conjunction with Section 11. Phrases such as "we cut costs to the bone" or "we deal direct with you so our costs are lower" shall not be used.

Guideline 6-A(6).

The words, phrases, illustrations and concepts listed are illustrations of the words, phrases, illustrations and concepts prohibited by the rule which creates the impression of a profit or gain to be realized by the insured when hospitalized.

Illustrations which depict paper currency or checks showing an amount payable are deceptive and misleading and are not permissible.

A hospital indemnity advertisement shall not include language such as "pay for a trip to Florida," "buy a new television," or otherwise imply that the insured will make a profit on hospitalization.

An advertisement which uses words such as "extra," "special," or "added" to describe any benefit in the policy is unacceptable.

Although the rule prohibits the use of the phrase "tax free," it does not prohibit the use of complete and accurate terminology explaining the Internal Revenue Service rules applicable to the taxation of accident and sickness benefits. The IRS rules provide that the premiums paid for and the benefits received from hospital indemnity policies are subject to the same rules as loss of time premiums and benefits and are not afforded the same favorable tax treatment as premiums for expense incurred hospital, medical and surgical benefit coverages. (Rev. Rul. 68-451 and Rev. Rul. 69-154.) Prominence either by caption, lead-in, bold-face or large type shall not be given in any manner to any statements relating to the tax status of such benefits.

Guideline 6-B(1).

An advertisement which is an invitation to contract as defined in Section 3J must recite the exceptions, reductions, and limitations as required by the rule and in a manner consistent with Section 4.

If an exception, reduction or limitation is important enough to use in a policy, it is of sufficient importance that its existence in the policy should be referred to in the advertisement regardless of whether it may also be the subject matter of a provision of the Uniform Individual Accident and Sickness Provision Law.

Some advertisements disclose exceptions, reductions and limitations as required, but the advertisement is so lengthy as to obscure the disclosure. Where the length of an advertisement has this effect, special emphasis must be given by changing the format to show the restrictions in a manner which does not minimize, render obscure or otherwise make them appear unimportant.

Guideline 6-B(2).

The rule imposes the same disclosure standards as the preceding paragraph with respect to policy provisions providing for waiting, elimination, probationary or similar time periods between the effective date of the policy and the effective date of coverage under the policy or at a time period between the date a loss occurs and the date benefits begin to accrue for such loss. The guideline for Subsection 6B(1) is equally applicable to this subsection. Where a policy has waiting, elimination, probationary or other such time periods, such provisions must be stated in negative terms. This requirement is comparable to that contemplated in Section 6A(4) as to exceptions, reductions and limitations.

Guideline 6-B(3).

The rule is similar to Section 6A(4) and requires a fair and accurate description of exceptions, limitations and reductions in a manner which does not minimize, render obscure or otherwise make them appear unimportant.

Advertisements must state exceptions, limitations and reductions in the negative and must not understate any exception, limitation or reduction or qualify any exception, limitation or reduction to emphasize coverage described elsewhere (e.g., "Does not pay for [insert exception, limitation or reduction], however, Medicare pays this" is not acceptable, nor is "Does not pay for the first four days in hospital for sickness, but pays for accident from first day"). (Underscoring indicates the manner in which statements are sometimes emphasized.)

Guideline 6-C(1).

The rule imposes the same disclosure standards with respect to preexisting conditions provisions as noted in Guideline 6-B(1). The comments under that guideline are equally applicable to this subsection of the rules since the preexisting conditions provision is an exception under the rules.

This rule implements the objective of Section 6A(3) by requiring in negative terms a description of the effect of a preexisting condition exclusion because such an exclusion is a restriction on coverage. The subdivision also prohibits the use of the phrase "preexisting condition" without an appropriate definition or description of the term and prohibits stating a reduction in the statutory time limit (such as a reduction from three years to two years or to one year) as an affirmative benefit. The words "appropriate definition or description" mean that the term "preexisting condition" must be defined as it is used by the company's claims department.

Guideline 6-C(2).

The phrase "no health questions" or words of similar import shall not be used if the policy excludes preexisting conditions.

Use of a phrase such as "guaranteed issue" or "automatic issue," if the policy excludes preexisting conditions for a certain period, must be accompanied by a statement disclosing that fact in a manner which does not minimize, render obscure, or otherwise make it appear unimportant and is otherwise consistent with Section 4.

Guideline 6-C(3).

Some states require approval of the application even when the application is not attached to the policy when issued. This rule does not change such a requirement. The text of this guideline should be modified to reflect the rule applicable in the particular state.

Copyright NAIC 1989 

Guideline 7.

This rule imposes the same disclosure standards with respect to policy provisions relating to renewability, cancellability and termination, modification of benefits, losses or premiums because of age or otherwise as stated in Guideline 6-B(1). The comments in that guideline are equally applicable to this section.

Advertisements of cancellable accident and sickness insurance policies must state that the contract is cancellable or renewable at the option of the company as the case may be. With respect to noncancellable policies and guaranteed renewable policies, the policy provisions, with respect to renewability, must be set forth and defined where appropriate. For example the following represent illustrations: A policy which is cancellable shall be advertised in a manner similar to "This policy can be cancelled by the company at any time." A policy which is renewable at the option of the insurance company shall be advertised in a manner to "This policy is renewable at the option of the company" or "The company has the right to refuse renewal of this policy" or "Renewable at the option of the insurer." Advertisements of such policies must indicate that the insurer has the right to increase premium rates. With respect to non-cancellable policies and guaranteed renewable policies, the rule requires a summary of the policy provisions with respect to renewability must be set forth and defined where appropriate. The disclosure of provisions relating to renewability requires the use of language such as "non-cancellable," "non-cancellable and guaranteed renewable," or "guaranteed renewable." Unless otherwise modified by law or regulation in an individual state, the use of those terms and the definitions provided shall be consistent with the definitions of those terms adopted by the National Association of Insurance Commissioners (See 1960 NAIC Proceedings I 153).

