advertised, or that any agent who may call upon the consumer in response to the advertisement, is connected with a governmental agency, such as the Social Security Administration.

F. An advertisement may not incorporate the word "Medicare" in the title of the plan or policy being advertised unless, wherever it appears, the word is qualified by language differentiating it from Medicare. The advertisement, however, shall not use the phrase "[ ] Medicare Department of the [ ] Insurance Company," or language of similar import.

G. An advertisement may not imply that the reader may lose a right or privilege or benefit under federal, state or local law if he or she fails to respond to the advertisement.

H. The use of letters, initials or symbols of the corporate name or trademark that would have the tendency or capacity to mislead or deceive the public as to the true identity of the insurer is prohibited unless the true, correct and complete name of the insurer is in close conjunction and in the same size type as the letters, initials or symbols of the corporate name or trademark.

I. The use of the name of an agency or "[ ] Underwriters" or "[ ] Plan" in type, size and location so as to have the capacity and tendency to mislead or deceive as to the true identity of the insurer is prohibited.

J. The use of an address so as to mislead or deceive as to true identity of the insurer, its location or licensing status is prohibited.

K. An insurer shall not use, in the trade name of its insurance policy, any terminology or words so similar to the name of a governmental agency or governmental program as to have the tendency to confuse, deceive or mislead the prospective purchaser.

L. Advertisements used by agents, producers, brokers or solicitors of an insurer shall have prior written approval of the insurer before they may be used.

M. An agent who makes contact with a consumer, as a result of acquiring that consumer's name from a lead-generating device, shall disclose that fact in the initial contact with the consumer. An agent or insurer may not use names produced from lead-generating devices that do not comply with the requirements of this regulation.

**Section 15. Group or Quasi-Group Implications**

A. An advertisement of a particular policy shall not state or imply that prospective insureds become group or quasi-group members covered under a group policy and as members, enjoy special rates or underwriting privileges, unless that is the fact.

© 1999 National Association of Insurance Commissioners

B. This regulation prohibits the solicitations of a particular class, such as governmental employees, by use of advertisements which state or imply that their occupational status entitles them to reduced rates on a group or other basis when, in fact, the policy being advertised is sold only on an individual basis at regular rates.

C. Advertisements that indicate that a particular coverage or policy is exclusively for "preferred risks" or a particular segment of the population or that a particular segment of the population is an acceptable risk, when the distinctions are not maintained in the issuance of policies, are prohibited.

D. An advertisement to join an association, trust or discretionary group that is also an invitation to contract for insurance coverage shall clearly disclose that the applicant will be purchasing both membership in the association, trust or discretionary group and insurance coverage. The insurer shall solicit insurance coverage on a separate and distinct application that requires a separate signature. The separate and distinct applications required need not be on separate documents or contained in a separate mailing. The insurance program shall be presented so as not to conceal the fact that the prospective members are purchasing insurance as well as applying for membership, if that is the case. Similarly, it is prohibited to use terms such as "enroll" or "join" to imply group or blanket insurance coverage when that is not the fact.

E. Advertisements for group or franchise group plans that provide a common benefit or a common combination of benefits shall not imply that the insurance coverage is tailored or designed specifically for that group, unless that is the fact.

> **Drafting Note:** The regulation prohibits the use of representations to any segment of the population that a particular policy or coverage is available only to that or similar segments of the population as preferred risks when actually the policy or coverage is available to members of the public at large at the same rates. For example, the regulation prohibits an advertisement labeled "Now for Readers of X Magazine."

## Section 16. Introductory, Initial or Special Offers

A.(1) An advertisement of an individual policy shall not directly or by implication represent that a contract or combination of contracts is an introductory, initial or special offer, or that applicants will receive substantial advantages not available at a later date, or that the offer is available only to a specified group of individuals, unless that is the fact. An advertisement shall not contain phrases describing an enrollment period as "special," "limited," or similar words or phrases when the insurer uses the enrollment periods as the usual method of marketing accident and sickness insurance.

(2) An enrollment period during which a particular insurance product may be purchased on an individual basis shall not be offered within this state unless there has been a lapse of not less than [insert number] months between the close of the immediately preceding enrollment period for the same product and the opening of the new enrollment period. The advertisement shall indicate the

© 1999 National Association of Insurance Commissioners

date by which the applicant must mail the application, which shall be not less than ten (10) days and not more than forty (40) days from the date that the enrollment period is advertised for the first time. This regulation applies to all advertising media, i.e., mail, newspapers, the Internet, radio, television, magazines and periodicals, by any one insurer. It is inapplicable to solicitations of employees or members of a particular group or association that otherwise would be eligible under specific provisions of the Insurance Code for group, blanket or franchise insurance. The phrase "any one insurer" includes all the affiliated companies of a group of insurance companies under common management or control.

**Drafting Note:** The regulation restricts the repetitive use of enrollment periods. The requirement of reasonable closing dates and waiting periods between enrollment periods was adopted to eliminate abuses that formerly existed. The regulation does not limit just the use of enrollment periods. It requires that a particular insurance product offered in an enrollment period through any advertising media, including the prepared presentations of agents, cannot be offered again in the entire state until a specified number of months from the close of the enrollment period have expired. Thus, an insurer must choose whether to use enrollment periods or open enrollment for a product. (See Paragraph (4) for a definition of "a particular insurance product."). The regulation does not prohibit multiple advertising during an enrollment period through any and all media published or transmitted within this state as long as the enrollment periods for all the advertisements have the same expiration date.

The regulation does not prohibit the solicitation of members of a group or association for the same product even though there has not been a lapse of a specified number of months since the close of a preceding enrollment period that was open to the general public for the same product. The regulation does not require separation by a specified number of months of enrollment periods for the same insurance product in this state if the advertising material is directed by an admitted insurer to persons by direct solicitation on the basis that a common relationship exists with an entity, such as a bank and its depositors, a department store to its charge account customers or an oil company to its credit card holders, and more than one of the organizations is sponsoring the insurance product at different times if providing the insurance under this method is not otherwise prohibited by law. However, the [insert number] month regulation does apply to one specific sponsor to the same person in this state on the basis of his or her status as a customer of that one specific entity only.

