# VI. MAJOR CONTRIBUTORS TO THIS REPORT

**Community Rated Audits Division**

Stephanie M. Shafer, Auditor-in-Charge
Corey G. Hill, Auditor

Melissa D. Brown, Senior Team Leader

Charles E. Gibbons, Division Chief (202) 606-4720

**Exhibit A**

## BLUELINCS HMO HEALTH PLAN
## SUMMARY OF QUESTIONED COSTS

| | |
|---|---|
| 1993 Defective Pricing | $1,348,239 |
| 1994 Defective Pricing | 590,038 |
| 1995 Defective Pricing | 266,015 |
| Total Defective Pricing | $2,204,292 |
| | |
| Lost Investment Income (Applied to Defective Pricing Questioned Amount) | $ 831,954 |
| | |
| Total Questioned Cost | $3,036,246 |

Exhibit B
Page 1 of

# BLUELINCS HMO HEALTH PLAN
# DEFECTIVE PRICING QUESTIONED AMOUNT

| | SINGLE | FAMILY |
|---|---|---|
| 1993 | | |
| FEBHP Line 3 Audited Rate | $80.45 | $200.98 |
| Market Price Adjustment | | |
| (given to Seagate Technology) | 11.25% | 11.25% |
| FEHBP Market Price Adjustment | ($9.05) | ($ 22.61) |
| Adjusted Line 3 Audited Rate | $71.40 | $178.37 |
| FEHBP Line 3 Reconciled Rate | 80.46 | 200.98 |
| Overcharge | $ 9.06 | $ 22.61 |
| 3/31/93 OPM Headcount | X 947 | 1,914 |
| Pay Periods | 26 | 26 |
| | $223,075 | $1,125,164 |

**1993 DP ADJUSTMENT** **$1,348,239**

| | SINGLE | FAMILY |
|---|---|---|
| 1994 | | |
| FEHBP Line 3 Audited Rate | $84.35 | $211.96 |
| Market Price Adjustment | | |
| (given to General Motors) | 4.0% | 4.0% |
| | ($ 3.37) | ($ 8.48) |
| Adjusted Line 3 Audited Rates | $80.98 | $203.48 |
| FEHBP Line 3 Reconciled Rates | $86.96 | $214.16 |
| Overcharge | $ 5.98 | $ 10.68 |
| 3/31/94 OPM Headcount | 1,016 | 1,556 |
| Pay Periods | 26 | 26 |
| | $157,968 | $432,070 |

**1994 DP ADJUSTMENT** **$590,038**

# BLUELINCS HMO HEALTH PLAN
# DEFECTIVE PRICING QUESTIONED AMOUNT

| | SINGLE | FAMILY |
|---|---|---|
| 1995 | | |
| FEHBP Line 3 Reconciled Rate | $80.25 | $199.43 |
| FEHBP Line 3 Audited Rate | 73.76 | 196.81 |
| Overcharge | $ 6.49 | $ 2.62 |
| 3/31/95 OPM Headcount | 956 | 1,537 |
| Pay Periods | 26 | 26 |
| | $161,315 | $ 104,700 |

**1995 DP ADJUSTMENT** **$266,015**

**Total Defective Pricing Questioned Costs** **$2,204,292**

Exhibit C

## BLUELINCS HMO HEALTH PLAN
## LOST INVESTMENT INCOME
## QUESTIONED AMOUNTS

| Year<br>Audit Findings: | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | Total |
|---|---|---|---|---|---|---|---|---|
| 1. Defective Pricing | $1,348,239 | $590,038 | $266,015 | $0 | $0 | $0 | $0 | $2,204,292 |
| Totals (per year): | $1,348,239 | $590,038 | $266,015 | $0 | $0 | $0 | $0 | $2,204,292 |
| Cumulative Totals: | $1,348,239 | $1,938,277 | $2,204,292 | $2,204,292 | $2,204,292 | $2,204,292 | $2,204,292 | $2,204,292 |
| Avg. Interest Rate (per year): | 6.063% | 6.250% | 7.250% | 6.438% | 6.563% | 6.125% | 5.750% | |
| Interest on Prior Years Findings: | $0 | $84,265 | $140,525 | $141,912 | $144,668 | $135,013 | $126,747 | $773,130 |
| Current Years Interest: | $40,872 | $18,439 | $9,643 | $0 | $0 | $0 | $0 | $68,954 |
| Total Cumulative Interest: | $40,872 | $102,704 | $150,168 | $141,912 | $144,668 | $135,013 | $126,747 | **$842,084** |
| Credit for return of $704,728 to OPM on September 29, 1999 | | | | | | | | -$10,130 |
| Total Lost Investment Income | | | | | | | | **$831,954** |

APPENDIX

EPSTEIN BECKER & GREEN, P.C.
ATTORNEYS AT LAW
1227 25TH STREET, N.W.
WASHINGTON, D.C. 20037-1156'
(202) 861-0900
FAX: (202) 296-2882

