**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SCOTT & WHITE HEATLH PLAN

Plaintiff

v. Civil No. 01 CV 1824 (JGP)

UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT,

Defendant.

**DECLARATION OF NANCY H. KICHAK**

I, Nancy H. Kichak, declare as follows, based on personal knowledge and information available to me as a result of my official duties:

1. I serve as Director of the Office of the Actuaries, Retirement and Insurance Service, for the United States Office of Personnel Management (OPM). I have occupied this position since 1987. Prior to occupying this position, I was the Supervisory Actuary for Insurance. My office is located at 1900 E Street, N.W., Washington D.C.

2. OPM is the Federal agency charged with the administration of the Federal Employees Health Benefits Act, 5 U.S.C. § 8901 *et seq.* ("FEHBA"). In my capacity as Director of the Office of Actuaries, I oversee the rate negotiations with all carriers in the Federal Employees Health Benefits Program ("FEHBP"). Approximately 180 carriers presently participate in the FEHBP.

3. OPM has successfully negotiated rates with carriers participating in the FEHBP since the inception of the program in 1959. Thus, OPM has specific experience, knowledge, and expertise in the setting of rates under the FEHBP and in rate negotiations.

4. OPM annually negotiates benefits and premiums with each carrier participating in the FEHBP. Premiums may be negotiated on the basis of experience rating or community rating. Rate proposals for a given calendar year are generally submitted in May of the prior year, and rate negotiations typically take place in June, July, and August so that rates are finalized prior to the open season for the given year.

5. Community rated health maintenance organizations are at risk when they determine their rates. If they charge too much, they are at risk of losing enrollees in the competitive open season process. If they charge too little, they may not earn enough premium income to meet the covered health services of the group. It is the carrier's responsibility to project the appropriate amount to charge for covered services in advance of the year in which the services will be provided.

6. OPM does not analyze the appropriateness of the underlying rate. Instead, it reviews the proposed rate to establish that the amounts the plan determines it will charge are distributed appropriately to the FEHBP and the carrier's other covered, non-Federal groups of a similar size. OPM does not question what judgment the carrier has applied in its projections.

7. OPM looks at data directly related to its responsibility under the FEHB law to evaluate a proposed rate in order to ensure that the FEHB rates accurately reflect the cost of benefits provided, and requires cost or pricing data sufficient to verify rates.

8. When OPM negotiates rates with a community rated carrier, its objective is to receive a rate that is derived in a manner consistent with the rate that carrier charges its other, non-Federal groups of a similar size.

9. OPM recognizes that the actual community rates, and methodologies for determining them, for the following contract year may not be available at the time of the carrier's rate submission.

10. FEHBP rate negotiation is premised on an estimate or projection of what a carrier's community rates will be for the ensuing contract year.

11. Generally, beginning in April of the contract year, after community rate are known, community rated carriers and OPM engage in a process to reconcile the community rates currently in force with the actual rates the carriers should have charged. The actual rates are derived after reviewing the methodology and discounts used to derive the rates charged to other similarly sized subscriber groups.

12. In years when the contract is renewed, if it is determined that the rates currently in force were higher than the reconciled rates, the carrier pays OPM the difference, through lower rates in subsequent years or by cash payment; if it is determined that the rates currently in force were lower than the reconciled rates, OPM pays the carrier the difference through higher rates in subsequent years or by cash payment from the contingency reserves to the extent that funds are available.

13. OPM's Office of the Actuaries requires data pertaining to SSSGs in order to perform a rate reconciliation. The data is requested when it becomes available, and it is analyzed after rate negotiations for the current year have been concluded and before the next year's premium is finalized. OPM sends a package of reconciliation instructions to the carriers each year that indicates what data is requested in support of adjustments to the carrier's community rate.

14. When carriers propose rates to OPM actuaries, and provide data as to actual rates and methodologies for reconciliation, the Program's actuaries use that data in the development and reconciliation of a rate. At the time of reconciliation, the Office of the Actuaries limits its review to the data the carrier makes available for reconciliation. The Office of the Actuaries does not obtain all detailed records that may be maintained at the carrier's place of business. The Office of the Actuaries does not have the resources, and it is not that Office's operational function, to look behind these data or to verify that they are correct and appropriate to use for purposes of negotiation and reconciliation.

15. OPM relies on the audit feature of the FEHBP to provide an incentive for the carriers to accurately represent the data that drives their rates in the first instance.

16. Amounts have been questioned with respect to Scott & White's charges to the FEHBP in past years, which have been resolved by the carrier's acquiescence and payment of funds due to the FEHBP, or by negotiation between the parties.

