# United States Court of Federal Claims

| | |
|---|---|
| **GHS Health Maintenance Organization, Inc., d/b/a BlueLincs HMO, Texas Health Choice, L.C., and Scott & White Health Plan,** ***Plaintiffs,*** <br><br> *v.* <br><br> **United States,** ***Defendant.*** | **No. 01-517C** <br><br> **Judge Marian Blank Horn** |

**Plaintiffs Scott & White Health Plan and Texas Health Choice, L.C.'s Motion for Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56, Plaintiffs Scott & White Health Plan and Texas Health Choice, L.C., respectfully move for summary judgment. A memorandum in support of this Motion is being filed together with this Motion.

December 22, 2005

Respectfully submitted,

Michael S. Nadel
McDermott Will & Emery LLP
600 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 756-8000

*Attorneys for Plaintiffs Scott & White Health Plan and Texas Health Choice, L.C.*

# United States Court of Federal Claims

| | |
|---|---|
| **GHS Health Maintenance Organization, Inc., d/b/a BlueLincs HMO, Texas Health Choice, L.C., and Scott & White Health Plan,** ***Plaintiffs,*** <br><br> *v.* <br><br> **United States,** ***Defendant.*** | **No. 01-517C** <br><br> **Judge Marian Blank Horn** |

**Plaintiffs Scott & White Health Plan and Texas Health Choice, L.C.'s Memorandum in Support of Their Motion for Summary Judgment**

Michael S. Nadel
McDermott Will & Emery LLP
600 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 756-8000

*Attorneys for Plaintiffs Scott & White Health Plan and Texas Health Choice, L.C.*

# Table of Contents

Introduction ....................................................................................................1

Statement of the Case ........................................................................................2

1. The Federal Employees Health Benefits Act ...........................................2

2. Compensation of Health Plans.................................................................3

3. Scott & White's Participation in the Program .........................................4

4. Texas Health's Participation in the Program ..........................................5

5. OPM's Refusal to Pay Amounts Owed for the Plans' Final Year. ...........6

Argument ..........................................................................................................8

The Court Should Grant the Plans' Motion For Summary Judgment.....................8

Standard ...........................................................................................................8

I. The Final Year Regulation Is Invalid on its Face. ...........................................8

A. The Final Year Regulation Is Invalid on Its Face Because It Provides Compensation that Does <u>Not</u> "Reasonably and Equitably Reflect the Cost of the Benefits Provided." .........................9

B. OPM's Rationales for the Final Year Regulation Fail as a Matter of Law. ..........................................................................10

1. OPM's First Rationale of Administrative Convenience Is Insufficient and Belied by OPM's Own Policies...........................11

2. OPM's Second Rationale Makes No Sense. .......................................14

3. The Administrative Record Contains No Support for the Final Year Regulation. ..........................................................14

4. OPM's Rationales Cannot Justify a Departure from the Act's Requirements. ..........................................................16

II. The Final Year Regulation Is Invalid as Applied to the Plans. ..............................19

III. The Invalidation of the Final Year Regulation Should Result in the Reformation of the Plans' Contracts and Payments of Sums That Would Have Been Due for the Final Year. ..........................................................21

A. The Plans Did Not Waive Their Right To Challenge The Validity of The Final Year Regulation by Signing or Continuing To Perform Under The Contract. ....22

B. Basic Fairness Requires The Avoidance of Unjust Enrichment. ....23

Conclusion ....25

## Table of Authorities

### Cases

*Barrett Refining Corp. v. United States*, 242 F.3d 1055 (Fed. Cir. 2001) ....24

*Beta Sys., Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988)....22, 23

*Bolden v. Blue Cross & Blue Shield Ass'n*, 669 F. Supp. 1096 (D.D.C. 1986)....2, 14, 15, 16

*Bolden v. Blue Cross & Blue Shield Ass'n*, 848 F.2d 201 (D.C. Cir. 1988) ....3

*Chris Berg v. United States*, 192 Cl. Ct. 176 (1970) ....23

*Foti v. Menlo Park*, 146 F.3d 629 (9th Cir. 1998) ....19

*Gold Line Ref., Ltd. v. United States*, 54 Fed. Cl. 285 (2002) ....23

*LaBarge Prods., Inc. v. West*, 46 F.3d 1547 (Fed. Cir. 1997) ....23

*Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000) ....11

*Mingus Constructors, Inc. v. United States*, 812 F.2d 1387 (Fed. Cir. 1987)....8

*Nat'l Fed'n of Fed. Employees v. Devine*, 679 F.2d 907 (D.C. Cir. 1981)....2

*Nat'l Mining Ass'n v. U.S. Army Corp. of Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998)....19

