Nos. 01-517C, 05-371C, 05-963C
(Judge Horn)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GHS HEALTH MAINTENANCE ORGANIZATION, INC.,
d/b/a BLUELINCS HMO,

Plaintiff,

TEXAS HEALTH CHOICE, L.C.,

Plaintiff,

SCOTT & WHITE HEALTH PLAN

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JANE W. VANNEMAN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, NW, 8th Floor
Washington, D.C. 20530
Telephone: (202) 307-1011
Facsimile: (202) 514-8624
Attorneys for Defendant

OF COUNSEL:

SUSAN WHITMAN, Esq.
JILL GERSTENFIELD, Esq.
U.S. Office of Personnel Management
Washington, D.C. 20415

February 17, 2006

## TABLE OF CONTENTS

Page

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

NATURE OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF FACTS AND COURSE OF PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . 6

A. Statutory and Regulatory Provisions And Contract Terms . . . . . . . . . . . . . . . . . . 6

B. Federal Employees' Health Benefits Program . . . . . . . . . . . . . . . . . . . . . . . . . . 10

1. Responsibility of Office of Personnel Management (OPM) To Administer The FEHBP And To Contract With Carriers . . . . . . . . . 10

2. Annual Rate Negotiations For Community Rated (HMO) Plans - Prepaid Basis, And Methodology To Estimate, Negotiate, And Determine Rates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

a. Annual Rate Negotiations - Prepaid Nature of HMO Plans . . . . 12

b. OPM's 1989 Revisions To Community Rating Methodology To Identify Rates as Market Prices, Established In Advance Of The Plan Year, And, To Incorporate FAR Principles Relating to Price Negotiation And Records Retention . . . . . . . . 14

c. OPM's 1997 Revision of Community Rating Methodology From Market Prices To Negotiated Benefits, To Ensure That Federal Groups Receive The Same Discounts That Are Enjoyed By The Carrier's SSSG . . . . . . . . . . . . . . . . . . . . . . . . 16

d. OPM Reviews Prepaid Rates Proposed By The Carriers To Establish That The Amounts To Be Charged Are Distributed Appropriately To The Federal Group And The Carrier's SSSG . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

3. Elements of the Rate Reconciliation Process For Carriers Which Continue In the FEHBP From Year to Year . . . . . . 20

4. Non-Reconciliation In the Year That Carrier Elects Not To Renew . . . . 22

5. Limited Audit Function of OPM's Office of Actuaries To Reconcile Rates, As Compared To Function Of OPM's Office of the Inspector General (OIG) To Verify That Carrier Used Accurate and Appropriate Data To Determine Rates . . . . . . . . . . . . . . . . . . . . . . . . . 23

C. Promulgation of the Non-Reconciliation Regulation in 1990 . . . . . . . . . . . . . . . 25

D. Plaintiffs' Contracts, Section 3.2, Included The Terms Of the Non-Reconciliation Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

I. Standard of Review - Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

II. The Nonreconciliation Regulation Is Not Arbitrary or Capricious; Rather, It Is Valid and Effective As A Matter of Law . . . . . . . . . . . . . . . . . . . . 33

A. OPM Enjoys the Presumption of Regularity In Promulgating Regulations That Govern The FEHBA . . . . . . . . . . . . . 33

1. OPM Meets The General Standards For APA Review . . . . . . . . 33

B. OPM Discretion To Administer the FEHBA Is Very Broad . . . . . . . . . . 38

C. OPM's Construction of The FEHBA Statute, With Reference To The Non-Reconciliation Regulation, Is Not Arbitrary or Capricious; Rather, It Is Consistent With The Law Requiring That Rates For Community Rated Plans Reasonably and Equitably Reflect The Cost of Benefits Provided . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

D. A Range of Rates For Community Rated Plans Satisfies The Statute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

E. The Court Should Not Set Aside The Regulation, Because Plaintiffs Failed To Challenge Promulgation of The Regulation During The Comment Period, Even Though They Clearly Had Opportunities To Do So . . . . . 45

F. The Non-Reconciliation Regulation Is Valid and Proper As Applied To Plaintiffs . . . . . 46

1. The Regulation Applies to All Community Rated Carriers, Including Plaintiffs, Without Regard To Whether The Underlying Rationale Of the Regulation Pertains To Their Individual Cases . . . . . 46

2. The Record Retention Provisions Specific To The Annual Rate Reconciliation, Governing The Carriers' Operations When They Remain In The Program, Do Not Apply To Non-Reconciliation Issues . . . . . 48

III. Plaintiffs Are Bound By The Terms Of Their Contracts, Section 3.2 . . . . . 50

A. This Court's CDA Review Is De Novo, and The Court Interprets The Terms of the Contract As A Matter of Law . . . . . 50

B. Plaintiffs Signed The Contracts That Contained The Terms Of The Non-Reconciliation Regulation, And Are Bound . . . . . 51

C. Plaintiffs Waived Any Right To Object To Section 3.2(b)(6) Of Their Contracts . . . . . 52

D. Laches Bars Plaintiffs' Claims . . . . . 54

E. Fairness Requires That The Court Enforce The Contract To Which The Parties Agreed . . . . . 56

V. OPM Did Not Breach Its Contract With Bluelincs . . . . . 59

CONCLUSION . . . . . 60

## TABLE OF AUTHORITIES

**CASES:** **Page(s)**

60 Key Centre Inc. v. Administrator of GSA,
47 F.3d 55 (2nd Cir. 1995) . . . . . . . . . . 34, 57

Aerolease Long Beach v. United States,
31 Fed. Cl. 342 (1994), aff'd 39 F.3d 1198 (Fed. Cir. 1994) . . . . . . . . . . 34

American Contracting Corp. v. United States,
217 Ct. Cl. 338 (1978) . . . . . . . . . . 51,59

American Federation of Government Employees v. Devine,
525 F. Supp. 250 (D.D.C. 1981) . . . . . . . . . . 11

American Telephone & Telegraph Co. v. United States,
307 F.3d 1374 (Fed. Cir. 2002) . . . . . . . . . . 52

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . 32

Appeal of Humana, Inc.,
00-2 BCA P31,142, ASBCA No. 49,951 (October 3, 2000) . . . . . . . . . . 11

AT&T v. United States,
48 Fed. C1. 156 (2000) . . . . . . . . . . 53

Assigned Car Cases,
274 U.S. 564 (1927) . . . . . . . . . . 47

Becho, Inc. v. United States,
47 Fed. Cl. 595 (2000) . . . . . . . . . . 58

Beta Systems v. United States,
838 F.2d 1179 (Fed. Cir.1988) . . . . . . . . . . 35

Boeing Company v. United States,
480 F.2d 854 (Ct. Cl. 1973) . . . . . . . . . . 36

Bolden v. Blue Cross and Blue Shield,
669 F.Supp. 1096 (D.C. Cir. 1986) . . . . . . . . . . 34

Bowman Transp. Inc. v. Arkansas-Best Freight System,
419 U.S. 281 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Brownlee v. DynCorp.,
349 F.3d 1343 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Burnett Elecs. Lab., Inc. v. United States,
479 F.2d 1329 (Ct. Cl. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Camp v. Pitts,
411 U.S. 38 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Caudill v. Blue Cross & Blue Shield of North Carolina,
999 F.2d 74 (4th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Chevron U.S.A. Inc., v. Natural Resources Defense Council, Inc.,
467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 35, 39

Chris Berg v. United States,
192 Ct. Cl. 176 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

City of Chicago v. Federal Power Commission,
385 F.2d 629 (D.C. Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Colon v. Apfel,
133 F.Supp. 2d 300 (S.D. N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Cornetta v. United States,
851 F.2d 1372 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Craft Mach. Works, Inc. v. United States,
926 F.2d 1110 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Cubic Applications, Inc. v. United States,
37 Fed. C1. 345 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Defenders of Wildlife v. Norton,
257 F.Supp.2d 53 (D.C. D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Do-Well Machine Shop, Inc v. United States,
870 F.2d 637 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

E. Walters & Co. v. United States,
576 F.2d 362 (Ct. C1. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Environmental Action, Inc. v. F.E.R.C,
939 F.2d 1057 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37,47

Federal Crop Insurance Corp. v. Merrill,
332 U.S. 380 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Foley Co. v. United States,
11 F.3d 1032 (Fed. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Food and Drug Administration v. Brown & Williamson Tobacco Corp.,
529 U.S. 120 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Giesler v. United States,
232 F.3d 864 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Gold Line Sullivan v. Zebley,
493 U.S. 521 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Gould, Inc. v. United States,
935 F.2d 1271 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Hartford Accident & Indemnity Co. v. United States,
130 Ct. C1. 490 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Hercules Inc. v. EPA,
598 F.2d 91 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Hermes Consolidated, Inc. v. United States,
58 Fed. Cl. 3 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53, 57

Jana, Inc. v. United States,
936 F.2d 1265 (Fed. Cir.), cert. denied, 502 U.S. 1030 (1992) . . . . . . . . . . . . . . . . 55, 56

Jersey Shore Broadcasting Corp. v. FCC,
37 F.3d 1531 (D.C.Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Kennedy v. Empire Blue Cross and Blue Shield,
989 F.2d 588 (2nd Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Kobleur v. Group Hospitalization,
954 F.2d 705 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

LaBarge Prods, Inc. v. West,
46 F.3d 1547 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

LaCoste v. United States,
9 Cl. Ct. 313, 315 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

LaForge & Budd Constr. Co. v. United States,
48 Fed. Cl. 566(2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Levin v. Connecticut Blue Cross and OPM,
487 F.Supp. 385 (N.D. Ill. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Ling-Temco-Vought, Inc. v. United States,
475 F.2d 630 (Ct. Cl. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 58

Mackall v. Casilear,
137 U.S. 556 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Methodist Hospital v. Shalala,
38 F.3d 1225 (D.C. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Mexican Intermodal Equipment v. United States,
61 Fed. Cl. 55 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Michigan Consol. Gas Co. v. F.E.R.C,
883 F.2d 117 (D.C. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Mingus Constr., Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Monon Corp. v. Stoughton Trailers, Inc.,
239 F.3d 1253 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Motor Vehicle Mfrs. Ass 'n v. State Farm Mutual Auto. Ins. Co.,
463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 41

Muratore v. United States Office of Personnel Management,
222 F.3d 918 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 39

Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC,
737 F.2d 1095 (D.C.Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

National Federation of Federal Employees [NFFE] v. Devine,
679 F.2d 907 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 37, 38, 41

National Treasury Employees Union [NTEU] v. Campbell,
589 F.2d 669 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 42, 46, 47

NFFE v. Devine,
679 F.2d 907 (D.C. Cir. (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11,37,38,41

Northrop Grumman Corp. v. United States,
47 Fed. Cl. 20 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

PCA Health Plans of Texas, Inc v. LaChance,
191 F.2d 1353 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

PCA Health Plans of Texas, Inc. v. LaChance,
191 F.3d at 1356 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 59

PCL Construction Services, Inc. v. United States,
41 Fed. C1. 242 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Permian Basin Area Rate Cases,
390 U.S. 747 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Port Authority of City of Saint Paul v. United States,
432 F.2d 455 (Ct. Cl. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Promac, Inc. v. West,
203 F.3d 786 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

QualMed Plans for Health of New Mexico, Inc. v. United States,
267 F.3d 1319 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Ragsdale v. Wolverine World Wide, Inc,
535 U.S. 81 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Reservation Ranch v. United States, 39 Fed. C1. 696, 712 (1997), aff'd., 217 F.3d 850 (Fed. Cir. 1999) (table) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

Ruggiero v. United States, 420 F.2d 709 (Fed. Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Rust v. Sullivan, 500 U.S. 173 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Scott & White v. Office of Personnel Management, No.01 CV 1824 (D. D.C.)(JGP) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Scott & White v. United States, No. 03-61C (Fed. Cl.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Southwestern Bell Tel. Co. v. FCC, 168 F.3d 1344 (D.C.Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

State of Michigan v. U.S. Environmental Protection Agency, 213 F.3d 663 ( D.C. Cir 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 45

Strahan v. Linnon, 967 F.Supp. 581 (D. Mass 1997), aff'd, 187 F.3d 623 (1st Cir. 1998) . . . . . . . . . . . . . . 45

T.L. Roof & Assocs. Constr. Co. v. United States, 28 Fed. Cl. 572 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Tackitt v. Prudential lns. Co., 758 F.2d 1572 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Tesoro Hawaii Corporation v. United States, 405 F.3d 1339 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Texas Health Choice v. Office of Personnel Management, 400 F.3d 895 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Time Warner Entertainment Co. v. FCC, 56 F.3d 151 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Tunik v. Merit Systems Protection Board , 407 F.3d 1326 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

U.S.v. FCC,
652 F.2d 72 (D.C.Cir.1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

United States v. Allegheny-Ludlum Steel Corp.,
406 U.S. 742 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

United States v. Florida East Coast Ry.,
410 U.S. 224 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

United States v. Larionoff,
431 U.S. 864 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

United States v. Mead Corp.,
533 U.S. 218 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 39

Vermont Yankee Nuclear Power Corp.,
435 U.S. 419 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 41

Whittaker Electronic Systems v. Dalton,
124 F.3d 1443 (Fed. Cir. 1997), reh'g denied and en banc suggestion
declined (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 53

Western Union Int'l, Inc. v. FCC,
804 F.2d 1280 (D.C. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Wilner Construction Co. v. United States,
24 F.3d 1397 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Wind River Min. Corp. v. United States,
946 F.2d 710 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

WorldCom, Inc. v. F.CC.,
238 F.3d 449 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 41, 47

