# United States Court of Federal Claims

| | |
|---|---|
| **GHS Health Maintenance Organization, Inc., d/b/a BlueLincs HMO, Texas Health Choice, L.C., and Scott & White Health Plan,** ***Plaintiffs,*** <br> *v.* <br> **United States,** ***Defendant.*** | **No. 01-517C** <br> **Judge Marian Blank Horn** |

**Plaintiffs Scott & White Health Plan and Texas Health Choice, L.C.'s**
**Reply Memorandum Regarding the Parties' Cross-Motions for Summary Judgment**

Michael S. Nadel
McDermott Will & Emery LLP
600 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 756-8000

*Attorneys for Plaintiffs*
*Scott & White Health Plan*
*and Texas Health Choice, L.C*

*Of Counsel:*

Joel L. Michaels
Maura A. Dalton
McDermott Will & Emery LLP
600 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 756-8000

## Table of Contents

Table of Authorities ..........iv

Introduction ..........1

Argument in Reply ..........3

I. The Final Year Regulation Irreconcilably Conflicts with the Act. ..........3

A. The Final Year Regulation Contravenes the Intent of Congress. ..........5

1. OPM's Rationale That It Is "Difficult" to Obtain Reconciliation Data Is Insufficient. OPM Cannot Fundamentally Alter the Statutory Scheme in the Name of "Administrability and Efficiency." ..........5

2. The Remainder of OPM's Defense of the Final Year Regulation Consists of Impermissible *Post Hoc* Rationalizations and Rests on Impermissible Non-Record Evidence. This Court's Review Must Be Confined to the Rationales and Evidence in the Rulemaking Record. ..........10

3. Even If They Are Considered by this Court, OPM's New Rationales Fail to Justify the Final Year Regulation's Departure from the Act. ..........11

a. OPM's "Financial Disincentive" Rationale Does Not Make Sense and Is Unsupported in the Administrative Record. ..........11

b. OPM's "Estimated Rate" Rationale Is Contrary to the Language of the Act and OPM's Own Rulemaking Decisions. ..........14

c. OPM's "Cost" Rationale Is Unsupported in the Administrative Record and Is Illogical. ..........16

B. The Risk Imposed by the Final Year Regulation Is Not Spread Evenly Between the Government and the Health Plans. ....17

II. The Final Year Regulation Is Invalid As Applied to the Plaintiffs. ....19

A. As-Applied Challenges to Regulations Are Legitimate. ....19

B. OPM's Argument That the Regulations Requiring the Retention of Reconciliation Records Do Not Apply To the Year of Non-Renewal Is Meritless. ....20

III. OPM's Procedural Defenses Fail. ....21

A. If the Court Agrees that the Final Year Regulation Is Invalid, It Should Reform the Plaintiffs' Contracts. ....21

B. OPM Has Forfeited Its Waiver and Laches Defenses. .... 22

C. Scott & White and Texas Health Have Not Waived Their Rights to Challenge the Final Year Regulation. ....25

D. Laches Does Not Bar the Plaintiffs' Claims. ....27

IV. Basic Fairness – Including the Avoidance of an Unjust Windfall – Requires That the Final Year Regulation Be Held Invalid. ....28

Conclusion ....30

## Table of Authorities

### Cases

*Am. Fed. of Gov't Employees v. United States*, 258 F.3d 1294 (Fed. Cir. 2001) ........................28

*Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 282 F.3d 818 (D.C. Cir. 2002) ..................19

*Arizona v. Thompson*, 281 F.3d 248 (D.C. Cir. 2002)................................................................10

*Ashe v. Corley*, 992 F.2d 540 (5th Cir. 1993) ............................................................................24

*Ass'n of Civ. Technicians v. Fed. Labor Rel. Auth.*, 269 F.3d 1112 (D.C. Cir. 2001)...........10, 11

*AT&T v. United States*, 48 Fed. Cl. 156 (2000) ..................................................................25, 26

*Bannercraft Clothing Co. v. Renegotiation Bd.*, 466 F.2d 345 (D.C. Cir. 1972).........................29

*Beta Systems v. United States*, 838 F.2d 1179 (Fed. Cir. 1988) ..........................................22, 25

*Camp v. Pitts*, 411 U.S. 138 (1973) ...........................................................................................11

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ............................5

*Chris Berg v. United States*, 192 Cl. Ct. 176 (1970) ..................................................................22

*Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345 (1997) .............................................26

*E. Walters & Co. v. United States*, 576 F.2d 362 (Ct. Cl. 1978) ................................................26

*First Fed. Sav. Bank of Hegewisch*, 52 Fed. Cl. 774 (2002) .......................................................24

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) .............................................................11

*Funding Sys. Leasing Corp. v. Pugh*, 530 F.2d 91 (5th Cir. 1976) ............................................24

*Harris v. Secretary*, 126 F.3d 339 (D.C. Cir. 1997)..........................................................23, 24

*Hartford Accident and Indem. Co. v. United States*, 127 F. Supp. 565 (Ct. Cl. 1955)...............26

*Jones v. D.C. Dep't of Corrections*, 429 F.3d 276 (D.C. Cir. 2005)............................................24

*LaBarge Prods., Inc. v. West*, 46 F.3d 1547 (Fed. Cir. 1997) ....................................................22

*Ling-Temco-Vought, Inc. v. United States*, 475 F.2d 630 (Ct. Cl. 1973) ...................................27

*Lomont v. O'Neill*, 285 F.3d 9 (D.C. Cir. 2002).........................................................................19

*Mexican Intermodal Equipment v. United States*, 61 Fed. Cl. 55 (2004) ....................................28

*Munchak Corp. v. Cunningham*, 457 F.2d 721, 725 (4th Cir. 1972) ........................................29

*PCL Constr. Servs, Inc. v. United States*, 41 Fed Cl. 242 (1998)...............................................26

*Promac v. West*, 203 F.3d 786 (Fed. Cir. 2000).................................................................27

*Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002)..........................................6, 7, 8, 9

*Smith-Haynie v. District of Columbia*, 155 F.3d 575 (D.C. Cir. 1998)......................................24

*Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997) ................................................26

**Statutes and Regulations**

5 U.S.C. § 8902 ......................................................................................................1, 4, 6, 7

48 C.F.R. § 52.215-2 .................................................................................................................21

48 C.F.R. § 1652.204-70 ...........................................................................................................21