The rule also requires a statement of the qualifying conditions which constitute limitations on the permanent nature of the coverage. These customarily fall into three categories: (1) age limits, (2) reservation of a right to increase premiums, and (3) the establishment of aggregate limits. For example, "non-cancellable and guaranteed renewable" does not fulfill the requirement of the rule if the policy contains a terminal age of sixty-five. In such a case, a proper statement would be "non-cancellable and guaranteed renewable to age sixty-five". If a guaranteed renewable policy reserves the right to increase premiums, the statement must be expanded into language similar to "guaranteed renewable to age sixty-five but the company reserves the right to increase premium rates on a class basis." If the contract contains an aggregate limit after which no further benefits are payable, the above statement must be amplified with the phrase "subject to a maximum aggregate amount of $50,000" or similar language. A policy may have one or more of the three basic limitations and an advertisement must describe each of those which the policy contains. Over fifty percent of new individual policy issues are guaranteed renewable; therefore, the fact that a policy is guaranteed renewable shall not be exaggerated.

This rule also requires the disclosure of any modification of benefits or losses covered because of age or for other reasons. Provisions for reduction of benefits at stated ages must be set forth. For example, a policy may contain a provision which reduces benefits fifty percent after age sixty although it is renewable to age sixty-five. Such a reduction would have to be set forth. Also, a provision for the elimination of certain hazards at any specific ages or after the policy has been in force for a specified time would have to be set forth.

An advertisement for a policy which provides for step-rated premium rates based upon the policy year or the insured's attained age must disclose such rate increases and the times or ages at which such premiums increase.

This rule requires that the qualifying conditions of renewability must be disclosed in a manner which does not minimize or render obscure the qualifying conditions of renewal.

Guideline 8-A.

The rule must be applied in conjunction with Section 9 and requires that all such statements must be genuine and not fictitious. Under the rule, the manufacturing, substantive editing or "doctoring up" of a testimonial is clearly prohibited as being false and misleading to the insurance-buying public. However, language which would be unacceptable under these rules must be edited out of a testimonial.

Guideline 8-B.

Reimbursement for substantial travel and entertainment expenses is also required to be disclosed; however, union scale wages required by union rules are not required to be disclosed. Travel away from the home of the person giving the testimonial or endorsement to a distant location involving transportation expenses, lodging expenses or expenses for meals constitutes payment and must be reflected as a paid endorsement.

Guideline 8-C.

The rule requires both that approval or endorsement of a policy by an individual, group of individuals, society, association, or other organization be factual and that any proprietary relationship between the sponsoring or endorsing organization and the insurer be disclosed. For example, if the dividend under an association group case is payable to the association, disclosure of that fact is required. Also, if the insurer or an officer of the insurer formed or controls the association, that fact must be disclosed. This guideline also applies to Section 8E.

Guideline 9-A.

This rule prohibits the use of statistics in a manner which is misleading and deceptive. This rule requires the disclosure of all relevant facts and prohibits the use of irrelevant facts.

An advertisement which states the dollar amount of claims paid must also indicate the period over which such claims have been paid.

If the term "loss ratio" is used, it shall be properly explained in the context of the advertisement and, unless the state has issued a regulation otherwise defining the term, it shall be calculated on the basis of premiums earned to losses incurred and shall not be on a yearly run-off basis.

Guideline 9-C.

The rule does not require that statistics for a state be used since such statistics as hospital charges and average stays may vary from state to state. When nationwide statistics are used such fact should be noted as such unless the statistics on the particular point are substantially the same in a state to which the advertisement is directed. Statistics may be used only if they are credible.

Guideline 11.

The rule prohibits disparaging, unfair or incomplete comparisons of policies or benefits which would have a tendency to deceive or mislead the public. The rule does not preclude the use of comparisons by health maintenance organizations, prepaid health plans and other direct service organizations which describe the difference between their prepaid health benefits coverage and indemnity insurance coverage.

Copyright NAIC 1989

Guideline 12-A.

The rule prohibits advertisements which imply that an insurer is licensed beyond the limits of those jurisdictions where it is actually licensed. An advertisement which contains testimonials from persons who reside in a state in which the insurer is not licensed or which refers to claims of persons residing in states in which the insurer is not licensed implies licensing in those states and therefore is in violation of this rule unless the advertisement states that the insurer is not licensed in those states.

Guideline 12-B.

Although the rule permits a reference to an insurer being licensed in a state where the advertisement appears, it does not allow exaggeration of the fact of such licensing nor does it permit the suggestion that competing insurers may not be so licensed because, in most states, an insurer must be licensed in the state to which it directs its advertising.

Terms such as "official" or words of similar import, used to describe any policy or application form are not permissible because of the potential for deceiving or misleading the public.

Guideline 13.

The rule recognizes the existence of holding companies. The requirement that the advertisement refer to the policy form number is applicable only to advertisements of individual and franchise policies that are invitations to contract.

Guideline 14.

The rule prohibits the use of representations to any segment of the population that a particular policy or coverage is available only to that or similar segments of the population as preferred risks when actually such policy or coverage is available to members of the public at large at the same rates. The rule prohibits an advertisement labeled "Now for Readers of X Magazine."

Guideline 15-A(1).

The rule prohibits advertising representing that a product is offered on an introductory, initial, special offer basis or otherwise which (1) will not be available later; or (2) is available only to certain individuals, unless such is the fact. This rule prohibits the repetitive use of such advertisements. Where an insurer uses enrollment periods as the usual method of advertising these policies, the rule prohibits describing an enrollment period as a special opportunity or offer for the applicant.

Guideline 15-A(2).