The number of months was left open in this regulation because several states permit six months; several states allow three months, and other states prohibit certain periods of enrollment. Whether the enrollment periods should be permissible and the period of time between enrollments are items on which each state should make its decision on an individual basis and each state should modify the time limit in this regulation to comply with state law.

(3) This regulation prohibits any statement or implication to the effect that only a specific number of policies will be sold, or that a time is fixed for the discontinuance of the sale of the particular policy advertised because of special advantages available in the policy, unless that is the fact.

(4) The phrase "a particular insurance product" in Paragraph (2) of this subsection means an insurance policy that provides substantially different benefits than those contained in any other policy. Different terms of renewability; an increase or decrease in the dollar amounts of benefits; an increase or decrease in any elimination period or waiting period from those available during

© 1999 National Association of Insurance Commissioners

an enrollment period for another policy shall not be sufficient to constitute the product being offered as a different product eligible for concurrent or overlapping enrollment periods.

> **Drafting Note:** This regulation defines the meaning of "a particular insurance product" and prohibits advertising of products having minor variations, such as different elimination periods or different amounts of daily hospital indemnity benefits, in a succession of enrollment periods.

B. An advertisement shall not offer a policy that utilizes a reduced initial premium rate in a manner that overemphasizes the availability and the amount of the initial reduced premium. When an insurer charges an initial premium that differs in amount from the amount of the renewal premium payable on the same mode, the advertisement shall not display the amount of the reduced initial premium either more frequently or more prominently than the renewal premium, and both the initial reduced premium and the renewal premium must be stated in juxtaposition in each portion of the advertisement where the initial reduced premium appears.

> **Drafting Note:** Some states prohibit a reduced initial premium. Section 16B does not imply that the states that prohibit an initial premium are not in conformity with the model regulation. This is an item to be decided on a state-by-state basis.

C. Special awards, such as a "safe drivers' award," shall not be used in connection with advertisements of accident and sickness insurance.

## Section 17. Statements about an Insurer

An advertisement shall not contain statements that are untrue in fact, or by implication misleading, with respect to the assets, corporate structure, financial standing, age or relative position of the insurer in the insurance business. An advertisement shall not contain a recommendation by any commercial rating system unless it clearly indicates the purpose of the recommendation and the limitations of the scope and extent of the recommendations.

> **Drafting Note:** This is closely related to the requirements of Section 10 concerning the use of statistics. The regulation prohibits insurers that have been organized for only a brief period of time advertising that they are "old" and also prohibits the use of images of a "home office" building in a manner that is misleading with respect to the actual size and magnitude of the insurer. Also, the occupations of the persons comprising the insurer's board of directors or the public's familiarity with their names or reputations are irrelevant and must not be emphasized. The preponderance of a particular occupation or profession among the board of directors of an insurer does not justify the advertisement of a plan of insurance offered to the general public as insurance designed or recommended by members of that occupation or profession. For example, it is prohibited for an insurance company to advertise a policy offered to the general public as "the physician's policy" or "the doctor's plan" simply because there is a preponderance of physicians on the board of directors of the insurer. The regulation prohibits the use of a recommendation of a commercial rating system unless the purpose, meaning and limitations of the recommendation are clearly indicated.

## Section 18. Enforcement Procedures

© 1999 National Association of Insurance Commissioners

A. Advertising File. Each insurer shall maintain at its home or principal office a complete file containing every printed, published or prepared advertisement of its individual policies and typical printed, published or prepared advertisements of its blanket, franchise and group policies hereafter disseminated in this or any other state, whether or not licensed in an other state, with a notation attached to each advertisement that indicates the manner and extent of distribution and the form number of any policy advertised. The file shall be subject to regular and periodical inspection by the commissioner. All of these advertisements shall be maintained in a file for a period of either four (4) years or until the filing of the next regular report on examination of the insurer, whichever is the longer period of time.

B. Certificate of Compliance. Each insurer required to file an annual statement shall file with the commissioner, with its annual statement, a certificate of compliance executed by an authorized officer of the insurer that states that, to the best of the officer's knowledge, information and belief, the advertisements that were disseminated by the insurer during the preceding statement year complied or were made to comply in all respects with the provisions of this regulation and the insurance laws of this state as implemented and interpreted by this regulation.

**Drafting Note:** Where the regulation was adopted on other than January 1 of the year, the required certification that all advertisements used in the preceding annual statement year complied with the regulation cannot be given. The respective insurance departments should consider remedying the problem in the Certificate of Compliance used for the calendar year in which the regulation was adopted.

**Section 19. Severability Provision**

If any section or portion of a section of this regulation, or its applicability to any person or circumstance is held invalid by a court, the remainder of the regulation, or the applicability of the provision to other persons or circumstances, shall not be affected.

**Section 20. Filing for Prior Review**

The commissioner may, at his or her discretion, require filing of any accident and sickness insurance advertising material for review prior to use.. The advertising material shall be filed by the insurer with the commissioner not less than thirty (30) days prior to the date the insurer desires to use the advertisement.

**Drafting Note:** This is an example of a regulation that may be used at the option of the commissioner in a state that elects to review advertisements prior to use. The NAIC takes no position on the question of whether advertising material should be subject to prior review by the commissioner.

---

*Legislative History (all references are to the Proceedings of the NAIC)*

*1956 Proc. I 127, 130, 131-137, 148 (adopted)*

© 1999 National Association of Insurance Commissioners

*1956 Proc. II 270, 301, 315 (interpretive guidelines established).*
*1957 Proc. I 76, 89-90, 99 (amended).*
*1972 Proc. I 15, 16, 555, 557, 563-580 (amended and reprinted).*
*1973 Proc. I 9, 11, 141, 224, 244-250 (amended and reprinted).*
*1973 Proc. II 18, 21, 370, 436, 438-442 (historical notes revised).*
*1974 Proc. II 8, 10, 380, 419, 420-441 (amended and reprinted).*
*1989 Proc. I 24-25, 702, 706-726 (amended and reprinted).*
*1998 Proc. 4th Quarter (amended and reprinted).*

© 1999 National Association of Insurance Commissioners

# APPENDIX E

## ORDER OF BENEFIT DETERMINATION RULES

**Model Regulation Service--January 1996**
**National Association of Insurance Commissioners**

# APPENDIX E
## ORDER OF BENEFIT DETERMINATION RULES

Model Regulation Service--January 1996
National Association of Insurance Commissioners

When two or more plans pay benefits, the rules for determining the order of payment are as follows:

A. The primary plan pays or provides its benefits as if the secondary plan or plans did not exist.

B. A plan that does not contain a coordination of benefits provision that is consistent with this regulation is always primary. There is one exception: coverage that is obtained by virtue of membership in a group that is designed to supplement a part of a basic package of benefits may provide that the supplementary coverage shall be excess to any other parts of the plan provided by the contract holder. Examples of these types of situations are major medical coverages that are superimposed over base plan hospital and surgical benefits, and insurance type coverages that are written in connection with a closed panel plan to provide out-of-network benefits.