DIRECT:
202-861-1854

250 PARK AVENUE
NEW YORK, NEW YORK 10177-0077'
(212) 351-4500

1875 CENTURY PARK EAST
LOS ANGELES, CALIFORNIA 90067-2501
(310) 556-8861

ONE LANDMARK SQUARE
STAMFORD, CONNECTICUT 06901-2601'
(203) 348-3737

ONE RIVERFRONT PLAZA
NEWARK, NEW JERSEY 07102'
(973) 642-1900

75 STATE STREET
BOSTON, MASSACHUSETTS 02109'
(617) 342-4000

TWO EMBARCADERO CENTER
SAN FRANCISCO, CALIFORNIA 94111
(415) 398-3500

12750 MERIT DRIVE
DALLAS, TEXAS 75251-1246'
(972) 490-3143

2400 SOUTH DIXIE HIGHWAY, SUITE 100
MIAMI, FLORIDA 33133-3141
(305) 856-1100

510 KING STREET, SUITE 301
ALEXANDRIA, VIRGINIA 22314-3132'
(703) 684-1204

111 SOUTH CALVERT STREET, SUITE 2700
BALTIMORE, MARYLAND 21202'
(410) 385-5275

'P.C. NEW YORK, WASHINGTON, D.C.
CONNECTICUT, VIRGINIA, NEW JERSEY
MASSACHUSETTS, MARYLAND AND TEXAS ONLY

September 9, 1999

Charles E. Gibbons
Chief, Community Rated Audits Division
Office of the Inspector General
Room 6400
United States Office of Personnel Management
Washington, D.C. 20415-0001

**Re: COMMENTS OF BLUELINCS HMO CONCERNING DRAFT AUDIT REPORT NO. N5-00-98-045**

Dear Mr. Gibbons:

On behalf of BlueCross BlueShield of Oklahoma d.b.a. BlueLincs HMO Health Plan ("BlueLincs"), we submit the following comments to the Office of Personnel Management ("OPM") under the Federal Employees Health Benefits Program ("FEHBP"). A copy of these comments is also provided herein on diskette in Word97 format. The auditors have questioned a total of $2,723,661, which includes $2,052,967 for allegedly defective pricing in the years 1993 through 1995 and $670,694 for lost investment income on the amounts claimed.

**1993**

The auditors have challenged BlueLinc's designation of York International and the City of Edmond as its similarly-sized subscriber groups ("SSSGs") for 1993.[1]

[1] The audit report indicates accurately that BlueLincs serves FEHBP enrollees in Oklahoma City, Tulsa, Lawton and other southwest Oklahoma areas. Draft Audit Report, at p.1. In fact, rates for the Oklahoma City and Tulsa service areas were developed separately until 1995. The rates questioned in this audit report relate to BlueLincs' Oklahoma City rates for 1993 and 1994 and for the combined service area for 1995.

DC:78590.1

Instead, the auditors chose the State of Oklahoma and Seagate Technology, groups closer in size to the FEHB plan, and claim that OPM is due $1,348,239 for an 11.25 percent discount Seagate allegedly received. OPM selected these plans because "these groups were closer in size to the FEHBP than the Plan's selected groups." Draft Audit Report, at p. 4.

BlueLincs maintains that, under the regulations existing at the time in question, it selected the appropriate SSSGs. OPM's interpretation of those regulations to require selection based solely on group size essentially ignores another equally important requirement of the test: that the SSSGs must be groups receiving substantially similar benefits. Moreover, even if selection were made solely on the basis of size without any consideration of the similarity of benefits, Seagate is not one of the SSSGs. Finally, any discount must be based on the average of any discounts given to the two appropriate SSSGs.

**A. Seagate is not a similarly-sized subscriber group because it does not have the same benefit package as the FEHBP.**

Seagate cannot serve as the SSSG because the basic benefit package under its plan was significantly different than that of the FEHBP plan. The FEHBAR regulations in effect at the time of rate development and reconciliation established three conditions for identification of a carrier's SSSGs. The regulations defined SSSGs as those two groups which "best meet" all three of the following conditions:

a) Have total number of contracts at the time of the rate proposal closest in size to the previous September's FEHB subscriber enrollment, as determined by OPM;

b) Purchase substantially the same basic benefit package proposed for the Federal group;

c) Are renewed during the plan's fiscal year.

FEHBAR 1602.170-11, reprinted at 55 Fed. Reg. 27406, 27414 (July 2, 1990).