17. In Final Audit Report No. UF-00-97-001, OPM's OIG made the following findings that Scott & White agreed to. With respect to contract year: 1991- Scott & White incorrectly calculated the FEHBP's mental health loading and premium tax credit; 1992 - the plan miscalculated the FEHBP mental health loading and inadvertently omitted a transplant loading from the FEHBP's rates, and gave an SSSG a more favorable premium tax percentage for 1992; 1993 - the FEHBP paid the same copay as one of the SSSGs but did not receive a reduction in its rates, paid an overcharge for mental health benefits, and did not receive the appropriate state premium tax percentage; 1994 - the plan overcharged the FEHBP for its mental health benefits and failed to give the FEHBP the appropriate state premium tax percentage; 1995 - the plan overcharged the FEHBP for its mental health benefits. With respect to 1995 and 1996, the OIG

made the following findings that Scott & White disagreed with: failure to give the FEHBP the same reduction in renewal rates given to SSSGs that renewed in September, and providing the FEHBP a credit loading instead of the 4 percent reduction for the office visit copayment that an SSSG received. The parties resolved the 1995 and 1996 questioned amounts through negotiation. Ultimately, the plan returned funds to the FEHBP due to the questioned charges.

18. OPM recognizes that the effectiveness of its Office of the Actuaries to develop a rate, and to reconcile that rate, depends upon the carrier's maintenance of records, the accessibility of those records, and the cooperation of the carrier in the conduct of an audit.

19. During the performance of a contract, OPM typically maintains a relationship with the carrier that is conducive to a productive negotiation. OPM also maintains oversight of the ongoing contract and in the event of an improper charge to the FEHBP, OPM uses the reserves earmarked for the carrier to prospectively correct prior improper rates.

20. When a contract is not renewed OPM's experience has been that its access to carrier records and data is constrained in a variety of ways. For example, if the carrier is purchased or merged by another carrier, whether or not the new entity takes on the FEHBP line of business, identification of and access to the former carrier's records can become a logistical challenge. OPM recognizes that its records retention requirements are typically greater than are requirements for a carrier's other lines of business. Once the contract is not renewed, the carrier finds itself with a greater recordkeeping requirement for a contract that is ended than for its ongoing business, the latter of which represents the carrier's priorities and focus of interest.

21. In the event that the carrier's rates currently in force are higher than the reconciled rates, the carrier may find itself owing funds to the FEHBP on reconciliation, and thus would have a

financial disincentive to provide access to data, particularly in view of its inability to look to future reserves to offset the improper prior rate.

22. OPM found that it was unable to obtain adequate data to reconcile rates for a variety of plans. In the case of Coordinated Health Care, which merged with HMO of Minnesota, documentation was insufficient to enable the Office of the Actuaries to reconcile the 1988 rates for Coordinated Health Care. As a result, OPM decided to reinstate the proposed rates and assumed no payment was due to OPM or the plan.

23. In the case of Maxicare Plans, in fourteen cases, the actual 1990 rates were significantly different from the rates that were originally proposed and the documentation provided to support these rate changes was not sufficient. Maxicare had filed for bankruptcy and its rate negotiation contact employee left the company. OPM's Office of the Actuaries recommended that any amounts due Maxicare as a result of the 1989 reconciliation, as well as amounts due from Maxicare to OPM, be held in abeyance until an audit of Maxicare was completed.

24. During the period prior to revising its community rating regulation, OPM's experience proved that carrier data was simply more difficult to obtain, for a variety of reasons, once the contract was not renewed, and community rates were correspondingly more difficult to reconcile and verify once the carrier had decided not to renew its contract.

25. As a result, OPM determined that it would not require a rate reconciliation in the year the contract is not renewed. This regulation places the burden of properly projecting estimated community rates equally on OPM and the carrier. It relieves the carrier of the requirement to continue to maintain data sufficient for rate reconciliation once the contract is terminated, and it relieves OPM from the administrative burden of identifying and accessing the appropriate data at a time when the carrier no longer participates in the FEHBP.

26. The parties equally share the risk of inaccurate rates negotiated in the year of nonrenewal.

27. During the initial rate negotiation, carriers and OPM estimate the following year's rates in good faith and on the best data available at the time of the negotiation. This rate will serve as the subscription rate for the following year, upon which employee premium is based, and the parties strive to project as accurate a rate as possible. During years when the contract is renewed, the incentive exists for the parties to use accurate and appropriate data because underestimating the rate could, upon reconciliation, raise the carrier's rate for the following year, adversely affecting the carrier's ability to attract enrollees.

28. Scott & White never expressed disagreement with OPM's interpretation of what contract section 3.2(b)(6) meant.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

May 6, 2002

Nancy H. Kichak
Nancy H. Kichak
Director, Office of the Actuaries
Retirement and Insurance Service