*Nat'l Treasury Employees Union v. Campbell*, 589 F.2d 669 (D.C. Cir. 1978)....18

*Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002)....8, 11, 13, 16, 17, 18, 19

*Sys. Fuels v. United States*, 66 Fed. Cl. 722 (2005)....8

*United States v. O'Hagan*, 521 U.S. 642 (1997) ....8

### Statutes and Regulations

5 U.S.C. § 8902 ....1, 2, 3, 9

48 C.F.R. §1652.204-70 ....12

48 C.F.R. § 1652.216-70 ....7, 14

### Federal Register

54 Fed. Reg. 43089 ....10

55 Fed. Reg. 27406 ....10, 11, 19

**Introduction**

This case is about a government regulation that irreconcilably conflicts with a law enacted by Congress. The Federal Employees Health Benefits Act ("FEBHA" or the "Act") requires the government to compensate health plans that provide health benefits to federal employees through the Federal Employees Health Benefits Program (the "Program"). The Act requires that health plans be compensated at rates that "reasonably and equitably reflect the cost of the benefits provided." 5 U.S.C. § 8902(*i*). Plaintiffs Scott & White Health Plan ("Scott & White") and Texas Health Choice, L.C. ("Texas Health") (collectively, the "Plans") provided health benefits through the Program. Until the final year of their participation in the Program, the government paid the Plans rates that reasonably and equitably reflected the cost of the benefits that the Plans provided. For the benefits that the Plans provided during the final year of its participation, however, the government, by its own calculation, underpaid Scott & White by $3,625,782 and underpaid Texas Health by $622,246.

The government underpaid the Plans for the final year of their participation pursuant to 48 C.F.R. § 1652.216-70(b)(6) (the "Final Year Regulation"), a regulation promulgated by the United States Office of Personnel Management ("OPM"), an agency of Defendant United States. The Final Year Regulation guarantees that during the final year of a health plan's participation in the Program, the compensation the health plan receives will <u>not</u> reasonably and equitably reflect the cost of the benefits it provided. As such, it irreconcilably conflicts with the legislative scheme enacted by Congress and is invalid. The

Court, therefore, should grant the Plans' motion for summary judgment and strike down the Final Year Regulation, either on its face or as applied to the Plans. The Court should then reform the contracts between OPM and the Plans in a manner consistent with its decision and order OPM to pay the Plans in a manner consistent with the reformed contracts.

**Statement of the Case**

**1. The Federal Employees Health Benefits Act**

FEHBA provides health benefits for federal employees, federal retirees, and their families. *See* 5 U.S.C. §§ 8901-14. FEHBA "provides for optional employee enrollment in one of approximately three-hundred competing health benefits plans." *Bolden v. Blue Cross & Blue Shield Ass'n*, 669 F. Supp. 1096, 1098 (D.D.C. 1986). FEHBA's purpose is to "protect federal employees against high and unpredictable costs of medical care and to assure that federal employee health benefits are equivalent to those available in the private sector so that the federal government can compete in recruitment and retention of competent personnel." *Nat'l Fed'n of Fed. Employees v. Devine*, 679 F.2d 907, 913 n.9 (D.C. Cir. 1981) (quoting *Am. Fed'n of Gov't Employees v. Devine*, 525 F. Supp. 250, 252 (D.D.C. 1981)). To accomplish this objective, FEHBA provides the following with respect to "comprehensive medical plans" like Scott & White and Texas Health:

> Rates charged under [the Program] shall <u>reasonably and equitably</u> reflect the cost of the benefits provided.

5 U.S.C. 8902(*i*) (emphasis added).[1]

FEHBA gives OPM broad authority to administer the Program. *Bolden v. Blue Cross & Blue Shield Ass'n*, 848 F.2d 201, 202 (D.C. Cir. 1988). OPM contracts with comprehensive medical plans to provide health benefits and each year renegotiates the coverage for federal employees covered by the Program.

**2. Compensation of Health Plans**

OPM annually establishes with each contractor the compensation rates and benefits for the next contract year, which begins each January 1. Each May, contractors are required to propose to OPM estimated rates for the next contract year. The estimated rates represent the contractors' estimates of what the contractors will charge similarly sized subscriber groups ("SSSGs") during the upcoming calendar year. Once the estimated rate proposals are approved, OPM compensates its contractors at these estimated rates on an interim basis during the contract year.[2]

Beginning in April of the contract year, contractors and OPM engage in a process to reconcile the current year's premium rates (which were estimates of what the contractor's SSSG rates would be) with the premium rates the contractor is actually charging an SSSG.[3] The reconciliation results in a finding either that the government paid the health plan too

[1] The remainder of the provision refers to other types of health care contracts not relevant to this case.