## STATUTES, RULES AND REGULATIONS

48 C.F.R. §52.215-2 . . . . . . . . . . 16, 23, 49

48 C. F. R. §152.204-70 . . . . . . . . . . 23

48 C. F. R. §1602.170-13(d) . . . . . . . . . . 15, 18, 42

48 C.F.R. §1615.406-2 . . . . . . . . . . 10

48 C.F.R. §1615.802(b) (1990) . . . . . . . . . . 15, 23

48 C. F. R. §1615.804-70 . . . . . . . . . . 19

48 C. F. R. §1616.7001 . . . . . . . . . . 22, 43

48 C. F. R. §1652.204-70 . . . . . . . . . . 49

48 C.F.R. §1652.216-70(b)(6) . . . . . . . . . . passim

53 FR 51781-01, 1988 WL 342709, 48 . . . . . . . . . . 10

54 FR 43089 . . . . . . . . . . passim

54 FR 43809 . . . . . . . . . . 10, 25, 26

55 FR 27406 . . . . . . . . . . passim

55 FR 27406-01, 1996 WL 334151 . . . . . . . . . . 10, 28

62 FR 47577 . . . . . . . . . . 8

Fed. R. Civ. P. 56(c) . . . . . . . . . . 1, 31

52 Fed Reg. 47570 . . . . . . . . . . 18

54 Fed. Reg. 43089-01 . . . . . . . . . . 25

55 Fed. Reg. 27406 . . . . . . . . . . 6, 10

58 Fed. Reg. 34769 (June 29, 1993) . . . . . . . . . . 10, 18

62 Fed. Reg. 47569 (September 10, 1997) . . . . . passim

5 U.S.C. §553 . . . . . 25

5 U.S.C. §706(2) . . . . . 33

5 U.S.C. §706 . . . . . 2

5 U.S.C. § 902(i) . . . . . 45

5 U.S.C. §8901 et seq . . . . . 2, 3. 10

5 U.S.C. §8902(i) . . . . . passim

5 U.S.C. §8903(4) . . . . . 11, 12, 17

40 U.S.C. §486(c), 10 U.S.C. Chapter 137, 42 U.S.C. §2473(c) . . . . . 25

41 U.S.C. §§601 et seq . . . . . 2, 3

41 U.S.C. §609(a)(3) . . . . . 50

42 USC 300e-1(8) . . . . . 14

44 U.S.C. §1507 . . . . . 54

**MISCELLANEOUS**

H.R. Rep. No. 957, 86th Cong., 1st Sess., 4 (1959) . . . . . 11

Pub.L. 100-517, 1988 HR 3235, 102 Stat 2578 42 USC 201 note . . . . . 15

H.R. Rept. No. 957, 86th Cong., 1st Sess. 1 (1959) reprinted in 1959 U.S.C.C.A.N. 2913, 2914 . . . . . 10

Rule 56(c) . . . . . 1

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| GHS HEALTH MAINTENANCE ORGANIZATION, INC., d/b/a BLUELINCS HMO, Plaintiff, | ) | |
| TEXAS HEALTH CHOICE, L.C., Plaintiff, | ) | |
| SCOTT & WHITE HEALTH PLAN Plaintiff, | ) | |
| v. | ) | Nos. 01-517C, 05-371C, 05-963C (Judge Horn) |
| UNITED STATES, Defendant. | ) | |

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Pursuant to Rule 56(c), defendant respectfully requests that this Court grant summary judgment in defendant's favor. Defendant relies upon plaintiffs' Complaints, defendant's memorandum of law in support of its motion, the parties' Joint Stipulation of Proposed Findings of Fact and Joint Statement of Issues of Law, and the administrative record, Appendix (App.) and Supplemental Appendix (Supp.App.).

Plaintiffs are three health benefits carriers (carriers) – GHS Bluelincs Health

Maintenance Organization (HMO) (Bluelincs), Texas Health Choice, L.C. (Texas Health), and Scott & White Health Plan (Scott and White). They executed contracts with the Office of Personnel Management (OPM) during the 1990s and until 1999 and/or 2000 to provide health benefits to Federal employees and retirees.

The Court consolidated the three cases, because they raise the same legal issue involving the validity of a "nonreconciliation" regulation promulgated by OPM governing the Federal Employees Health Benefits Act (FEHBA), 5 U.S.C. §8901 et seq. and contract matters. As explained below, defendant filed the Administrative Record (App. 1-87) because the issue involving the validity of an OPM regulation is subject to review pursuant to the standards of the Administrative Procedure Act (APA), 5 U.S.C. §706. The remainder of the documents in the appendices are contract documents specific to each of the three plaintiffs. Because these contracts are governed by the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§601 et seq., the court's review, and interpretation of pertinent contract provisions, is de novo.[1]

## STATEMENT OF THE ISSUES

1. Whether 48 C.F.R. §1652.216-70(b)(6), the "nonreconciliation" regulation, is valid on its face and/or as applied to plaintiffs.

2. Whether plaintiffs are bound by the contracts they executed which included section 3.2, the terms of the non-reconciliation regulation at issue, even if the non-reconciliation regulation is held to be invalid.

3. Whether plaintiffs, having performed the contracts, have waived their right to object to the terms of the contract and/or the regulation relating to the nonreconciliation of rates in the

[1] See section 5.36, Disputes, App. 132 (Scott & White).

final year of nonrenewal.

4. Whether plaintiffs' claims are barred by the doctrine of laches.

5. Whether, if plaintiffs were to prevail on liability;

a. BlueLincs would be entitled to recover $369,127, or some lesser amount.

b. Scott & White would be entitled to recover $3,625,782, or some lesser amount.

c. Texas Health Choice would be entitled to recover $622,246, or some lesser amount.

NATURE OF THE CASE

These cases involve contracts between the carriers and OPM. The contracts are governed by the Contract Disputes Act (CDA), 41 U.S.C. §§601 et. seq. These CDA cases are unusual, however, because plaintiffs attempt to challenge the validity of an OPM regulation, the terms of which were expressly incorporated into the contracts. The contracts were executed on an annual basis since at least 1990 when OPM promulgated the regulation, and included section 3.2 with the nonreconciliation of rates provision.

For years, the three carriers - Bluelincs, Scott & White, and Texas Health - entered into contracts with OPM under the Federal Employees Health Benefits Act (FEHBA), 5 U.S.C. § 8901 et seq. See Joint Stipulation of Facts (Stip). ¶1-2; ¶15 (Bluelincs); ¶28-29 (Texas Health); ¶¶40-41 (Scott & White).[2] At the time that plaintiffs commenced litigation,[3] they had performed

---

[2] The contracts are contained in the appendix. App. 87-378 (Bluelincs); App. 87-181, 188-238 (Scott & White); App. 87-256 (Texas Health). The CDA claim letters are also in the appendix. App. 510, 525 (Bluelincs); App. 246 (Scott & White); App. 270 (Texas Health). There are no contracting officers' final decisions, and the claims are deemed denied.

[3] Only Bluelincs filed first in this Court. Both Scott & White, and Texas Health Choice, filed first in a Federal district court. See Texas Health Choice v. Office of Personnel

their contracts for numerous years and each had notified OPM that it would exit the Federal Employees Health Benefits Program (FEHBP). Stip. ¶¶19, 22 (Bluelincs); ¶¶40-41 (Scott & White); ¶29 (Texas Health). Each of the carriers submitted a certified claim to the contracting officer. See Stip. ¶¶ 24-25 (Bluelincs); ¶¶33-34 (Texas Health); ¶¶44-45 (Scott & White).[4] Therefore, this Court possesses jurisdiction to entertain the action.

Plaintiffs are health maintenance organizations (HMOs), or, "community rated plans," that offer health plans under the FEHBP on a **prepaid** basis. The HMO prepaid basis plans are

---

Management, 400 F.3d 895 (Fed. Cir. 2005)(case transferred from district court to Court of Federal Claims).

Scott and White filed first in the United States District Court for the District of Columbia, Scott & White v. Office of Personnel Management, No.01 CV 1824 (JGP), and later, filed in this Court. Scott & White v. United States, No. 03-61C (Fed. Cl.); this Court dismissed without prejudice. Order, April 22, 2003. However, after the decision of the United States Court of Appeals for the Federal Circuit in Texas Health Choice, the district court transferred the Scott & White case to this Court, and Scott & White filed its complaint in this Court, No. 05-963C (Fed. Cl.).

[4] There are minor factual differences with respect to each of the three plaintiffs, none of which are pertinent to the legal issues addressed in the dispositive motions. Bluelincs and OPM had an earlier dispute involving lost investment income. Stip. ¶¶20-21, 23. OPM withheld from Scott and White an amount that would have otherwise been payable because of an unresolved audit issue. Stip. ¶¶38-39. OPM at first paid Texas Health a reconciliation amount, but later recouped that amount after Texas Health announced that it would exit the FEHBA program. Stip. ¶¶28-31.

different than plans that are based upon an "experience-rated" basis. Plaintiffs challenge the OPM regulation, 48 C. F. R. §1652.216-70(b)(6) that governs the manner and conditions under which OPM and the various community-rated health plans "reconcile" community rates from year to year – those rates charged to the relevant FEHBA group, as compared with other non-Federal employer groups that the carrier insures. Specifically, plaintiffs contend that the "reconciled" rate is a rate necessary to satisfy the statutory provision set forth at 5 U.S.C. §8902(i), which provides that rates must "reasonably and equitably reflect the cost of benefits" provided under the FEHBA.

We establish that the nonreconciliation regulation – the terms of which were expressly incorporated into the contracts for all of the contract years at issue[5] - satisfies the statute by providing, in the final year of contract nonrenewal, for the **unreconciled**, binding rate to which the carriers agreed upon negotiations with OPM, for which they projected their costs as ably as their information would allow in advance of that final plan year. **Reconciled** rates merely mirror more closely the rates charged to other comparable employer groups that the carrier insures. We establish that, as such, reconciled rates are no better a reflection of "actual costs of benefits" than unreconciled rates.

[5] Bluelincs held its contract from 1990 to 2000 (Bluelincs, Stip. ¶19). Scott & White held its contract from 1990 to 1999 (Scott & White, Stip. ¶41). Texas Health held its contract from 1990 to 2000 (Stip. ¶29).

STATEMENT OF FACTS AND COURSE OF PROCEEDINGS

A. Statutory and Regulatory Provisions And Contract Terms

There are statutory, regulatory, and contract provisions at issue. The statutory provision upon which plaintiffs rely is 5 U.S.C. §8902(i):

> Rates charged under health benefits plans described by 8903 or 8903a of this title shall reasonably and equitably reflect the cost of the benefits provided. Rates under health benefits plans described by section 8903(1) and (2) of this title shall be determined on a basis which, in the judgment of the Office, is consistent with the lowest schedule of basic rates generally charged for new group health benefit plans issued to large employers. The rates determined for the first contract term shall be continued for later contract terms, except that they may be readjusted for any later term, based on past experience and benefit adjustments under the later contract. **Any readjustment in rates shall be made in advance of the contract term in which they will apply** and on a basis which, in the judgment of the Office, is consistent with the general practice of carriers which issue group health benefit plans to large employers.

(emphases added).

The specific "non-reconciliation" regulation at issue, subsection 6, of 48 C. F. R. §1652.216-70(b)(6), that implements the statutory provision quoted above, provides, in pertinent part:

> In the event this contract is not renewed, **neither the Government nor the Carrier shall be entitled to any adjustment** or claim for the difference between the subscription rates prior to rate reconciliation and the actual subscription rates.

(emphasis added). See 54 FR 43089, App. 3-31; 55 FR 27406, App. 48.

The terms of the nonreconciliation regulation are expressly included in the contracts, specifically in section 3.2(b)(6). Stip. ¶12; Part 1, Section 1.1, 1.2, 1.4; App. 263 (BL); App. 5

(Scott & White); App. 118 (Texas Health). Section 3.2 provides for annual accounting of the HMO's operations, and, also for adjustments to the subscription rates for community rated plans. As of 1991, the accounting and price adjustment clause in the contract provided:

> Section 3.2 ACCOUNTING AND PRICE ADJUSTMENT (JAN. 1991)
> (FEHBAR 1652.216-70
> (a) *Annual Accounting Statement.*
> The Carrier, not later than 90 days after the end of each contract period, shall furnish to OPM for that contract period an accounting of its operations under the contract. The accounting shall be in a form prescribed by OPM.
> (b) *Adjustments*
> (1) The contract is community rated as defined in FEHBAR 1602.170-2.
> (2) The subscription rates agreed to in this contract are derived from the market price, which is a per member per month (PMPM) capitation of its equivalent that applies to a combination of subscriber groups. The market price established in this contract may be an estimate of the Carrier's actual market price that will be in effect during the contract period.
> (3) If, for the contract period, the Carrier establishes an actual market price higher than the market price established for this contract and the higher market price is actually paid by the similarly sized subscriber groups (see FEHBAR 1602.170-11), the Carrier may include an adjustment to the next contract period's FEHBP rates to recover the difference between the estimated market price and the actual market price.
> (4) If, for the contract period, the Carrier establishes an actual market price lower than the market established for this contract and the lower market price is actually paid by similarly sized subscriber groups, the Carrier shall reimburse the Fund, for example, by reducing the next contract period's FEHB rates to reflect the difference between the estimated market price and the actual market price.
> (5) No upward adjustment in the rate established for this contract will be allowed or considered by the Government or will be made by the Carrier in this or in any other contract period on the basis of actual costs incurred, actual benefits provided, or actual size of composition of the FEHBP group during this contract period.
> (6) In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the estimate and the actual market price, PMPM capitation or revenue requirement.

(emphases added).

As of 1998, the clause was revised as follows:

Accounting and Price Adjustment (JAN 1998)

(a) Annual Accounting Statement. The Carrier, not later than 90 days after the end of each contract period, shall furnish to OPM for that contract period an accounting of its operations under the contract. The accounting shall be in the form prescribed by OPM.

(b) Adjustment.

(1) This contract is community rated as defined in FEHBAR 1602.170-2.

(2) The subscription rates agreed to in this contract shall be equivalent to the subscription rates given to the carrier's similarly sized subscriber groups (SSSGs) as defined in FEHBAR 1602.170-13.

(3) If, at the time of the rate reconciliation, the subscription rates are found to be lower than the equivalent rates for the lower of the two SSSGs, the carrier may include an adjustment to the Federal group's rates for the next contract period.

(4) If, at the time of the rate reconciliation, the subscription rates are found to be higher than the equivalent rates for the lower of the two SSSGs, the Carrier shall reimburse the Fund, for example, by reducing the FEHB rates for the next contract term to reflect the difference between the estimated rates and the rates which are derived using the methodology of the lower rated SSSG.

(5) No upward adjustment in the rate established for this contract will be allowed or considered by the Government or will be made by the Carrier in this or in any other contract period on the basis of actual costs incurred, actual benefits provided, or actual size or composition of the FEHBP group during this contract period.