48 C.F.R. § 1652.216-70(b)(6) .....................................................................................................1

**Miscellaneous**

FED. R. CIV. P. 8 ........................................................................................................................23

55 Fed. Reg. 27406 (1990) ..................................................................................................5, 14, 16

62 Fed. Reg. 47569 (1997) ..........................................................................................................13

**Introduction**

OPM has used every conceivable means at its disposal to avoid the plain language of the Federal Employees Health Benefits Act ("FEHBA"). OPM unnecessarily sprinkles its argument with terms such as "experience rating," "community rating," "premiums," and "methodologies" in a transparent effort to confuse this Court into deferring to OPM's expertise. But the statute at issue in this case, 5 U.S.C. § 8902(*i*), is written in plain English. It states that health plans participating in the Federal Employees Health Benefits Program (the "Program") "shall" be compensated by OPM at rates that "reasonably and equitably reflect the cost of the benefits provided." 5 U.S.C. § 8902(*i*). One need not be a health law expert or an actuary to understand that language. Either OPM is complying with the statute or it is not. With respect to 48 C.F.R. § 1652.216-70(b)(6) (the "Final Year Regulation"), it is not.

It is undisputed that OPM, as the administrator of the Program, developed a three-step process to satisfy FEHBA. First, before the contract year begins, participating health plans estimate the prices they will charge similar sized subscriber groups ("SSSGs") in the private sector. The Government pays the plans at those estimated rates. Second, during the contract year, the Government and the plans reconcile the estimated years with the rates that the health plan actually charged the SSSGs. Third, if the plan was charging the Government too much, the plan pays the Government the difference. If the plan was charging the Government too little, the Government pays the plan the difference.

It is also undisputed that during the final year of a plan's participation in the program, that process is short-circuited. The third step – payment, either to the health plan or the Government – does not occur. It is undisputed the reason payment does

not occur is because of a clause that appears in every health plan's contract that provides that in the final year of a plan's participation, there is no payment. And it is undisputed that the presence of this clause in the contract is non-negotiable. The Final Year Regulation requires that this clause appear in every Program contract.

Because the Final Year Reconciliation ensures that the Government will not pay a plan money that OPM's own reconciliation process determined was owed for the final year of the plan's participation in the Program, the Final Year Regulation conflicts with FEHBA's requirement that plans be compensated at rates that reasonably and equitably conflict with the cost of the benefits provided. Plaintiffs do not challenge OPM's expertise, or its discretion to determine the best method by which to compensate plans reasonably and equitable, as required by FEHBA. The problem is that OPM <u>has</u> devised a method to comply with FEBHA: the three-step process described above. It is OPM's <u>departure</u> from that process during the final year of a plan's participation that is contrary to the statute.

OPM cannot avoid the statute with appeals for deference or canards of "administrability." OPM itself has already determined that the amount that reasonably and equitably reflected the cost of the benefits Scott & White provided in the 1999 contract year was $3,625,782 <u>less</u> than OPM paid Scott & White. Similarly, OPM itself has already determined that the amount that reasonable and equitably reflected the cost of the benefits Texas Health provided in the 2001 contract year was $622,279 <u>less</u> than OPM paid Texas Health. Now OPM refuses to pay the plans those sums – a result required by the Final Year Regulation. Thus, the Final Year Regulation has fundamentally altered the statutory scheme established by Congress. OPM's defenses reveal the Final Year Regulation to be little more than the illegitimate codification of

illogic and government laziness: OPM is unwilling to press its contractors for records that OPM's own regulations require them to retain. As a matter of law, the Final Year Regulation must fail. OPM's arguments that the plans must be held to the terms of their contracts even if those contracts are invalid under FEHBA also must fail. The Government cannot profit from an invalid regulation.

## Argument in Reply

### I. The Final Year Regulation Irreconcilably Conflicts with the Act.

OPM's strategy on the merits seems to be to attempt to confuse the Court into deference. OPM has described, in the most complicated way possible, what is at root a relatively simple program: Almost eight months before the contract year begins, health plans provide estimated rates that the Government will pay the plans, on an interim basis, for the benefits that the plans provide. Those estimated rates may be higher or lower than the rates the plan actually ends up charging relevant comparison groups – the SSSGs. Then, after the contract year is well underway, the health plan and OPM engage in a reconciliation process to determine what rate the Government <u>should</u> be paying. Either the Government has been paying too much or too little. The result of the reconciliation is that if the Government has paid too much, the plan must pay the Government the difference; if the Government has paid too little, the Government must pay the plan the difference.

To see how the Final Year Regulation is contrary to FEHBA, the Court need only consider two hypothetical plans, Plan A and Plan B. Both plans entered the program in 1995. Both plans provided exactly the same health benefits over the 1995, 1996, 1997,

1998, and 1999 contract years. In each contract year, both plans' estimated rates turned out to be below the rates that the Government actually should have been paying, so for each year, both plans were reimbursed by the Government in amounts totaling $4 million per year. In the fall of 1999, Plan A decided to participate in the program for the 2000 contract year. Plan B decided to withdraw from the program. Both plans have adequate documentation to support reconciliation. For the 1999 contract year, Plan A is reimbursed approximately $4 million. Plan B is owed $4 million but receives nothing.

In the scenario above, the two plans provided the same benefits for the same costs. The government was under the same obligation to compensate both at rates that reasonably and equitably reflect the cost of the benefits provided. Yet the plan that renewed its contract received payments $4 million higher than the plan that withdrew. No matter how much deference is owed to OPM, it is clear that one of these plans was not compensated as Congress commanded.

Congress required OPM to ensure that the rates paid to the plans "reasonably and equitably reflect the cost of the benefits provided." 5 U.S.C. § 8902(*i*). Scott & White and Texas Health do not challenge the core features of the system OPM developed to implement that requirement. But when OPM promulgated the Final Year Regulation, OPM departed from the statutory requirement. Whatever legal standard is applied to analyze it, OPM's departure is inconsistent with FEHBA. The Final Year Regulation, therefore, must be struck down.

### A. The Final Year Regulation Contravenes the Intent of Congress.

The *Chevron* doctrine is not a license for agencies to disregard laws passed by Congress. If a court, "employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984). The Final Year Regulation fails to give effect to the clear intention Congress expressed in FEHBA, because it contradicts the statutory criterion for compensation. In addition, as shown below, the Regulation is patently unreasonable, and arbitrary and capricious.