The rule restricts the repetitive use of enrollment periods. The requirement of reasonable closing dates and waiting periods between enrollment periods was adopted to eliminate the abuses which formerly existed. The rule does not limit just the use of enrollment periods. It requires that a particular insurance product offered in an enrollment period through any advertising media, including the prepared presentations of agents, cannot be offered again in the entire state until [insert number] months from the close of the enrollment period have expired. Thus, an insurer must choose whether to use enrollment periods or open enrollment for a product. (See Section 15A(4) for definitions of "a particular insurance product.")

The rule does not prohibit multiple advertising during an enrollment period through any and all media published or transmitted within this state as long as the enrollment periods for all such advertisements have the same expiration date.

The rule does not prohibit the solicitation of members of a group or association for the same product even though there has not been a lapse of [insert number] months since the close of a preceding enrollment period which was open to the general public for the same product.

The rule does not require separation by [insert number] months of enrollment periods for the same insurance product in this State if the advertising material is directed by an admitted insurer to persons by direct mail on the basis that a common relationship exists with an entity, such as a bank and its depositors, a department store to its charge account customers or an oil company to its credit card holders, and more than one of such organizations is sponsoring such insurance product at different times if providing such insurance under such a method is not otherwise prohibited by law; provided, however, the [insert number] month rule does apply to one specific sponsor to the same person in this State on the basis of their status as customers of that one specific entity only.

NOTE: The number of months was left blank in this rule because several states currently permit six months; several states allow three months, and other states currently prohibit such periods of enrollment. Whether such enrollment periods should be permissible and the period of time between enrollments are items on which each state should make its decision on an individual basis and each state should modify the time limit in this guideline to comply with the rule adopted by the particular state.

## Guideline 15-A(4).

The rule defines the meaning of "a particular insurance product" in Section 15A(2) and prohibits advertising of products having minor variations, such as different elimination periods or different amounts of daily hospital indemnity benefits, in a succession of enrollment periods.

## Guideline 16.

The rule is closely related to the requirements of Section 9 concerning the use of statistics. The rule prohibits insurers which have been organized for only a brief period of time advertising that they are "old" and also prohibits the use of illustrations of a "home office" building in a manner which is misleading with respect to the actual size and magnitude of the insurer. Also, the occupations of the persons comprising the insurer's board of directors or the public's familiarity with their names or reputations is irrelevant and must not be emphasized. The preponderance of a particular occupation or profession among the board of directors of an insurer does not justify the advertisement of a plan of insurance offered to the general public as insurance designed or recommended by members of that occupation or profession. For example, it is unacceptable for an insurance company to advertise a policy offered to the general public as "the physicians' policy" or "the doctor's plan" simply because there is a preponderance of physicians or doctors on the board of directors of the insurer. The rule prohibits the use of a recommendation of a commercial rating system unless the purpose, meaning and limitations of the recommendation are clearly indicated.

## Guideline 19.

This rule is attached as an example of the text of a rule which may be used at the option of the Commissioner in a state which elects to review advertisements prior to use. The NAIC takes no position here on the question of whether advertising material should be subject to prior review by the Commissioner.

Copyright NAIC 1989

*Legislative History (all references are to the Proceedings of the NAIC)*

*1956 Proc. I 127, 130, 131-137, 148 (adopted)*
*1956 Proc. II 270, 301, 315 (interpretive guidelines established).*
*1957 Proc. I 76, 89-90, 99 (amended).*
*1972 Proc. I 15, 16, 555, 557, 563-580 (amended and reprinted).*
*1973 Proc. I 9, 11, 141, 224, 244-250 (amended and reprinted).*
*1973 Proc. II 18, 21, 370, 436, 438-442 (historical notes revised).*
*1974 Proc. II 3, 10, 380, 419, 420-441 (amended and reprinted).*
*1989 Proc. I 9, 24-25, 702, 706-726 (amended and reprinted).*

# APPENDIX E

ORDER OF BENEFIT DETERMINATION RULES

Model Regulation Service--January 1996
National Association of Insurance Commissioners

# APPENDIX E
# ORDER OF BENEFIT DETERMINATION RULES
## Model Regulation Service--January 1996
## National Association of Insurance Commissioners

When two or more plans pay benefits, the rules for determining the order of payment are as follows:

A. The primary plan pays or provides its benefits as if the secondary plan or plans did not exist.

B. A plan that does not contain a coordination of benefits provision that is consistent with this regulation is always primary. There is one exception: coverage that is obtained by virtue of membership in a group that is designed to supplement a part of a basic package of benefits may provide that the supplementary coverage shall be excess to any other parts of the plan provided by the contract holder. Examples of these types of situations are major medical coverages that are superimposed over base plan hospital and surgical benefits, and insurance type coverages that are written in connection with a closed panel plan to provide out-of-network benefits.

C. A plan may consider the benefits paid or provided by another plan in determining its benefits only when it is secondary to that other plan.

D. The first of the following rules that describes which plan pays its benefits before another plan is the rule to use.

(1) Non-Dependent or Dependent. The plan that covers the person other than as a dependent, for example as an employee, member, subscriber or retiree is primary and the plan that covers the person as a dependent is secondary. However, if the person is a Medicare beneficiary and, as a result of federal law, Medicare is secondary to the plan covering the person as a dependent; and primary to the plan covering the person as other than a dependent (e.g., a retired employee); then the order of benefits between the two plans is reversed so that the plan covering the person as an employee, member, subscriber or retiree is secondary and the other plan is primary.

(2) Child Covered Under More Than One Plan. The order of benefits when a child is covered by more than one plan is:

(a) The primary plan is the plan of the parent whose birthday is earlier in the year if:

- The parents are married;
- The parents are not separated (whether or not they ever have been married); or
- A court decree awards joint custody without specifying that one party has the responsibility to provide health care coverage.

If both parents have the same birthday, the plan that covered either of the parents longer is primary.

(b) If the specific terms of the court decree state that one of the parents is responsible for the child's health care expenses or health care coverage and the plan of that parent has actual knowledge of those terms, that plan is primary. This rule applies to claim determination periods or plan years commencing after the plan is given notice of the court decree.