C. A plan may consider the benefits paid or provided by another plan in determining its benefits only when it is secondary to that other plan.

D. The first of the following rules that describes which plan pays its benefits before another plan is the rule to use.

(1) Non-Dependent or Dependent. The plan that covers the person other than as a dependent, for example as an employee, member, subscriber or retiree is primary and the plan that covers the person as a dependent is secondary. However, if the person is a Medicare beneficiary and, as a result of federal law, Medicare is secondary to the plan covering the person as a dependent; and primary to the plan covering the person as other than a dependent (e.g., a retired employee); then the order of benefits between the two plans is reversed so that the plan covering the person as an employee, member, subscriber or retiree is secondary and the other plan is primary.

(2) Child Covered Under More Than One Plan. The order of benefits when a child is covered by more than one plan is:

(a) The primary plan is the plan of the parent whose birthday is earlier in the year if:

- The parents are married;
- The parents are not separated (whether or not they ever have been married); or
- A court decree awards joint custody without specifying that one party has the responsibility to provide health care coverage.

If both parents have the same birthday, the plan that covered either of the parents longer is primary.

(b) If the specific terms of the court decree state that one of the parents is responsible for the child's health care expenses or health care coverage and the plan of that parent has actual knowledge of those terms, that plan is primary. This rule applies to claim determination periods or plan years commencing after the plan is given notice of the court decree.

(c) If the parents are not married, or are separated (whether or not they ever have been married) or are divorced, the order of benefits is:

- The plan of the custodial parent
- The plan of the spouse of the custodial parent;
- The plan of the non-custodial parent; and then
- The plan of the spouse of the non-custodial parent.

(3) Active or inactive employee. The plan that covers a person as an employee who is neither laid off nor retired, is primary. The same would hold true if a person is a dependent of a person covered as a retiree and an employee. If the other plan does not have this rule, and if, as a result, the plans do not agree on the order of benefits, this rule is ignored. Coverage provided an individual as a retired worker and as a dependent of an actively working spouse will be determined under the rule labeled B(1).

(4) Continuation coverage. If a person whose coverage is provided under a right of continuation provided by federal or state law also is covered under another plan, the plan covering the person as an employee, member, subscriber or retiree (or as that person's dependent) is primary, and the continuation coverage is secondary. If the other plan does not have this rule, and if, as a result, the plans do not agree on the order of benefits, this rule is ignored.

(5) Longer or shorter length of coverage. The plan that covered the person as an employee, member, subscriber or retiree longer is primary.

(6) If the preceding rules do not determine the primary plan, the allowable expenses shall be shared equally between the plans meeting the following definition of plan, for purposes of order of benefits determination. In addition, this plan will not pay more than it would have paid had it been primary.

(a) A "plan" is any of the following that provides benefits or services for medical or dental care or treatment. However, if separate contracts are used to provide coordinated coverage for members of a group, the separate contracts are considered parts of the same plan and there is no COB among those separate contracts.

(*i*) "Plan" includes: group insurance, closed panel or other forms of group or group-type coverage (whether insured or uninsured); hospital indemnity benefits in excess of $200 per day; medical care components of group long-term care contracts, such as skilled nursing care; medical benefits under group or individual automobile contracts; and Medicare or other governmental benefits, as permitted by law.

(*ii*) "Plan" does not include: individual or family insurance; closed panel or other individual coverage (except for group-type coverage); amounts of hospital indemnity insurance of $200 or less per day; school accident type coverage, benefits for non-medical components of group long-term care policies; Medicare supplement policies, Medicaid policies and coverage under other governmental plans, unless permitted by law.

Each contract for coverage under (*i*) or (*ii*) is a separate plan. If a plan has two parts and COB rules apply only to one of the two, each of the parts is treated as a separate plan.

United States
**Office of**
**Personnel Management**
Washington, D.C. 20415

In Reply Refer To: Your Reference:

Susan Furgerson, CPA
Vice President, Finance
BlueLincs HMO Health Plan
1400 South Boston
PO Box 21128
Tulsa, Oklahoma 74121-1128

APR 21 2000

Dear Ms. Furgerson:

Enclosed are three copies of Final Audit Report No. N5-00-98-045 dated April 12, 2000, on the operations of BlueLincs HMO Health Plan of Tulsa, Oklahoma under the Federal Employees Health Benefits Program (FEHBP). The audit was conducted by the Office of Personnel Management's (OPM) Office of the Inspector General, and covers contract years 1993 through 1998.

The audit questions $3,036,246, consisting of $2,204,292 for inappropriate health benefits charges and $831,954 for lost investment income. We note that you submitted a check to us on September 29, 1999, for partial payment of the 1994 audit finding and full payment of the 1995 audit finding exclusive of lost investment income charges, for $704,728. The net amount you currently owe for inappropriate health benefits charges is $1,499,564 ($2,204,292-$704,728), and $831,954 for lost investment income.