In accordance with a literal reading of the regulations, only similarly sized plans with substantially similar benefits could be selected as SSSGs. Any other interpretation of the regulations that excludes the "same basic benefit" test would be inconsistent with the rules of interpretation. It is a well-established rule of statutory and regulatory construction that each word of a provision must be given effect to avoid rendering any terms meaningless. See 2A N. Singer, Sutherland on Statutory Construction § 46.06 (Sand rev. 5th ed. 1992). It appears that in 1993 OPM shared BlueLincs' interpretation of the regulation. In Attachment IIIB of the Reconciliation, OPM gave these instructions

DC:78590.1

for designating SSSGs: "The SSSGs should be the two community-rated groups that are closest in size to the Federal group." Exhibit A, Attachment IIIB, Q36. Nonetheless, in subsequent questions, it permitted plans to explain why they selected groups other than those closest in size as their SSSGs. Exhibit A, Attachment IIIB, Q41 and Q42.[2]

Even if the regulation contained an ambiguity, under the rule of <u>contra proferentum</u>, BlueLincs' interpretation prevails. When there are two reasonable conflicting interpretations of a provision, the one that favors the non-drafting party will be adopted. Not only was OPM the drafter of the regulation, it knew or should have known that BlueLincs was relying on the "same basic benefit" test in selecting its SSSGs in 1993. During the rate reconciliation process, BlueLincs manifested to OPM its understanding of the applicability of the "same basic benefit" requirements test to its SSSG selection and its reliance on that distinction. By letter dated July 17, 1992, Lyndle Ellis, BlueLinc's Vice President of Finance, wrote to Ms. Nancy H. Kichak, Director, Office of Actuaries, forwarding rating documentation regarding two other employer groups and stating: "We contend that these groups do not meet the definition of Similar Size [sic] Subscriber Groups (SSSGs) since they have different benefit plans, different capitation rates, and different tier types." Exhibit B. In Attachment IIIB, its Reconciliation Sheet, BlueLincs indicated that five groups other than those it selected as the SSSGs were closer in size to the FEHBP plan. Exhibit A, Attachment IIIB, Q40. (Only one of those, Xerox, was based on BlueLincs' Plan 2 and it was a three-tier plan; the coverage for Seagate is described as "custom plan.") Bluelincs explained that the plans closer in size than the SSSGs had "significantly different benefit plans with different capitation rate." Exhibit A, Attachment IIIB, Q42.

BlueLincs properly designated plans other than Seagate as the SSSGs because Seagate's plan included a significantly different package of benefits than the FEHB plan. Initially, we note that neither the FEHB plan nor the Seagate plan were based on one of BlueLincs' four standard plans. Both included customized features. However, the FEHB plan was based on BlueLincs Plan 2, while Seagate's plan was based on BlueLincs Plan 3.[3] One major difference between both the standard Plans 2 and 3 and the customized versions provided was the copayment for physician services, which was $5 per visit for the FEHB plan and $10 per visit for Seagate. Given that this benefit is the most frequently utilized under any plan, such a difference is substantial. In addition, there were differences in allergy treatment and allergy serum (50% versus $0), physical

---

2 Nor could this instruction, referring only to size, govern over the three-pronged test of the regulation. Even a specific contract provision cannot override a provision required by statute. <u>See</u> <u>Hydracon Corp</u>., ENGBCA 3462, 75-2 BCA ¶ 11,489 at 54,812-12. In this case, it is indisputable that the unilateral reconciliation instructions cannot override a regulation.

3 The differences between copayment and co-insurance rates is the basis on which BlueLincs distinguishes between its plans. For example, Plan 1 coverage provides a higher level of benefits at a lower out-of-pocket cost to its enrollees than coverage based on Plan 4.

DC:78590.1

therapy and speech therapy ($10 versus 20%) and mental health and substance abuse. See Exhibit C, 1993 Benefit Matrix. In light of the number and magnitude of the differences between the two plans, OPM cannot reasonably maintain that the plans include substantially similar benefit packages.

To our knowledge, OPM has never defined what it considered to be "substantially the same basic benefit package" despite carrier requests that it do so. At the time the regulations were promulgated, carriers requested clarification of the "same basic benefit" prong of the definition. In the preamble to the final regulation, OPM noted the confusion the term engendered, as expressed in comments to the proposed regulations:

> Several respondents expressed the following concerns and requests for clarification of the term "substantially the same benefit package." They questioned whether the two groups closest in size to the FEHB group could use different rating methods. *** What happens when no other groups have substantially the same benefits package as the FEHB group . . . .

55 Fed. Reg. 27406, 27408. OPM responded by stating that "OPM will negotiate benefits packages in a manner that should result in a number of groups having substantially the same benefits package." Id. It continued, as follows, after providing a few specific responses to other questions:

> The answers to the above questions, as well as specific data related to prices offered to SSSGs and demographic and utilization characteristics of those groups, are lengthy and OPM needs the flexibility to adapt to changes in the insurance industry from year to year. Consequently, it is not appropriate to publish this information in regulation. Detailed information concerning rating procedures will be provided to the carriers in the rate instruction package for each contract period.

Id.

OPM's Community Rating Guidelines for the 1993 rate year included no guidance regarding the determination of "substantially similar benefit" packages. In fact, it made no mention of this aspect of the SSSG selection. It did, however, contradict the regulations in other aspects. For example, that document indicated that SSSGs would be determined based on enrollment figures for the rate year under consideration rather than the September prior to the rate quote. Community Rating Guidelines, at p. 3.[4]

[4] We submit that, in any case, the Rating Guidelines could not supercede the requirements of the regulations. Nonetheless, on this particular question, the Rating Guidelines were silent and the regulatory requirement is uncontradicted. It appears that the auditors simply chose to ignore it.