[2] Joint Stipulation of Facts ("Stip.") ¶ 5.

[3] Stip. ¶ 8.

much or too little. If it is determined that the government paid too much – *i.e.*, that the estimated rates were higher than the actual rates the health plan should have been paid – the health plan refunds the government the difference. If it is determined that the government paid too little – *i.e.*, that the estimated rates were *lower* than the actual rates the health plan should have been paid – the government pays the health plan the difference.[4] As discussed below, however, in the final year of the health plan's participation in the Program, the reconciliation process does not run its course.

**3. Scott & White's Participation in the Program**

Scott & White provided health benefits to federal employees in Texas as part of the Program.[5] In July 1999, OPM completed the reconciliation process with respect to Scott & White's 1999 contract year.[6] OPM compared the estimated rates it had negotiated with Scott & White with the actual rates Scott & White should have been paid. OPM determined that it had paid Scott & White an amount $3,625,752 <u>less</u> than the amount that would have

---

[4] Stip. ¶ 11.

[5] Stip. ¶ 36.

[6] Stip. ¶ 37.

reasonably and equitably reflected the cost of the benefits provided.[7] If Scott & White had renewed its contract for the year 2000, therefore, the government would have paid Scott & White $3,625,752 for the benefits provided in 1999.[8]

In September 1999, Scott & White informed OPM that it would not renew its contract with the government for the 2000 contract year.[9] For this reason, OPM refused to pay Scott & White the $3,625,789 due from the 1999 reconciliation.[10]

**4. Texas Health's Participation in the Program**

Texas Health is an HMO licensed in Texas.[11] Like Scott & White, Texas Health provided health care to federal employees in Texas. During the 2001 contract year, OPM calculated a reconciliation amount with respect to Texas Health. OPM concluded that Texas Health was owed $622,246 for 2001. OPM paid Texas Health this sum.[12]

---

[7] By letter dated July 30, 1999, OPM told Scott & White: "We have calculated the difference between the 1999 contract rates and the rates that should be charged based on your plan's actual community rates in effect on January 1, 1999 and the information you provided about the plan's Similar Sized Subscriber Groups (SSSGs). The result of this reconciliation . . . is that your plan is due $5,461,752." Stip. ¶ 38; Scott & White Appendix ("SWA") 184. 39. Of the total $5,461,752 due to Scott & White, $3,625,782 resulted from the 1999 rate reconciliation process. Stip. ¶ 39.

[8] Stip. ¶ 40.

[9] Stip. ¶ 41; SWA241.

[10] Stip. ¶ 42.

[11] Stip. ¶ 27.

[12] Stip. ¶ 28;

Subsequently, Texas Health gave OPM written notice of nonrenewal of the Contract.[13] As a result, on October 15, 2001, OPM requested that Texas Health return the $622,246 that was paid to Texas Health pursuant to the 2001 rate reconciliation performed earlier in the year.[14] OPM subsequently recouped the $622,246 through a reduction of Texas Health's December 2001 premium.[15]

**5. OPM's Refusal to Pay Amounts Owed for the Plans' Final Year.**

As discussed above, OPM refused to pay Scott & White $3,625,789 with respect to the final year of its participation; OPM refused to pay Texas Health Choice $622,246 with respect to its final year of participation. To support its refusal to the Plans, OPM relies on Clause 3.2(b)(6) of its contracts with the Plans.[16] The clause states:

> In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the estimated and the actual market price, PMPM capitation or revenue requirement.[17]

---

[13] Stip. ¶ 29; Texas Health Appendix ("THA") 259.

[14] Stip. ¶ 30; THA267.

[15] Stip. ¶ 31.

[16] Stip. ¶¶ 32, 43.

[17] SWA108; THA119.

This clause appeared in the contract because the Final Year Regulation requires that it appear there. 48 C.F.R. § 1652.216-70(b)(6). The presence of the clause was not negotiated.[18] The Final Year Regulation states:

> § 1652.216.70. Accounting and Price Adjustment.
>
> As prescribed in Section 1616.7001, the following clause shall be inserted in all FEHBP contracts based on a combination of cost and price analysis (community rated). . . .
>
> (b) Adjustment. . . .
>
> (6) In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the subscription rates prior to rate reconciliation and the actual subscription rates.

48 C.F.R. § 1652.216-70. Essentially, the regulation provides that in the final year of a contract, neither the government nor the health plan is entitled to the money that would otherwise be owed as a result of the reconciliation. Thus, if a health plan chooses not to renew its contract with the government, it is paid the estimated rates rather than the "actual market price." The reconciliation process, which implements the FEHBA's command that the government compensate health plans at rates that reasonably and equitably reflect the cost of the benefits provided, is thereby abandoned.

[18] Stip. ¶ 12.