(6) In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the subscription rates prior to rate reconciliation and the actual subscription rates.

62 FR 47577, Sept. 10, 1997.

Thus, as the statute, regulation, and contract provide, the rate negotiation for community rated plans is based upon the carrier's estimate of what its community rates will be for the ensuing year, and this estimated rate is in effect during the contract period. OPM conducts an annual "reconciliation" (or, "adjustment" ) in which OPM determines whether the actual negotiated subscription rate charged to the Federal group was higher or lower than the price charged to a similarly sized subscriber groups (SSSG), with an adjustment upward or downward (if necessary), **to rates for the next contract period**. Pursuant to subsection (5), there is **no**

**adjustment in the rates** for the then-current contract period or any other contract period on the basis of actual costs incurred, actual benefits provided, or actual size of the composition of the FEHBP group. Thus, when the carrier continues its participation in the FEHBA program from year to year, the parties "reconcile" community rates (negotiated between the parties in advance of a contract year, and, based upon estimates of what the contractor believed its actual community rates would be), with "actual" community rates -- once the rates for the carrier's other comparable groups for the contract year become known, and OPM is able to determine that the Federal subscriber group was afforded the benefit of the lowest discount in the rates. If, in the reconciliation process, it is determined that the reconciled rates were higher or lower than the carriers' proposed estimated rates, the carrier may adjust its rates downward, or upward, respectively, **for the subsequent year** to account for the difference.[6] However, **no adjustment in rates is ever made for the then-current insurance year**.

When a carrier makes the choice not to renew its participation in the FEHBA program for the following insurance year, the "nonreconciliation" regulation applies. Contract provision 3.2(b)(6) provides that **no reconciliation** of rates will take place for that final year of the carrier's participation when the contract is not renewed. There is no reconciliation, in part, because **there are no rates to adjust for the subsequent insurance year**. The regulation places the risk of inaccurate negotiated rates equally upon OPM and the carriers in the year a

---

[6] In certain limited circumstances, rates might be changed for the current year, if OPM were to adjust or reduce rates if the carrier had submitted defective pricing or defective cost or pricing data. E.g., FEHBAR 1652-215-70, section 3.3 of the contract. App. 108 (Scott & White). See generally QualMed Plans for Health of New Mexico, Inc. v. United States, 267 F.3d 1319 (Fed. Cir. 2001); PCA Health Plans of Texas, Inc v. LaChance, 191 F.2d 1353 (Fed. Cir. 1999)(carrier's incorrect selection of SSSG constitutes provision of defective cost or pricing data).

carrier later makes the decision not renew its FEHBP contract. Stip. ¶12.

B. Federal Employees' Health Benefits Program

1. Responsibility of Office of Personnel Management (OPM) To Administer The FEHBP And To Contract With Carriers

Because resolution of the issues involves a complex statutory scheme, background facts necessarily derive from statutes and caselaw.[5]

The Federal Employees Health Benefits (FEHB) Program was created in 1959 by the Federal Employees Health Benefits Act (FEHBA), 5 U.S.C. §8901 et seq., to provide Federal employees protection against the financially burdensome costs of medical service through a comprehensive Government-wide program of insurance. H.R. Rept. No. 957, 86th Cong., 1st Sess. 1 (1959) reprinted in 1959 U.S.C.C.A.N. 2913, 2914. In creating the FEHB Program, Congress intended "to assure that federal employee health benefits are equivalent to those available in the private sector so that the federal government can compete in the recruitment and retention of competent personnel." E.g, American Federation of Government Employees v. Devine, 525 F. Supp. 250, 252 (D.D.C. 1981).

[5] Various Federal Register publications set forth changes in the programs and reasons for those changes over periods pertinent to this case. E.g., 48 CFR 1615.406-2 Certificate of Accurate Cost or Pricing Data for Community-Rated Carriers; 53 FR 51781-01, 1988 WL 342709, 48 CFR Parts 1602, 1632, and 1652 December 23, 1988 (regulation to enhance OPM's financial management of FEHB Program; cost to the government and to enrollees is very important); 54 FR 43809, App. 3-31; 55 FR 27406-01, 1996 WL 334151 (revision of contract clauses and community rating practices, July 2, 1990); 58 FR 34769, 1993 WL 229615 (June 29, 1993) (revision of definition of SSSG; contract size requirement, not necessarily substantially same benefits package as Federal group); 62 FR 47569, 1997 WL 556873, Sept 10, 1997 (rate instructions contain guidance, not policy statements by OPM; complexities of FEHB program carriers' rating systems).

The FEHBA grants OPM broad discretionary authority to negotiate and contract for the benefits to be offered by health carriers. National Federation of Federal Employees [NFFE] v. Devine, 679 F.2d 907, 912 (D.C. Cir. 1981). In enacting the FEHBA, Congress intended that OPM would obtain "maximum health benefits for employees at the lowest possible cost to themselves and to the Government." H.R. Rep. No. 957, 86th Cong., 1st Sess., 4 (1959); NFFE v. Devine, 679 F.2d at 912. "When the cost to the government reaches a final figure, the extent and nature of the health benefits to be made available is the only open ended matter. The entire legislative scheme is based upon OPM considering cost to the government in contracting for health benefit plans." Id.

Pursuant to the FEHBA, Congress expressly delegated authority to OPM to negotiate health benefit contracts with carriers, promulgate regulations and, in general, administer the program. Id. §§8902, 8913; 5 C. F. R. Ch. 89. OPM promulgated regulations that govern the FEHBP at 5 CFR Chapter 89 and 48 C.F.R. Part 16. NFFE v. Devine, 679 F.2d at 907.

As described below, health maintenance organization plans – or, community rated plans – are offered under the FEHBP on a prepaid basis. 5 U.S.C. §8903(4). Rates for these "community rated" plans are based upon the rates that the carrier charges its other customers for comparable levels of benefits. See, e.g. Appeal of Humana, Inc., 00-2 BCA P 31,142, ASBCA No. 49,951 (October 3, 2000).

2. Annual Rate Negotiations for Community Rated (HMO) Plans - Prepaid Basis, and Methodology To Estimate, Negotiate, And Determine Rates

a. Annual Rate Negotiations - Prepaid Nature of HMO Plans

OPM annually **negotiates** benefits and premiums with each carrier participating in the FEHB Program. Premiums may be negotiated upon the basis of experience rating or community rating. Rate proposals for a given calendar year are generally submitted in May of the prior year, and rate negotiations between OPM and the carriers typically take place in June, July and August, so that rates are established prior to the open season for the given year. Kichak Decl at ¶4, Supp. App. 2.[6]

There were essentially two major types of health benefits plans described by 5 U.S.C. §§8903 and 8903a, the universe of plans with which OPM is authorized to contract. The **community rated** plan is at issue here, as contrasted with the **experience rated** plan. The differences between the two plans is significant for purposes of these cases. The Government-wide Service Benefit Plan is described by 5 U.S.C. §8903(1); this plan is an **experience-rated, fee-for-service plan,** the rates for which are developed for any given year by taking into account past experience and actual costs. In contrast, for community rated HMO plans, the rates are developed based upon estimated subscription rates for the year, on a per member per month capitation rate, depending upon the demographics of the subscriber groups and the benefits

[6] The parties generally agree on the rough chronology for the process of rate negotiations. Stip. ¶¶5-6, 8. Details are set forth in the declaration of Ms. Nancy Kichak, Director of Office of the Actuaries, Retirement and Insurance Service for OPM. Supp. App. 1-7. Her declaration is Docket Document number 44, filed December 6, 2005. Because there were no appendix page numbers assigned, we identify our references by the paragraph and page number of her declaration.

packages offered, and based upon a prepaid basis.

Although the FEHBA expressly describes the method for determining rates for experience rated plans at §8902(i), the FEHBA does not describe a **rating methodology to apply to community rated comprehensive medical plans,** such as the plans of the three plaintiff carriers. Authority for entering into contracts with these plans is set forth at section 8903(4), which provides that these plans will offer benefits "in whole or in substantial part on a prepaid basis."

Thus, in advance of the contract year for a community rated plan, it cannot be known what the “actual”cost of benefits to be provided will be. Rather, the actual cost of benefits can not be determined until after the utilization of services by the Federal subscribers is known. Thus, the notion -- to which the plaintiffs/carriers cavalierly refer as “Russian Roulette,” whereby the carrier is necessarily either underpaid or overpaid by the Government -- is a notion that is inherent in the essence of insurance risk, and is a natural result of the **statutory prepaid** nature of the community-rated contracts. This result is not affected by the fact of reconciliation or nonreconciliation of rates.

OPM recognizes that in developing a rate for the Federal contract, prior to the contract year, the community rated carriers do not yet possess information about rates for their comparable employer groups. Reconciliation permits the carrier and OPM to use the later-acquired information – rates for comparable employer groups determined after OPM has negotiated the Federal rate - to make adjustments to **future rates for subsequent insurance years**, or to compensate the carrier or OPM for inaccurate estimates of comparison group rates, for carriers that remain in the program in ensuing years. Rate reconciliation, however, **does not**

**change the rate in effect for any given contract year**, nor does it mean that a rate negotiated for a year fails to reflect the best estimates at the time of the negotiations.

Therefore, unreconciled rates are valid approximations, on a prepaid basis, of the anticipated cost of any particular benefit package. Reconciled rates do not represent better estimates of the cost of benefits provided to the Federal group than unreconciled rates -- they are merely better reflections of rates that the particular carrier charges its other large employer groups.

As discussed below, the Federal group is necessarily either a higher or lower utilizer of services than a comparison group. Therefore, even charging a reconciled rate identical to the comparison group rate does not ensure that the rate will reflect the actual cost of benefits provided to, or utilized by, the Federal group.

b. OPM's 1989 Revisions To Community Rating Methodology To Identify Rates as Market Prices, Established In Advance Of The Plan Year, And, To Incorporate FAR Principles Relating to Price Negotiation And Records Retention

In 1989, OPM revised its community rating methodology. In light of the HMO Amendments Act of 1988, P.L. 100-517, OPM modified its community rating system to recognize increasing diversity in community rating practices and to redefine community rating to identify resulting rates as "market prices" under the Federal Acquisition Regulation (FAR). 54 Fed. Reg. 43089.[7] OPM's objective, through regulation, is to obtain rates that are reasonable and

[7] See 42 USC 300e-1(8)(C), regulations promulgated by the Department of Health and Human Services, governing HMO. This regulation provides, in part, that if a HMO sets rates of payment for individuals and families by groups, it shall classify all of the members of the organization into classes based upon factors which the HMO determines predict the differences in the use of health services by the individuals or families in each class. The HMO also determines its revenue requirements for providing services to the members of each class, and is

equitable for the FEHBP group, as compared to the rates that the carriers charge to the SSSGs. Pub.L. 100-517, 1988 HR 3235, 102 Stat 2578 42 USC 201 note, Health Maintenance Organization Amendments of 1988; 55 Fed. Reg. 27406 at 27406, 27409.

OPM's new community rating methodology was developed, drawing in part from the experience rating language of 5 U.S.C. §8902(i). The SSSG mechanism ensured that rates for the Federal group would be consistent with the **lowest** schedule of rates that the carrier generally charged for large employers, by comparing the groups of similar size to the Federal group, and selecting, for the Federal group, the lowest of the two rates derived with consistent methodology. 48 C. F. R. §1602.170-13(d). OPM replaced the prospective "adjustment for experience of the group" component of the experience rating process, applicable to section 8903(1) and (2) plans, with the "prepaid basis" element required by section 8903(4) for community rated plans, by requiring an estimated "market price" to be established **in advance of the plan year**. The community rating methodology provided for a **future reconciliation of estimated to actual market prices as a manner of ensuring rates are consistent with that of similarly sized groups served by the carrier**.

The community rating methodology also incorporated three elements of FAR policy relating to market prices, price negotiation, and record retention, including:

(1) the policy of deeming a community rate the equivalent of the FAR's description of an established catalog or market price, 48 C.F.R. §1615.802(b) (1990);

(2) implementing and supplementing FAR subpart 15.8 policy regarding price negotiation and price analysis, 48 C. F. R. §1615.802 (1990); and,

---

to establish the rates of payments on the basis of a composite of the organization’s revenue requirements.

(3) implementing and supplementing the FAR records retention provisions at 48 C.F.R. §§52.215-2 and 1652.204-70 that would enable data presented by a carrier to be analyzed and verified as a manner of establishing accountability.

The result of OPM's reliance upon experience rating and FAR principles - to develop the methodology for community rates - was a regulation that, as of 1990, used the market price as its cornerstone. The regulation also incorporated elements of consistency with other similarly large employer groups, advance determination of a rate that does not equate to actual experience, and fair market prices capable of verification through price analysis. 48 C. F. R. §1652.216-70 (1990).

c. OPM's 1997 Revision of Community Rating Methodology From Market Prices To Negotiated Benefits, To Ensure That Federal Groups Receive The Same Discounts That Are Enjoyed By The Carrier's SSSG

In September 1997, OPM altered its characterization of community rates from "market prices" to "negotiated benefits." In view of increasing complexities in the community rating industry, OPM recognized that FEHBP contracts no longer fit neatly into the FAR "market price" category. Supplemental, 62 Fed. Reg. 47569, 47570 (September 10, 1997). In recharacterizing the nature of community rated FEHBP contracts, OPM indicated that its responsibility is to ensure a reasonable and equitable rate for Federal enrollees and the Government. OPM stated that "one of the ways OPM accomplishes this is to require the same discounts for the FEHB Program that are enjoyed by the SSSGs; and analyzing cost or pricing data is the only way OPM can achieve accountability." 62 Fed. Reg. 47569, 47570.

As earlier, the nonreconciliation in year of nonrenewal provision was the final clause in the regulation governing community rates.

d. OPM Reviews Prepaid Rates Proposed By The Carriers

To Establish That The Amounts To Be Charged
Are Distributed Appropriately To the Federal Group
And The Carrier's SSSG

As explained above, community rated HMOs provide comprehensive medical plans under the FEHBP on a "prepaid" basis. 5 U.S.C. § 8903(4). Thus, community rated carriers may not adjust their rates for actual experience or utilization of health services by the covered group. 48 C.F.R. §1652.216-70(b)(5). The carriers are at risk when they determine their rates. If they charge too much, they are at risk of losing enrollees in the competitive open season process. If they charge too little, they may not earn enough premium income to meet the covered health services of the group. It is the carrier's responsibility to project the appropriate amount to charge for covered services in advance of the year in which the services will be provided. Kichak Decl. ¶5, Supp. App. 2; Stip. ¶7.