#### 1. OPM's Rationale That It Is "Difficult" to Obtain Reconciliation Data Is Insufficient. OPM Cannot Fundamentally Alter the Statutory Scheme in the Name of "Administrability and Efficiency."

OPM offers only one argument that reflects the administrative record in this case: OPM argues that the agency found it difficult to obtain adequate data to perform a reconciliation when carriers had not renewed their contracts. This rationale mirrors OPM's comments in promulgating the regulation. *See* 55 Fed. Reg. 27406, 27410 (1990) ("OPM's experience has been that it is difficult to get adequate data from plans when they have terminated.").[1]

[1] OPM does not even attempt to defend the second rationale of the Regulation – that "in the event a plan goes out of business, there are no rates to reconcile." 55 Fed. Reg. 27406, 27410 (1990).

The only evidence for this statement in the rulemaking record is two instances in which the documentation of a non-renewing plan was insufficient (out of hundreds of participating health plans). In both instances, OPM responded to the insufficient data by decreeing that no payment should be due to the Government or the plan because of the lack of sufficient data in those particular cases. *See* Texas Health Appendix ("THA") 1, 2.

The fatal flaw in this rationale for the Final Year Regulation is that difficulty in obtaining records has nothing whatever to do with the sole statutory criterion – that rates "reasonably and equitably reflect the cost of the benefits provided." 5 U.S.C. § 8902(*i*). Difficulty in obtaining records has nothing to do with "the cost" of the benefits provided. Difficulty in obtaining records does not "reflect" those costs – reasonably or equitably or otherwise. Moreover, whether a plan renews its contract bears no relationship to the "cost" of benefits already provided.

OPM's rationale boils down to administrative convenience – "administrability and efficiency"; OPM does not want to be bothered trying to obtain documentation in the year of non-renewal. Even if the rationale made sense, it would be insufficient to justify departure from the statute. The Supreme Court has stated that "[r]egardless of how serious the problem an administrative agency seeks to address, . . . it may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000)).

OPM contends that "so long as the agency's logic [regarding a decision based on ease of administration and enforcement] is reasonable, a court has no basis upon which to require the agency to engage in a different or more searching legal analysis." OPM Br. at 37. To the contrary, this Court's basis for a more searching analysis was provided by the Supreme Court in *Ragsdale*. In *Ragsdale*, the primary authority relied on by Scott & White and Texas Health in their opening brief, the Supreme Court explained that ease of administration can never excuse an agency decision inconsistent with a legislative scheme enacted by Congress. *Id.* at 91. Here, as explained below and in Plaintiffs' opening briefs, the Final Year Regulation is inconsistent with FEHBA. Congress required that health plans be compensated at rates that "reasonably and equitably reflect the cost of the benefits provided." 5 U.S.C. § 8902(*i*). OPM has determined that it complies with that statutory mandate by reconciling a health plan's rates with those the health plan charges its SSSGs, and OPM has devised a process to affect that reconciliation. By short-circuiting its own process in the final year of a plan's participation, OPM is acting inconsistently with the legislative scheme.

Moreover, *Ragsdale* holds that even where consideration of an agency's administrative burdens is appropriate, and the agency makes a presumption related to administrability on which it predicates its rulemaking, there must be an "empirical or logical basis for this presumption." *Ragsdale*, 535 U.S. at 90. No such basis in present in this case. The administrative record establishes that out of hundreds of plans participating in the program, OPM had difficulty obtaining adequate data from <u>two</u>. This very case demonstrates, empirically, that when plans go out of business, there are rates to reconcile. Texas Health has gone out of business. Yet OPM was able to obtain

adequate data, complete the reconciliation process, and determine that Texas Health was owed $622,246 for the final year for its participation in the program.

Additionally, *Ragsdale* holds that categorical rules based on administrative convenience must be reflect broad generalizations holding true in so many cases that inquiry into whether they apply to the case at hand would be needless and wasteful." *Id.* at 91. Nothing in the record suggests that the generalizations on which OPM relies are true in anything but the most exceptional cases. At the time it promulgated the Final Year Regulation, OPM cited only two instances in which it had been difficult to obtain adequate data from a plan in the final year of its participation. OPM cited no instances in which a plan had gone out of business so there were no rates to reconcile. The materially identical factual circumstances of each of the three Plaintiffs suggests that OPM's generalizations do not meet the criterion of *Ragsdale*. Each plan had completed the reconciliation before it terminated its participation from the Program. Each plan provided OPM with adequate data. And each plan retained that data, pursuant to OPM's own document retention regulations and guidelines. The plaintiffs, rather than OPM's generalization, reflects the typical case, and nothing in the administrative record suggests otherwise.

The Government's half-hearted attempt to distinguish *Ragsdale* fails. *See* OPM Br. at 35 n.9. In *Ragsdale*, the Supreme Court set forth broad principles of administrative law. The Court did not limit its holding to the particular set of facts and regulations in the case. The Court did not base its analysis in *Ragsdale* on the fact that the regulation at issue was a "categorical rule," nor does it matter that the parties know in advance the possible results of the Final Year Regulation. Instead, *Ragsdale* stands for the fundamental administrative law proposition that a regulation cannot stand if it is

arbitrary, capricious or manifestly contrary to the statute, and that rationales of administrative convenience will not save an otherwise invalid regulation *Ragsdale*, 535 U.S. at 86-91. Nowhere in the rulemaking record is there any indication or even a claim that OPM would be unable to solve its problem with recalcitrant health plans either by simply denying reconciliation when they fail to produce adequate documentation or by pursuing the remedies available to it. OPM just finds it inconvenient to implement these solutions.

Finally, even assuming that OPM were legally correct – that OPM need only employ "reasonable logic" to justify regulations based on administrative convenience – the Final Year Regulation fails that test. It is not logical to decide that because in some instances, it may be difficult or costly to obtain adequate data, the Government with withhold (or be denied) payment in all instances. This is especially true because, as this litigation demonstrates, the reconciliation process often is already complete by the time a plan announces its withdrawal from the program. Likewise, it is not "reasonable" or "logical" to declare that because "when a plan goes out of business, there are no rates to reconcile" so therefore OPM will perform no reconciliation for any plan that goes out of business. The reasonable course for OPM might be to decide (1) that if adequate data cannot be obtained, there will be no reconciliation or payment, and (2) that if there are no rates to reconcile, there would be no reconciliation or payment. But it is unreasonable and illogical to take the position that even where there are rates to reconcile and the rates have been reconciled, there will be no payment. The Government does not and cannot justify such a rule.