(c) If the parents are not married, or are separated (whether or not they ever

have been married) or are divorced, the order of benefits is:

- The plan of the custodial parent;
- The plan of the spouse of the custodial parent;
- The plan of the non-custodial parent; and then
- The plan of the spouse of the non-custodial parent.

(3) Active or inactive employee. The plan that covers a person as an employee who is neither laid off nor retired, is primary. The same would hold true if a person is a dependent of a person covered as a retiree and an employee. If the other plan does not have this rule, and if, as a result, the plans do not agree on the order of benefits, this rule is ignored. Coverage provided an individual as a retired worker and as a dependent of an actively working spouse will be determined under the rule labeled B(1).

(4) Continuation coverage. If a person whose coverage is provided under a right of continuation provided by federal or state law also is covered under another plan, the plan covering the person as an employee, member, subscriber or retiree (or as that person's dependent) is primary, and the continuation coverage is secondary. If the other plan does not have this rule, and if, as a result, the plans do not agree on the order of benefits, this rule is ignored.

(5) Longer or shorter length of coverage. The plan that covered the person as an employee, member, subscriber or retiree longer is primary.

(6) If the preceding rules do not determine the primary plan, the allowable expenses shall be shared equally between the plans meeting the following definition of plan, for purposes of order of benefits determination. In addition, this plan will not pay more than it would have paid had it been primary.

(a) A "plan" is any of the following that provides benefits or services for medical or dental care or treatment. However, if separate contracts are used to provide coordinated coverage for members of a group, the separate contracts are considered parts of the same plan and there is no COB among those separate contracts.

(*i*) "Plan" includes: group insurance, closed panel or other forms of group or group-type coverage (whether insured or uninsured); hospital indemnity benefits in excess of $200 per day; medical care components of group long-term care contracts, such as skilled nursing care; medical benefits under group or individual automobile contracts; and Medicare or other governmental benefits, as permitted by law.

(*ii*) "Plan" does not include: individual or family insurance; closed panel or other individual coverage (except for group-type coverage); amounts of hospital indemnity insurance of $200 or less per day; school accident type coverage, benefits for non-medical components of group long-term care policies; Medicare supplement policies, Medicaid policies and coverage under other governmental plans, unless permitted by law.

Each contract for coverage under (*i*) or (*ii*) is a separate plan. If a plan has two parts and COB rules apply only to one of the two, each of the parts is treated as a separate plan.

# FEHB Program Carrier Letter

## Community-Rated Carriers

U.S. Office of Personnel Management
Office of Insurance Programs

**Letter No. 1998-049**

**Date:** November 6, 1998

Community-rated HMO [39]

**SUBJECT:** **1999 Contract Amendment**

This letter transmits an amendment to the 1999 Federal Employees Health Benefits (FEHB) Program Standard Contract. The amendment revises APPENDIX A - BROCHURE TEXT and implements a provision in OPM's 1999 appropriations language that requires carriers to offer contraceptive benefits. Pursuant to the legislation and the President's signing statement, we are instructing participating FEHB carriers to offer the full range of FDA-approved contraceptive options in 1999. In addition, all related services must be covered. Copies of the applicable legislative language and signing statement are attached. Any plan that objects to such coverage on the basis of religious beliefs must notify OPM of the basis for its objection in order to receive the exemption. We will be issuing a Benefits Administration Letter (BAL) instructing agencies to inform employees of this change. Please use your normal methods of communication to make sure enrollees are aware of it as well. If your plan utilizes a drug formulary, you are reminded that non-formulary drugs are covered when prescribed by a plan doctor.

The new benefits are to be prescribed within your existing prescription drug distribution structure, such as, retail drug and mail order prescription drug programs. Contraceptive drugs or devices made available as a result of this amendment are not to receive disparate benefit treatment. Enrollees whose Plan doctors hold religious beliefs or moral convictions that prevent them from prescribing contraceptive methods must be permitted to use another Plan doctor. Since most carriers in the Program already offer contraceptive benefits (though not for all types of contraceptive methods), we do not anticipate a material impact on costs in the Program or plan premiums.

Contact your OPM contract specialist if you have any questions about the amendment. Please sign the contract amendment and return it to the contract specialist by November 20, 1998.

Sincerely,

Frank D. Titus

Frank D. Titus
Assistant Director
for Insurance Programs

Enclosures

**EXC[illegible]T FROM THE "OMNIBUS CONSOLIDATED AND EMERGENCY SUPPLEMENTAL APPROPRIATIONS ACT OF 1999" PUBLIC LAW 105-277, signed 10/21/98**

Sec. 656. (a) None of the funds appropriated by this Act may be used to enter into or renew a contract which includes a provision providing prescription drug coverage, except where the contract also includes a provision for contraceptive coverage.

(b) Nothing in this section shall apply to a contract with:
(1) any of the following religious plans:
(a) SelectCare
(b) Personal CaresHMO
(c) Care Choices
(d) OSF Health Plans, Inc.
(e) Yellowstone Community Health Plan

(2) any existing or future plan, if the plan objects to such coverage on the basis of religious beliefs.

(c) In implementing this section, any plan that enters into or renews a contract under this section may not subject any individual to discrimination on the basis that the individual refuses to prescribe contraceptives because such activities would be contrary to the individual's religious beliefs or moral convictions.

(d) Nothing in this section shall be construed to require coverage of abortion or abortion-related services.

********************************

**STATEMENT BY THE PRESIDENT**

I have signed into law H.R. 4328, the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999.

I am pleased to note that this measure includes language requiring every health plan in the Federal Employees Health Benefits Program to provide coverage for contraception, unless the plan expresses objections to providing such coverage on the basis of religious beliefs. In order to maximize this significant benefit for the many women participating in this Program, I will direct the Office of Personnel Management to instruct participating plans to implement this provision by offering the full range of contraceptive options in 1999.