We encourage you to submit any additional documentation in support of your position on the outstanding audit issues for contract years 1993 through 1995. Please provide the information to us within 30 days from the date of this letter, via express mail to the following address:

Office of Personnel Management
Office of Insurance Programs
ATTN: Mary F. Saunders
1900 E Street, NW, Room 3422
Washington, D.C. 20415

Should you or members of your staff have questions concerning the audit issues, please contact Mary Saunders at (202) 606-0745

Sincerely,

Frank D. Titus
Assistant Director
for Insurance Programs

Enclosures

cc: David Lewis, Chief
Insurance Contracts Division III

Daniel B. Abrahams, Legal Counsel
for BlueLincs HMO Health Plan

bcc: Office of the Inspector General

Office of the Actuaries

UNITED STATES
OFFICE OF PERSONNEL MANAGEMENT
WASHINGTON, DC 20415-1100

OFFICE OF
THE INSPECTOR GENERAL

# EXECUTIVE SUMMARY

## AUDIT REPORT

Federal Employees' Health Benefits Program
Comprehensive Medical Plan-Community Rated
Bluelincs HMO Health Plan
Tulsa, Oklahoma
Contract Number CS 2074 Plan N5

Report No. N5-00-98-045 Date April 12, 2000

The Office of the Inspector General performed an audit of the Federal Employees' Health Benefits Program (FEHBP) operations at Bluelincs HMO Health Plan (Plan), for contract years 1993 through 1998. As a result of the audit, we are questioning $3,036,246, consisting of $2,204,292 for inappropriate health benefits charges to the FEHBP in 1993 through 1995, and $831,954 for lost investment income on the findings related to defective pricing. The Plan's rating of the FEHBP was in accordance with applicable laws and regulations for 1996 through 1998.

The Certificates of Accurate Pricing the Plan signed in 1993 through 1995 were defective, requiring a price reduction to the FEHBP in accordance with federal regulations. In each year, the Plan charged rates to the FEHBP that exceeded the market price. The market price rate was determined by the rate advantages provided to the similarly sized subscriber groups (SSSGs) in 1993 and 1994. Also, the Plan did not correctly calculate the FEHBP's age/sex factors in 1994 and 1995, resulting in overcharges to the FEHBP in those years. Therefore, we reduced the FEHBP's rates by the best market price adjustment afforded an SSSG in 1993 and 1994. We also revised the FEHBP's rates in 1994 and 1995, using the appropriate age/sex factors, to derive the appropriate audited rates. The revised rates were compared to the reconciled rates to determine the overcharges in 1993 through 1995.



OIG-01
May 1999

Overall, we determined that the FEHBP was overcharged $2,204,292; $1,348,239 in 1993, $590,038 in 1994, and $266,015 in 1995. The Plan returned $704,728 to the FEHBP on September 29, 1999.

Consistent with the contract, the FEHBP is also due $831,954 for lost investment income calculated through December 31, 1999, on the defective pricing findings in 1993 through 1995. Additional lost investment income on the amounts due should be assessed for the period beginning January 1, 2000, until the funds have been returned to the FEHBP.

In its comments to the draft report, the Plan stated that it did not contest the re-development of the FEHBP's age/sex factors in 1994 and 1995. However, the Plan did not agree with the auditor's re-selection of the SSSGs in 1993 and felt that any discount applied to the FEHBP's rates, in 1993 and 1994, should be based on an average of the SSSG discounts, not the largest discount.. Further, the Plan felt that, due to errors in the calculation, the additional 1994 discount should be 3.1 percent. Finally, the Plan stated that the FEHBP's 1995 autologous bone morrow transplant loading was based on an inappropriate cost.

As stated above, the Plan submitted a check in the amount of $704,728 to OPM on September 29, 1999. This was for payment of the 1994 and 1995 findings, as presented in the draft report. The lost investment income schedule was adjusted to reflect the return of $704,728 to the FEHBP.

UNITED STATES
OFFICE OF PERSONNEL MANAGEMENT
WASHINGTON, DC 20415-1100

OFFICE OF
THE INSPECTOR GENERAL

# AUDIT REPORT

Federal Employees' Health Benefits Program
Comprehensive Medical Plan-Community Rated
Bluelincs HMO Health Plan
Tulsa, Oklahoma
Contract Number CS 2074 Plan N5

Report No. N5-00-98-045 Date April 12, 2000

Harvey D. Thorp
Assistant Inspector General
for Audits



OIG-01
May 1999

# CONTENTS

| | | Page |
|---|---|---|
| | EXECUTIVE SUMMARY | i |
| I. | INTRODUCTION AND BACKGROUND | 1 |
| II. | OBJECTIVES, SCOPE, AND METHODOLOGY | 2 |
| III. | AUDIT FINDINGS AND RECOMMENDATIONS | 3 |
| | A. Premium Rates | 3 |
| | 1. Defective Pricing | 3 |
| | 2. Lost Investment Income | 11 |
| IV. | REPORT ON COMPLIANCE | 13 |
| V. | REPORT ON INTERNAL CONTROLS | 14 |
| VI. | MAJOR CONTRIBUTORS TO THIS REPORT | 16 |
| | Exhibit A (Summary of Questioned Costs) | |
| | Exhibit B (Defective Pricing Questioned Amount) | |
| | Exhibit C (Lost Investment Income) | |
| | Appendix (Bluelincs' reply dated September 9, 1999, to the draft audit report) | |

# I. INTRODUCTION AND BACKGROUND

## Introduction

We completed an audit of the Federal Employees' Health Benefits Program (FEHBP) operations at Bluelincs HMO Health Plan (Plan), in Tulsa, Oklahoma. The audit covered contract years 1993 through 1998. The audit was conducted pursuant to the provisions of Contract CS 2074; 5 U.S.C. chapter 89; and 5 Code of Federal Regulations (CFR) Chapter 1, Part 890. The audit was performed by the Office of Personnel Management's (OPM) Office of the Inspector General (OIG), as established by the Inspector General Act of 1978, as amended.

## Background

The FEHBP was established by the Federal Employees' Health Benefits Act (Public Law 86-382), enacted on September 28, 1959. The FEHBP was created to provide health insurance benefits for federal employees, annuitants, and dependents. The FEHBP is administered by OPM's Retirement and Insurance Service. The provisions of the Federal Employees' Health Benefits Act are implemented by OPM through regulations which are codified in Chapter 1, Part 890 of Title 5, CFR. Health insurance coverage is provided through contracts with various health insurance carriers that provide either service benefits, indemnity benefits, or comprehensive medical services.

The Plan entered the FEHBP in 1986 as a federally qualified community-rated carrier. Primary health care services are provided to Plan members in Oklahoma City, Tulsa, Lawton, and other southwest Oklahoma areas.

The Plan reported the following federal enrollment statistics for March 31 of each year:

| | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|---|---|
| Contracts | 2,916 | 2,443 | 2,432 | 2,215 | 2,254 | * |
| Members | 7,601 | 5,829 | 5,729 | 4,601 | 4,966 | * |

* Table 1 data for this year was not provided by the Plan.