OPM subsequently deleted the "same basic benefit" requirement, stating that carriers found it vague. In a Proposed Rule dated June 29, 1993, OPM explained the change:

> Thus, the proposed revision would eliminate the **current requirement** that the SSSGs must purchase substantially the same basic benefits package as proposed for the Federal group. The concept of "substantially the same basic benefits package" confused many plans. As a result, many chose inappropriate SSSGs and did not consider other more appropriate groups because they erroneously believed that the basic benefits package was substantially different. OPM believes that **this problem will be corrected** by defining SSSGs solely in terms of contract size, and by using actuarial analysis to reconcile any benefits differences.

58 Fed. Reg. 34768,34769 (emphasis supplied). The regulations did not become final until March 30, 1994, see 59 Fed. Reg. 14761, 14762 and 14764. Thus, there can be no argument that these revised regulations have any application to 1993, the year in question.

Despite the existence of a binding regulation requiring consideration of the similarity of the benefits package in selecting SSSGs and despite BlueLincs' clear reliance on that rule, the OPM auditors ignore the rule, selecting plans that "were closer in size to the FEHBP than the Plan's selected groups." Draft Audit Report, at p. 4. OPM cannot, however, disregard the regulation in force in 1993 merely because it discovered that carriers' compliance with it was problematical. Moreover, BlueLincs is entitled to rely on its own reasonable interpretation of "substantially the same basic benefit package" in light of OPM's failure to define the term, which OPM had drafted, and BlueLincs' reliance on the distinctions it created. As BlueLincs interpreted the test, it properly selected York International and City of Edmond as its SSSGs.

**B. Seagate is not an SSSG because it is not closest in size to the FEHBP.**

Even if OPM's practice of selecting SSSGs based completely on size could be justified under the regulations, Seagate is not one of the two groups closest in size to the FEHBP. BlueLincs submits that, under OPM's own methodology, the second SSSG should be Southwestern Bell/Mobile. In 1993, Southwestern Bell had 451 subscribers and Southwestern Bell Mobile had 41, for a total subscriber count of 492.[5] Seagate, in comparison, had only 466. This makes the combined Southwestern Bell entity the putative SSSG under OPM's own theory.

---

5 We note that these subscribers are all in the Oklahoma City area.

We assume that OPM treated these two entities as two separate plans for purposes of the size comparison. But BlueLincs submits that their membership should be combined for this determination. Southwestern Bell and Southwestern Bell Mobile are two related divisions of the same parent company. Southwestern Bell, a subsidiary of SBC Communications, Inc., has a unit now known as Southwestern Bell Wireless, which was known in the past as Southwestern Bell Mobile. See Exhibit D, Excerpts from Southwestern Bell's Web Page and associated hyperlinks. While the plans were rated separately by BlueLincs in 1993, BlueLincs has since combined them into one plan. Simply put, Southwestern Bell and Southwestern Bell Mobile were a single employer under common ownership and control for the purpose of determining subscriber counts and the applicable SSSG.

As a result, BlueLincs has calculated a rate for the combined group based on a weighted average of the plans' rates. That rate indicates that Southwestern Bell/Mobile received a discount of .58 percent, which would represent a total overcharge to OPM of $69,796.22. Exhibit E, Calculations of Southwestern Bell/Mobile Discount. To the extent that BlueLincs originally picked the wrong SSSGs (which BlueLincs submits is not the case), any adjustment to BlueLincs' contract should be based on the Southwestern Bell/Mobile discount rather than the discount received by Seagate.[6]

**C. Any contract adjustment for the years 1993 through 1995 should be based on an average of any discounts given to the two SSSGs.**

BlueLincs submits that during the contract years in question, 1993 through 1995, OPM's remedy is limited to averaging the rate adjustments of the two SSSGs rather than benefitting from the lowest rate given to either of the SSSGs. BlueLincs submits that the plain regulatory language in effect from 1991 through 1997 establishes "averaging" of the SSSG rates as the appropriate remedy. The FEHBP provisions in existence during those years did not require payment of the lower of the two SSSG rates. Indeed, OPM only amended the FEHBAR on September 10, 1997 to issue binding regulations that required plans for the first time to use "the lower of the two rates" rather than average rates. See FEHBAR § 1602.170-13(d) reprinted at 62 Fed. Reg. 47574 (Sept. 10, 1997). BlueLincs takes the position that the regulations only required an average rate remedy until the 1997 regulation clarified the rules.

In mid-1990, OPM promulgated a final rule for the FEHBP, establishing the SSSG approach. 55 Fed. Reg. 27406 (July 2, 1990). In addition to defining the SSSGs, the OPM regulation stated as follows:

---

6 We acknowledge that this position conflicts with what we submit is the appropriate interpretation of the SSSG regulation, given that the Southwestern Bell/Mobile plan has significantly different benefits than does the FEHBP. However, we make this argument in the alternative, in the event that OPM persists in ignoring that portion of the regulation.