## Argument

## The Court Should Grant the Plans' Motion For Summary Judgment.

## Standard

On a motion for summary judgment, if there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law. *Sys. Fuels v. United States*, 66 Fed. Cl. 722, 727 (2005). When evaluating cross-motions for summary judgment, as are presented in this case, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

## I. The Final Year Regulation Is Invalid on its Face.

An agency's judgment that a particular regulation fits within the statutory framework it administers must be given considerable weight by the Court. *See United States v. O'Hagan*, 521 U.S. 642, 673 (1997). The Court's deference, however, "has important limits: A regulation cannot stand if it is arbitrary, capricious, or manifestly contrary to the statute." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002). To determine whether the Final Year Regulation is valid, the Court "must consult the Act, viewing it as a 'symmetrical and coherent regulatory scheme.'" *Id.* (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995)). Such a consultation will reveal that the Final Year Regulation is manifestly contrary to the plain meaning of the Act.

### A. The Final Year Regulation Is Invalid on Its Face Because It Provides Compensation that Does Not "Reasonably and Equitably Reflect the Cost of the Benefits Provided."

The Act requires that the government compensate health plans participating in the Program at a rate that "reasonably and equitably reflects the actual cost of the benefits provided." 5 U.S.C. § 8902(*i*). Congress charged OPM with promulgating regulations to ensure that the Act's standard of reasonable and equitable compensation is met. Generally speaking, OPM has done so. OPM's reconciliation process generally results in a payment, either by the government or by a health plan, that – except in the final year of a contract – ensures that the health plan was paid what it was supposed to be paid – no more and no less. With respect to the final year of a health plan's participation in the Program, however, OPM has deviated from Congress's charge.

The Final Year Regulation turns a health plan's last year in the Program into a compulsory game of Russian Roulette for both the government and the health plan, with a guarantee that one party will find the chamber loaded. Either the health plan overcharges the government in the final year, in which case the taxpayers are cheated, or the government underpays, in which case the health plan is denied the compensation to which it is entitled. In either case, the Final Year Regulation violates Congress's directive that rates paid equitably and reasonably reflect the cost of the benefits provided.

The Act contains no exception for the final year of a health plan's participation in the Program. The Act does not say that government compensation to health plans must reasonably and equitably reflect the actual cost of the benefits provides, except in the last

year, when the compensation need not be reasonable or equitable. The Act does not permit the government to penalize a health plan that decides not to renew its contract with the government to the tune of millions of dollars. Likewise, the Act does not permit a health plan, upon discovering that the government has overpaid it by millions of dollars, simply to decline to renew the contract and thereby keep the money.

Yet, the Final Year Regulation has all these effects. It essentially cancels the reconciliation in the last year of the contract, guaranteeing that, whether by underpayment or overpayment, the government will pay an amount different – in some cases, vastly different – from the amount commanded by the Act.[19] Thus it is invalid, and the Court should strike it down.

### B. OPM's Rationales for the Final Year Regulation Fail as a Matter of Law.

The administrative record of the promulgation of the Final Year Regulation is limited. The preamble to the proposed version of the regulation said nothing about it. 54 Fed. Reg. 43089, 43090 (Oct. 20, 1989). When OPM published the final version of the regulation in 1990, OPM justified the regulation as follows:

> The clause in 1652.216-70 provides that if the FEHBP contract is not renewed, neither the Government nor the carrier is entitled to any adjustment for the difference between the estimated and actual market price. Two commenters did not understand why

[19] The regulation also creates an incentive for a health plan to propose overly high estimated rates if it knows it is entering the final year of its participation in the program.

> nonrenewal of the contract impacts the rate reconciliation and settlement process.
>
> OPM's experience has been that it is difficult to get adequate data from plans when they have terminated. Further, in the event a plan goes out of business, there are no rates to reconcile. In the opinion of OPM, the most reasonable solution is for both the Government and the carrier to bear the risk of a carrier's termination.

55 Fed. Reg. 27406, 27410 (July 2, 1990). This statement constitutes the sole expression of OPM's rationale for the Final Year Regulation.

### 1. OPM's First Rationale of Administrative Convenience Is Insufficient and Belied by OPM's Own Policies.

OPM's rationale, which essentially consists of a claim of administrative convenience, is inconsistent with the statute and insufficient as a matter of law. As the Supreme Court recently reiterated, "Regardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *Ragsdale*, 535 U.S. at 91 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000)).