OPM does not analyze the appropriateness of the underlying rate. Instead, it reviews the carrier's proposed rate to establish that the amounts the plan determines it will charge are distributed appropriately to the FEHBP and the carrier's other covered, non-Federal groups of a similar size (SSSG). OPM also does not question what judgment the carrier has applied in its cost and premium projections. Kichak Decl. ¶6, Supp. App. 2; 62 FR 47569, 47571. OPM simply looks at data directly related to its responsibility under the FEHB law to evaluate a proposed rate in order to ensure that the FEHB rates reasonably and equitably reflect the cost of benefits provided, and requires cost or pricing data sufficient to verify rates. Kichak Deck ¶7, Supp. App. 2**;** 62 FR 47569, 47571. See Stip. ¶¶9-10.

Therefore, it is not expected that rates for a community rated carrier will reflect, in fact, the actual cost of benefits provided to the group, as is the case for experience rated carriers.

Rather, it is the community rated carrier's goal to cover its costs and generate a profit by the application of the negotiated rate. When OPM negotiates rates with a community rated carrier, OPM's objective is to receive a rate that is derived in a manner consistent with the rate that the carrier charges its other, non-Federal groups of a similar size. See, e.g., Supplemental, 58 Fed. Reg. 34769, 34769 (June 29, 1993); Kichak Decl. ¶8, Supp.App. 2.

OPM uses the regulatory term "similarly sized subscriber groups," or "SSSGs," to describe a carrier's two other employer groups that present a risk pool of approximately the same size and utilize the same rating method as the FEHBP group. Specifically, SSSGs are defined to be

> a comprehensive medical plan carrier's two employer groups that: (1) As of the date specified by OPM in the rate instructions, have a subscriber enrollment closest to the FEHBP subscriber enrollment; and (2) use any rating method other than retrospective experience rating; and (3) meet the criteria specified in the rate instructions issued by OPM.

48 C. F. R. §1602.170-13(a).

Thus, until 1997, OPM required its community rated carriers to use SSSG rates to calculate the FEHBP group's rates as its manner of ensuring that the community rate met the FAR requirements of a "market price." Supplemental, 54 Fed. Reg. 43089, 43090. After 1997, OPM continued to require the use of SSSGs, to ensure that the **negotiated** rate is a "fair and reasonable premium rate." Supplemental, 52 Fed Reg. 47570. OPM ultimately determines the FEHBP rate "by selecting the lower of the two rates derived by using rating methods consistent with those used to derive the SSSG rates." 48 C. F. R. §1602.170-13(d).

Thus, FEHBP rates are not required to equal SSSG rates in dollar terms. Rather, they are required to be developed using a methodology that is consistent with the methodology used to

determine the rates for the carrier's SSSGs. 48 C. F. R. §1615.804-70; Supplemental, 55 Fed. Reg. 27406, 27409 (July 2, 1990). For example, if an actuarial estimate regarding claims is used for the FEHBP group, the actuarial methodology used to establish that estimate should also be used to set the SSSG's rates. Supplemental, 62 FR 47569, 47571.

OPM recognizes that the actual community rates, and methodologies for determining them, for the following contract year, may not be available at the time of the carrier's rate submission to OPM. Kichak Decl. ¶9, Supp. App. 3. Prior to 1997, in developing proposed rates, carriers were expected to start from a current market price and adjust that price for the next year. Supplemental, 54 Fed. Reg. 43089, 43090 (October 20, 1989). Presently, the FEHBP rate negotiation is premised upon an estimate or projection of what a carrier's community rates will be for the ensuing contract year. Kichak Decl. ¶10, Supp. App. 3. Generally, beginning in April of the contract year, after community rates are known, community rated carriers and OPM engage in a process to reconcile the community rates currently in force with the actual rates the carriers should have charged. The actual rates are derived after reviewing the methodology and discounts used to derive the rates charged to other similarly sized subscriber groups. Kichak Decl. ¶11, Supp. App. 3.

In years when the contract is renewed, if it is determined that the rates currently in force were higher than the reconciled rates, the carrier pays OPM the difference, through lower rates **in subsequent years,** or by cash payment. If it is determined that the rates currently in force were lower than the reconciled rates, OPM pays the carrier the difference through higher rates **in subsequent years,** or by cash payment from the contingency reserves to the extent that funds are available. Kichak Decl. ¶12, Supp. App. 3; 48 C. F. R. § 1652.216-70(b)(3),(4). This is the

rate reconciliation process.

3. Elements of the Rate Reconciliation Process
<u>For Carriers Which Continue In the FEHBP From Year to Year</u>

OPM's Office of the Actuaries requires data pertaining to SSSGs in order to perform a rate reconciliation. The data is requested when it becomes available, and it is analyzed after rate negotiations for the current year have been concluded and before the next year's premium is finalized. OPM sends a package of rate reconciliation instructions to the carriers each year that indicates what data is requested in support of adjustments to the carrier's community rate for the following insurance year. 55 FR 27406, 27409; Kichak Decl. ¶13, Supp. App. 3-4; .Supp. App. 532.-645.

We include in a second Supplemental Appendix a copy of OPM rate reconciliation instructions and/or guidelines for 1997 and 1998 for community rated plans. Supp.App. 532–645. A quick review of these materials establishes that the reconciliation process is complex and requires not only data, but a **qualitative evaluation of methodologies and actuarial assumptions.** The reconciliation process does not involve any OPM judgment about the actual reasonableness of any specific market prices or dollar adjustments upon which the carrier establishes subscription rates or premiums.

For example, in the reconciliation process, OPM determines the difference between the carrier's estimated Federal group rates proposed for a particular year and the actual Federal group rate - the actual rates "should be equivalent to the lowest rates the carrier charged a Similarly Sized Subscriber Group (SSSG)." Supp. App. 534. The Reconciliation Questionnaire requires information from the carriers relating to their particular rating process (whether it is Traditional (TCR), Community Rating by class (CRC), or Adjusted Community Rating (ACR)).

Supp. App. 534-35; 62 FR 47569, 1997 WL 556873.

OPM also requires information on all potential SSSGs of a carrier, because, for "equivalent rates," the Federal group should receive any rate discounts or other advantages (including benefit loadings) given to the SSSGs. Supp. App. 537-38; Supp. App. 541 (actual Federal group rates in the reconciliation should be equivalent to the lowest rates the carrier charged an SSSG). For carriers with multiple rating areas covered under the same contract with OPM, they must choose two SSSGs for every Federal group, although the two SSSGs need not be located in the same geographic region. Supp. App. 538. Further, the enrollment data must be current, whether it is group-specific demographic assumptions (family size, self-family enrollment mix), carrier-wide enrollment mix, or other demographic assumptions. Supp. App. 541.

Thus, the reconciliation "is simply a re-submission of the proposal, using the carriers' actual 1997 PMPM capitation rate (or equivalent) as a basis for the Federal group's rates." Supp. App. 542; see Supp. App. 544. Detailed information is required so that OPM's actuaries can easily verify the rates, determine whether the benefits packages for the SSSGs differ from those for the Federal group, and determine which of the carrier's groups are the closest in total contract size to the Federal group; the carrier's proposed reconciliation will not be accepted if the documentation is incomplete or the calculations are unclear. Supp. App. 545, 559, 562.[8]

---

[8] For example, if the carrier uses the ACR, it may use a method based on utilization data, or it may use a prospective method based on actual Federal claims data, using the same experience periods, no special benefits loadings, adjustments for claims of annuitants age 65 and over and corresponding Medicare adjustments. Certain rules apply relating to loadings for administrative expenses, with trend factors the same for the Federal group and the SSSG. Supp. App. 542-43. Step-up factors (conversion of the capitation rate to a self rate, or, to a family rate) should be done properly. Supp. App. 544.

Finally, the carrier is required to complete a “Certificate of Accurate Pricing For Community Rates Plans” that the “methodology used to determine the FEHBP rates is consistent with the methodology used to determine the rates for the plans’ Similarly Sized Subscriber Groups.” Supp. App. 591.

The results of this rate reconciliation process is adjusted rates for carriers that continue in the program for the following insurance year.

4. Non-Reconciliation In the Year That Carrier Elects Not To Renew

There is an exception to the reconciliation requirement: if the carrier does not renew its contract, and thereby terminates its participation in the FEHBP, there is no reconciliation of rates for that year. There is no adjustment of rates upward or downward, because there are no future rates to adjust.

The "nonreconciliation in year of nonrenewal" regulation is the subject of this lawsuit. The regulation states:

> In the event this contract is not renewed, neither the Government nor the Carrier shall be entitled to any adjustment or claim for the difference between the subscription rates prior to rate reconciliation and the actual subscription rates.

48 C. F. R. § 1652.216-70(b)(6).

This “nonreconciliation in year of nonrenewal” regulation is required to be inserted into community rated contracts pursuant to 48 C. F. R. §1616.7001. In each plaintiff’s contract, the provision appears at section 3.2(b)(6).

5. Limited Audit Function of OPM's Office of Actuaries To Reconcile Rates, As Compared To Function Of OPM’s Office of the Inspector General (OIG) To Verify That Carrier Used Accurate and Appropriate Data To Determine Rates

OPM's Office of Insurance Programs requires carriers to certify that their cost or pricing data is accurate, and to maintain records in support of their annual statement of operations. The agency relies upon its regulatory and contractual provisions preserving its right to audit carrier records as its manner of enforcing appropriate rates. 48 C. F. R. §52.215-2; 48 C. F. R. §152.204-70; 48 C. F. R. §1615.802; Contract section 3.4. When carriers propose rates to OPM actuaries, and provide data as to actual rates and methodologies for reconciliation, the Program's actuaries use that data in the development and reconciliation of a rate.

At the time of reconciliation, however, the Office of the Actuaries limits its review to the data the carrier makes available for reconciliation. The Office of the Actuaries does not obtain all detailed records that may be maintained at the carrier's place of business. Stip. ¶¶9-10. The Office of the Actuaries does not have the resources, and it is not that Office's operational function, to look behind these data or to verify that they are correct and appropriate to use for purposes of negotiation and reconciliation. Kichak Decl. ¶14, Supp.App. 4.

Rather, it is the Office of the Inspector General (OIG), OPM's independent audit component, that checks, after the fact, to verify that the carrier used accurate and appropriate data in determining its rates. In the event that a carrier is found on audit to have overcharged the agency, the Office of Insurance Programs may take appropriate corrective action, including assessment of interest on improper charges or amounts due to the FEHBP. OPM also has the option, for a continuing contract, to negotiate a lower rate in future years to recoup improperly high rates in past years. Kichak Decl. ¶12, Supp. App. 3.

OPM relies upon the audit feature of the FEHBP to provide an incentive for the carriers to represent accurately the data that drives their rates in the first instance. Kichak Decl. ¶15,

Supp. App. 4. Nonetheless, OPM recognizes that parties may differ in their interpretations, use of data, and methodologies used to derive rates. These are routinely questioned by OPM's OIG on audit, and the FEHBP contracting officer regularly issues final agency decisions that assert amounts due from carriers to the program as a result of inappropriate use of data and inappropriately determined rates. Indeed, OPM questioned amounts with respect to Scott & White's charges to the FEHBP in past years, which have been resolved by the carrier's acquiescence and payment of funds due to the FEHBP. Kichak Decl. ¶16, Supp. App. 4.

OPM recognizes that the effectiveness of its Office of the Actuaries to develop a rate, and to reconcile that rate, depends upon the carrier's maintenance of records, the accessibility of those records, and the cooperation of the carrier in the conduct of an audit. Kichak Decl. ¶18, Supp. App. 5. During the performance of a contract, OPM typically maintains a relationship with the carrier that is conducive to a productive negotiation. OPM also maintains oversight of the continuing contract and, in the event, of an improper charge to the FEHBP, OPM uses the reserves earmarked for the carrier to prospectively correct prior improper rates. Kichak Decl. ¶19, Supp. App. 5.

In contrast, when a contract is not renewed, OPM's experience has been that its access to carrier records and data is constrained in a variety of ways. For example, if the carrier is purchased by or merged into another carrier, whether or not the new entity takes on the FEHBP line of business, identification of and access to the former carrier's records can become a logistical challenge. OPM recognizes that its records retention requirements are typically greater than requirements for a carrier's other lines of business. Once the contract is not renewed, the carrier finds itself with a greater recordkeeping requirement for a contract that is ended than for

its continuing business, the latter of which represents the carrier's priorities and focus of interest. Kichak Decl. ¶20, Supp.App. 5. In the event that the carrier's actual rates currently in force are higher than its actual community rates, the carrier may find itself owing funds to the FEHBP on reconciliation, and thus, would have a financial disincentive to provide access to data, particularly in view of its inability to look to future reserves to offset the improper prior rate. Kichak Decl. ¶21, Supp.App. 5.

C. Promulgation of the Non-Reconciliation Regulation in 1990

OPM promulgated the challenged regulation approximately sixteen years ago under the FEHBA, the Federal Acquisition Regulations (FAR) authorized by 40 U.S.C. §486(c), 10 U.S.C. Chapter 137, 42 U.S.C. §2473(c), and in compliance with the Administrative Procedure Act (APA), 5 U.S.C. §553.

On October 20, 1989, OPM published its proposed rulemaking action, with regard to the FEHBAR; Revision of Contract Clauses and Community Rating Practices. 54 Fed. Reg. 43089-01. This regulation proposed to establish the nonreconciliation in year of nonrenewal provision. After a notice and comment period, the regulatory provision ultimately was incorporated at section 3.2(6)(b) in each plaintiffs' contracts, effective January 1, 1991. Stip. ¶13.

As explained in the notice and comment process, OPM found that it was unable to obtain adequate data to reconcile rates for a variety of plans. 54 FR 43809, App. 3-31. In one example, Coordinated Health Care merged with HMO of Minnesota, and documentation was insufficient to enable the Office of the Actuaries to reconcile the 1988 rates for Coordinated Health Care. App. 1. As a result, OPM decided to reinstate the carrier's proposed rates for the then-current

year and assumed no payment was due either to OPM or the plan. Kichak Decl. ¶22, Supp. App.6.