**2. The Remainder of OPM's Defense of the Final Year Regulation Consists of Impermissible *Post Hoc* Rationalizations and Rests on Impermissible Non-Record Evidence. This Court's Review Must Be Confined to the Rationales and Evidence in the Rulemaking Record.**

OPM's remaining defenses of the Final Year Regulation are astonishing. First, none of the additional rationales offered by OPM appear in the regulation's preamble or in the rulemaking record. Second, almost none of the evidence that OPM cites is in the administrative record. For example, OPM states:

> If reconciliation were to occur in the year of nonrenewal, however, in that year a carrier would have a financial disincentive to provide adequate data that would tend to show that the rates currently in force are higher than actual community rates. Kichak Decl. ¶ 21. Upon not renewing participation in the FEHBP, the carrier could harbor a hope or expectation that insufficient data would suffice, or that its data would not, within the next five years, be audited.

OPM Br. at 43. Elsewhere, OPM argues that "the initial [estimated] rate is a reasonable and equitable rate that satisfies the statute." *Id.* at 44. But the administrative record contains none of this. It contains <u>no</u> discussion of financial incentives or disincentives, <u>no</u> mention of hopes that audits will not occur, and <u>no</u> assertion that estimated rates meet the statutory criteria or reflect "the SSSG methodology." Also, the administrative record contains no declaration by Nancy H. Kichak.

An agency rationale for a regulation that is not stated in the rulemaking record must be disregarded. *See Arizona v. Thompson*, 281 F.3d 248, 258-59 (D.C. Cir. 2002); *Ass'n of Civilian Technicians v. Fed. Labor Relations Auth.*, 269 F.3d 1112, 1117 (D.C. Cir.

2001). Similarly, evidence that is not present in the administrative record must be struck from the judicial record; a regulation must be judged on the basis of the record the agency developed at the time it was issued, not in a court. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (stating that a court's review is confined to evidence in agency rulemaking record); *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court").

Therefore, OPM must be held to the rationales it announced when the Regulation was adopted. Review should be confined to the rulemaking record on which the Regulation was based, and extra-record evidence, such as the Kichak Declaration, should be stricken and disregarded.

**3. Even If They Are Considered by this Court, OPM's New Rationales Fail to Justify the Final Year Regulation's Departure from the Act.**

**a. OPM's "Financial Disincentive" Rationale Does Not Make Sense and Is Unsupported in the Administrative Record.**

OPM's new "financial disincentive" rationale appears to be this: If the Final Year Regulation were invalidated, and if a particular reconciliation were to occur <u>after</u> the contractor has decided to not renew, and if the estimated rates were <u>higher</u> than the actual community rates (*i.e.*, the final rates), then that contractor would have a financial disincentive to provide OPM with adequate data. In that case, the contractor would hope that its inadequate data would be accepted or would never be audited.

This new rationale is as absurd as it is unsupported in the rulemaking record. First, there is no reason to believe the implicit premise of this "financial disincentive" rationale – that a non-renewing carrier is less likely to be audited than one who does renew. OPM cannot deny that *all* over-charging contractors – whether they renew or not – have equal reason to harbor hopes of not being audited, and thus that all would share this supposed financial disincentive to produce records. If the rationale had any merit, it would apply to every contract year, regardless of non-renewal.

Second, there is no rational relationship between this "reason" and the far-reaching Final Year Regulation. This new rationale does not apply where (as here) the contractor had been undercharging the Government – *i.e.*, where the estimated rates are lower than the actual community rates. In those cases, the contractor has no incentive to hide records from OPM, and every incentive to produce them. Where a contractor has been overcharging the Government, this rationale can be met and the statutory criterion implemented by simply disallowing all costs not documented in compliance with the Record Retention Regulations and using one of the various methods available to OPM to force the plan to provide adequate documentation. Thus, the Final Year Regulation bears no rational relationship to this supposed "problem" of financial incentives.

To the contrary, the Final Year Regulation guarantees that the "financial incentive" problem will be even worse. Under the Final Year Regulation, a health plan that knows it is entering the final year of its participation in the Program has an

undeniable incentive to set estimated rates higher than what it expects the community rates will turn out to be, because the Final Year Regulation provides that the health plan would never have to pay the Government back the difference. For example, if Scott & White had undertaken this strategy – which it did not – the Government would have found itself at the short end of the stick, perhaps for much more than $3,625,782.

The only evidence in the administrative record on this point indicates that OPM was aware that the Final Year Regulation would aggravate the "financial incentive" problem, not solve it. During the rulemaking, OPM's inspector general commented: "Here too, we do not believe the Government's interests are adequately protected. The clause does not address the potential for a Plan to intentionally overcharge the Program prior to withdrawing from the Program." THA 41. No answer to this concern can be found anywhere in the administrative record, nor does OPM's new rationale account for it.

When health plans charge too much in the last year of participation, the Final Year Regulation injures taxpayers and depletes the Federal Employees Health Benefits Fund, a trust that OPM has a statutory mandate to protect. *See* 62 Fed. Reg. 47569, 47570 col. 3 (1997). Where health plans charge too little, the Final Year Regulation injures the health plans. In all cases, the Final Year Regulation guarantees that the command of FEHBA will not be followed in the final year of a plan's participation. Thus, this new rationale for the regulation fails.

**b. OPM's "Estimated Rate" Rationale Is Contrary to the Language of the Act and OPM's Own Rulemaking Decisions.**

In another attempt to raise a rationale that does not appear in the rulemaking record, OPM claims that estimated rates "reasonably and equitably reflect the cost of the benefits provided" within the meaning of the Act. OPM Br. at 44. This new rationale is inconsistent with FEHBA's plain language. Estimated rates reflect only estimates of the costs of the benefits to be provided to during the upcoming contract year. The Act, however, requires compensation at a rate that reasonably and equitably reflects the cost of the benefits "provided" – not benefits "to be provided." Only the reconciled rate reflects the costs of the benefits actually provided during the contract year. That is precisely why the reconciliation process exists.