# 2000

# CONTRACT

## Year 2000 Amendments to the Standard Contract for Community-Rated Carriers

1. Add new Sections 1.23, NOTICE TO ENROLLEES ON TERMINATION OF FEHBP OR PROVIDER CONTRACT, and 1.24, TRANSITIONAL CARE, to implement the continuity of care provisions of the Patients' Bill of Rights, as follows:

SECTION 1.23
NOTICE TO ENROLLEES ON TERMINATION OF FEHBP OR PROVIDER CONTRACT (JAN 2000)

(a) Enrollees who are undergoing treatment for a chronic or disabling condition or who are in the second or third trimester of pregnancy at the time a carrier terminates (1) all or part of its FEHBP contract, or (2) the enrollee's specialty provider contract for reasons other than cause, may be able to continue to see their specialty provider for up to 90 days or through their postpartum care.

(b) The Carrier shall notify its enrollees in writing of its intent to terminate all or part of its FEHBP contract, including service area reductions, or the enrollees' specialty provider contract, for reasons other than cause in order to allow sufficient time for the enrollees to arrange for continued care after the 90-day period. The Carrier shall send the notice in time to ensure it is received by the enrollees no less than 90 days prior to the date it terminates the contract, unless the Carrier demonstrates it was prevented from doing so for reasons beyond its control. The Carrier's prompt notice will ensure that the notification period and the transitional care period run concurrently.

SECTION 1.24
TRANSITIONAL CARE (JAN 2000)

(a) Transitional care is specialized care provided for up to 90 days or through the postpartum period to an enrollee undergoing treatment for a chronic or disabling condition or who is in the second or third trimester of pregnancy when his or her carrier terminates (1) all or part of its FEHBP contract, or (2) the enrollee's specialty provider contract for reasons other than cause. The 90-day period begins the earlier of the date the enrollee receives the notice required under Section 1.23, Notice to Enrollees on Termination of FEHBP or Provider Contract, or the date the Carrier's or the provider's contract ends.

(b) Beginning January 1, 2000, the Carrier shall ensure the following:

(1) *If it terminates a part of its FEHB contract or a specialty provider contract* other than for cause, it allows enrollees who are undergoing treatment for a chronic or disabling condition or who are in the second or third trimester of pregnancy to continue treatment under the specialty provider for up to 90 days, or through their postpartum period, under the same terms and conditions that existed at the beginning of the transitional care period; and

(2) *If it enrolls a new member who involuntarily changed carriers because the enrollee's former carrier was no longer available in the FEHB Program*, it provides transitional care for the enrollee if he or she is undergoing treatment for a chronic or disabling condition or is in the second or third trimester of pregnancy for up to 90 days, or through the postpartum period, under the same terms and conditions the enrollee had under the prior carrier.

(c) In addition, the Carrier shall (1) pay for or provide the transitional care required under this clause at no additional cost to enrollees;

(2) require the specialty provider to promptly transfer all medical records to the designated new provider during or upon completion of the transition period, as authorized by the patient; and,

(3) require the specialty provider to give all necessary information to the Carrier for quality assurance purposes.

2. Add a new clause 2.14, CONTINUING REQUIREMENTS AFTER TERMINATION OF THE CARRIER, to reinforce certain existing contractual requirements as follows:

SECTION 2.14
CONTINUING REQUIREMENTS AFTER TERMINATION OF THE CARRIER (JAN 2000)

(a) The Carrier shall fulfill all of the requirements agreed to under the contract that continue after termination. The order of precedence for the

applicable laws, regulations, and the contract are listed in Section 1.3.

(b) Contract requirements that extend beyond the date of the Carrier's termination include, but are not limited to, offering conversion contracts to enrollees during the 31-day extension of coverage for conversion, providing benefits to the enrollee until the effective date of the new enrollment, and processing and paying claims incurred prior to the termination date.

3. Redate Section 3.2, ACCOUNTING AND PRICE ADJUSTMENT, as JAN 2000; add a new paragraph (c) to conform to the DoD Demonstration Project interim regulations published on July 6, 1999, as follows:

SECTION 3.2
ACCOUNTING AND PRICE ADJUSTMENT (JAN 2000) (FEHBAR 1652.216-70)

(a) *Annual Accounting Statement.* The Carrier, not later than 90 days after the end of each contract period, shall furnish to OPM for that contract period an accounting of its operations under the contract. The accounting shall be in the form prescribed by OPM.

(b) *Adjustment.* (1) This contract is community rated as defined in FEHBAR 1602.170-2.

(2) The subscription rates agreed to in this contract shall be equivalent to the subscription rates given to the Carrier's similarly sized subscriber groups (SSSGs) as defined in FEHBAR1602.170-13.

(3) If, at the time of the rate reconciliation, the subscription rates are found to be lower than the equivalent rates for the lower of the two SSSGs, the Carrier may include an adjustment to the Federal group's rates for the next contract period.

(4) If, at the time of the rate reconciliation, the subscription rates are found to be higher than the equivalent rates for the lower of the two SSSGs, the Carrier shall reimburse the Fund, for example, by reducing the FEHB rates for the next contract term to reflect the difference between the estimated rates and the rates which are derived using the methodology of the lower rated SSSG.

(5) No upward adjustment in the rate established for this contract will be allowed or considered by the Government or will be made by the Carrier in this or in any other contract period on the basis of actual costs incurred, actual benefits provided, or actual size or composition of the FEHBP group during this contract period.

(6) In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the subscription rates prior to rate reconciliation and the actual subscription rates.

(c) *Exception for the 3-Year DoD Demonstration Project (10 U.S.C. 1108).* Similarly sized subscriber group (SSSG) rating methodologies shall not be used to determine the reasonableness of the Carrier's demonstration project premium rates. The Carrier's rates shall not be adjusted for equivalency with SSSG rating methodologies. The Carrier shall benchmark premiums against adjusted community rates if available, Medigap offerings, or other similar products.