This was the first audit of the Plan. The audit results were discussed with Plan officials at an exit conference and were provided to Plan officials in a draft audit report. The Plan's comments in reply to the draft report were considered in the preparation of the final report and are included, as appropriate, as the Appendix.

# II. OBJECTIVES, SCOPE, AND METHODOLOGY

## Objectives

The primary objectives of the audit were to verify that the Plan offered market price rates to the FEHBP and that the loadings to the FEHBP rates were reasonable and equitable. Additional tests were performed to determine if the Plan was in compliance with the provisions of the laws and regulations governing the FEHBP.

## Scope

This financial related audit covered contract years 1993 through 1998. The FEHBP paid premiums to the Plan of approximately $12,100,000; $10,200,000; $9,300,000; $8,500,000; $7,800,000; and $8,800,000 for the years 1993 through 1998, respectively.

We obtained an understanding of the Plan's internal control structure, but did not use this information to determine the nature, timing, and extent of our review procedures. However, the audit included such tests of the Plan's rating systems and such other auditing procedures as we considered necessary under the circumstances.

In conducting the audit, we relied to varying degrees on computer generated billings, enrollment, and claims data provided by the Plan. We did not verify the reliability of the data generated by the various systems involved. However, we believe that the data available was sufficient to achieve our audit objectives. Except as noted above, the audit was performed in accordance with generally accepted government auditing standards.

The audit field work was performed at Bluelincs HMO Health Plan's offices in Tulsa, Oklahoma, during September 1998. Additional audit work was completed at our office in Washington, D.C.

## Methodology

We examined the Plan's federal rate submissions and related documents as a basis for validating the market price rates. Actual rate development documentation and billings to other groups were examined to determine the market price rates. Finally, we used the contract, the Federal Employees Health Benefits Acquisition Regulations (FEHBAR), and OPM's Rate Instructions to Community Rated Carriers to determine the propriety of the FEHBP premiums and the reasonableness and acceptability of the Plan's rating systems.

To gain an understanding of the internal controls in the Plan's rating systems, we reviewed Plan rating policies and procedures, and interviewed Plan officials regarding the systems' controls.

# III. AUDIT FINDINGS AND RECOMMENDATIONS

## A. Premium Rates

### 1. Defective Pricing $2,204,292

The Certificates of Accurate Pricing the Plan signed in 1993 through 1995 were defective, requiring a price reduction to the FEHBP in accordance with federal regulations. Application of defective pricing (DP) remedies for the years in question show that the FEHBP is entitled to premium adjustments totaling $2,204,292 (See Exhibit B). The Plan's rating of the FEHBP was in accordance with applicable laws and regulations in 1996 through 1998.

Carriers proposing rates to OPM are required to submit a Certificate of Accurate Pricing which certifies that proposed subscription rates, subject to adjustments recognized by OPM, are market price rates. As described in greater detail below, OPM regulations refer to a market price rate in conjunction with the rates offered to a similarly sized subscriber group (SSSG). If it is found that the FEHBP was charged higher than the market price rate (i.e., the best rate offered to an SSSG), a condition of DP exists, requiring a downward adjustment of the FEHBP premiums to the equivalent market price rate.

For all years reviewed, the Plan applied a community rating-by-class (CRC) methodology to rate its groups. A base community rate is initially developed for each benefit plan and any standard loadings. These rates are then multiplied by a group's age/sex factors. The factors are comprised of age factors, which were consistent for each tier group (2-tier, 3-tier, etc.). These factors were multiplied by a group's enrollment mix to arrive at the group's age/sex factors. Because each tier group has its own set of age factors, the resulting age/sex factor acts as both an age/sex factor and a step-up factor in determining a group's rates. If significant fluctuations are evident in the resulting tier rates when compared to the prior year's rates, the rates were redistributed to make them more consistent. A revenue check is performed on the redistributed rates. The resulting rates, after redistribution, were the rates quoted to the group. In some instances, these rates were artificially lowered due to competition or market pressures. In these situations, the best rate advantage granted an SSSG is applied to the FEHBP's rates.

1993

The Plan selected York International and the City of Edmond as the SSSGs in the 1993 reconciliation. We disagree with the Plan's selections. We chose the State of Oklahoma and Seagate Technology as the SSSGs for 1993 because these groups were closer in size to the FEHBP than the Plan's selected groups. Our review of the market price rates charged to the SSSGs showed that Seagate Technology received a rate advantage.

Using the rating documentation provided by the Plan and the community rate filings, we developed audited rates for Seagate Technology. We then compared the audited rates to the group billings and discovered that Seagate Technology had received an 11.25 percent rate advantage. As stated above, the FEHBP should be rated in a manner consistent with the SSSGs. Accordingly, we applied the 11.25 percent advantage to the FEHBP's rates and determined that the FEHBP is due $1,348,239 for 1993 (See Exhibit B).

**Plan's Response (See Appendix):**

"The auditors have challenged BlueLinc's designation of York International and the City of Edmond as its similarly-sized subscriber groups ('SSSGs') for 1993. Instead, the auditors chose the State of Oklahoma and Seagate Technology, groups closer in size to the FEHB plan, and claim that OPM is due $1,348,239 for an 11.25 percent discount Seagate allegedly received. OPM selected these plans because 'these groups were closer in size to the FEHBP than the Plan's selected groups.'

"BlueLincs maintains that, under the regulations existing at the time in question, it selected the appropriate SSSGs. OPM's interpretation of those regulations to require selection based solely on group size essentially ignores another equally important requirement of the test: that the SSSGs must be groups receiving substantially similar benefits. Moreover, even if selection were made solely on the basis of size without any consideration of the similarity of benefits, Seagate is not one of the SSSGs. Finally, any discount must be based on the average of any discounts given to the two appropriate SSSGs.

**"A. Seagate is not a similarly-sized subscriber group because it does not have the same benefit package as the FEHBP.**

"Seagate cannot serve as the SSSG because the basic benefit package under its plan was significantly different than that of the FEHBP plan. The FEHBAR

regulations in effect at the time of rate development and reconciliation established three conditions for identification of a carrier's SSSGs. The regulations defined SSSGs as those two groups which 'best meet' all three of the following conditions:

> "a) Have total number of contracts at the time of the rate proposal closest in size to the previous September's FEHB subscriber enrollment, as determined by OPM;
>
> "b) Purchase substantially the same basic benefit package proposed for the Federal group;
>
> "c) Are renewed during the plan's fiscal year.