> Contracts will also be subject to a price adjustment if it is determined that different market price**s** were actually used for the similarly sized subscriber group**s**....

FEHBP § 1615.802(b)(3) reprinted at 55 Fed. Reg. 27414 (1990) (emphasis supplied). This regulatory language gives OPM a downward price adjustment if OPM is charged more than the "market prices" employed for the "similarly sized subscriber groups." (Note that, in both cases, OPM uses the plural of the relevant term.) The preamble to the regulatory changes also describes this provision as requiring the carrier "to identify necessary price adjustments when it is later determined that different market prices were actually used for the SSSGs." 55 Fed. Reg. 27409 (1990). The plain language indicates that a price adjustment must be determined in reference to the rates given to the two SSSGs – in other words, rather than a lowest rate remedy, an average rate remedy must be employed. Nothing in the regulations or the preamble states or even suggests that the lowest of the rates given to an SSSG should form the basis for a price adjustment.

Even in 1994, when OPM reincorporated "lowest rate" language into the regulation quoted above, the language continued to refer to the discounts for "the two SSSGs," which we submit requires averaging of any discounts given. See 59 Fed. Reg. 14761, 14765 (Mar. 30, 1994). The methodology in question is once again linked to the discounts for the "two SSSGs." BlueLincs's reading of this regulation is that OPM gets the average discount of the two SSSGs.

The plural form for "rates" and "two SSSGs" used in the final rates must be contrasted with the language in the original OPM proposal. The proposed rule read as follows:

> Contracts will be subject to a downward price adjustment if OPM determines that the rate for one or both of the similarly sized subscriber groups is lower than that which would be obtained by basing such rate on the plan's community rate. Such adjustments will be based on the lowest rate given to a similarly sized subscribe group.

FEHBAR § 1615.802(b)(3) reprinted at 58 Fed. Reg. 34769, 34771 (June 29, 1993). In that proposal, OPM sought the adjustment based on the lowest rate (not "rates") given to a group (not "groups"). While the proposed rules has its ambiguities, they were compounded in nature by the changes OPM made in the final rule. On information and belief, OPM contractors have argued repeatedly that the 1995 and earlier regulations only required "average" SSSG discounts.

OPM did not adopt the proposed rule. The preamble to the 1994 final OPM regulations noted that "[a] number of carriers were confused by OPM's statement in the Supplementary Information section of the proposed regulations that a carrier must give the Federal group the lowest discount given any SSSG." 59 Fed. Reg. 14762 (1994).

OPM clarified that "[t]his language was never intended to require the lowest rate[,]" just the correct methodology. Id. OPM proceeded to revise its regulations, and in doing so it created new and perhaps unforeseen deficiencies or ambiguities as to the calculation of the SSSG discount. Since the ambiguities were introduced only in the "final regulation" stage, Plans did not have a chance to offer comments.

In fact, OPM tried to close this door by its subsequent regulatory efforts. In June of 1996 OPM published proposed regulations which defined SSSGs in pertinent part as follows:

> OPM shall determine the FEHBP rate by selecting the lower of the two rates derived by using rating methods consistent with those used to derive the SSSG rate.

FEHBAR § 1602.170-12(d) reprinted at 61 Fed. Reg. 32406 (1996). A similar proposed provision was added to the price adjustment clause:

> Contracts shall be subject to a downward price adjustment if OPM determines that the Federal group was charged more than it would have been charged using a methodology consistent with that used for the SSSGs. Such adjustments shall be based on the lower of the two rates determined by using the methodology (including discounts) the Carrier used for the two SSSGs.

FEHBAR § 1615.802(c)(4) reprinted at 61 Fed. Reg. 32406 (1996). Thus, for the first time, after the 1995 contract year, OPM introduced the "lower of the two rates" methodology. Even the preamble of the proposed regulation noted that "we [OPM] have made a number of clarifications of the definition of SSSGs." Id. at 32404. Among these clarifications, was the "lower of the rates" regulatory language. The proposed rules also clearly stated that:

> The SSSG clarifications in § 1602.170-12 of the regulation will be applicable for the rate instructions for the 1998 contract year.

Id. at 32404.

OPM thereafter issued final rules effective October 10, 1997. 62 Fed. Reg. 47569 (Sept. 10, 1997). Therein, OPM amended FEHBAR § 1602.70-12(d) and § 1615.802(c)(4) to provide for an adjustment based on "the lower of the two rates" given an SSSG. See id. at 47574 and 47575.

For 1993, BlueLincs calculates that Southwestern Bell/Mobile received a discount of .58 percent. According to the auditors' workpapers, the State of Oklahoma paid a premium of 1.64 percent. See Exhibit F, Selected Workpapers. Averaging the

two produces a rate premium of .53 percent rather than a discount. In other words, BlueLincs owes OPM nothing for 1993.[7]

**1994**

The auditors have questioned $438,713 based on discounts granted to the SSSGs and an overcharge to the FEHBP based on an erroneous age/sex factor. BlueLincs does not contest the latter finding. However, any price adjustment based on discounts afforded to SSSGs should be based on the average rate remedy discussed above.