OPM's rationale of administrative convenience is entirely unsupported by the record and contradicted by OPM's own regulations. First, OPM states that its "experience has been that it is difficult to get adequate data from plans when they have terminated." 55 Fed. Reg. 27406. Here, as in other cases, the agency "provides no explanation of why this is so, and it seems dubious." *Michigan v. EPA*, 213 F.3d 663, 684 (D.C. Cir. 2000). OPM <u>requires</u> all health plans participating in the Program to maintain <u>all</u> the records used in the final

year's reconciliation process for five years *after* the termination of the contract. Under OPM's regulations,

> the Carrier shall retain and make available all records applicable to a contract term that support the annual statement of operations and, for contracts that exceed the threshold at FAR 15.804-2(a)(1), the rate submission for that contract term for a period of 5 years after the end of the contract term to which the records relate, except that enrollee and/or patient claim records shall be maintained for 3 years after the end of the contract term to which the claim records relate.

48 C.F.R. § 1652.204-70 (the "Retention Regulation") (emphasis added). This Retention Regulation is required to be incorporated into plans' contracts at Clause 3.4.[20] Indeed, OPM's own guidelines make it clear that the Retention Regulation requires plans to retain the very same documents used in the reconciliation process and to retain all of the data the OPM uses to perform the reconciliation. OPM's guidelines state:

---

[20] For example, Clause 3.4 of the Plans' contracts states:

> Notwithstanding the provisions of Section 5.7 . . . the Carrier of a contract of $500,000 or more will retain and make available all records applicable to a contract term that support the annual statement of operations and the rate submission for that contract term for a period of 5 years after the end of the contract term to which the records relate, except that individual enrollee and/or patient claim records shall be maintained for 3 years after the end of the contract term to which the claim records relate.

SWA108; THA120.

> All rate agreements between OPM and the carrier are subject to audits by the OPM Office of the Inspector General. The results of such audits may require modifications to previous agreements and subsequent rate adjustment. Pursuant to contract clause 3.4, Contractor Records Retention (FEHBAR 1652.204.70 [the Retention Regulation]), <u>OPM requires all carriers to maintain documentation to support all calculations and statements pertaining to this reconciliation.</u> This includes documents to support the SSSG rates. And, for carriers using an ACR [adjusted community rating] method, this includes detailed reports supporting all data (e.g., claims data) used to derive the rates.

*OPM Reconciliation Guidelines – 1999* at 6 (emphasis added), attached as Exhibit A. Thus, OPM's purported "experience" that "it is difficult to get adequate data from plans when they have terminated" is belied by OPM's own regulations and guidelines.

OPM's first rationale is also inconsistent with the very nature of the Program. In nearly all instances, the Retention Regulation and the fact that reconciliations often are complete before a plan informs OPM of its intention not to renew will ensure that it almost never will be "difficult to get adequate data from plans when they have terminated." Indeed, it is a fair assumption that this difficulty will not occur "in any but the most exceptional of cases." *Ragsdale*, 535 U.S. at 93. Certainly, the record contains no evidence that was difficult to obtain data in even a majority of cases. There is also no reason why OPM could not resolve that supposed difficulty by placing on any plan seeking a refund the burden of coming forward with the necessary supporting documentation.

**2. OPM's Second Rationale Makes No Sense.**

OPM's second rationale for the Final Year Regulation is even more problematic. OPM rationalizes that "in the event a plan goes out of business, there are no rates to reconcile." 55 Fed. Reg. 27406. Not only is this rationale empty formalism, but it is contradicted by the text of the regulation itself, which expressly speaks of reconciling "subscription rates prior to rate reconciliations" and "actual subscription rates." 48 C.F.R. § 1652.216-70(b)(6). The contractual clause required by the Final Year Regulation states:

> In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between *the subscription rates prior to rate reconciliation* and *the actual subscription rates.*

48 C.F.R. § 1652.216-70(b)(6) (emphasis added). Thus, the regulation contemplates that there are indeed rates to reconcile. More importantly, OPM does not need the Final Year Regulation or any other regulation to avoid performing rate reconciliations when there are no rates to reconcile. This rationale has no application to the many health plans that stay in business after ending their contracts with OPM.

**3. The Administrative Record Contains No Support for the Final Year Regulation.**

Previous attempts by OPM to defend its regulations based on speculative assertions that following the law as enacted by Congress would be administratively difficult have been rejected. In *Bolden v. Blue Cross & Blue Shield Association*, 669 F. Supp. 1096 (D.D.C. 1986), OPM promulgated a regulation directing that the Program's surplus reserve money

be refunded to certain Blue Cross/Blue Shield enrollees. *Id.* at 1102. When enrollees who did not qualify for the refund challenged the regulation, OPM supported it on several grounds, including administrative convenience. The court rejected OPM's argument, observing that "OPM merely assumes that a refund to past enrollees would be administratively difficult. There is no concrete evidence that including plaintiffs in the refund would significantly burden OPM." *Id.* at 1105 (emphasis added). The court admonished: "Mere speculation is not enough." *Id.* (emphasis added)