As another example, in the case of Maxicare Plans, in fourteen cases, the actual 1990 rates were significantly different from the rates that the carrier initially proposed and the carriers' documentation to support the rate changes was not sufficient. Maxicare had filed for bankruptcy and its rate negotiation contact employee left the company. App. 2; Kichak Decl. ¶23, Supp. App. 6. Therefore, OPM's Office of the Actuaries recommended that any amounts due Maxicare as a result of the 1989 reconciliation, as well as amounts due from Maxicare to OPM, be held in abeyance until an audit of Maxicare was completed. Id.

During the period prior to revising its community rating regulation, OPM's experience proved that carrier data was simply more difficult to obtain, for a variety of reasons, once the contract was not renewed, and community rates were correspondingly more difficult to reconcile and verify once the carrier had decided not to renew its contract. Kichak Decl. ¶24, Supp. App.6.

OPM accepted public comment on these regulations during the period October 1989 to January 1990. OPM received sixteen public comments on several aspects of the regulations, including: the effective date of the regulations; community rated carriers' rating methodologies; advertising expenses; coordination of benefits; certification of accounting statements; and, other matters covered by the proposed regulation. 54 FR 43809. OPM received additional comment from its Office of the Inspector General. Id.

OPM did not receive any comment on the regulations from any of the plaintiffs. Of all of the comments OPM received, only three dealt with the issue of non-reconciliation in the year of

non-renewal:

1. Epstein, Becker & Green, representing a number of carriers in FEHBP and the American Managed Care Review Association which includes carriers participating in the FEHBP, dated December 19, 1989. Objected to 48 C. F. R. §1652.216-70(b)(6) "in that it penalizes a carrier in its final year of participation in the FEHBP because it did not accurately anticipate seven months earlier (when the rates were filed with the Office of Personnel Management) what its community rate would be on January 1 of the final contract year. The reconciliation process should be applied to every carrier whether or not they intend to participate the following contract year." App. 32.

2. Partners National Health Plan, dated January 4, 1990. "If the contract is not renewed, the proposal states that neither the Government nor the Carrier is entitled to any adjustment (payable or receivable) for the difference between the estimated and actual rates. Why should the fact that the contract is not being renewed impact the rate reconciliation and settlement process?" App. 36.

3. OPM's Office of the Inspector General, dated January 2, 1990. "We do not believe that the Government's interests are adequately protected. The clause does not address the potential for a plan to intentionally overcharge the Program prior to withdrawing from the Program. We believe the clause should only apply when the contract is not renewed for the convenience of the Government, as defined elsewhere in the FAR." App. 38.

OPM determined that it would not require a rate reconciliation in the year the contract is not renewed. This regulation places the burden of properly projecting the estimated community rates equally upon OPM and the carrier. It relieves the carrier of the requirement to continue to maintain data sufficient for rate reconciliation once the contract is terminated, and, it relieves OPM from the administrative burden of identifying and accessing the appropriate data at a time when the carrier no longer participates in the FEHBP. Kichak Decl. ¶25, Supp. App. 6. The parties equally share the risk of inaccurate rates negotiated in the year of nonrenewal. Kichak Decl. ¶26, Supp. App 6.

On July 2, 1990, OPM published its final rulemaking action. 55 Fed. Reg. 27406-01, App. 42-50. As a result of comments received on the regulation, OPM changed the effective

date of the regulation and its application to the contracts from January 1, 1990 to January 1, 1991 (except for certain provisions not pertinent here). Among other amendments, the regulations clarified: the definition of a community rate; the requirements for SSSGs; and, the required certification of accounting statement accuracy. Id.

OPM did not change the proposed non-reconciliation regulation and required the contract clause at 48 C.F.R. §1652.216-70(b)(6). The agency articulated its reasons as follows:

> The clause in 1652.216-70 provides that if the FEHBP contract is not renewed, neither the Government nor the carrier is entitled to any adjustment for the difference between the estimated and actual market price. Two commenters did not understand why nonrenewal of the contract impacts the rate reconciliation and settlement process. OPM's experience has been that it is difficult to get adequate data from plans when they have terminated. Further, in the event a plan goes out of business, there are no rates to reconcile. In the opinion of OPM, the most reasonable solution is for both the Government and the carrier to bear the risk of a carrier's termination.

55 Fed. Reg. 27406, 27410 (July 2,1990).

OPM articulated, internally to its OIG, its rationale for retaining the terms of the regulation as proposed.

> The argument for claims or adjustments in price when a contract is not renewed can be made by either party. For example, one respondent to the proposed rule wants to be able to bill the Government in the event of nonrenewal. Nevertheless, our past experience has been that, on termination, the carriers generally do not have adequate data available for us to make price adjustments. Further, in the event a plan goes out of business, there are no rates to reconcile. In our opinion, the most reasonable solution is for both the Government and the carrier to bear the risk of a carrier's termination. OPM continues to have recourse to debt collection agencies and the courts if the situation warrants.

OPM response to OIG, page 5, July 3, 1990, App. 42.

D. Plaintiffs' Contracts, Section 3.2, <u>Included The Terms Of the Non-Reconciliation Regulation</u>

On or about March 3, 1990, OPM circulated a proposed standard contract for community-rated carriers for review and comment. The proposed contract included the non-reconciliation clause at section 3.2, Accounting and Price Adjustment (JAN 1990), 48 C. F. R. §1652.216-70(b)(6)(quoted above). OPM received a comment from the law firm Epstein, Becker & Green, dated April 25, 1990. This comment did not raise the subject matter of proposed section 3.2.

All three plaintiffs were participants in the FEHB Program as of 1989-1990, when the regulatory provision was proposed and later promulgated, and when the provision was incorporated into their FEHB contracts at section 3.2. From January 1991 through the date at which each of the three plaintiffs notified OPM that it would not renew its participation in the FEHBP (1999 and 2000), the regulation was in force, and was contained in section 3.2 of their contracts, executed annually.

None of the three plaintiffs any longer maintains a FEHBP contract with OPM. Nonetheless, plaintiffs now seek a judicial declaration that the regulation is invalid, or invalid as applied to them, and money damages under their contracts. Plaintiffs allege that the regulation conflicts with its authorizing statute.

SUMMARY OF THE ARGUMENT

OPM is entitled to substantial deference in interpreting the FEHB statute that Congress charged it with administering, and in promulgating the non-reconciliation regulation to implement that statute. The regulation is a valid and proper exercise of OPM's very broad authority to administer the FEHBP in accordance with OPM's statutory mission.

The FEHBA provides that rates that insurance carriers charge Federal employees "shall reasonably and equitably reflect the cost of the benefits provided." 5 U.S.C. § 8902(i). OPM's regulation implements that statute appropriately for community-rated carriers, which contracts are on a prepaid basis. The regulation – that neither OPM nor the carrier is entitled to any adjustment of rates in the final year of nonrenewal based upon any difference in the subscription rates and the actual rates charged to the SSSG for that year - is a permissible construction of the FEHBA, promotes efficiency and management of the program. The nonreconciliation regulation is a reasonable choice of alternatives to allocate the risk of incorrectly estimated and/or negotiated rates in the year in which a carrier chooses to exit the program, because there are no future rates to reconcile.

The regulation that the carriers challenge is fully consistent with the FEHBA and the FAR. OPM administers the FEHBP in a manner that permits the carriers and OPM to negotiate contract rates that reasonably and equitably reflect the cost of benefits provided, while maintaining a balance of prudent oversight over the rates, administrative efficiency, and certainty for the agency and the carriers. Plaintiffs' narrow view of what rate would satisfy the statute is strained at best, and in any event, does not represent any more accurate a reflection of the very

complicated "cost of benefits provided" than does the rate OPM adopted, after full negotiations with plaintiffs, under this regulation.

In any event, the contract should be enforced, as written, including section 3.2, the non-reconciliation provision. Each of the three plaintiff carriers agreed, for years, to abide by the regulatory provision now challenged, by virtue of section 3.2 in the contracts that they performed since at least 1990 -- until they notified OPM in 1999 or 2000 that they chose to exit the FEHB program. Prior to terminating their contracts, none of the plaintiffs objected to the regulation or to the contract clause based upon the regulation. Thus, all three carriers waived any right they might have had to contest that regulation and/or section 3.2 of the contract. Having failed to object, the carriers cannot now argue that section 3.2 in their contracts that had governed their performance during the periods before performance was completed - with rates adjusted for the following insurance years based upon the comparison of subscription rates to actual SSSG rates - should somehow now be inapplicable as applied to them.

Plaintiffs' claims are also barred by the doctrine of laches, because there was unreasonable and unexcused delay in raising their claims, and prejudice to the Government caused by plaintiffs' unreasonable and unexcused delay.

## ARGUMENT

### I. Standard of Review - Summary Judgment

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c). A party opposing a motion for summary judgment must set forth specific facts showing that there is a genuine issue for trial. There must be enough of a showing that a rational trier of fact could reasonably

find for the non-moving party. E.g., Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 250 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986); Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); Mingus Constr., Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987); Mexican Intermodal Equipment v. United States, 61 Fed. Cl. 55, 61-63 (2004)(cases cited).

In this case, even accepting all facts as presented in the Complaints as true, plaintiffs cannot establish that they are entitled to summary judgment. There is no disputed issue of material fact. OPM is entitled to judgment as a matter of law.

The case involves a regulation promulgated in accordance with the APA, and incorporated into an arms-length Government procurement contract that was performed and which plaintiffs later chose to terminate. The contract clause is consistent with FAR objectives and is not prohibited by the FAR. The parties agree: about the terms of the regulation and its practical effect; that the regulation was incorporated into the contracts that plaintiffs performed; and, that the carriers chose not to renew their contracts with OPM.

The sole disagreement is whether the regulation, is arbitrary, capricious, or not in accordance with law, generally and as applied to them, and/or whether the contract should be enforced as written, including section 3.2.

## II. The Nonreconciliation Regulation Is Not Arbitrary or Capricious; Rather, It Is Valid and Effective As A Matter of Law

### A. OPM Enjoys the Presumption of Regularity In Promulgating Regulations That Govern The FEHBA

#### 1. OPM Meets The General Standards For APA Review

Under the APA, a court may set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action enjoys a "presumption of regularity," and plaintiff faces a heavy burden in proving that OPM violated this standard. E.g., Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415 (1971). The standard is a "deferential" one that "presume[s] the validity of agency action." State of Michigan v. U.S. Environmental Protection Agency, 213 F.3d 663, 324 ( D.C. Cir 2000); Southwestern Bell Tel. Co. v. FCC, 168 F.3d 1344, 1352 (D.C.Cir. 1999); Jersey Shore Broadcasting Corp. v. FCC, 37 F.3d 1531, 1537 (D.C.Cir.1994). Plaintiffs cannot meet the very high legal standard for demonstrating that OPM's regulation is invalid.

In Chevron U.S.A. Inc., v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), the Supreme Court set forth a two-prong analysis that governs whether an agency's interpretation of a statute is valid under 5 U.S.C. §706(2)(A). The first question under Chevron is whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter. If the statute is silent or ambiguous with respect to the issue, it is for the court to determine whether the agency's answer is based upon a "permissible construction" of the statute. Chevron, 467 at 843 & n.11 (to uphold agency's interpretation, court need not conclude that agency construction was the only permissible

construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding); Rust v. Sullivan, 500 U.S. 173, 184 (1991)(court should uphold agency construction of statute if it reflects plausible construction of the plain language of statute); Tunik v. Merit Systems Protection Board , 407 F.3d 1326, 1335-38 (Fed. Cir. 2005)(agency may fill any statutory gaps); Brownlee v. DynCorp., 349 F.3d 1343, 1354 (Fed. Cir. 2003); Port Authority of City of Saint Paul v. United States, 432 F.2d 455, 458-59 (Ct. Cl. 1970)(for court to invalidate agency action, must be "clearly wrong" or clearly contradict the terms or purposes of the statute); Bolden v. Blue Cross and Blue Shield, 669 F.Supp. 1096, 1101-02 (D.C. Cir. 1986)(uphold regulation if there was a rational basis); Colon v. Apfel, 133 F.Supp. 2d 300, 344.(S.D. N.Y. 2001) (court should defer to any reasonable agency construction of statute); see also Methodist Hospital v. Shalala, 38 F.3d 1225 (D.C. Cir. 1994); Levin v. Connecticut Blue Cross and OPM, 487 F.Supp. 385, 387-89 (N.D. Ill. 1980)(OPM considered relevant factors and did not make clear error of judgment).[9]

---

[9] Many of the cases upon which plaintiffs rely do not support their position. For example, in Food and Drug Administration v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 130-31(2000), the Court noted the general principles of deference to the agency, the agency's responsibility to assess the wisdom of policy choices, and its greater familiarity with ever-changing facts surrounding the subjects regulated. While the Court invalidated the regulations, the case is readily distinguishable. Among other things, it was clear that Congress intended to preclude FDA authority to regulate tobacco. Id.

Moreover, the rationale of at least one case cited by plaintiffs, Aerolease Long Beach v. United States, 31 Fed. Cl. 342 (1994), aff'd 39 F.3d 1198 (Fed. Cir. 1994)(Table), was somewhat weakened by a subsequent decision. In 60 Key Centre Inc. v. Administrator of GSA, 47 F.3d 55 (2nd Cir. 1995), the court concluded that the agency interpretation of its own regulations is of controlling weight unless it is "plainly erroneous," citing United States v. Larionoff, 431 U.S. 864 (1977)).

Further, plaintiffs' reliance upon Gold Line Sullivan v. Zebley, 493 U.S. 521 (1990), and other cases involving price indices, is misplaced, given the recent decision of the Federal Circuit

Upon recently revisiting the issue in United States v. Mead Corp., 533 U.S. 218, 227 (2001), the Supreme Court held: "Administrative implementation of a particular statutory provision qualifies for Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." Mead, 533 U.S. at 226-227.