OPM's new rational is inconsistent with its formal determinations in rulemaking that reconciliation is necessary to meet the statutory criterion. OPM stated that to achieve the "primary objective" of "obtain[ing] rates which are reasonable and equitable for the FEHBP group," OPM "will examine only the rating of the plans' SSSGs" – that is, the rates charged to comparison groups, which are determined by the reconciliation process. 55 Fed. Reg. 27406, 27409 col. 1 (1990) (emphasis added). In other words, OPM formally determined in rulemaking that only by ascertaining the rates of the comparison groups through the reconciliation process can a "reasonable and equitable" rate be calculated. Yet when health plans provide the estimated rates to OPM, the relevant SSSGs have not been identified and their rates are unknown. Under

OPM's rulemaking pronouncements, therefore, the estimated rates cannot be "reasonable and equitable" within the meaning of FEHBA.

Instructions that OPM sent to contractors for the 1999 contract year also demonstrate that the purpose of going through the reconciliation process is to satisfy the Act's "reasonable and equitable" requirement. The instructions state:

> OPM Community Rating Guidelines – 1999
>
> Similarly Sized Subscriber Groups (SSSGs)
>
> We began using the concept of "Similarly Sized Subscriber Groups" (SSSGs) in the 1991 rate year. The purpose of the SSSG concept is to ensure that the Federal group receives an equitable and reasonable rate.

*FEBHP Program Carrier Letter*, Letter No. 1998-016-A, Apr. 10, 1998, attached as Exhibit AA, at 4.

In other words, OPM has declared officially that the only way to arrive at a "reasonable and equitable rate" is to use the reconciliation process (in which SSSGs are identified and the rate methodologies they employ are ascertained). If the estimated rates themselves satisfied this objective, the reconciliation process would be superfluous. Thus OPM's official and formal OPM pronouncements contradict the *post hoc* rationales OPM has invented for this litigation.

To defend the Final Year Regulation, OPM has gone so far as to argue that the result produced by the reconciliation-and-payment process does not satisfy FEBHBA any better than simply using the estimated rates only. Obviously the Government does

not really believe this, or it would not require itself and the plans to go through the burdensome reconciliation process every year – including the final year. OPM's argument that a "range of rates" satisfy the statutory mandate, and OPM's suggestion that the reconciliation process is not necessary because neither the estimated nor the reconciled rates provide a truly "reasonable and equitable" measure of the costs of providing health care benefits,[2] is belied by OPM's own rationale for the reconciliation process. OPM formally determined in rulemaking that it is "only" through the reconciliation process that a "reasonable and equitable" rate can be calculated. 55 Fed. Reg. 27406, 27409 (1990).

Ultimately, if the Government *post hoc* arguments were correct, then there would be no need for the reconciliation process to proceed during <u>any</u> of the FEHBP contract years. It makes no sense that the Government would keep a three-step process for determining rates in place if the outcome of the first step of the process (*i.e.*, the estimated rates) was comparable to the outcome after the second and third steps of the process (*i.e.*, the reconciled rates, which reflect the actual market costs of the benefits provided during the contract year, following by payment).

**c. OPM's "Cost" Rationale Is Unsupported in the Administrative Record and Is Illogical.**

Finally, OPM contends that it is "well-established that an agency may, and should, consider the cost to the Government in making determinations relating to the

[2] *See* OPM Br. at 42.

program at issue." OPM Br. at 37. Yet nothing in the administrative record indicates that OPM considered cost in promulgating the Final Year Regulation. Nor can cost reasonably be considered a factor that supports the regulation. If it were true that "when a plan goes out of business, there are no rates to reconcile," then there is no cost to the Government, because there could be no reconciliation. If there are rates to reconcile, then the cost of performing the reconciliation would be the same as it would be if the plan were remaining in the program. And if – as with Scott & White, Texas Health, and BlueLincs – the reconciliation actually occurs, there is no cost in making the payment that the reconciliation determines is due. Similarly, if it were true that it is "difficult to get adequate data from plans when they have termination," and if that difficulty increased cost to the Government (a contention for which the administrative record provides no support), the Final Year Regulation still would not save the Government money, because it does not prevent the data-gathering component of the reconciliation process. Rather, it simply prevents payment. Avoiding this expense – payment to the carriers of the amount that OPM has determined it owes under its own method of statutory compliance – is the true objective of the Final Year Regulation, but it is not an objective that should be countenanced by this Court.

### B. The Risk Imposed by the Final Year Regulation Is Not Spread Evenly Between the Government and the Health Plans.

In its defense of the regulation, the Government repeatedly insists that the risk associated with the Final Year Regulation is spread evenly between the health plans and the Government. This is inaccurate. The Final Year Regulation may deny OPM the benefit of receiving any later adjustment to the estimated prices under the regular reconciliation process. The regulatory scheme established by OPM, however, protects other means available to the Government to ensure that it will be paid the entire

amount that it would otherwise have received had the usual reconciliation and payment process been completed.

The letter from OPM to the OIG, which OPM itself cites, shows that OPM sought to reassure the OIG that, even under the truncated process set forth by the Final Year Regulation, the Government was not waiving its ability to collect money from FEHBP carriers:

> Further, in the event a plan goes out of business, there are no rates to reconcile. In our opinion, the most reasonable solution is for both the Government and the carrier to bear the risk of a carrier's termination. OPM continues to have recourse to debt collection agencies and the courts if the situation warrants.

THA 42 (emphasis added). The Final Year Regulation provides the plans with no similar recourse, and instead places the majority of the risk on the health plans.

Further exacerbating this discrepancy are the extensive audit rights that the Government possesses under the FEHBA. As OPM's brief also points out, despite the Final Year Regulation, OPM retains audit rights that are wholly independent of the reconciliation process, and this process, which may result in substantial repayments to the Government, remains in place even after a plan has terminated its participation in the Program. *See* OPM Br. at 22-24. Thus, the Government may eventually recover any overpayment. A health plan, however, can never recover the money it is owed – money that OPM has likely already determined it is owed – for the final year of its participation. Thus, the Final Year Regulation does not equally spread risk between the Government and the plans, and the Court should reject arguments by OPM that rest on that erroneous contention.