(End of Clause)

4. Redate Section 3.3, RATE REDUCTION FOR DEFECTIVE PRICING OR DEFECTIVE COST OR PRICING DATA (FEHBAR 1652.215-70), as JAN 2000; add a new paragraph (d) to to conform to the DoD Demonstration Project interim regulations published on July 6, 1999, as follows:

SECTION 3.3
RATE REDUCTION FOR DEFECTIVE PRICING OR DEFECTIVE COST OR PRICING DATA (JAN-2000) (FEHBAR 1652.215-70)

(a) If any rate established in connection with this contract was increased because (1) the Carrier submitted, or kept in its files in support of the FEHBP rate, cost or pricing data that were not complete, accurate, or current as certified in the Certificate of Accurate Cost or Pricing Data (FEHBAR 1615.804-70); (2) the Carrier submitted, or kept in its files in support of the FEHBP rate, cost or pricing data that were not accurate as represented in the rate proposal documents; (3) the Carrier developed FEHBP rates with a rating methodology and structure inconsistent with that used to develop rates for similarly sized subscriber groups (see FEHBAR §1602.170-13) as certified in the Certificate of Accurate Cost or Pricing Data for Community Rated Carriers; or (4) the Carrier submitted or kept in its files in support of the FEHBP rate, data or information of any description that were not complete, accurate, and current--then, the rate shall be reduced in the amount by which the price was

increased because of the defective data or information.

(b)(1) If the Contracting Officer determines under paragraph (a) of this clause that a price or cost reduction should be made, the Carrier agrees not to raise the following matters as a defense: (i) The Carrier was a sole source supplier or otherwise was in a superior bargaining position and thus the price of the contract would not have been modified even if accurate, complete, and current cost or pricing data had been submitted or maintained and identified.

(ii) The Contracting Officer should have known that the cost or pricing data in issue were defective even though the Carrier took no affirmative action to bring the character of the data to the attention of the Contracting Officer.

(iii) The contract was based on an agreement about the total cost of the contract and there was no agreement about the cost of each item procured under the contract.

(iv) The Carrier did not submit or keep in its files a Certificate of Current Cost or Pricing Data.

(2)(i) Except as prohibited by subdivision (b)(2)(ii) of this clause, an offset in an amount determined appropriate by the Contracting Officer based upon the facts shall be allowed against the amount of a contract price reduction if–

(A) The Carrier certifies to the Contracting Officer that, to the best of the Carrier's knowledge and belief, the Carrier is entitled to the offset in the amount requested; and

(B) The Carrier proves that the cost or pricing data were available before the date of agreement on the price of the contract (or price of the modification) and that the data were not submitted before such date.

(ii) An offset shall not be allowed if—

(A) The understated data was known by the Carrier to be understated when the Certificate of Current Cost or Pricing Data was signed; or

(B) The Government proves that the facts demonstrate that the contract price would not have increased in the amount to be offset even if the available data had been submitted before the date of agreement on price.

(c) When the Contracting Officer determines that the rates shall be reduced and the Government is thereby entitled to a refund, the Carrier shall be liable to and shall pay the FEHB Fund at the time the overpayment is repaid–

(1) Simple interest on the amount of the overpayment from the date the overpayment was paid from the FEHB Fund to the Carrier until the date the overcharge is liquidated. In calculating the amount of interest due, the Carrier shall use the quarterly rate determinations by the Secretary of the Treasury under the authority of 26 U.S.C. 6621(a)(2) applicable to the periods the overcharge was retained by the Carrier shall be used; and,

(2) A penalty equal to the amount of overpayment, if the Carrier knowingly submitted cost or pricing data which was incomplete, inaccurate, or noncurrent.

(d) _Exception for the DoD Demonstration Project._ Similarly sized subscriber group (SSSG) rating methodologies shall not be used to determine the reasonableness of the Carrier's demonstration project premium rates. The Carrier's rates shall not be adjusted for equivalency with SSSG rating methodologies. The Carrier shall benchmark premiums against adjusted community rates if available, Medigap offerings, or other similar products.

(End of Clause)

5. Redate Section 3.7, SURVEY CHARGES, as JAN 2000 and add amended language as follows:

SECTION 3.7
SURVEY CHARGES (JAN 2000)

(a) If the Carrier participates in an FEHB annual consumer assessment survey, it shall pay OPM's contractor a pro rata share of the total cost of consolidating and reporting the survey results to OPM. The Carrier shall pay a separate fee for each plan option and /or rating area. The Carrier agrees to pay the contractor's invoice within 30 days of the billing date. If the Carrier does not remit payment to the contractor within 60 days of the billing date, OPM shall withhold the amount due from the Carrier's subscription charges according to FEHBAR 1652.232-70, Payments–community-rated contracts, and forward payment to the contractor.

(b) Costs incurred by the Carrier for contracting with a vendor to conduct the survey shall be the Carrier's responsibility.

6. For carriers participating in the 3-year DoD Demonstration Project only, add a new clause under Section 4.1, entitled PARTICIPATION IN THE DoD DEMONSTRATION PROJECT, to implement the joint DoD/FEHBP Demonstration Project authorized by 10 U.S.C. 1108, as follows:

For carriers participating in the 3-Year DoD Demonstration Project only:

SECTION 4.1
PARTICIPATION IN DoD/FEHBP DEMONSTRATION PROJECT
(JAN 2000)

(a) The Carrier shall participate in the DoD/FEHBP Demonstration Project authorized by 10 U.S.C. 1108 ("DoD Demonstration Project") under the terms and conditions specified by OPM.

(b) In setting the premium rate, the Carrier shall comply with the requirements in Section 3.2, Accounting and Price Adjustment (FEHBAR 1652.216-70), and 3.3, Rate Reduction for Defective Pricing or Defective Cost or Pricing Data (FEHBAR 1652.215-70).