"FEHBAR 1602.170-11, reprinted at 55 Fed. Reg. 27406, 27414 (July 2, 1990).

"In accordance with a literal reading of the regulations, only similarly sized plans with substantially similar benefits could be selected as SSSGs. Any other interpretation of the regulations that excludes the 'same basic benefit' test would be inconsistent with the rules of interpretation.

"B. **Seagate is not an SSSG because it is not closest in size to the FEHBP.**

"Even if OPM's practice of selecting SSSGs based completely on size could be justified under the regulations, Seagate is not one of the two groups closest in size to the FEHBP. BlueLincs submits that, under OPM's own methodology, the second SSSG should be Southwestern Bell/Mobile. In 1993, Southwestern Bell had 451 subscribers and Southwestern Bell Mobile had 41, for a total subscriber count of 492. Seagate, in comparison, had only 466. This makes the combined Southwestern Bell entity the putative SSSG under OPM's own theory.

"We assume that OPM treated these two entities as two separate plans for purposes of the size comparison. But BlueLincs submits that their membership should be combined for this determination. Southwestern Bell and Southwestern Bell Mobile are two related divisions of the same parent company. Southwestern Bell, a subsidiary of SBC Communications, Inc., has a unit now known as Southwestern Bell Wireless, which was known in

the past as Southwestern Bell Mobile. See Exhibit D, Excerpts from Southwestern Bell's Web Page and associated hyperlinks. While the plans were rated separately by BlueLincs in 1993, BlueLincs has since combined them into one plan. Simply put, Southwestern Bell and Southwestern Bell Mobile were a single employer under common ownership and control for the purpose of determining subscriber counts and the applicable SSSG.

"As a result, BlueLincs has calculated a rate for the combined group based on a weighted average of the plans' rates. That rate indicates that Southwestern Bell/Mobile received a discount of .58 percent, which would represent a total overcharge to OPM of $69,796.22. Exhibit E, Calculations of Southwestern Bell/Mobile Discount. To the extent that BlueLincs originally picked the wrong SSSGs (which BlueLincs submits is not the case), any adjustment to BlueLincs' contract should be based on the Southwestern Bell/Mobile discount rather than the discount received by Seagate.

**"C. Any contract adjustment for the years 1993 through 1995 should be based on an average of any discounts given to the two SSSGs.**

"BlueLincs submits that during the contract years in question, 1993 through 1995, OPM's remedy is limited to averaging the rate adjustments of the two SSSGs rather than benefitting from the lowest rate given to either of the SSSGs. BlueLincs submits that the plain regulatory language in effect from 1991 through 1997 establishes 'averaging' of the SSSG rates as the appropriate remedy. The FEHBP provisions in existence during those years did not require payment of the lower of the two SSSG rates. Indeed, OPM only amended the FEHBAR on September 10, 1997 to issue binding regulations that required plans for the first time to use 'the lower of the two rates' rather than average rates. See FEHBAR § 1602.170-13(d) reprinted at 62 Fed. Reg. 47574 (Sept. 10, 1997). BlueLincs takes the position that the regulations only required an average rate remedy until the 1997 regulation clarified the rules."

OIG's Response:

We do not agree with the Plan's contention that Seagate had significantly different benefits than the FEHBP and therefore, should not be an SSSG. Upon reviewing Exhibit C to the Plan's response (1993 Benefit Matrix), we note that

the groups listed in the matrix have basically the same benefits, but different copayments. Different copayments affect the out-of-pocket costs for each subscriber, but, do not affect the level of benefits a subscriber is entitled to receive. Therefore, we do not accept the Plan's argument that Seagate's different copayment levels equals different benefits.

We also do not agree that Southwestern Bell should be an SSSG. The data we received from the Plan during the audit indicated that Southwestern Bell and Southwestern Bell/Mobile were two separate groups in 1993. During the audit, the Plan was asked why Southwestern Bell/Mobile was not included in the Southwestern Bell group calculation. The Plan responded that, in 1993, Southwestern Bell/Mobile was a separate group with separately negotiated rates. Since Southwestern Bell and Southwestern Bell/Mobile have separately negotiated contracts and rates, the groups should be considered as two separate groups for SSSG selection purposes.

The Plan further believes that any discount given to the FEHBP should be based on the average of discounts given to the SSSGs. We do not agree with the Plan. In our opinion, OPM has always intended for the FEHBP to receive a rate equivalent to the best rate granted to other subscriber groups. Beginning with the SSSG remedy, the pool of other subscriber groups reviewed was limited to two. However, the regulations do not state that an average of the two groups is to be applied to the FEBHP's rates. We continue to believe that the FEHBP should receive the largest rate advantage granted to either SSSG. Accordingly, we applied the 11.25 percent discount grated to Seagate to the FEHBP's rates and determined that the FEHBP is due $1,348,239.

<u>1994</u>

In its 1994 reconciliation, the Plan selected the State of Oklahoma and General Motors (GM) as the SSSGs. We agree with the Plan's selections. However, our review of the market price rates charged to the SSSGs showed that General Motors and the State of Oklahoma received rate advantages. In addition, we found that the FEHBP was overcharged in 1994.

Using the rating documentation provided by the Plan and the community rate filings, we developed audited rates for the SSSGs. We then compared the audited rates to the group billings and found that General Motors and the State of Oklahoma received rate advantages of 7.3 percent and 5.51 percent, respectively. However, since the FEHBP only received a 3.3 percent rate adjustment in the 1994

reconciliation, an additional reduction to the FEHBP rates was required. Therefore, we reduced the largest discount of 7.3 percent by the 3.3 percent discount granted the FEHBP and applied a net 4 percent discount to the FEHBP's audited rates in determining questioned costs.

We also found that the Plan overcharged the FEHBP in 1994. In determining the FEHBP's age/sex factors, the Plan inadvertently included enrollees over age 65 in the enrollment totals. Enrollees in this tier were excluded in the age/sex calculation for the SSSGs. Therefore, we revised the age/sex factors by excluding over age 65 enrollees. The revised factors were then applied to the base community capitations to arrive at the audited rates for the FEHBP. When we applied the net 4 percent discount discussed above to the FEHBP's audited rates, we found that the FEHBP was overcharged $590,038[1] for 1994 (See Exhibit B).