Preliminarily, it appears that the auditors erred in calculating the price adjustment due for 1994. In calculating BlueLincs' rates, the auditors used the 1995 United Autoworkers benefit factor rather than the 1994 benefit factor of 1.035. This error benefited BlueLincs. However, the auditors also erred in calculating the discount because they based it on the FEHBP's Oklahoma City rates but used the demographics of the Oklahoma City plus Tulsa service area for General Motors ("GM"). This is inappropriate. Any adjustment should be based purely on the Oklahoma City rates and demographics rather than "mixing apples and oranges." This error benefited OPM. Revising the calculation to reflect these changes (and separating its GM rates and demographics into Oklahoma City and Tulsa components), BlueLincs calculates that the amount due to OPM based on a supplemental GM discount of 3.1 percent would be $504,656 rather than the amount calculated by OPM, $438,713.00. Exhibit G, 1994 GM Discount Calculation.

Averaging the GM net discount of 3.1 percent with the State of Oklahoma discount of 2.21 percent produces a discount of 2.66 percent. Based on the average rate remedy, BlueLincs would owe OPM $445,292.64 for 1994.

**1995**

The auditors have questioned a total of $266,015 based on the use of an outdated age factor. BlueLincs does not contest this finding. However, BlueLincs has discovered an apparent error in OPM's rate calculation for 1995. The auditors used a base rate of $.38 (the cost to BlueLincs) rather than a base rate of $.76 (the actual premium) for the autologous bone marrow transplant coverage. See Exhibit H, Tillinghast Memorandum. Correcting this error, which benefited BlueLincs, produces an increase in the price adjustment of $24,076, such that BlueLincs would owe OPM $290,091 for 1995.

---

7 In the event that OPM rejects the approach of averaging the discount with a premium rate, at a minimum, OPM should permit averaging the Southwestern Bell/Mobile discount with zero for the State of Oklahoma, reducing the discount to .29 percent and the price adjustment to $34,772.40.

**Lost Investment Income**

The auditors have questioned $670,694 in lost investment income on the amounts claimed. Obviously, all adjustments in the underlying claim would affect this calculation.

BlueLincs contests OPM's entitlement to recover interest under Federal Acquisition Regulation § 52.215-23, the Price Reduction for Defective Pricing Data – Modifications clause. BlueLincs maintains that that clause is inapplicable to OPM's claim for a number of reasons, including but not limited to the application of the exemptions for catalog and market prices and prices set by law and regulation and the fact that the claim involves rating methodology rather than defective data. We recognize that this issue may not be resolved definitively until the final resolution of PCA Health Plans of Texas, Inc., v. OPM, ASBCA No. 48711, 198 WL 399,678 (June 24, 1998) which is currently under appeal to the Court of Appeals for the Federal Circuit. We reserve the right to submit further comments on this issue when there is a final resolution of that dispute. In the meantime, BlueLincs respectfully reserves all rights to challenge all lost investment income claims.

BlueLincs is willing to pay the undisputed principal amounts for 1994 and 1995, assuming that it is permitted to reserve its right to contest the interest assessment for all three years and to leave pending the settlement negotiations for 1993. BlueLincs would propose to pay the principal amounts proposed by the auditors in the Draft Audit Report, without regard to the apparent errors in favor of both BlueLincs and OPM that BlueLincs identified. BlueLincs intends to submit a check in the near future for these amounts, subject to this reservation of rights.

We are submitting these comments to comply with OPM's deadline, but we are continuing our analysis regarding the questioned amounts. Should we discover any further issues, we will supplement our comments promptly.

Very truly yours,

Daniel Abrahams

Daniel B. Abrahams
Constance A. Wilkinson

cc: Ms. Susan Furgerson
Jacqueline Haglund, Esq.

DC:78590.1

Attachment IIIB

**RECONCILIATION QUESTIONNAIRE**

PLAN Blue Lincs HMO (Okla. City) STATE: Oklahoma CODE: ______

Q1. What method of community rating did you use in your 1993 rate proposal?

[ ] TCR (Traditional Community Rating)

[X] CRC (Community Rating By Class)

[ ] ACR (Adjusted Community Rating)

a [ ] OPM's "Suggested" ACR Method

b [ ] A Method Using Actual Claims Data

c [ ] Other

Q2. If you used ACR, give a brief description of your method.

Q3. Is the method you are using for the 1993 reconciliation the same as the method used in the 1993 proposal?

[X] YES

[ ] NO

If No, explain.

If your answer to Q1 was that you used <u>only</u> an ACR method using actual claims data, and you use the same method in the reconciliation, skip to question 24. If you used OPM's "suggested" ACR method, go to Q31.



Exhibit A

Attachment IIIB

Q4. On what type of community rate did you base your 1993 rates for the FEHBP and other groups?

[ ] Standard set of two-tiered rates applicable to all groups with a two-tiered rate structure.

[X] Per member/per month capitation rate

Note that it is possible to have both the above blocks checked. That is, the plan may use a standard set of two-tiered rates which are derived from a capitation rate.