In the instant case, OPM has merely assumed that it would be administratively difficult to pay all or a majority of health plans (or to be paid by all or a majority of health plans) the amount determined by the reconciliation. There is no "concrete evidence" of that difficulty in the administrative record. Instead, the administrative record contains evidence of only two instances in which the documentation of a non-renewing plan was insufficient – two plans out of the hundreds that participate. In both instances, OPM responded to the insufficient data by decreeing that no payment should be due to the government or the plan because of the lack of sufficient data in those particular cases. *See* THA1, THA2. OPM's solution in those cases makes sense, and suggests that a reasonable rule would be one that states that, where adequate data cannot be obtained, no payment will occur. That contrasts with the Final Year Regulation, which states *per se* that no payment will occur, regardless of whether adequate data can be obtained. Therefore, as in

*Bolden*, "to the extent . . . that OPM's decision rests on administrative concerns, it is not supported by the record." *Bolden*, 669 F. Supp. at 1105.[21]

#### 4. OPM's Rationales Cannot Justify a Departure from the Act's Requirements.

Even if the record did support the notion that the Final Year Regulation serves the interest of administrative convenience, the regulation is still invalid, because it alters the Act's regulatory scheme in a fundamental way: It relieves the government of the requirement of ensuring that the plan was paid in a way that "reasonably and equitably" reflects the costs of the benefits provided. *See Ragsdale*, 535 U.S. at 90-91. In *Ragsdale*, the Supreme Court considered precisely this kind of unreasonable regulation. *Ragsdale* dealt with a challenge to a Department of Labor regulation implementing the Family and Medical Leave Act ("FMLA"). FMLA provides a cause of action against employers who "interfere with, restrain, or deny the exercise of" employees' rights to take leave under FMLA. *Id.* The Department of Labor's regulation established a bright-line rule that "[i]f an employee takes paid or unpaid leave and the employer does not designate the leave as FMLA leave, the leave taken does not count against an employee's FMLA entitlement." *Id.* at 90 (quoting 29 C.F.R. § 825.700(a)). The Court characterized the regulation as "extreme":

> The penalty provision does not say that in certain situations an employer's failure to make the designation will violate § 2615 and entitle the employee to additional leave. Rather, the

[21] The regulation in *Bolden* ultimately was upheld on other grounds.

> regulation establishes an irrebuttable presumption that the employee's exercise of FMLA rights was impaired -- and that the employee deserves 12 more weeks. There is no empirical or logical basis for this presumption, as the facts of this case well demonstrate.

*Id.* (emphasis added). A similar characterization applies to the Final Year Regulation, which does not say that payment will not follow reconciliation in the final year of the contract if administrative difficulty prevents the reconciliation's completion, but rather says that payment will never follow reconciliation in the final year of the contract.

Like the regulation in *Ragsdale*, OPM's Final Year Regulation "contradicts and undermines" the Act's regulatory scheme. *Ragsdale*, 535 U.S. at 92. The Supreme Court's "previous decisions . . . do not authorize agencies to contravene Congress' will in this manner." *Id.* The regulation in *Ragsdale* was particularly offensive to the Court because it "amends the FMLA's most fundamental substantive guarantee." *Id.* at 93. Similarly, the promise of rates that "reasonably and equitably reflect the cost of the benefits provided" is FEHBA's most fundamental substantive guarantee. Indeed, 5 U.S.C. § 8902(*i*) is the chief limit on OPM's freedom to administer the Program. *Nat'l Treasury Employees Union v. Campbell*, 589 F.2d 669, 678 (D.C. Cir. 1978). Without authority or adequate justification, OPM has ignored that limit. It has replaced Congress's "reasonable and equitable" standard with an unnecessary method for allocating risk. Instead of a rational system, both the health plan and the government must play Russian Roulette. Indeed, when the Final Year Regulation was proposed, OPM's own Inspector General recognized the danger the

regulation posed to the government. Commenting on the regulation, the Inspector General wrote:

> Here too, we do not believe that the Government's interests are adequately protected. The clause does not address the potential for a Plan to intentionally overcharge the Program prior to withdrawing from the Program. We believe the clause should only apply when the contract is not renewed 'for the convenience of the Government,' as defined elsewhere in the FAR."

SWA41. Just as the Supreme Court invalidated the regulation in *Ragsdale*, this Court should strike down the Final Year Regulation.