There are a variety of factors that courts consider in reviewing an agency's promulgation of regulations under the APA standards.

a. Expertise of agency. Courts routinely defer to an agency's expertise in administering complex programs. E.g.. Muratore v. United States Office of

---

in Tesoro Hawaii Corporation v. United States, 405 F.3d 1339 (Fed. Cir. 2005). In Tesoro, the court of appeals ascertained the plain meaning of a regulation and enforced it as written, denying the contractors' claims that the price index clause was illegal. Similarly, in Beta Systems v. United States, 838 F2d 1179 (Fed. Cir.1988), upon which plaintiffs rely, the court remanded, concluding that reformation was appropriate because the contractor had not assumed the risk that the economic price adjustment clause would not fairly measure actual economic situation. Here, however, the plaintiffs clearly assumed the risk of the non-reconciliation clause by their agreement to it.

Finally, Ragsdale v. Wolverine World Wide, Inc, 535 U.S. 81 (2002), is inapposite. The Court invalidated the regulation because the categorical penalty (additional leave) that the Secretary of Labor imposed for breach of a provision of the Family Medical Leave Act (FMLA) was contrary to the Act's remedial design. The regulation was also unconnected to any prejudice the employee might have suffered from the employer's failure to give notice that the generous medical leave allowed would count against the FMLA entitlement. Further, the statute expressly provided for a monetary penalty, and the Secretary's additional penalty (the claimed 42 weeks as compared to the FLMA limit of 12 weeks) was inconsistent with the statute. There are no comparable circumstances here. In fact, here, to the extent that the non-reconciliation regulation is a "categorical" rule (as the Court characterized the rule in Ragsdale), the general rule holds in all of the cases: all of the carriers and OPM know in advance (by virtue of the regulation and section 3.2 of the contract), of the allocation of risk relating to nonreconciliation of rates in the final year of non-renewal.

Personnel Management, 222 F.3d 918 (11th Cir. 2000). This is particularly appropriate when an agency's interpretation involves policy determinations within the agency's statutory domain, and the agency expertise clearly informed the decision subject to review.

b. Agency policy judgments. It is not the Court's role to second guess an agency's policy judgment, so long as it comports with established standards of administrative practice. An agency's "[j]udgment about the best regulatory tools to employ in a particular situation is . . . entitled to considerable deference from the generalist judiciary." WorldCom, Inc. v. F.CC., 238 F.3d 449, 457 (D.C. Cir. 2001), quoting Western Union Int'l, Inc. v. FCC, 804 F.2d 1280, 1292 (D.C.Cir.1986). Accord Boeing Company v. United States, 480 F.2d 854, 868-69 (Ct. Cl. 1973)(disagreement with policy does not render regulation invalid).

c. Consideration of relevant factors. An agency rule could be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass 'n v. State Farm Mutual Auto. Ins. Co., 463 U.S. 29 (1983). The reviewing court should, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp. Inc. v. Arkansas-Best Freight System, 419 U.S. 281, 286 (1974); see also Camp v. Pitts, 411 U.S. 38 (1973) (per curiam). "Formulation of procedures is basically to be left within the discretion of agencies to which Congress has confided the responsibility for substantive judgments." Vermont Yankee Nuclear Power Corp., 435 U.S. 419, 425 (1978).

d. Agency predictions relating to the program administered. An administrative agency may make and rely upon predictions. "Making . . . predictions is clearly within the Commission's expertise" and these predictions will be upheld if rationally based on evidence in the record. Michigan Consol. Gas Co. v. F.E.R.C, 883 F.2d 117, 124 (D.C. Cir. 1989).

What is required by law is that agency policies and standards be reasonable and nondiscriminatory, and flow rationally from findings that are reasonable inferences from substantial evidence. City of Chicago v. Federal Power Commission, 385 F.2d 629 (D.C. Cir. 1967). An agency's "reasonable prediction deserves our deference notwithstanding that there might also be another reasonable view." Environmental Action, Inc. v. F.E.R.C, 939 F.2d 1057 (D.C. Cir. 1991).

e. Ease of administration and enforceability. An agency may properly decide to make ease of administration and enforceability a consideration in setting its regulatory standard. So long as the agency's logic is reasonable, a court has no basis upon which to require the agency to engage in a different or more searching analysis. See, U.S.v. FCC, 652 F.2d 72 (D.C.Cir.1980) (en banc). It is also well-established that an agency may, and should, consider the cost to the Government in making determinations relating to the program at issue. E.g., NFFE v. Devine, 679 F.2d at 912.

As further explained below, all of these factors are pertinent here. OPM possesses expertise to administer and manage the complex, nationwide, FEHBA program, and make policy judgments, as the health care industry evolves over time. OPM explained its rationale for the nonreconciliation regulation, and provided the opportunity to plaintiffs and others to comment

upon the proposed regulation. OPM relied upon its predictions relating to HMO rates, whether they were based upon market price, and later based upon negotiated benefits, with Federal groups to receive the same discounts as those afforded to SSSGs of the carriers. OPM also considered the ease and the cost of administering the program when HMO providers made the choice to exit the program. OPM considered the enforceability of OPM's requirements relating to the estimation and negotiation of rates, and whether carriers would, in general, maintain sufficient records relating to the methodology by which they estimated their rates, and also whether carriers exiting the program would have an incentive to cooperate with OPM in any possible reconciliation process at that time.

B. OPM Discretion To Administer the FEHBA Is Very Broad

Numerous courts of appeals have recognized OPM's broad authority to administer the FEHBA program and deferred to OPM's discretion on various matters. It is axiomatic that Congress' "grant of authority given OPM to approve benefit plans is very broad." E.g., Tackitt v. Prudential lns. Co., 758 F.2d 1572, 1575 (11th Cir. 1985); NFFE v. Devine, 679 F.2d 907 (D.C. Cir. (1981). In National Treasury Employees Union [NTEU] v. Campbell, 589 F.2d 669, 678 (D.C. Cir. 1978), the court of appeals held that OPM possesses broad discretion to study and evaluate complex accounting and actuarial methods involved in setting rates, and that a court cannot substitute its own judgment so long as the rates are reasonably supported by OPM's construction of the applicable data and records. The court of appeals for the Eleventh Circuit held that OPM's interpretation of a FEHBA regulation is valid when it is "reasonable and consistent with the regulation's language, with the FEHBA, and with the legislative intent." Kobleur v. Group Hospitalization, 954 F.2d 705, 709 (11th Cir. 1992). Similarly, that court

concluded that OPM may take a broad, national view when it interprets the statutes and regulations, ensuring consistent, nationwide application. Muratore, 222 F.3d at 918. Accord Caudill v. Blue Cross & Blue Shield of North Carolina, 999 F.2d 74 (4th Cir. 1993); see Kennedy v. Empire Blue Cross and Blue Shield, 989 F.2d 588, 594 (2nd Cir. 1993)(in section 8902(j), insurance carriers agree to be bound by OPM's interpretation of their contracts).

As we establish below, OPM's interpretation of the statutory provision requiring reasonable and equitable rates for community rated plans is reasonable under Chevron, Mead, and the cases cited above. Where, as here, OPM interprets a statute that it is entrusted with administering, its interpretation is entitled to "considerable weight." Chevron, 467 U.S. at 844; United States v. Mead Corp., 533 U.S. at 227.

C. OPM's Construction of The FEHBA Statute, With Reference To The Non-Reconciliation Regulation, Is Not Arbitrary or Capricious; Rather, It Is Consistent With The Law Requiring That Rates For Community Rated Plans Reasonably and Equitably Reflect The Cost of Benefits Provided

OPM's construction of the FEHBA statute, as it implemented section 8902(i) requiring reasonable rates, is not arbitrary or capricious. Nor is OPM's regulation clearly wrong, or an impermissible construction of the statute. The Court should defer to OPM"s expertise in this area, particularly because the methodology for the development of rates in the HMO arena over the last twenty years has been constantly evolving, with the introduction of legislation affecting HMOs (e.g., the 1988 Act), OPM's regulatory refinement of its oversight of these plans, as well as significant changes in the health care and insurance industry and the increasing diversity and complexity of HMOs and their rate methodologies. The Court should defer to OPM's predictions relating to HMO programs, and its judgment about how best to ensure that carriers provide to insured Federal groups the same discounts and comparable benefits packages as they

provide to comparable employer groups of similar size. OPM is in the best position to determine how best to administer the program, to balance statutory requirements against the limited resources OPM possesses, in order to minimize costs to the Government and to FEHBA enrollees.

Here, OPM's judgment of the appropriate rates for community rated carriers is premised upon Congress' direction that some of the plans offered to Federal employees would be **prepaid**, with rates set at the beginning of the contract year for particular packages of benefits, not subject to change for that insurance year. Not only is OPM's interpretation of the non-reconciliation regulation reasonable pursuant to FEHBA, it is consistent with the cost or pricing analysis and contractor accountability principles of the FAR. Moreover, OPM’s interpretation of the statutory requirement for reasonable and equitable rates and the nonreconciliation regulation alleviates the administrative burden and inefficiencies the agency had experienced in attempting to deal with community rated carriers which had terminated contracts with OPM and for which no rates could be adjusted for the next following insurance year.

As explained above, the reconciliation process is a complex one, and, in large part, qualitative in nature. OPM is entitled to rely upon its determination that it is difficult to obtain adequate data, based on its experience in reconciling rates in the year of nonrenewal, and to construct a community rating policy that eases the administrative burdens of operating in the face of that difficulty. "Administrative agencies and administrators will be familiar with the industries which they regulate and will be in a better position than federal courts or Congress

itself to design procedural rules adapted to the peculiarities of the industry and the tasks of the agency involved." Vermont Yankee Nuclear Power Corporation, 435 U.S. at 525. See, e.g., Time Warner Entertainment Co. v. FCC, 56 F.3d 151, 163 (D.C. Cir. 1995).

It is apparent that OPM made a rational connection between the difficulties in reconciling rates it had experienced and the rule it made, relying upon factors that Congress intended it to consider. Motor Vehicle Mfrs. Ass'n, 463 U.S. 29. Whether there exists a different or better way to regulate community rates under 5 U.S.C. §8902(i) when a carrier exits the program does not mean that the regulation is arbitrary or capricious. See, e.g., WorldCom. Inc., 238 F.3d at 459 (admittedly "imperfect" use of collocation as a proxy for market power resulted in just and reasonable rates; agency made reasonable policy determination and sufficiently explained basis for its decision);. Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC, 737 F.2d 1095, 1116 (D.C.Cir. 1984)(agency rationale need not be perfect to support a regulation).

Finally, it is established that OPM may, and should, consider the cost to the Government in making determinations relating to the FEHBA. E.g., NFFE v. Devine, 679 F.2d at 912. With OPM's authority comes the fiscal responsibilities to maintain the operation of the program on a sound financial basis, with a concern for the cost to the Government as well as to the enrollees. Id. at 911-14. That OPM decided to consider the resources and expenses that would be required of its various offices (e.g., Insurance Services and OIG) if OPM were to perform both a rate reconciliation and an audit every time one of the hundreds of carriers chose to exit the FEHBA program, is reasonable. See 62 FR 47569, 1997 WL 556873 (almost 400 plans in the program, as of 1997).

OPM fashioned an indisputably equitable solution: OPM and the carriers would **share**

**the risk equally** of any adjustment upward or downward in the final year of the carrier's participation. Accord National Treasury Employees Union, 589 F.2d at 678 (broad zone of administrative discretion to OPM to evaluate complex accounting and actuarial methods involved in setting rates).

Plaintiffs have offered nothing to rebut the presumption of validity, or to meet the heavy burden imposed upon them, as challengers to the validity of the regulation. Accordingly, this Court should defer to OPM's interpretation of the statute, and its implementation of the statutory provision requiring reasonable and equitable rates by promulgation of the nonreconciliation regulation.

D. A Range of Rates For Community Rated Plans Satisfies The Statute

Plaintiffs attempt to advance the notion that there necessarily exists one precise, statutorily-mandated rate that satisfies 5 U.S.C. § 8902(i), and that any other rate is "too high" or "too low." Plaintiffs rely upon the fact that, in their cases, OPM had calculated a reconciliation amount before they informed OPM that they would exit the program. However, plaintiffs' view is a distorted characterization of the rating and reconciliation process.

As discussed above, community rates are driven by actuarial science applied to data that is maintained and presented by the carrier to OPM. It is not required that the rates equal, precisely, the cost of benefits, nor is it required that the SSSG price must equal, in dollar terms, the FEHBP price. Rather, what is required is that the rates for the FEHBA enrollees be developed using **rating methods** consistent with those used to derive the carrier's SSSG rates, 48 C. F. R. § 1602.170-13(d) (1997), and that the rates are subject to cost and price analysis and verification if OPM audits them. 54 Fed. Reg. 43089; 55 Fed. Reg. 27406, 27409, 27413-14

(basic reasonableness test, §1615.802(b)(1); "equivalent" price, not necessarily "same" price); 48 C. F. R. §§1616.7001; 1652.216-70 (1997).

Thus, a range of rates may satisfy the statute. It is the parties' **negotiations** each year that ultimately bind them, at the beginning of the insurance year, to the prepaid HMO rate.

During the initial rate negotiation, carriers and OPM estimate the following year's rates using the best data available at the time of the negotiations. This negotiated rate serves as the subscription rate for the year, upon which the amount of employee premium (paid in large part by the Federal Government, see 62 FR 47569, 1997 WL 556873) is based. During this process, the parties strive to project as accurate a rate as possible. During years when the contract is renewed, there is an incentive for the parties to use accurate and appropriate data because, underestimating the rate could, upon reconciliation, raise the carrier's rate for the following year, adversely affecting the carrier's ability to attract enrollees in later years. Kichak Decl. ¶27, Supp. App. 7.

However, if reconciliation were to occur in the year of nonrenewal, in that year a carrier would have a financial disincentive to provide data that would tend to show that the rates currently in force are higher than actual community rates. Kichak Deck ¶21, Supp. App. 5. Upon not renewing participation in the FEHBP, the carrier could harbor a hope or expectation that insufficient data would suffice, or that its data would not, within the next five years, be audited. It was OPM's experience, set forth during the notice and comment period, that in instances where carriers had not renewed their contracts, it was difficult, for a variety of reasons, to obtain adequate data with which to reconcile community rates.