## II. The Final Year Regulation Is Invalid As Applied to the Plaintiffs.

### A. As-Applied Challenges to Regulations Are Legitimate.

While asserting that the Final Year Regulation is "valid and proper" as applied to Plaintiffs, OPM never disputes that the rationales for the Final Year Regulation do not apply to Scott & White or Texas Health. The gist of OPM's response seems to be that regulations "apply nationwide, and equally to all regulated entities, no matter whether the particularized rationales that give rise to the regulations apply in an individual case." OPM Br. at 46. This argument literally means that as-applied challenges could never succeed. Yet, courts do consider such challenges and consider "whether, in a particular application, the regulations would be arbitrary and capricious." *Lomont v. O'Neill*, 285 F.3d 9, 17-18 (D.C. Cir. 2002); *see also Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 282 F.3d 818, 830 (D.C. Cir. 2002) (upholding facial validity of regulation but remanding for discovery relating to as-applied challenge so that party may "show why its particular circumstances render the regulation unlawful"). None of the cases OPM cites for this sweeping assertion concern as-applied challenges; indeed, almost none concern invalidity challenges at all.

The as-applied challenge by Scott & White and Texas Health stands on stronger grounds than the usual as-applied challenge. This is not a case in which the inapplicability of a regulation's rationale to the facts, or its unreasonableness as applied, or its inconsistency with the statutory criterion as applied, are uncertain or debatable. Here, there is no such uncertainty. OPM does not dispute that the Final Year

Regulation's rationales do not apply here. OPM does not deny that, with respect to Scott & White and Texas Health, it <u>had</u> adequate documentation, <u>performed</u> the reconciliation for the year of non-renewal, and <u>calculated</u> the exact rates that, but for the Final Year Regulation, "reasonably and equitably reflect the cost of the benefits provided."

### B. OPM's Argument That the Regulations Requiring the Retention of Reconciliation Records Do Not Apply to the Year of Non-Renewal Is Meritless.

In their opening brief, Plaintiffs relied on regulatory and contractual provisions requiring retention of records to support Plaintiffs' argument that they could have – and were required to be able to – supply adequate information for a reconciliation in the final year of participation. OPM claims this reliance is "misplaced." OPM Br. at 48. The reason for this, OPM asserts, is that "[t]hese record retention requirements apply, on their face, to annual operations and rate reconciliations. However, these record retention provisions do not apply to the nonreconciliation of rates. They do not apply for the simply reason that there is no 'reconciliation of rates in the final year of the carrier's participation." OPM Br. at 49.

If this bold assertion were correct, OPM's approach to dealing with the purported problem of insufficient data would be contrary to the very cornerstone of all federal contracts – that contractors document their use of federal funds. But OPM's assertion is wrong; it mischaracterizes both the regulation and the contract. <u>Neither</u> the regulation <u>nor</u> the contract provide that "there is no 'reconciliation' in the final year of

the carrier's participation." *Id.* Rather, both state that no one "shall be entitled to any adjustment or claim" – *not* that there will be no reconciliation. In other words, there is reconciliation; there is simply no payment. (This is why OPM's dubbing of challenged regulation as the "Non-reconciliation Regulation" is a misnomer.) The Government should understand that, because it happed in this very case. There were reconciliations. They determined that Scott & White and Texas Health were owed money. Although the Government did not pay, nothing in the Records Retention Regulations relieves the plans from retaining records for the year of non-renewal. *See* 48 C.F.R. §§ 52.215-2 and 1652.204-70.

**III. OPM's Procedural Defenses Fail.**

OPM argues that even if the Final Year Regulation is invalid and contrary to law, the Government should be able to keep the money that it possess only because of invalid regulation – money that OPM itself determined it would otherwise owe to Plaintiffs. OPM's arguments are odious, especially because it is the Government that is offering them. The Government is asserting it should profit from its own illegal regulation. The Government is denying it can ever be called to account for its conduct. The Government's arguments are also wrong.

**A. If the Court Agrees that the Final Year Regulation Is Invalid, It Should Reform the Plaintiffs' Contracts.**

The Government first argues that, even if the regulation is invalid, the Court should not reform the contract to excise the illegal clause because neither OPM nor the carriers "made any mistake" in signing the contract. However, OPM cites no law, and Plaintiffs are aware of none, limiting this Court's power to reform a contract to

instances of mistake. To the contrary, the Federal Circuit has held reformation appropriate despite a contractor's initial adherence to a contract provision that was later shown to be illegal. *LaBarge Prods., Inc. v. West*, 46 F.3d 1547 (Fed. Cir. 1997). Similarly, in *Beta Systems v. United States*, 838 F.2d 1179 (Fed. Cir. 1988), the Federal Circuit ordered a contract reformed to strike a clause the violated a regulation, despite the fact that the contractor had knowingly acquiesced to the illegal clause. *Id.* at 1185-86. The Government mistakenly argues that *Beta Systems* is not applicable in this case, because here the plaintiffs "clearly assumed the risk of the non-reconciliation clause by their agreement to it." OPM Br. at 35 n.9. However, *Beta Systems* expressly refutes that argument. The Federal Circuit wrote that "[i]f the [clause] that was selected does not comply with . . . [the regulations], even approximately, <u>it is not controlling whether or not . . . [the contractor] or the government foresaw</u>, <u>or accepted the risk of failing to foresee, this defect in the [clause].</u>" *Beta Sys.*, 383 F.2d at 1186 (emphasis added).

Ultimately, this Court should reform the contract because the government cannot profit from a contractual provision that was illegal. As the Court of Claims concluded in *Chris Berg v. United States*, 192 Cl. Ct. 176 (1970): "If officials of the Government make a contract they are not authorized to make, the other party is not bound by estoppel or acquiescence or even failing to protest." *Id.* at 183.

**B. OPM Has Forfeited Its Waiver and Laches Defenses.**

OPM also argues that Plaintiffs' claims are barred by the doctrines of waiver and laches. OPM Br. at 52, 54. The Government asserts that Plaintiffs waived their rights to object to the clause required by the Final Year Regulation "[b]y failing to challenge the contract clause at any time prior to its substantial completion of the contract." *Id.* at 52. The Government further asserts that laches bars Plaintiffs' claims because they "failed

to challenge the promulgation of the regulation in 1990 and continued to sign their annual [Program] contracts for years." *Id.* at 54. OPM's defenses are easily disposed of: OPM forfeited these defense by failing to raise them in its answers.