(c) If the Carrier has experienced costs far in excess of the premiums for the DoD enrollment group, OPM will reimburse the Carrier first from the Carrier's demonstration project Contingency Reserve and then from OPM's Administrative Reserve. At the end of the demonstration project, any surplus will be placed in the Contingency Reserve of all carriers continuing in the FEHB Program following the termination of the DoD demonstration project. Credit will be in proportion to the amount of subscription charges paid and accrued to the carriers' plan during the final year of the demonstration project.

(d) The Carrier shall compile, maintain, and, when requested by OPM, report data on the plan's experience to produce reports containing the following information and analysis:

(1) The number of eligible beneficiaries who elect to participate in the demonstration project.

(2) The number of eligible beneficiaries who elected to participate in the demonstration project and did not have Medicare Part B coverage before electing to participate.

(3) The costs of health benefits charges and the costs (direct and indirect) of administering the benefits and services provided to eligible beneficiaries who elect to participate in the demonstration project as compared to similarly situated enrollees in the FEHB Program.

(4) Prescription drug costs for demonstration project beneficiaries.

7. Update the introductory paragraph and paragraph (a)5. of Appendix D-a to include website material under supplemental literature, as follows:

APPENDIX D-a
FEHB SUPPLEMENTAL LITERATURE GUIDELINES

This is the primary guide a Carrier should use to assess whether the Carrier's supplemental marketing literature, including website material, complies with FEHBAR 1603.70, Misleading, Deceptive or Unfair Advertising. (Use the NAIC Guidelines for additional guidance when needed.)

a) 5. Under the FEHBP, the FEHB brochure is based on text approved by OPM and is a complete statement of benefits, limitations, and exclusions. Include the following statement (website material should include the statement as a preface) in all supplemental literature which in any way discusses Plan benefits:

*"This is a summary [or brief description] of the features of the [insert Plan's name]. Before making a final decision, please read the Plan's Federal brochure ([insert brochure number]). All benefits are subject to the definitions, limitations, and exclusions set forth in the Federal brochure.*

# CONTRACT FOR FEDERAL EMPLOYEES HEALTH BENEFITS

**CONTRACT NO:** CS 2074
**EFFECTIVE:** 01-01-2000

**ORIGINAL CONTRACT EFFECTIVE: 01-01-86**

***BETWEEN:*** **THE UNITED STATES OFFICE OF PERSONNEL MANAGEMENT** *hereinafter called the OPM, the Agency, or the Government*

**AND**

**CONTRACTOR:** **BLUELINCS HMO**

**Address:** **3401 NW 63RD**
**OKLAHOMA CITY, OK 73116**

**In consideration of payment by the Agency of subscription charges set forth in Appendix B, the Carrier agrees to perform all of the services set forth in this contract, including Appendix A.**

**FOR THE CARRIER**

Lyndle Ellis
**Name of Person Authorized to Execute contract (*Type or print*)**

Group Vice President
***Title***

[signature]
***Signature***

12-20-99
***Date Signed***

**FOR THE GOVERNMENT**

**DAVID A. LEWIS**
**Name of Contracting Officer (*Type or print*)**

**CHIEF, INSURANCE CONTRACTS DIV III**
***Title***

[signature]
***Signature***

5.1.00
***Date Signed***

# FEDERAL EMPLOYEES
# HEALTH BENEFITS PROGRAM

## *STANDARD CONTRACT*

## *FOR*

## *COMMUNITY-RATED HEALTH MAINTENANCE ORGANIZATION CARRIERS*

# 2000

(CR-2000)

# TABLE OF CONTENTS

This is a community-rated contract for the Health Maintenance Organization Carrier and consists of the cover page, the table of contents and the provisions, clauses and appendices as included in PARTS 1 through 6.

## PART I - GENERAL PROVISIONS


1.1 DEFINITIONS OF FEHB TERMS
1.2 ENTIRE CONTRACT
1.3 ORDER OF PRECEDENCE
1.4 INCORPORATION OF LAWS AND REGULATIONS
1.5 RECORDS AND INFORMATION TO BE FURNISHED BY OPM
1.6 CONFIDENTIALITY OF RECORDS (FEHBAR)
1.7 STATISTICS AND SPECIAL STUDIES
1.8 NOTICE
1.9 FEHB QUALITY ASSURANCE
1.10 NOTICE OF SIGNIFICANT EVENTS (FEHBAR)
1.11 FEHB INSPECTION (FEHBAR)
1.12 CORRECTION OF DEFICIENCIES
1.13 INFORMATION AND MARKETING MATERIALS
1.14 MISLEADING, DECEPTIVE OR UNFAIR ADVERTISING (FEHBAR)
1.15 RENEWAL AND WITHDRAWAL OF APPROVAL (FEHBAR)
1.16 [RESERVED]
1.17 NOVATION AGREEMENT (FEHBAR)
1.18 AGREEMENT TO RECOGNIZE CARRIER'S CHANGE OF NAME (FEHBAR)
1.19 CERTIFICATION UNDER P.L. 104-191 (HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996)
1.20 PATIENTS' BILL OF RIGHTS
1.21 [RESERVED]
1.22 HIPAA COMPLIANCE
1.23 NOTICE TO ENROLLEES ON TERMINATION OF FEHBP OR PROVIDER CONTRACT
1.24 TRANSITIONAL CARE