Plan's Response

"The auditors have questioned $438,713[2] based on discounts granted to the SSSGs and an overcharge to the FEHBP based on an erroneous age/sex factor. BlueLincs does not contest the latter finding. However, any price adjustment based on discounts afforded to SSSGs should be based on the average rate remedy discussed above.

"Preliminarily, it appears that the auditors erred in calculating the price adjustment due for 1994. In calculating BlueLincs' rates, the auditors used the 1995 United Autoworkers benefit factor rather than the 1994 benefit factor of 1.035. This error benefited BlueLincs. However, the auditors also erred in calculating the discount because they based it on the FEHBP's Oklahoma City rates but used the demographics of the Oklahoma City plus Tulsa service area for General Motors ('GM'). This is inappropriate. Any adjustment should be based purely on the Oklahoma City rates and demographics rather than 'mixing apples and oranges.' This error benefited OPM. Revising the calculation to reflect these changes (and separating its GM rates and demographics into Oklahoma City and Tulsa components), BlueLincs calculates that the amount due to OPM based on a supplemental GM discount of 3.1

---

[1]In the draft report, as submitted to the Plan for its comment, we questioned $438,713 based on a net discount to GM of 2.6 percent. However, based on additional information provided by the Plan, we determined that the net discount to GM should be 4 percent. Application of this discount to the FEHBP's rates shows that the overcharge should be $590,038.

[2]See footnote 1

percent would be $504,656 rather than the amount calculated by OPM, $438,713.00. Exhibit G, 1994 GM Discount Calculation.

"Averaging the GM net discount of 3.1 percent with the State of Oklahoma discount of 2.21 percent produces a discount of 2.66 percent. Based on the average rate remedy, BlueLincs would owe OPM $445,292.64 for 1994."

OIG's Response

We acknowledge that the Plan agrees that the FEHBP's age/sex factor was overstated in 1994. Further, we note that on September 29, 1999, the Plan returned $438,713 to the FEHBP. This was for the original questioned amount identified in the draft audit report.

Also, we agree with the Plan that the United Autoworkers benefit factor applied to GM's rates in 1994 should have been 1.035, not 1.016. However, we do not agree with the Plan's statement that GM's Tulsa demographics should be removed from the calculation of GM's rates. The Plan's rate development shows that, for both the Hourly and Salaried employees, Oklahoma City and Tulsa demographics were combined to determine GM's rates for 1994. We acknowledge that GM is an SSSG for the FEHBP's Oklahoma City enrollment code; however, since GM's rates were developed based on total Oklahoma City and Tulsa demographics, it is inappropriate to separate the two regions at this time. Based on our analysis, we determined that GM's net discount was 4 percent. Application of the 4 percent discount to the FEHBP's audited 1994 rates shows an overcharge of $590,038. The body of the finding was adjusted to reflect this change.

Further, we do not agree with the Plan's belief that an average of the SSSGs' discounts should be used to determine questioned costs. As previously stated, the FEHBP should receive a rate equivalent to the best rate, not an average of the SSSGs' rates. Therefore, for 1994, the discount to the FEHBP should have been 7.3 percent instead of the 3.3 percent applied in the reconciliation. Thus, an adjustment of 4 percent is necessary for the FEHBP to receive the best rate.

1995

The Plan selected the State of Oklahoma and General Motors as the SSSGs in the 1995 reconciliation. We agreed with the Plan's selections. Our review of the market price rates charged to the SSSGs showed that both SSSGs were billed appropriate rates. However, our review of the

FEHBP's rate development revealed that the FEHBP was overcharged $266,015 due to an error in calculating the FEHBP's age/sex factors.

In determining age/sex factors for all groups, the Plan used age factors which are applied to each group's enrollment. Each rating tier (2-tier groups, 3-tier groups, etc.) has its own set of age factors. During 1994, the Plan's actuaries adjusted the age factors for all tier groups. This adjustment occurred after the 1995 proposal had been submitted, but before the FEHBP's January 1, 1995 renewal date. Because the Plan's internal policy states that no rate quotes are revised once released to the group, the FEHBP's age/sex factors did not reflect the updated age factors. This was also the case for any group that submitted a rate quote at the same time as the FEHBP.

While the Plan followed its internal policy and did not adjust groups' rates for the new factors, the policy violated requirements in the 1995 rate instructions. The instructions stipulate, "...if you used plan-wide enrollment-mix or other demographic assumptions, and you revised these assumptions after you submitted the proposal (and before January 1, 1995) <u>and</u> you used the revisions for your SSSGs, you should base the reconciliation on the revised assumptions." Since the age factors are the same for each tier group, the factors would be considered plan-wide factors.

The Plan used the updated factors in the development of General Motor's rates (a January 1995 renewing SSSG). Therefore, the FEHBP's rates should have been revised to reflect the use of the updated factors. Consequently, we redeveloped the FEHBP's rates, using the updated age factors to determine the FEHBP's age/sex factors, and found that the FEHBP was overcharged $266,015 for 1995 (See Exhibit B).

<u>Plan's Response</u>

"The auditors have questioned a total of $266,015 based on the use of an outdated age factor. BlueLincs does not contest this finding. However, BlueLincs has discovered an apparent error in OPM's rate calculation for 1995. The auditors used a base rate of $.38 (the cost to BlueLincs) rather than a base rate of $.76 (the actual premium) for the autologous bone marrow transplant coverage. See Exhibit H, Tillinghast Memorandum. Correcting this error, which benefited BlueLincs, produces an increase in the price adjustment of $24,076, such that BlueLincs would owe OPM $290,091 for 1995."

OIG's Response

We acknowledge that the Plan agrees with the finding in 1995 and note that on September 29, 1999, $266,015 was returned to the FEHBP. However, we do not agree that the wrong base rate was used in calculating the ABMT loading. The proposed reconciliation submitted by the Plan in 1995 contained an ABMT loading of $.47 single and $1.18 family. This was based on the $.76 base rate identified by the Plan. However, the loading was subsequently revised to $.24 single and $.59 family, based on a $.38 base rate. This reduction in the ABMT loading was based on an agreement between OPM and the Plan. Therefore, it is inappropriate to attempt to increase the ABMT loading at this time. Accordingly, we did not adjust the questioned costs in 1995.

**Recommendation 1**

We recommend that the contracting officer require the Plan to return a net amount of $1,499,564 ($2,204,292 - $704,728) to the FEHBP for defective pricing in contract years 1993 through 1995.

2. **Lost Investment Income** **$831,954**

In accordance with the FEHBP contract, the FEHBP is entitled to a recovery of lost investment income on the DP findings for years 1993 through 1995. We determined that the FEHBP is due $831,954 for lost investment income covering the years 1993 through 1999 (See Exhibit C). In addition, the FEHBP is entitled to lost investment income for the period beginning January 1, 2000, until the funds have been returned to the FEHBP.

Section 5.9 (e) of the contract states, "If any reduction in the contract price under this clause reduces the price of items for which payment was made prior to the date of the modification reflecting the price reduction, the Contractor shall be liable to and shall pay the United States at the time such overpayment is repaid--

> (1) Simple interest on the amount of such over-payment to be computed from the date(s) of overpayment to the Contractor to the date the Government is repaid by the Contractor ...."

We calculated the lost investment income based on the United States Department of Treasury's semiannual cost of capital rates.

Plan's Response

The Plan does not believe that the FEHBP is entitled to recover interest and is waiting the final decision of the Court of Appeals for the federal Circuit, pertaining to PCA Health Plans of Texas, Inc., v. OPM, ASBCA No. 48711, 198 WL 399,678 (June 4, 1998).

OIG's Response

We continue to believe that lost investment income is should be paid to the FEHBP in accordance with the contract. We acknowledge the return of $704,728 to the FEHBP by the Plan and have adjusted the lost investment income calculation accordingly.

**Recommendation 2**

We recommend that the contracting officer require the Plan to return $831,954 to the FEHBP for lost investment income for the period 1993 through 1999. In addition, we recommend that the contracting officer assess the Plan lost investment income on amounts due for the period beginning January 1, 2000, until the funds have been returned to the FEHBP.

# IV. REPORT ON COMPLIANCE

We audited the FEHBP operations at Bluelincs HMO Health Plan (Plan) in Tulsa, Oklahoma, for contract years 1993 through 1998. We conducted the audit in accordance with generally accepted government auditing standards, issued by the Comptroller General of the United States.

Community-rated carriers participating in the FEHBP are subject to various federal, state and local laws, regulations, and ordinances. While most carriers are subject to state jurisdiction, many are further subject to the Health Maintenance Organization Act of 1973 (Public Law 93-222), as amended (i.e., many community-rated carriers are federally qualified). In addition, participation in the FEHBP also subjects the carriers to the Federal Employees' Health Benefits Act and implementing regulations promulgated by the Office of Personnel Management.

The FEHBP should pay a market price rate, which is defined as the best rate offered to either of the two groups closest in size to the FEHBP. In contracting with community-rated carriers, OPM relies on carrier compliance with appropriate laws and regulations and, consequently, does not negotiate base rates. OPM negotiations relate primarily to the level of coverage and other unique features of the FEHBP. The carrier's management is responsible for establishing an internal control structure to assure compliance with all applicable laws and regulations.

OIG audits of community-rated carriers contracting with OPM are designed to test compliance with applicable laws and regulations and to provide reasonable assurance of detecting errors, irregularities, and illegal acts. Accordingly, we performed tests to determine if the Plan had complied with those provisions, which if not followed, could have a material impact on the FEHBP premiums as charged by the Plan for the years audited. However, our audit does not guarantee discovery of all illegal acts or improper charges resulting from instances of noncompliance.

Our audit of the FEHBP operations of the Plan showed that, for the areas tested, the Plan did not comply with applicable laws and regulations in 1993, 1994, and 1995. The areas of non-compliance are described in the "Audit Findings and Recommendations" section of this report. We recommend that the Plan return $3,036,246, including lost investment income, to the FEHBP for inappropriate charges during this period.

In regard to contract years 1996, 1997, and 1998, we found that the Plan was in substantial compliance with the applicable laws and regulations.

## V. REPORT ON INTERNAL CONTROLS

We audited the FEHBP operations at Bluelincs HMO Health Plan (Plan) in Tulsa, Oklahoma, for contract years 1993 through 1998. The audit was performed in accordance with generally accepted government auditing standards, issued by the Comptroller General of the United States.

Our review of internal controls was limited to the procedures the Plan has in place to ensure that:

- The appropriate similarly sized subscriber groups (SSSGs) are selected;
- the rates charged the FEHBP are the market price rates (i.e., equivalent to the best rate offered to SSSGs); and
- loadings to the FEHBP rates are reasonable and equitable.

To gain an understanding of the relevant controls, we reviewed the Plan's rating system documentation (i.e., policies and procedures), interviewed appropriate Plan officials, and performed other auditing procedures necessary to meet our audit objectives.

Plan management is responsible for establishing and maintaining a system of internal controls and procedures which ensure compliance with applicable statutory and regulatory requirements. In fulfilling this responsibility, estimates and judgement by management are required to assess the expected benefits and related costs of the internal control structure. Because of inherent limitations in any system of internal controls, errors or irregularities may nevertheless occur and not be detected. Also, projections of any evaluation of the system to future periods is subject to the risk that procedures may become inadequate because of changes in conditions or that the degree of compliance with the procedures may deteriorate.

The audit, made for the limited purpose described above, would not necessarily disclose all reportable conditions in the system. Accordingly, we do not express an opinion on the system of internal controls of the Plan, taken as a whole. However, our review noted certain matters involving the internal controls identified above that we consider to be reportable conditions. Reportable conditions involve matters coming to our attention relating to significant deficiencies in the design or operation of the internal control structure that, in our judgement, could adversely affect the Plan's ability to record, process, summarize, and report premium rates to OPM. Our audit showed that the internal controls over the Plan's rate setting process were not sufficient to assure that the appropriate SSSGs were

selected, or that the FEHBP was charged market price rates in 1993 through 1995. The resulting deficiencies which had a detrimental impact upon the FEHBP are described in detail in the "Audit Findings and Recommendations" section of this report.

The internal controls over the Plan's rate setting process were sufficient to assure that the FEHBP was charged market price rates for contract years 1996, 1997, and 1998.