[ ] Other (Explain)

Q5. If you used a standard set of two-tiered rates (applicable to all groups) what are they?

Self __________ Family __________

[X] NA

Q6. If you used a capitation rate, what is the actual (as opposed to what may have been estimated in the proposal) capitation rate on which the 1993 FEHBP rates should be based? 110.24 (no change from proposal)

[ ] NA

Q7. If you used a capitation rate for 1993 and converted it to a self rate and a family rate using step-up factors, what are these step-up factors? Specifically, what is the step-up factor used to convert the capitation rate to the self rate? What is the step-up factor used to convert the self rate to the family rate?

Self / Capitation = __________ Family / Self = __________

[X] NA (Do not use step-up factors) Go To Question 11

See attached Rate Development worksheet

Attachment IIIB

Q8. Are the above step-up factors the same as those used in the 1993 rate proposal which you submitted in May 1992?

[ ] YES

[ ] NO

If No, is the reason because the plan revised its community-wide demographics after the 1993 rate proposal was made (and used the revised step-up factors for its SSSGs)?

[ ] YES

[ ] NO

If No, what was the reason for the change in the step-up factors?

N/A

Q9. How are the above step-up factors derived? Explain briefly (a numerical formula for each factor is the preferred form of explanation). Example:

$$\text{Self/Capitation} = 1.17 = \frac{.40 + .60(3.5)}{.40 + .60(2.9)}$$

Q10. Do you use step-up factors for all groups?

[ ] YES

[ ] NO

If No, explain the criteria that you use to determine when step-up factors are applicable.

Attachment IIIB

Q11. If you use enrollment-mix or other demographic assumptions at any point in the development of the 1993 FEHB rates, (including development of step-up factors), what are they?

% Self Contracts ________

% Family Contracts ________

Family Size ________

Other:

see attached rate development worksheet

Q12. Are the demographic assumptions in Q11 the same as they were in the 1993 rate proposal?

[X] YES

[ ] NO

[ ] NA

If No, or NA, is the reason because the plan revised its community-wide demographics after the 1993 rate proposal (and used the revised demographics for its SSSGs?)

[ ] YES

[ ] NO

If No, explain.

Attachment IIIB

Q13. Show the calculations behind the rates that you have on line 1 on the reconciliation sheet. <u>DO NOT REFER US TO ANOTHER SHEET FOR THIS CALCULATION. WHAT WE WANT HERE IS A SIMPLE EXPLANATION OF WHERE THE LINE 1 RATES COME FROM</u>

Example:

Capitation = $25.00
CRC Adjustment Factor = 1.08
Adjusted Capitation = $25 x 1.08 = $27
1st Level Step Up Factor = 1.1
Line 1 Self Rate = $27 x 1.1 = $29.70
2nd Level Step Up Factor = 2.9
Line 1 Family Rate = $29.70 x 2.9 = $86.13

<u>Self</u>

| | |
|---|---|
| Capitation rate (monthly) | 110.24 |
| age/sex adjustment factor | 1.3286 |
| Monthly rate | 146.47 |
| Bi weekly Rate - line 1 | 67.60 |

<u>Family</u>

| | |
|---|---|
| Capitation rate (monthly) | 110.24 |
| age/sex adjustment factor | 3.3188 |
| Monthly Rate | 365.87 |
| Bi weekly rate - line 1 | 168.86 |

Attachment IIIB

Q13A. Do your Line 1 rates include a loading for any tax, fee or monetary payment imposed on the plan by a state or local government?

[X] YES

[ ] NO

If Yes, have you included a negative loading in the Special Benefits Section of the reconciliation?

[X] YES

[ ] NO

If No, explain.

If you use Community Rating By Class (CRC), go to Q14; otherwise, go to Q33.

Attachment IIIB

Questions 14 - 23 apply to plans which use a Community Rating By Class methodology (CRC).

Q14. What CRC factors do you use?

[X] AGE

[X] SEX

[ ] OTHER ________, ________, ________

Q15. Did you begin with a capitation rate?

[X] YES

[ ] NO

If Yes, what is the underlying capitation rate? 110.24

Q16. Did you develop a CRC adjustment factor, which was used to adjust the underlying capitation rate?

[X] YES

[ ] NO

If Yes, what is the CRC adjustment factor? Self - 1.3286 Family - 3.3188

Q17. If there is a CRC adjustment factor, explain in simple language how you derived it. DO NOT REFER US TO ANOTHER SHEET FOR THIS EXPLANATION. WHAT WE WANT HERE IS A BRIEF VERBAL EXPLANATION OF WHERE THE ADJUSTMENT FACTOR COMES FROM.

First, the specific demographs for the FEHBP group were determined separately for self only and family enrollees. These demographics were loaded into an actuarially developed rating formula (copy attached) which produced the group specific CRC adjustment factors.

Attachment IIIB

Q18. If you use a CRC adjustment factor, you should submit any age/sex distribution sheets that were used to derive this adjustment factor. Have you enclosed these worksheets?

[X] YES

[ ] NO

[ ] NA

If No, explain.

Q19. If there is a CRC adjustment factor, is it the same as it was in the 1993 rate proposal?

[X] YES

[ ] NO

If No, explain.

Q20. If either of your SSSG's has an industry factor less than 1.00, did you apply the lowest factor less than 1.00 to the FEHB rates?

[ ] YES

[ ] NO

[X] NA

If No, explain.

**Attachment IIIB**

Q21. If both your SSSG's have industry factors greater than 1.00, did you apply an industry factor of 1.00 to the FEHBP rates?

[X] YES

[ ] NO

If No, explain.

Q22. Does your age/sex distribution sheet include an age band for annuitants age 65 and above?

[X] YES (included in the 60-64 age band

[ ] NO

If No, you should use a standard Medicare loading.

Attachment IIIB

Q23. If you answered yes to Q22, does the relative utilization factor associated with that age band include reimbursement for HCFA COB payments?

[X] YES

[ ] NO

[ ] NA

If Yes, there should be no Medicare loading.

If No, you should take a negative Medicare loading to credit HCFA reimbursements.

GO TO QUESTION 33 UNLESS YOU USE ACR

Questions 24 - 30 apply to plans using an ACR rating methodology with actual claims data.

Q24. Did you use the same experience period in the reconciliation that you used in the proposal?

[ ] YES

[ ] NO

If No, explain why it changed. As a general rule, it should not change.

Attachment IIIB

Q25. Did you use the same trend that you used in the proposal?

[ ] YES

[ ] NO

If No, explain

N/A

Q26. If you use completion factors to derive incurred claims, do you use the same set of factors for all groups?

[ ] YES

[ ] NO

[ ] NA

If No, explain

Q27. If you use a completion factor to derive incurred claims, did the factor remain the same between the proposal and the reconciliation?.

[ ] YES

[ ] NO

[ ] NA

If No, explain

Attachment IIIB

Q28. What kind of administrative loading did you use?

[ ] A flat community rated pm/pm administrative charge.

[ ] A percentage of claims.

Explain how you computed the administrative charge.

N/A

Q29. Did the claims used in the rate development reflect special benefits?

[ ] YES

[ ] NO

Q30. Did you reduce claims used in the rate development by COB income that the plan received from HCFA?

[ ] YES

[ ] NO

Attachment IIIB

Q31 and Q32 are for plans which answered Q1 by saying they use OPM's "suggestesd" ACR method (or which checked the "other" box).

Q31. Did you begin with a capitation rate?

[ ] YES

[ ] NO

N/A

If Yes, what is the capitation rate ____________?

If No, explain what it is you did. DO NOT REFER US TO ANOTHER SHEET FOR THIS EXPLANATION. WHAT WE WANT HERE IS A SIMPLE VERBAL EXPLANATION.

Attachment IIIB

Q32. If you used a capitation rate, explain below what you did to adjust it. Indicate clearly how you broke the capitation rate into components, what you used for utilization factors, and what the adjusted capitation rate is. Use extra sheets if necessary. DO NOT REFER US TO ANOTHER SHEET CONTAINING NUMEROUS CALCULATIONS WITH NO EXPLANATION. WHAT WE WANT HERE IS A CLEAR, BRIEF EXPLANATION OF YOUR METHODOLOGY.

N/A

Attachment IIIB

Q33. Are the special loadings given in the reconciliation the same as they were in the proposal?

[X] YES

[ ] NO

If No, explain.

Q34. Are you required to file your community rates with any State regulatory agency?

[X] YES

[ ] NO

Q35. If you answered yes to Q34, have you circled the appropriate community rates in red on the copy of the insurance department filing that you have enclosed?

[X] YES

[ ] NO

If No, explain.

If Yes, what is the page number of the insurance department filing on which the appropriate rates appear (please number the pages by hand if necessary)? 2

Attachment IIIB

Q36. Give the names and enrollments of your Similarly Sized Subscriber Groups (SSSGs). IMPORTANT NOTE: The SSSGs should be the two community-rated groups that are closest in size to the Federal group. You should indicate how the benefit packages differ from that of the Federal group. The enrollment that you should use for these groups should be the latest 1993 enrollment available.

| | (Contracts) Enrollment | |
|---|---|---|
| Name | Self | Family |
| 1. York International | 67 | 146 |
| 2. City of Edmond | 31 | 40 |

Q37. What method of community rating (TCR, CRC, ACR) did you use to rate the following groups?

| | Method |
|---|---|
| 1. FEHBP | CRC |
| 2. SSSG #1 | CRC |
| 3. SSSG #2 | CRC |

Q38. What are the 1993 net-to-carrier rates for the FEHBP and your Similary-Sized-Subscriber-Groups?

| | Self | Family | |
|---|---|---|---|
| 1. FEHBP | 80.78 | 201.78 | (From Line 5, Attachment III) |
| 2. SSSG #1 | 58.73 | 168.24 | |
| 3. SSSG #2 | 80.74 | 248.01 | |