The government defended the regulation in *Ragsdale* by arguing it was justified by administrative convenience. The Court rejected that defense. It first noted that administrative convenience could never excuse agency action inconsistent with the legislative scheme enacted by Congress. *Id.* at 91. Furthermore, the Court continued, even if the agency was authorized to reconfigure Congress's chosen scheme on the basis of "administrative convenience, this particular rule would be an unreasonable choice. . . . [C]ategorical rules . . . reflect broad generalizations holding true in so many cases that inquiry into whether they apply to the case at hand would be needless and wasteful." *Id.* at 1163. But "[w]hen the generalizations fail to hold in the run of cases . . . the justification for the categorical rule disappears." *Id.* Here, it cannot even be said, based on the administrative record, that the generalizations underlying the Final Year Regulation would

"hold true in but few cases." *Id.*[22] They certainly do not hold true in the cases of Scott & White and Texas Health, as discussed below.

**II. The Final Year Regulation Is Invalid as Applied to the Plans.**

Even if the Final Year Regulation were valid as applied to some health plan somewhere, it is unquestionably invalid as applied to the Plans, for neither of the two rationales for the regulation have application to the Plans.[23]

The first rationale for the regulation is that "experience has been that it is difficult to get adequate data from plans when they have terminated." 55 Fed. Reg. 27406. This rationale does not apply to Scott & White because OPM indisputably did get adequate data

[22] Even if there were some circumstance in which a plan's nonrenewal did make it administratively difficult for OPM to obtain adequate data to perform the reconciliation, that would not save the statute from a facial challenge. As the D.C. Circuit has explained: "The Supreme Court has never adopted a 'no set of circumstances' test to assess the validity of a regulation challenged as facially incompatible with governing statutory law. Indeed, the Court in at least one case, *Sullivan v. Zebley*, 493 U.S. 521 (1990), upheld a facial challenge under normal *Chevron* standards, despite the existence of clearly valid applications of the regulation." *Nat'l Mining Ass'n v. U.S. Army Corp. of Eng'rs*, 145 F.3d 1399, 1407 (D.C. Cir. 1998). The D.C. Circuit's "cases confirm that the normal *Chevron* test is not transformed into an even more lenient 'no valid applications' test just because the attack is facial. We have on several occasions invalidated agency regulations challenged as facially inconsistent with governing statutes despite the presence of easily imaginable valid applications." *Id.* at 1407-08.

[23] An as-applied challenge contends that a law or regulation is invalid as applied to a particular litigant, even though the law may be capable of valid application to others. *See Foti v. Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) ("An as-applied challenge does not implicate the enforcement of the law against third parties. . . . A successful as-applied challenge does not render the law itself invalid but only the particular application of the law.").

from Scott & White to perform the 1999 reconciliation. In fact, OPM completed this reconciliation several months before Scott & White announced its intention to terminate. OPM told Scott & White that it was owed and would be paid $3,625,752. Similarly, OPM indisputably received adequate data from Texas Health to perform the 2001 reconciliation. OPM completed the Texas Health reconciliation before Texas Health announced its intention to terminate. OPM determined that Texas Health should be paid $622,246.

Moreover, even if OPM had not attempted to obtain data from the Plans for several years after its participation in the Program terminated, OPM still would have been able to obtain adequate data without any difficulty. The Plans reviewed and abided by OPM's Reconciliation Guidelines, which specify the documentation that carriers must maintain to support all calculations and statements pertaining to the reconciliation for five years after the contract year. *See* page 13-14, *supra*.[24] It was not (and it never would be) difficult for OPM to get adequate data from the Plans despite their decisions not to renew their Contracts with the government.

OPM's second rationale for the Final Year Regulation – "in the event a plan goes out of business, there are no rates to reconcile" – is equally inapplicable, whatever it might mean. Scott & White was in business throughout the 1999 contract year, was in business in 2001 when Scott & White commenced this lawsuit, and still is in business today.[25]

[24] *See* Declaration of Jimmy Carroll, *attached as* Exhibit B, at ¶¶ 6-7; Declaration of Frank Collins, *attached as* Exhibit C, at ¶ 2.

[25] *See* Declaration of Jimmy Carroll, *attached as* Exhibit B, at ¶¶ 8-9.

Similarly, Texas Health was in business throughout the 2001 contract year.[26] In other words, there were rates to reconcile, and OPM reconciled them, discovering that the rates the government was paying the Plans were below the rates to which the Plans were entitled.

For the Plans, the amounts being improperly withheld by OPM are large sums of money. OPM has already determined that, absent the Final Year Regulation, under the regulatory scheme OPM itself set up to administer the Act, Scott & White would be owed $3,625,752 and Texas Health would be own $622,246. The reasons that OPM has offered for the Final Year Regulation simply do not apply to Scott & White or Texas Health. They do not justify the Final Year Regulation's departure from the legislative scheme Congress set forth in the Act. The Final Year Regulation, therefore, is invalid, at least as applied to the Plans.

**III. The Invalidation of the Final Year Regulation Should Result in the Reformation of the Plans' Contracts and Payments of Sums That Would Have Been Due for the Final Year.**

OPM cannot do by contract what FEHBA forbids it to do by regulation. The doctrine of equity requires fairness to both parties and a balancing of various considerations, including both parties' conduct. Where, as here, the government would be allowed to prosper from OPM's failure to comply with Congress's intent, while the Plans

[26] *See* Declaration of Frank Collins, *attached as* Exhibit C, at ¶ 3.

would be injured, reformation of the contract and payment for the final year of the Plans' participation are appropriately fair and equitable remedies.

**A. The Plans Did Not Waive Their Right To Challenge The Validity of The Final Year Regulation by Signing or Continuing To Perform Under The Contract.**

The performance of a contract does not preclude a contractor from challenging a regulation or contract term as contrary to statute. To the contrary, when a contract or a provision thereof is in violation of the law but has been fully performed, the Court can reform it to correct the illegal term. *Beta Sys., Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988). In *Beta Systems*, the Federal Circuit held that even a contractor's knowing acquiescence to a pricing clause that violates a procurement regulation does not waive an objection to the illegal clause:

> The government's insistence during negotiations on use of . . . [the pricing clause], and the contractor's acquiescence, does not immunize the government from the consequences of the failure of the clause to comply with the law stated in the [Defense Acquisition Regulation] . . . . The risk of unintentional failure of a contract term to comply with a legal requirement does not fall solely on the contractor. If the [clause] that was selected does not comply with . . . [the regulations], even approximately, it is not controlling whether or not . . . [the contractor] or the government foresaw, or accepted the risk of failing to foresee, this defect in the [clause]. . . . If the contract is in violation of the DAR, and does not meet the requirement that an index be selected that approximately tracks the economic changes affecting this contract, then reformation is appropriate.

*Id.* at 1184-85 (emphasis supplied). That is the principle that controls this case. *See also Gold Line Ref., Ltd. v. United States*, 54 Fed. Cl. 285 (2002) ("It is the view of the court that implicit in the decisions permitting reformation of a fully performed contract containing an illegal term or provision is permission for the contractor to challenge that illegal term. Accordingly, having determined that the EPA clause in Gold Line's contract was unauthorized, the court finds no waiver of Gold Line's right to challenge the inclusion of that contract term under a theory of either quantum valebant or reformation for mutual mistake.").

The government cannot profit from a contractual provision that was illegal. As the Court of Claims concluded in *Chris Berg v. United States*, 192 Cl. Ct. 176 (1970): "If officials of the Government make a contract they are not authorized to make, the other party is not bound by estoppel or acquiescence or even failing to protest." *Id.* at 183.

**B. Basic Fairness Requires The Avoidance of Unjust Enrichment.**

The Plans are entitled to the equitable remedy of reformation. Where, as here, the government's misconduct results in a violation of law in the writing of the contract, courts will reform the contract to correct the illegal term. *See LaBarge Prods., Inc. v. West*, 46 F.3d 1547 (Fed. Cir. 1997) (holding reformation appropriate despite the contractor's initial adherence to a contract provision that was later shown to be illegal); *see also Gold Line*, 54 Fed. Cl. at 296.

Further, once the offending clause is struck out, "the express contract simply incorporates an implied-in-fact promise by the government to pay at least fair market value . . . under the contract." *Barrett Refining Corp. v. United States*, 242 F.3d 1055, 1059 (Fed. Cir. 2001). In *Barrett*, the court found that a price escalation clause was unauthorized and unenforceable and reasoned that since there was no longer an express clause covering price escalation, there was nothing to preclude an implied-in-fact agreement on that term. *See id.* at 1060. Fundamental to the court's decision was its factual finding of a promise by the government to pay at least fair market value. Similarly, FEBHA requires the government to compensate participating health plans at rates that "reasonably and equitably" reflect the cost of the benefits provided. Here, OPM bargained for, agreed to pay for, and accepted the Plans' services. Because the Final Year Regulation and the corresponding contractual clause are invalid, the Plans are entitled to the funds they would otherwise be owed as a result of the reconciliation.

## Conclusion

The Final Year Regulation, 48 C.F.R. § 1652.216-70(b)(6), irreconcilably conflicts with FEHBA, both facially and as applied to the Plans. Therefore, Scott & White and Texas Health, for the above stated reasons, respectfully request that this Court grant its motion for summary judgment.

December 22, 2005

Respectfully submitted,

Michael S. Nadel
McDermott Will & Emery LLP
600 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 756-8000

*Attorneys for Plaintiffs*
*Scott & White Health Plan*
*and Texas Health Choice, L.C.*