Contrary to plaintiffs' primary argument, the mere fact that OPM had calculated a rate

reconciliation **before** each of them elected to exit the program does not mean that the data used in the calculation were necessarily adequate. Plaintiffs uniformly assert that their data and interpretations are sound and that each of the carriers would, but for the nonreconciliation regulation, be entitled to a transfer of funds from OPM. At this stage of the proceedings, each of the three plaintiff carriers would have no doubt offered to deliver records for audit. This willingness to offer records would likely be driven by plaintiffs' beliefs that their estimated rates were lower than their "actual" rates, and that they each would be entitled to a refund. However, should a review of the records underlying the data proffered by these carriers with respect to reconciliation begin to demonstrate any problem with the rating methodology applied to the Federal group and/or any of the potential SSSGS, that problem could potentially result in the carrier owing money to OPM. Thus, it is possible that each or any of the plaintiffs, in theory, could become less cooperative and adequate data could become less available.[10]

What section 8902(i) requires is a **reasonable and equitable reflection of the cost of benefits provided when comparing the Federal group to the appropriate SSSG**. OPM's regulation adds to the community rating methodology a clause that enhances administrability and efficiency by correcting for a perceived lack of accountability on the part of the carrier in the year of nonrenewal. This is because, in advance of known utilization of medical resources, on a prepaid basis, the initial negotiated rate is based on an estimate of the carrier's community rate for the next year. Assuming that the parties fairly negotiate for this initial rate in good faith, at arm's length, and using the best data available at the time, **the initial rate is a reasonable and**

[10] Moreover, the reconciliation result would not be reliable if the data supporting it is unavailable or inadequate.

**equitable rate that satisfies the statute**. As the District of Columbia circuit has concluded, "The relevant question is whether the agency's numbers are within a 'zone of reasonableness,' not whether its numbers are precisely right." Hercules Inc. v. EPA, 598 F.2d 91, 107-8 (D.C. Cir. 1978).

Therefore, reconciliation does not produce a more accurate reflection of the "cost of benefits provided," under 5 U.S.C. § 8902(i). Rather, reconciliation produces a more accurate reflection of what the carrier charged the other comparable groups that it insures. OPM's nonreconciliation regulation yields rates that are within the zone of reasonableness and satisfy 5 U.S.C. § 902(i).

Accordingly, the regulation is not arbitrary or capricious but, rather, is valid and effective as a matter of law.

E. The Court Should Not Set Aside The Regulation, Because Plaintiffs Failed To Challenge Promulgation of Regulation During The Comment Period, Even Though They Clearly Had Opportunities To Do So

In any event, the three carriers here failed to provide any comments, or otherwise challenge the proposed promulgation of the regulation, during the comment period in late 1989 to early 1900 – a time when they were participants in the FEHBA and possessed their contracts with OPM. As the United States Court of Appeals for the District of Columbia Circuit has held, in these circumstances, in which plaintiffs made no challenge at the time, the court would not set aside the regulation. State of Michigan, 213 F.3d at 663.[11]

[11] It is also likely that any claim that the carriers might have had to challenge the regulation is now time-barred by the six year statute of limitations. E.g., Defenders of Wildlife v. Norton, 257 F.Supp.2d 53, 67 (D.C. D.C. 2003); Strahan v. Linnon, 967 F.Supp. 581, 607 (D. Mass 1997), aff'd, 187 F.3d 623 (1st Cir. 1998)(Table); Wind River Min. Corp. v. United States, 946 F.2d 710, 714-15 (9th Cir. 1991; 28 U.S.C. §2401(a).

F. The Non-Reconciliation Regulation
Is Valid and Proper As Applied To Plaintiffs

1. The Regulation Applies to All Community Rated Carriers, Including Plaintiffs, Without Regard To Whether The Underlying Rationale Of the Regulation Pertains To Their Individual Cases

Plaintiffs argue that the rationales for the regulation do not apply to them, and, therefore, the regulation should be invalid as applied to them. Plaintiffs rely upon the fact that each had submitted documentation for the rate reconciliation process during the year in which they later chose to exit the program, and that OPM had performed the reconciliation calculation before each chose to exit the FEHBA program. Stip. ¶¶16-19, 22 (Bluelincs); ¶¶37-39 (Scott & White); ¶28 (Texas Health). Scott & White claims that it is not difficult to get adequate data about the amount it asserts it is owed because "OPM indisputably did get adequate data from Scott & White to perform the 1999 reconciliation." Motion at 20. Plaintiffs based their argument in part upon their view that record retention obligations and audit rights survive nonrenewal of the contract termination, and that none of the carriers went out of business during the final year of performance. Stip. ¶26 (Bluelincs); ¶46 (Scott & White); ¶35 (Texas Health). According to plaintiffs, OPM could secure the data it would require to perform the reconciliation calculation.

OPM's regulations, however, apply nationwide, and equally to all regulated entities, no matter whether the particularized rationales that gave rise to the regulation apply in an individual case. That is because, when a Federal agency regulates – whether it is pursuant to the FEHBP and/or the FAR – it does so to establish the rules of the program for all participants. See NTEU v. Campbell, 589 F.2d at 678-79 (court ordered OPM to specify which procurement regulations apply to carriers participating in FEHBP so that parties would be certain, in advance, of their

rights and obligations under the program). These procurement regulations also required the nonreconciliation in year of nonrenewal to be inserted into plaintiff carriers' contracts with OPM.

Caselaw dictates against the result advanced by plaintiffs. "[I]n establishing a rule of general application, it is not a condition of its validity that there be adduced evidence of its appropriateness in respect to every [entity] to which it will be applicable. In this connection, the [agency...] may reason from the particular to the general. Assigned Car Cases, 274 U.S. 564, 583 (1927). In promulgating general rules, the agency is not required to determine, and take into account, the actual effect of the rule upon each person subject to the rules. See United States v. Florida East Coast Ry., 410 U.S. 224, 246 (1973); United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 749 (1972); Permian Basin Area Rate Cases, 390 U.S. 747, 768-774 (1968).

Contrary to plaintiffs' contentions, OPM is entitled to attempt to predict the behavior of the population it regulates, and, regulate in anticipation of that behavior. "There is little question that agency prognostications . . . may be used in the formulation of policy; 'it is within the scope of the agency's expertise to make . . . a prediction about the market it regulates, and a reasonable prediction deserves our deference notwithstanding that there might also be another reasonable view.'" WorldCom, Inc., 238 F.3d at 459, quoting Environmental Action Inc. v. FERC, 939 F.2d 1057, 1064 (D.C. Cir. 1991).

The regulation establishes the rights and responsibilities of all of the contractors in the FEHBA. Parties subject to the rules may not selectively choose, after the fact, which regulations apply. NTEU v. Campbell, 589 F.2d at 678. Thus, whether any of the plaintiffs could provide, or did provide, OPM with adequate data necessary to calculate a reconciliation amount, does not

determine the validity of the nonreconciliation regulation.

The carriers allege here that they are shouldering the economic burden of the risk. However, the regulation is not invalid just because, in hindsight, a party is dissatisfied with the result of the regulation's application.[12] The program rules are established in advance of their application, and the fact that a rationale upon which the rule is based does not speak to the circumstances of an individual case, years later, does not render the rule invalid as applied to the individual case.

In its final rule, OPM placed the burden of risk, as a result of nonreconciliation, **equally upon the Government and the carriers**. There could hardly be any rule more fair in these circumstances.

2. The Record Retention Provisions Specific To The Annual Rate Reconciliation, Governing The Carriers' Operations When They Remain In The Program, Do Not Apply To Non-Reconciliation Issues

Plaintiffs rely upon the record retention provisions to support their argument that they could have supplied adequate information and data for a reconciliation in their final year of participation. However, plaintiffs' reliance is misplaced.

The record retention provisions specific to data for the carrier's operations do not apply to reconciliation matters and the final year of nonrenewal. That is because the record retention provisions require the carriers to retain and make available "all records applicable to a contract term that support the annual statement of operations and the rate submission for that contract term . . including all calculations and statements pertaining to reconciliation for five years after

[12] Had the carriers found themselves in a surplus position with money owing to the Government in the event of reconciliation, one is hard-pressed to imagine the carriers challenging the validity of the nonreconciliation regulation, or alternatively, acceding to any OPM determination that money was due and payable to OPM.

the end of the contract term. 48 C. F. R. §1652.204-70; 48 C. F. R. 52.215-2; Contracts section 3.4 (Contractor Records Retention)(FEHBAR 1652-204.70))(emphasis added), App. 108 (Scott & White).[13] Thus, the record retention requirements relate to the contractor's operations, and records involved rate reconciliations (e.g., in developing the carriers' methodologies and actuarial assumptions for actual rate reconciliations for the Federal groups and the possible SSSGs, while the carriers are participating in the FEHB program, to support any adjustments made to future insurance years based upon past differences in subscription rates). These record retention requirements apply, on their face, to annual operations and rate reconciliations.

However, these record retention provisions do not apply to the **nonreconciliation** of rates. They do not apply for the simple reason that there is no "reconciliation" of rates in the final year of the carrier's participation.

Notwithstanding the inapplicability of the record retention provisions of section 3.4 of the contract (and the corresponding regulations), plaintiffs assert that they "indisputably" presented "adequate" data to OPM and so that OPM could have performed reconciliation of their final year rates. However, it is not clear that the data presented was "adequate," in the sense that it would prove acceptable to OPM's OIG were OIG to conduct an audit, or ultimately to the Office of Insurance Programs should OIG have questioned the data. The data that Scott & White and the other carriers presented for reconciliation was not verified, and was not subject to verification by subsequent audit.

Therefore, notwithstanding plaintiffs' allegations as to adequate data, OPM has no

---

[13] See also section 5.7, Audit and Records - Negotiation, App. 114 (Scott & White), section 5.9, Price Reduction for Defective Cost or Pricing Data - Modifications, App. 115 (Scott & White) (and section 5.11, App. 116).

authority, legally, to compel, this type of documentation, for purposes of any "rate reconciliation" in the final year of nonrenewal - because there is no reconciliation in that final year. Nor, or as a practical matter, can OPM, as it determined when promulgating the regulation, necessarily obtain adequate data when a carrier exits the program.

Therefore, plaintiff's reliance upon the record retention provisions is misplaced.

## III. Plaintiffs Are Bound By The Terms Of Their Contracts, Section 3.2

### A. This Court's CDA Review Is De Novo, and The Court Interprets The Terms of the Contract As A Matter of Law

Plaintiffs' CDA contracts contain section 3.2, quoted above in our Statement of the Facts. It is well-established that review in a CDA is de novo. E.g., Wilner Construction Co. v. United States, 24 F.3d 1397 (1994)(en banc).[14] Further, in a CDA case, this Court interprets contractual provisions as a matter of law. E.g., Craft Mach. Works, Inc. v. United States, 926 F.2d 1110 1113 (Fed. Cir. 1991). The court should apply a plain and ordinary meaning to the contract language. E.g., Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993); Gould, Inc. v. United States, 935 F.2d 1271, 1273 (Fed. Cir. 1991).

Here, there is no dispute between the parties – section 3.2 of the contract requires that there be no reconciliation of rates in the year of non-renewal. Therefore, even if this Court were to hold the regulation to be invalid, plaintiffs are bound by the contracts they signed, which included the provision for nonreconciliation of rates in the final year of nonrenewal.

[14] Review is de novo even in cases, as here, in which the contracting officers did not render a final contracting officer's decision, and there was a "deemed denial." 41 U.S.C. §609(a)(3).

B. Plaintiffs Signed The Contracts That Contained The Terms Of The Non-Reconciliation Regulation, And Are Bound

From 1990 forward, for more than ten years, each of the three plaintiffs signed, each year, the contract with OPM that contained section 3.2, the terms of the non-reconciliation regulation. It is axiomatic that a contractor is held to its voluntary contractual commitment. E.g., American Contracting Corp. v. United States, 217 Ct. Cl. 338, 359 (1978); Giesler v. United States, 232 F.3d 864, 869 (Fed. Cir. 2000); Mexican Intermodal Equipment, 61 Fed. Cl. at 65 (same). See Stip. ¶3.

By statute, Congress authorized OPM to execute these contracts. 5 U.S.C. § 8902(a), E.g., Bolden, 848 F.2d at 203. All affected carriers, including the three plaintiffs here, had an opportunity to comment upon the proposed contract language, during 1989-1990 and the notice and comment period for the regulation. To the extent that plaintiffs argue that their contracts should be reformed so as to delete the non-reconciliation regulation, reformation is not warranted because there was no mistake. E.g.. Burnett Elecs. Lab., Inc. v. United States, 479 F.2d 1329, 1333 (Ct. Cl. 1973)(purpose of reformation to conform words of contract to those the parties actually intended); Ruggiero v. United States, 420 F.2d 709, 713 (Fed. Cir. 1970)(reformation when court is concerned with overreaching by Government); T.L. Roof & Assocs. Constr. Co. v. United States, 28 Fed. Cl. 572, 577 (1993)(no unusual circumstances were present)..

Plaintiffs signed the contract as it was written, including section 3.2. Neither OPM nor the carriers made any mistake. Rather, the carriers either knew, or were charged with, knowing the law and the regulatory terms. There was no overreaching by the Government. Reformation of the contract is not warranted.

Accordingly, the Court should enforce the contract as written.

B. Plaintiffs Waived Any Right To Object
To Section 3.2(b)(6) Of Their Contracts

Even if the Court were to hold the regulation invalid and contemplate reformation of the contract to delete the non-reconciliation regulation, plaintiffs waived any right to object now to the terms of the regulation because those terms were expressly incorporated into the FEHBA contracts — contracts that plaintiffs signed, each year from 1990, and contracts that plaintiffs fully performed before choosing to exit the FEHBA program. By failing to challenge the contract clause at any time prior to its substantial completion of the contract, each plaintiff waived its right to object to the clause.

Plaintiffs ignore clear precedent of this circuit on waiver. "The doctrine of waiver precludes a contractor from challenging the validity of a contract on the basis of a regulatory violation or on any other basis, where it fails to raise the problem prior to execution, or even prior to litigation, on which it later bases its challenge." Whittaker Electronic Systems v. Dalton, 124 F.3d 1443 (Fed. Cir. 1997), reh'g denied and en banc suggestion declined (1997); see American Telephone & Telegraph Co. v. United States, 307 F.3d 1374 (Fed. Cir. 2002), reh'g en banc denied (2003), cert. denied, 540 U.S. 937 (2003)(ATT should have raised issue at a time when effective remedy was available); Hermes Consolidated, Inc. v. United States, 58 Fed. Cl. 3, 14, 19 (2003). In Whittaker, the United States Court of Appeals for the Federal Circuit held that the contractor waived its right to challenge the validity of a contract based upon the violation of a Defense Acquisition Regulation, because the contractor failed to make a timely objection prior to execution of the contract. The court concluded that the contractor had failed to complain and had substantially completed the contract without raising the problem prior to

litigation, and therefore, was precluded from challenging the contract. Id. Accord Mexican Intermodal, 61 Fed. Cl. at 68-70 (concluding, in reliance upon Whittaker, that the contractor belatedly attempted to seek the benefit of a bargain that it did not make, and ruling in favor of the contractor would undermine the fairness of the procurement process).

Plaintiffs' challenge here to the non-reconciliation contract clause is similar to the appellant's claim in Whittaker, and, should be rejected for the same reasons. None of the plaintiff carriers was ever obligated to enter into a contract, for any of the years beginning in 1990 with the initial application of the regulation with OPM and the incorporation of the terms of the regulation into the contract. As in Whittaker, plaintiffs never objected to the non-reconciliation contract clause, never asserted that it was invalid or inconsistent with the FEHBA, and never complained that there had been an unfair allocation of the risks of economic uncertainty. On the contrary, plaintiffs accepted fully the terms of their contracts and continued to perform under them for approximately nine or more years, reaping all benefits of the contract consistent with the terms upon which it had agreed, including rate reconciliations – and only then, having made the choice to exit the FEHBA program at a time when there could no further rate reconciliations – challenged the nonreconciliation regulation.

Since Whittaker, the Court of Federal Claims has applied the doctrine of waiver in several cases and rejected untimely claims for additional payments based upon an alleged or actual violation of a procurement regulation. See AT&T v. United States, 48 Fed. C1. 156 (2000) (even if contracting officer's selection of contract type violated regulations, the time to have raised such concerns was during negotiations, not years after contract completion); PCL Construction Services, Inc. v. United States, 41 Fed. C1. 242 (1998) (use of the "subject to

availability clause" was apparent on the face of the solicitation, thus, contractor should have raised any objections to the use of the clause or failure to follow FAR administrative procedures prior to submission of bids).

Under these circumstances, if plaintiffs suffered injury at all, it was a result of the rates they proposed, estimated, and negotiated under the contracts, and not a result of the regulation.

Thus, plaintiffs have waived their rights to challenge the nonreconciliation in year of nonrenewal clause, whether or not the underlying regulation is ultimately upheld as valid. Contractors are charged with notice of Government regulations. See 44 U.S.C. § 1507; Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380 (1947) (appearance of regulations in the Federal Register gives legal notice of their contents). There is nothing on the record to indicate that the plaintiffs had a different view of what was contemplated or intended by section 3.2(b)(6) than did OPM. Plaintiffs never expressed disagreement with OPM's interpretation of what contract section 3.2(b)(6) meant. Kichak Decl. ¶28, Supp.App. 7. Accordingly, when plaintiffs executed and performed the contracts, annually, over the course of nine or more years during which it was included in the contract, the plaintiffs acquiesced in and were bound by the plain meaning of section 3.2(b)(6). Plaintiffs must not now be allowed to select which contract clauses apply to it, accepting the underlying regulation when it does not cause financial disadvantage to the carrier, and complaining when it fails to result in financial advantage to it.

C. Laches Bars Plaintiffs' Claims

Alternatively, the doctrine of laches bars plaintiffs' claims. Laches is based upon the public policy which discourages stale demands, because courts find it more difficult to do justice in those circumstances. E.g. Mexican Intermodal, 61 Fed. Cl. at 70-72, citing Mackall v.

Casilear, 137 U.S. 556, 56 (1890); LaForge & Budd Constr. Co. v. United States, 48 Fed. CL. 566, 570 (2001). The dismissal of a claim based upon laches may be proper regardless of whether the statute of limitations has tolled a given claim. Mexican Intermodal, 61 Fed. Cl. at 70, citing LaCoste v. United States, 9 Cl. Ct. 313, 315 (1986). To prevail on laches, the defending party must demonstrate unreasonable, unexcused delay by the claimant, and prejudice, either economic or prejudice in mounting a defense. Mexican Intermodal, 61 Fed. Cl. at 71, citing Jana, Inc. v. United States, 936 F.2d 1265, 1269 (Fed. Cir.), cert. denied, 502 U.S. 1030 (1992).

Here, all of the elements of laches are met because plaintiffs failed to challenge the promulgation of the regulation in 1990 and continued to sign their annual FEHB contracts for years. It was only in the year in which they chose to exit the FEHB program that they challenged the validity of the non-reconciliation regulation.[15] While the delay in Mexican Intermodal was approximately four and one half years, the delay here was significantly longer, or more than ten years -–– from January 1990 (effective date of the regulation) or the 1990 FEHB year when the terms of the regulation were incorporated into the contracts, to, 1999 and 2000, when the carriers completed their contracts and chose to exit the FEHB program and then challenged, for the first time, the non-reconciliation regulation. See id., at 71 (discussing periods of time in laches cases). The delay here was clearly unreasonable.

Further, the delay is not excused. Mexican Intermodal, 61 Fed. Cl. at 71, citing Cornetta v. United States, 851 F.2d 1372, 1377-78 (Fed. Cir. 1988). In fact, plaintiffs have never

[15] We do not argue any CDA statute of limitations. Each of the three plaintiffs submitted a CDA claim to the contracting officer in a timely manner: Bluelincs in July 2001, and supplemental claim in March 2002, Stip. ¶¶24-25; Scott and White in October 2000; and, Texas Health in January 2002.

proferred any reason for their delay.

The Government has been prejudiced by the unreasonable and unexcused delay, including the economic harm that would affect the Government were plaintiffs to prevail. See Mexican Intermodal, 61 Fed. Cl. at 71-72. In addition, at least with respect to Bluelincs, which relies upon alleged telephone conversations in October 2000, with Ms. Sherry Simon, OPM, relating to a reconciliation calculation, the passage of time leads to fading memories. Stip. ¶47 a and b. Id., citing JANA, Inc. v. United States, 936 F.2d at 1269 (prejudice in mounting a defense).

Accordingly, laches bars plaintiffs' claims.

D. Fairness Requires That The Court Enforce The Contract To Which The Parties Agreed

The waiver and laches principles are related. Some courts consider the waiver issue as one of fairness. Here, plaintiffs attempt to turn the fairness principles upside down. Contrary to plaintiffs' view, the only fair result is to enforce the contract as written. See Stip. ¶3.

In Ling-Temco-Vought, Inc. v. United States, 475 F.2d 630 (Ct. Cl. 1973), the contractor pursued a claim for contract reformation based upon alleged mutual mistake. The Court, on the basis of waiver, rejected the claim because the contractor knew the actual facts at an early stage, but waited to assert the claim until after the contract was completed. The contractor "in effect retained all options for itself," and "made its calculations entirely in its own favor, without proper consideration of the defendant's position." Id. at 149. The Court found that these actions violated the "basic principle calling for fair treatment of both parties." Id. at 148-149. See also Promac, Inc. v. West, 203 F.3d 786, 789 (Fed. Cir. 2000) (contractor actively participated in allegedly improper procurement actions, and had unclean hands; not entitled to equitable

remedy); E. Walters & Co. v. United States, 576 F.2d 362, 367 (Ct. C1. 1978) (contractor waived challenge to legality of option clause when it failed to protest, at time of award, Government's use of option provision; prejudice to Government); Hartford Accident & Indemnity Co. v. United States, 130 Ct. C1. 490, 494 (1955) (surety which performed with knowledge of terms of Government contract was estopped to assert that contract was executed without authority); Hermes Consolidated, Inc. v. United States, 58 Fed. Cl. 3, 14-15 (2003); Cubic Applications, Inc. v. United States, 37 Fed. C1. 345 (1997) (court rejected equitable remedy because contractor knew of an illegality argument, but instead attempted to win the contract); see 60 Key Center Inc. v. Administrator of GSA, 47 F.3d at 60 (all bidders were aware, or, should have been aware of policy to allow late bids until the deadline for best and final offers; statute and regulation designed to produce best possible contracts for the Government in the majority of cases). Accord Mexican Intermodal Equipment, 61 Fed. Cl. at 69-70 (to permit additional compensation would be unfair to Government and other bidders, given that contractor delayed so long in submitting claim; proper time to raise challenge was at time of contract negotiation when effective remedy was available).[16]

These fairness principles apply here. Each of the three carriers was silent regarding the non-reconciliation clause in the contract - beginning in 1990 when the regulation was

[16] As the court explained in Mexican Intermodal, plaintiffs err in attempting to rely upon LaBarge Prods, Inc. v. West, 46 F.3d 1547 (Fed. Cir. 1997), Chris Berg v. United States, 192 Ct. Cl. 176 (1970), cases that are clearly distinguishable here. In LaBarge and Chris Berg, the contractors raised their concerns about the procurement process **before** contract award, not as here, after contract completion. While the court of appeals in LeBarge did not reach the issue of waiver, and decided against the contractor because the Government had not engaged in prohibited conduct, the court also noted that the Government's action in LaBarge was based upon a rational basis and legitimate reasons. Similarly, here, as we established above, OPM's nonreconciliation regulation is not arbitrary or capricious.

promulgated, and the terms included in the contract, and for each of the subsequent years that the carriers executed contracts with OPM until each chose to exit the FEHB program. Their silence - for more than a decade -- whether for tactical reasons or based upon some other motivation, constitutes a waiver of their claims. Courts have recognized that contractors often purposefully decline to mention what they perceive to be wrongful Government conduct in order to attempt to obtain the benefits of a contract to maintain a valuable customer relationship. See Becho, Inc. v. United States, 47 Fed. Cl. 595, 604 (2000). Plaintiffs could have challenged the inclusion of the non-reconciliation clause during the proposal process, prior to rate negotiation, and/or each year during the rate negotiations. However, none of the three plaintiffs availed themselves of that option. Rather, the carriers each submitted a proposal, were awarded the annual contracts, performed the contracts, and were paid the full contract price each year. Plaintiffs cannot now seek additional compensation above and beyond that contemplated by the contract terms. Plaintiffs' belated attempt to rewrite the contract, years after the fact, should be rejected. Plaintiffs clearly had the opportunity to challenge this provision, even if they believed that the Government considered the non-reconciliation clause to be non-negotiable, and even if they believed that to challenge its use might affect its ability to obtain the contract. See Reservation Ranch v. United States, 39 Fed. C1. 696, 712 (1997), aff'd., 217 F.3d 850 (Fed. Cir. 1999) (table) (rejecting contractor argument that it did not press an issue because it believed it was "powerless to negotiate the issue"). See Ling-Temco-Vought, 475 F.2d at 636-38.[17]

---

[17] Plaintiffs' argument that the non-reconciliation regulation was "not negotiable" lacks merit. Indeed, the Federal Circuit has rejected this same type of claim. See, PCA Health Plans of Texas, Inc. v. LaChance, 191 F.3d at 1356. In that case, PCA asserted that it was not bound by the modified regulation, in part, because OPM declared that the amendment was "not negotiable." However, as the court concluded, PCA signed the amended contract, thereby agreeing to its effective date. That OPM was unwilling to negotiate the language of the modified

Accordingly, it would be patently unfair to OPM, and to all the other FEHBP carriers, to permit the three carriers at this late stage to reform their contracts using an alternative clause not included in the original contract and/or to re-price their contracts after they have been fully performed.[18]

V. OPM Did Not Breach Its Contract With Bluelincs

BlueLincs, in its separate motion (and unlike Scott & White and Texas Health), asserts that OPM "breached" its contract with BlueLincs. BL motion at 9. Because OPM's regulation is reasonable and valid, as demonstrated above, and because the contract, section 3.2(b)(6), in each the contract that Bluelincs signed contracts is a valid and enforceable contract provision, OPM's actions were in conformance with the contract. Thus, OPM has not breached its contract with BlueLincs. E.g., American Contracting Corp., 217 Ct. Cl. at 359; Mexican Intermodal Equipment, 61 Fed. Cl. at 65(same); Northrop Grumman Corp. v. United States, 47 Fed. Cl. 20, 43-44 (2000)(enforce contract as written, because no unjust result; contractor was cognizant of risks, was sophisticated and had available to it all the information necessary to bid on contract).[19]

---

provision is irrelevant, because PCA could have simply refused to accept the new terms of the contract. The court of appeals affirmed that PCA agreed that the modified section 5.9 would be effective January 1, 1991, and OPM was entitled to interest pursuant to that clause. Id. Here, OPM never informed plaintiffs that the non-reconciliation was non negotiable. Even if it had, the plaintiffs signed the contracts, repeatedly, each year, and are bound.

[18] Because the issues briefed involve liability, not damages, we do not address the quantum aspect of the cases, if any. We respectfully request that, if the court denies our motion for summary judgment and/or grants plaintiffs' motion for summary judgment, the parties address any possible damages proceedings at that time.

[19] Bluelincs also contends that the contract clause, "Order of Precedence," requires that the statute govern over any inconsistency with the contract. However, Bluelincs's argument here is simply a restatement of its argument that the regulation is invalid. Therefore, BL's argument lacks merit.

See Do-Well Machine Shop, Inc v. United States, 870 F.2d 637, 640 (Fed. Cir. 1989)(United States may enforce agreement to a particular contractual provision).

Therefore, BlueLincs is not entitled to damages for breach of contract.

## CONCLUSION

For these reasons, defendant respectfully requests that the Court grant summary judgment in its favor, and deny plaintiffs' motion for summary judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

/s/ David M. Cohen
DAVID M. COHEN
Director

/s/ Jane W. Vanneman
JANE W. VANNEMAN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., NW
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Phone: (202) 307-1011
Fax: (202) 514-8624

SUSAN WHITMAN, Esq.
JILL GERSTENFIELD, Esq.
U.S. Office of Personnel Management
Washington D.C.

February 17. 2006

.

CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of February, 2006, a copy of the foregoing "DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.