Both waiver and laches are affirmative defenses that must be pled by a defendant in its answer. FED. R. CIV. P. 8(c). Failure to "plead an affirmative defense under Rule 8(c) constitutes failure to make a timely assertion of the defense. The failure to plead need not be intentional for the party to lose its right to raise the defense." *Harris v. Secretary*, 126 F.3d 339, 343 (D.C. Cir. 1997).

The Government filed its answer to Scott & White's complaint in the U.S. District Court for the District of Columbia on January 11, 2002. *See* Exhibit BB. The Government raised four affirmative defenses – failure to state a claim, lack of subject matter jurisdiction, lack of entitlement to an award of costs or attorneys' fees, and failure to exhaust administrative remedies. (In its motion for summary judgment, the Government appears to have abandoned all of these defenses.) However, the Government did not plead waiver or laches in its answer. Although it has been afforded more than four years to do so, the Government has never amended its answer to plead waiver or laches, nor did it file any answer in this Court to Scott & White's Amended Complaint.

Similarly, on April 1, 2003, the Government filed its answer to Texas Health's complaint in the U.S. District Court for the Eastern District of Texas. *See* Exhibit CC. The Government again declined to raise waiver or laches as affirmative defenses. The Government has not amended its answer to add waiver or laches, and it did not answer Texas Health's Amended Complaint in this Court.

A party cannot "raise an affirmative defense for the first time in a dispositive motion." *Harris*, 126 F.3d at 342. Rather, "failure to raise the defense in pleadings constitutes forfeiture under Rule 8(c). The language of Rule 8(c) itself requires that the defense of statute of limitations be raised affirmatively in 'a pleading to a preceding pleading.' Although the Rules do not explicitly mention waiver or forfeiture as the consequence of failure to follow Rule 8(c), it is well-settled that '[a] party's failure to plead an affirmative defense . . . generally 'results in the waiver of that defense and its exclusion from the case.'" *Id.* at 342-43 (quoting FED. R. CIV. P. 8(c) and *Dole v. Williams Enters.*, 876 F.2d 186, 189 (D.C. Cir. 1989)). Because the Government raised waiver and laches for the first time by dispositive motion, the defenses have been forfeited.[3] To grant summary judgment based on a defense not first raised in the pleadings is reversible error. *See Jones v. D.C. Dep't of Corrections*, 429 F.3d 276, 279-80 (D.C. Cir. 2005); *see also Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998) ("The precise holding of Harris is that an affirmative defense not raised by answer cannot be raised in dispositive motions that are filed post-answer.").

---

[3] There is a split among the circuits as to the rule set forth by *Harris*. The Federal Circuit appears not to have addressed the issue. Importantly, however, the forfeiture rule has been adopted by both of the circuits in which the Government filed its answers in this case. *See Harris*, 126 F.3d at 342-44; *Ashe v. Corley*, 992 F.2d 540, 545 n.7 (5th Cir. 1993) (rejecting an argument on statute of limitations in a summary judgment motion because the defense had not been pled in the answer); *Funding Sys. Leasing Corp. v. Pugh*, 530 F.2d 91, 96 (5th Cir. 1976) ("When the defendant has waived his affirmative defense by failing to allege it in his answer, or have it included in a pre-trial order of the district court that supersedes the pleadings, he cannot revive the defense in a memorandum in support of a motion for summary judgment." Additionally, this Court has cited *Harris* approvingly. *See First Fed. Sav. Bank of Hegewisch*, 52 Fed. Cl. 774, 789 (2002).

**C. Scott & White and Texas Health Have Not Waived Their Rights to Challenge the Final Year Regulation.**

Contrary to OPM's assertion, there is no rule that performance of a contract precludes a contractor from challenging a regulation or contract term as contrary to statute. As one might expect, the general rule is the opposite. *See Beta Sys., Inc. v. United States*, 838 F.2d 1179 (Fed. Cir. 1988). OPM invokes only cases exemplifying three narrow exceptions to the general rule, none of which apply here.

As noted above in the context of reformation, in *Beta Systems*, the Federal Circuit held that even a contractor's knowing acquiescence to a pricing clause that violates a procurement regulation does not waive an objection to the illegal clause:

> The government's insistence during negotiations on use of . . . [the pricing clause], and the contractor's acquiescence, does not immunize the government from the consequences of the failure of the clause to comply with the law stated in the [Defense Acquisition Regulation] . . . . The risk of unintentional failure of a contract term to comply with a legal requirement does not fall solely on the contractor. If the [clause] that was selected does not comply with . . . [the regulations], even approximately, it is not controlling whether or not . . . [the contractor] or the government foresaw, or accepted the risk of failing to foresee, this defect in the [clause].

*Id.* at 1184-85.

This Court broadly surveyed and harmonized many cases in this area in *AT&T v. United States*, 48 Fed. Cl. 156 (2000). The court distilled one line of cases to hold that "price terms that disregard the dictates of a mandatory regulation or statute . . . support the remedy of reformation" – the general principle that covers this case. *Id*. It held that this principle did not apply, however, if the violated statute or regulations were

intended to benefit the government rather than the contractor. *Id*. at 159-60 (noting cases finding waiver as to "contract procedures and contract clauses intended primarily for government's benefit"). Here, health plans are a principal beneficiary of the statutory obligation for compensation. Hence, that exception is inapplicable.

A second line of cases summarized in *AT&T* finds waiver where the violated procurement requirements require the exercise of judgment or discretion by the agency's contracting officer that would otherwise have been judicially reviewable and that exercise is challenged after execution of the contract. *Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997), on which OPM heavily relies, exemplifies this exception. In *Whittaker*, the contracting officer judged that inclusion of an option clause would not cause the contractor to incur "undue" risks within the meaning of a procurement regulation. The court held that it was too late to challenge that judgment after full performance. Other cases cited by OPM stand for the same proposition.[4] Because the Final Year Regulation does not allow OPM contracting officers to use judgment or discretion, this exception does not apply.

A third line of cases discussed in *AT&T* makes an exception to the general rule where the contractor has unclean hands. This exception requires that the contractor "benefited from and actively participated in" the very procurement violation of which it

---

[4] *See PCL Constr. Servs, Inc. v. United States*, 41 Fed Cl. 242 (1998) (violated regulations provided "guidance" to contracting officer on selection of contract type); *Cubic Applications, Inc. v. United States*, 37 Fed. Cl. 345, 356-67 (1997) (similar); *AT&T*, 48 Fed. Cl. at 161 (contracting officer's exercise of discretion under regulations); *E. Walters & Co. v. United States*, 576 F.2d 362 (Ct. Cl. 1978) (decision to include option clause); *see also Hartford Accident and Indem. Co. v. United States*, 127 F. Supp. 565 (Ct. Cl. 1955).

now complains. *See, e.g.*, *Promac v. West*, 203 F.3d 786, 787-89 (Fed. Cir. 2000).[5] OPM does not allege any such facts here.

Accordingly, the plans did not waive its right to challenge the validity of the Final Year Clause and Regulation.

**D. Laches Does Not Bar the Plaintiffs' Claims.**

OPM invokes the doctrine of laches, stating – apparently without irony – that it is "based upon the public policy which discourages stale demands, because courts find it more difficult to do justice in those circumstances." OPM Br. at 54. These cases were timely filed. Scott & White brought suit in 2001 regarding events that took place in 1999. Texas Health brought suit in 2002 regarding events that took place in 2001. Courts were prevented from "do[ing] justice" because for four years, OPM directed its litigation tactics toward preventing consideration of the merits of the Final Year Regulation. The Government cannot now profit from the delay that it caused.

OPM's complaint that "plaintiffs failed to challenge the promulgation of the regulation in 1990 and continued to sign their annual [Program] contracts for year" must be disingenuous. *See* OPM Br. at 55. It was impossible for plaintiffs to challenge the contract clause until their participation in the Program had terminated. Until the Plans decided to end their participation in the Program and the Government subsequently refused to pay (or recouped) the funds due to them based on their final year reconciliations, neither Scot & White nor Texas Health had standing to challenge

[5] OPM also prominently cites *Ling-Temco-Vought, Inc. v. United States*, 475 F.2d 630 (Ct. Cl. 1973), where a contractor was estopped from challenging a fully-performed contract on the ground of mutual mistake. The case has nothing to do with the public interest implicated when an agency violates a statute or regulation, and is thus inapposite.

the Final Year Regulation. In order to have standing to challenge a regulation, a plaintiff must demonstrate that: (1) it has suffered sufficient 'injury in fact;' (2) that the injury is 'fairly traceable' to the agency's decision and is 'likely to be redressed by a favorable decision;' and (3) that the interests sought to be protected are 'arguably within the zone of interests to be protected or regulated. *Am. Fed. of Gov't Employees v. United States*, 258 F.3d 1294, 1298 (Fed. Cir. 2001) (citing *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust*, 522 U.S. 479, 488 (1998)). Until the Plans were denied payment under the Final Year Regulation, they had not suffered an "injury in fact" caused by the Final Year Regulation. The Government would surely (and properly) have moved to dismiss such a claim.

"To prevail on a defense of laches, the defending party must show unreasonable, unexcused delay by the claimant, and prejudice to the other party." *Mexican Intermodal Equipment v. United States*, 61 Fed. Cl 55, 57 (2004). In this case, there was no delay by the plans, let alone an "unreasonable" or an "unexcused" delay. As outlined above, the Plans were only able to challenge the regulation after they had suffered an "injury in fact" that was sufficient to result in standing, and this did not occur until after the Government failed to refund money based on the Final Year Regulation.

## IV. Basic Fairness – Including the Avoidance of an Unjust Windfall – Requires That the Final Year Regulation Be Held Invalid.

Turning any reasonable notion of justice on its head, OPM argues that "basic fairness" requires this Court enforce the plans' contracts as written <u>even if</u> they are invalid and contrary to FEHBA.

As shown above, the cases OPM cites are inapposite. Moreover, OPM's argument twists this case inside-out. It is the Government that is seeking unjust

enrichment here, not the plans. It is the Government that is withholding millions of dollars that it determined are otherwise required to be paid to Scott & White and Texas Health in order to "reasonably and equitably reflect the cost of the benefits" the plans provided.

Nowhere does OPM claim that it was somehow damaged because Scott & White and Texas Health did not bring their claims earlier (claims that earlier would have failed). OPM never claims reliance on the plans' lack of protest (protest that would surely have been ignored, as were all the comments on the Final Year Regulation, including those by OPM's own inspector general). Nor does OPM deny that any protest to its contracting officer of the Final Year Regulation or the Clause would have been futile, for the Regulation required inclusion of the Clause and the contracting officer had no discretion to delete the Clause from OPM's contract. Equity does not require a futile act.[6]

Nor can OPM claim that Scott & White or Texas Health would be unjustly benefited or enriched if this Court strikes down the Final Year Regulation. On the contrary, it is OPM that is seeking unjust enrichment. After conclusively determining through the reconciliation process that the amount OPM paid Scott & White for 1999 is $3,625,782 less than the amount that "reasonable and equitably reflects the cost of

[6] *Bannercraft Clothing Co. v. Renegotiation Bd.*, 466 F.2d 345, 355 (D.C. Cir. 1972), *rev'd on another grounds*, 415 U.S. 1 (1974); *Munchak Corp. v. Cunningham*, 457 F.2d 721, 725 (4th Cir. 1972) ("Equity does not require the doing of a futile act as a condition to the granting of equitable relief.").

benefits provided," OPM now wants to keep the $3,625,782 for itself even *if* the Final Year Regulation is invalid. And OPM wants to keep for itself the $622,246 that it determined it owes Texas Health for the final year of its participation. That is the result that would represent unjust enrichment.

Finally, OPM does not and cannot demonstrate that it will suffer any prejudice if this Court hears the plans' challenge to the Final Year Regulation and reforms the contract to strike the clause. All that will happen is that the Government will have to disgorge money that, according to FEHBA, does not belong to it. That is not unfair. Rather, it is the only fair result.

**Conclusion**

For the reasons stated above, in their opening briefs, and in BlueLinc's briefs, Scott & White and Texas Health respectfully request that this Court grant their motion, enter summary judgment on their behalf, and provide them with the relief requested in their Amended Complaints.

March 31, 2006

Respectfully submitted,

Michael S. Nadel
McDermott Will & Emery LLP
600 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 756-8000

*Attorney for Plaintiffs*
*Scott & White Health Plan*
*and Texas Health Choice, L.C*

*Of Counsel:*

Joel L. Michaels
Maura A. Dalton
McDermott Will & Emery LLP
600 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 756-8000