## PART II - BENEFITS


2.1 ENROLLMENT ELIGIBILITY AND EVIDENCE OF ENROLLMENT
2.2 BENEFITS PROVIDED
2.3 PAYMENT OF BENEFITS AND PROVISION OF SERVICES AND SUPPLIES
2.4 TERMINATION OF COVERAGE AND CONVERSION PRIVILEGES
2.5 SUBROGATION
2.6 COORDINATION OF BENEFITS (FEHBAR)
2.7 DEBARMENT AND OTHER SANCTIONS
2.8 FILING HEALTH BENEFIT CLAIMS/COURT REVIEW OF DISPUTED CLAIMS
2.9 PROTECTION OF MEMBERS AGAINST PROVIDER CLAIMS
2.10 INDEPENDENT LABORATORIES
2.11 CLAIMS PROCESSING
2.12 CALCULATION OF COST SHARING PROVISIONS
2.13 BENEFITS PAYMENTS WHEN MEDICARE IS PRIMARY
2.14 CONTINUING REQUIREMENTS AFTER TERMINATION OF THE CARRIER


## PART III - PAYMENTS, CHARGES AND ACCOUNTING


3.1 PAYMENTS (FEHBAR)
3.2 ACCOUNTING AND PRICE ADJUSTMENT (FEHBAR)
3.3 RATE REDUCTION FOR DEFECTIVE PRICING OR DEFECTIVE COST OR PRICING DATA (FEHBAR)
3.4 CONTRACTOR RECORDS RETENTION (FEHBAR)
3.5 APPROVAL FOR THE ASSIGNMENT OF CLAIMS (FEHBAR)
3.6 DISCREPANCIES BETWEEN ENROLLMENT AND PAYMENTS TO CARRIER
3.7 SURVEY CHARGES

PART IV - SPECIAL PROVISIONS

4.1 ALTERATIONS IN CONTRACT (FAR)

PART V - STANDARD CLAUSES

This contract shall include all of the following standard clauses required by the Federal Acquisition Regulation (FAR) or Federal Employees Health Benefits Acquisition Regulation (FEHBAR).

5.1 DEFINITIONS
5.2 [RESERVED]
5.3 GRATUITIES
5.4 COVENANT AGAINST CONTINGENT FEES
5.5 ANTI-KICKBACK PROCEDURES
5.6 [RESERVED]
5.7 AUDIT AND RECORDS-NEGOTIATION
5.8 thru 5.13 [RESERVED]
5.14 UTILIZATION OF SMALL BUSINESS CONCERNS
5.15 [RESERVED]
5.16 [RESERVED]
5.17 CONVICT LABOR
5.18 CONTRACT WORK HOURS AND SAFETY STANDARDS ACT-OVERTIME COMPENSATION
5.19 EQUAL OPPORTUNITY
5.20 [RESERVED]
5.21 NOTIFICATION OF VISA DENIAL
5.22 AFFIRMATIVE ACTION FOR DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA
5.23 AFFIRMATIVE ACTION FOR WORKERS WITH DISABILITIES
5.24 CLEAN AIR AND WATER
5.25 DRUG FREE WORKPLACE
5.26 FEDERAL, STATE, AND LOCAL TAXES
5.27 [RESERVED]
5.28 TAXES-CONTRACTS PERFORMED IN U.S. POSSESSIONS OR PUERTO RICO
5.29 TAXES - FOREIGN NEGOTIATED BENEFITS CONTRACTS (JAN 1998) (FEHBAR 1652.229-70)
5.30 COST ACCOUNTING STANDARDS
5.31 DISCLOSURE AND CONSISTENCY OF COST ACCOUNTING PRACTICES
5.32 ADMINISTRATION OF COST ACCOUNTING STANDARDS
5.33 DISCOUNTS FOR PROMPT PAYMENT
5.34 INTEREST (FEHBAR MODIFICATION OF FAR)
5.35 ASSIGNMENT OF CLAIMS
5.36 DISPUTES
5.37 [RESERVED]
5.38 CHANGES--NEGOTIATED BENEFITS CONTRACTS
5.39 [RESERVED]
5.40 GOVERNMENT PROPERTY (NEGOTIATED BENEFITS CONTRACTS)
5.41 [RESERVED]
5.42 PREFERENCE FOR U.S.-FLAG AIR CARRIERS
5.43 [RESERVED]
5.44 AUTHORIZED DEVIATIONS IN CLAUSES
5.45 LIMITATION ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS
5.46 [RESERVED]
5.47 PROTECTING THE GOVERNMENT'S INTEREST WHEN SUBCONTRACTING WITH CONTRACTORS DEBARRED, SUSPENDED OR PROPOSED FOR DEBARMENT
5.48 BANKRUPTCY
5.49 FEHBP TERMINATION FOR CONVENIENCE OF THE GOVERNMENT--NEGOTIATED BENEFITS CONTRACTS
5.50 FEHBP TERMINATION FOR DEFAULT--NEGOTIATED BENEFITS CONTRACTS
5.51 [RESERVED]
5.52 [RESERVED]
5.53 NOTICE TO THE GOVERNMENT OF LABOR DISPUTES
5.54 [RESERVED]
5.55 EMPLOYMENT REPORTS ON DISABLED VETERANS AND VETERANS OF THE VIETNAM ERA
5.56 AUTHORIZATION AND CONSENT

5.57 NOTICE AND ASSISTANCE REGARDING PATENT AND COPYRIGHT INFRINGEMENT

5.58 PAYMENT BY ELECTRONIC FUNDS TRANSFER—CENTRAL CONTRACTOR REGISTRATION

5.59 PROHIBITION OF SEGREGATED FACILITIES


PART VI – APPENDICES


A- BROCHURE TEXT

B- SCHEDULE OF RATES, CHARGES AND LIMITATIONS

C- CONTRACT ADMINISTRATION DATA

D- (a) FEHBP SUPPLEMENTAL LITERATURE GUIDELINES JANUARY 2000; (b) ADVERTISEMENTS OF ACCIDENT AND SICKNESS INSURANCE MODEL REGULATION (1999)

E- ORDER OF BENEFIT DETERMINATION RULES, GROUP COORDINATION OF BENEFITS REGULATION, MODEL REGULATION SERVICE - JANUARY 1996, NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS