Nos. 01-517C, 05-371C, 05-963C
(Judge Horn)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GHS HEALTH MAINTENANCE ORGANIZATION, INC.,
d/b/a BLUELINCS HMO,
Plaintiff,

TEXAS HEALTH CHOICE, L.C.,
Plaintiff,

SCOTT & WHITE HEALTH PLAN
Plaintiff,

v.

THE UNITED STATES,
Defendant.

---

# DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JANE W. VANNEMAN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, NW, 8th Floor
Washington, D.C. 20530
Telephone: (202) 307-1011
Facsimile: (202) 514-8624
Attorneys for Defendant

SUSAN WHITMAN, Esq.
JILL GERSTENFIELD, Esq.
U.S. Office of Personnel Management
Washington, D.C. 20415

May 19, 2006

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . v

DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT . . . . . 1

INTRODUCTION . . . . . 2

1. The Major Flaws In Plaintiffs' Briefs . . . . . 2

2. The FEHBA Rate Reconciliation Process As It Applies To Community Rated Carriers That Provide Prepaid Plans . . . . . 4

ARGUMENT . . . . . 7

I. The Court's Review Of Plaintiffs' Challenge To The Non-Reconciliation Regulation, As Inconsistent With The Statute, Is Limited . . . . . 7

II. The Non-Reconciliation Regulation Is Not Inconsistent With The Statute . . . . . 9

A. The Language In The Statute, Requiring Rates That "Reasonably and Equitably Reflect" The "Cost of Benefits" Provided, Is Very Broad . . . . . 9

1. Reasonable and Equitable . . . . . 9

2. Cost of Benefits . . . . . 10

3. OPM's Interpretation Of The Statute Is Consistent With Other Federal Law Governing **Prepaid** Health Plans . . . . . 13

4. Equitable Rates For The FEHBP Group Requires A Comparison Of "Rates" To The **Appropriate Similarly Sized Subscriber Group (SSSG)** Of The Carrier, Not A Comparison To The Carrier's **Non-SSSG** Group . . . . . 15

B. The Non-Reconciliation Regulation Is Not Arbitrary Or Capricious . . . 17

1. The Regulation Is Valid Because It Is Based Upon Sound Rationales . . . 18

2. OPM's Rationales For The Non-Reconciliation Regulation Are Supported And Make Sense . . . 20

a. Financial Disincentive . . . 20

b. Estimated Rates . . . 21

c. Costs To The Government . . . 23

4. The Risk Imposed By The Non-Reconciliation Regulation Is Spread Equally Between The Government And The Health Plans . . . 24

C. Plaintiffs' Reliance Upon *Amfac Resorts* Is Misplaced . . . 25

D. Plaintiffs' Arguments Relating To Record Retention Are Fatally Flawed . . . 27

E That OPM Might Have Chosen Alternative Means To Address Rates In The Year In Which A Community Rated Carrier Elects To Exit The Program Does Not Invalidate The Means That OPM Chose . . . 28

F. The Regulation "As Applied" To Plaintiffs Is Consistent With The Statute . . . 33

1. OPM May Reason From The Particular To The General, And Promulgate A Rule Of Uniform Application For The FEHB Program . . . 33

2. Even If OPM Performs A **Calculation** Of The Reconciliation, In Anticipation Of A Rate Reconciliation Or Adjustment, **No Rate Adjustment** Is Required If The Carrier Chooses To Exit The FEHB Program . . . 36

G. Even If This Court Strikes The Kichak Declaration, The Regulation Is Consistent With The Statute . . . 38

III. Plaintiffs Are Bound By The Terms Of Their Contracts, Section 3.2; Reformation Of The Contract Is Not Warranted . . . . . . . . . . . . . . . 38

A. Plaintiffs Waived Any Challenge To The Contract Terms . . . . . . . . . . . 38

1. This Court's CDA Review Is De Novo; Plaintiffs Might Have Been Able To Initiate The CDA Disputes Process Years Ago . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

2. None of The Three Plaintiffs Submitted Any Comments Upon The Proposed Regulation, And Waived Their Right To Challenge It Later . . . . . . . . . . . . . . . . . 40

B. Congress Intended The Statute To Benefit The Government And Federal Enrollees, Not To Benefit Health Plans . . . . . . . . . . . . . . . . 40

1. Governing Law In This Circuit Provides That, If A Statute Is Intended To Benefit The Government, A Contract Provision That May Be Inconsistent With A Statute Nevertheless Is Enforceable . . . . . . . . . . . . . . . . . . . . 40

2. Legislative History Of The FEHBA Makes Clear That The Nonreconciliation Regulation Is For The Benefit Of The Government And Federal Enrollees, Not The Carriers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

C. **Even If** The Court Concludes That The Nonreconciliation Regulation Is Invalid, Plaintiffs Remain Bound By Section 3.2 Of The Contract To Nonreconciliation In The Final Year . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

D There Was No Mutual Mistake . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

E. There Is No Unjust Enrichment In Favor Of OPM . . . . . . . . . . . . . . . . . 49

F. Contract Reformation Is Not Warranted . . . . . . . . . . . . . . . . . . . . . . . . . 49

IV. Laches Bars Plaintiffs' Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

A. The Government Has Not Been Required To File An Answer In This Court; That No Affirmative Defense Of Laches Has Yet Been Pled Does Not Bar Our Laches Defense . . . . . . . . . . . . . 51

B. Any Delays In This Case Were Caused By Plaintiffs, Who Either Filed In The Wrong Court And/Or Did Not Pursue Diligently The Case Filed In This Court . . . . . . . . . . . . . . . . . . . . 53

C. The Time To Evaluate Laches Should Be Measured From 1990, The Year In Which OPM Promulgated The Nonreconciliation Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

D. Fairness Requires That The Court Enforce The Contract To Which The Parties Agreed . . . . . . . . . . . . . . . . . . . . . . . 54

IV. Bluelincs Raised The "Forfeiture" Argument Too Late In The Briefing; In Any Event, There Was No Forfeiture . . . . . . . . . . . . . . . . . . . . 55

A. Bluelincs' Belated Attempt To Argue Forfeiture As A Merits Issue Should Be Rejected . . . . . . . . . . . . . . . . . . . . . . . . . . 55

B. There Was No "Forfeiture" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

## TABLE OF AUTHORITIES

### CASES

**Page(s)**

AT&T v. United States,
48 Fed. Cl. 156 (2000) . . . . . . . . . . 41, 42, 48

Amfac Resorts, L.L.C. v. United States Dept of Interior,
282 F.3d 818 (D.C. Cir. 2002), rev'd on other grounds sub nom.
Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803 (2003) . . . . 25, 26, 27, 61

Arizona v. Thompson,
281 F.3d 248 (D.C. Cir. 2002) . . . . . . . . . . 8

Assigned Car Cases,
274 U.S. 564 (1927) . . . . . . . . . . 33, 34

Association of Civilian Technicians v. Federal Labor Relations Authority,
269 F.3d 1112 (D.C. Cir. 2001) . . . . . . . . . . 8

Becho, Inc. v. United States,
47 Fed. Cl. 595 (2000) . . . . . . . . . . 55

Beta Systems v. United States,
838 F.2d 1179 (Fed. Cir. 1997) . . . . . . . . . . 45, 48, 50

Camp v. Pitt,
411 U.S. 138 (1973) . . . . . . . . . . 8

Cessna Aircraft Co. v. Dalton,
126 F.3d 1442 (Fed. Cir. 1997) . . . . . . . . . . 41

Chevron U.S.A. Inc., v. Natural Resources Defense Council, Inc.,
467 U.S. 837 (1984) . . . . . . . . . . 8, 9

Chris Berg, Inc. v. United States,
426 F.2d 314 (Ct. Cl. 1970) . . . . . . . . . . 45, 46, 50

Chris Berg v. United States,
192 Ct. Cl. 176 (1970) . . . . . . . . . . 50

Christopher Village, LP v. United States,
360 F.3d 1319 (Fed. Cir. 2004) . . . . . . . . . . 52

Cities Serv. Helex Inc. v. United States,
542 F.2d 1306 (Ct. Cl. 1976) . . . . . . . . . . 53

Consolidated Edison Company of New York v. Abraham,
314 F.3d 129 (Fed. Cir. 2002) . . . . . . . . . . 23, 24

First Fed. Sav. Bank of Hegewisch,
52 Fed. Cl. 774 (2002) . . . . . . . . . . 52

Fla. Power & Light Co. v. Lorion,
470 U.S. 729 (1985) . . . . . . . . . . 8

Foman v. Davis,
371 U.S. 178 (1962) . . . . . . . . . . 51

Harris v. Secretary,
126 F.3d 339 (D.C. Cir. 1997) . . . . . . . . . . 52

Hassan v. United States Postal Serv.,
824 F.2d 260 (11th Cir. 1988), citing Blonder-Tongue Lab., Inc. v. Univ. of Ill. Found., 402 U.S. 313 (1971) . . . . . . . . . . 53

INS v. National Center for Immigrant' Rights,
502 U.S. 183 (1991) . . . . . . . . . . 26

Illinois Central R. R. Co. v. Interstate Commerce Commission,
206 U.S. 441 (1907) . . . . . . . . . . 34

Illinois Commerce Comm'n v. Interstate Commerce Comm'n,
776 F.2d 355 (D.C. Cir. 1985) . . . . . . . . . . 28

Interstate Commerce Commission v. Illinois Central R. R. Co.,
215 U. S. 452 (1910) . . . . . . . . . . 33

Knickerbocker Life Ins. Co. v. Norton,
96 U.S (6 Otto) 234 (1885) . . . . . . . . . . 56, 57

LaBarge Products Inc. v. West,
46 F.3d 1547 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46, 50

Ling-Temco-Vought v. United States,
475 F.2d 630 (Ct. Cl. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Lomont v. O'Neill,
285 F.3d 9 (D.C. Cir 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

Mexican Intermodal Equipment v. United States,
61 Fed. Cl. 55 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Mineral Policy Center v. Norton,
292 F.Supp. 2d 30 (D.C. D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27

NTEU v. Campbell,
589 F.2d 669 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC,
737 F.2d 1095 (D.C.Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

National Mining Ass'n v. Army Corps of Engineers,
145 F.3d 1399 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Permian Basin Area Rate Cases,
390 U.S. 747 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Precision Pine & Timber, Inc. v. United States.,
50 Fed. Cl. 35 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Promac, Inc. v. West,
203 F.3d 786 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Reno v. Flores,
507 U.S. 292 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 26

Rough Diamond Co. v. United States,
351 F.2d 636 (1965), cert. denied, 383 U.S. 957 (1966) . . . . . . . . . . . . . . . . . 45, 46, 47

Rough Diamond Co. v. United States,
173 Ct. Cl. 15, cert. denied, 383 U.S. 957 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Scott & White Health Plan v. Office of Personnel Management,
No. 01-1824 (JGP) (D. D.C.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Skinner & Eddy Corporation v. United States,
249 U. S. 557 (1919) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Stockton East Water District et al. v. United States,
2006 WL 932374 (Fed. Cl. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Texas Health Choice v. Office of Personnel Management,
400 F.3d 895 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Texas Health Choice v. United States Office of Personnel Management,
No. 9:03-CV-14 (E.D. Texas) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Tobin v. United States,
59 F.Supp. 410 (Ct. Cl. 1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 57

United States v. Allegheny-Ludlum Steel Corp.,
406 U.S. 742 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

United States v. Edmondston,
181 U.S. 500 (1901) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

United States v. Florida East Coast Ry,
410 U.S. 224 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

United States v. New River Co.,
265 U. S. 533 (1924) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

United States v. Salerno,
481 U.S. 739 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Western Paper Makers' Chemical Co. v. United States,
271 U. S. 268 (1926) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Whittaker Electronic Systems v. Dalton,
124 F.3d 1443 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

WorldCom, Inc. v. F.CC.,
238 F.3d 449 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 32

## STATUTES, RULES AND REGULATIONS

42 C.F.R. §1602.170 . . . . . . . . . . 13

48 C.F.R. 1602-170.2 . . . . . . . . . . 11

48 C.F.R. 1602.170-5 . . . . . . . . . . 14

48 C.F.R. 1602.170-13 . . . . . . . . . . 14

48 C.F.R. 1652 . . . . . . . . . . 12

48 C.F.R. 1652-216.70 . . . . . . . . . . 5, 6, 7

54 FR 43089 . . . . . . . . . . 8

55 FR 27406 . . . . . . . . . . 8, 9, 16, 21

55 FR 27414 . . . . . . . . . . 14

62 FR 47569 . . . . . . . . . . 6

62 FR 47573 . . . . . . . . . . 14

62 FR 47574 . . . . . . . . . . 14

70 FR 31378 . . . . . . . . . . 14

Fed.R.Civ.P. 8(c) . . . . . . . . . . 53

62 Fed. Reg. 47569, 47570 . . . . . . . . . . 6

Health Maintenance Organization Amendments of 1988, P.L. 100-517, 1988 HR 3235, 102 Stat 2578, 42 U.S.C. 201 note . . . . . . . . . . 13

5 USC 8903(4) . . . . . . . . . . 4

5 U.S.C. § 8902(i) . . . . . . . . . . passim

5 U.S.C. §8902(i) . . . . . . . . . . 2

5 U.S.C. § 8903(4) . . . . . . . . . . 2, 4, 15, 42

28 U.S.C. §1491(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

41 U.S.C. §§601 et seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

41 U.S.C. §605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

42 U.S.C. §300e-1(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Rule 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## MISCELLANEOUS

1959 U.S. Code Cong. &Admin. News, 2913, 2916 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

1959 USCCAN at 2916 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

1959 USCCAN at 2923 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

H. Rept. No. 957, 86th Cong 1st Sess . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| GHS HEALTH MAINTENANCE ORGANIZATION, INC., d/b/a BLUELINCS HMO, Plaintiff, | ) | |
| TEXAS HEALTH CHOICE, L.C., Plaintiff, | ) | |
| SCOTT & WHITE HEALTH PLAN Plaintiff, | ) | |
| v. | ) | Nos. 01-517C, 05-371C, 05-963C (Judge Horn) |
| UNITED STATES, Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION
TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

1. The Major Flaws In Plaintiffs' Briefs

In this reply brief, [1] defendant, the United States demonstrates that plaintiffs' briefs[2] are long on rhetoric, but short on substance.

This case involves the Federal Employees Health Benefits Act (FEHBA), 5 U.S.C. §§8902(i) (rates), and 8903(4) (prepaid plans). While raising a laundry list of arguments, plaintiffs fail to address most of the legal principles and judicial decisions upon which we rely. The decisions that they cite do not support their arguments. While accusing the Government of improper motives, they present a misleading view of the fundamental nature and purposes of the rate reconciliation process for a carrier that functions on a **prepaid** basis, a "community rated" carrier – a process that provides for an **adjustment,** or, "reconciliation," to the rates for the following insurance year, **but only if the carrier remains in the FEHB program**. Rather than address the necessary complexities of the FEHB program and the rationales for the non-reconciliation regulation, plaintiffs proffer numerous "strawmen" – imaginary propositions, set up only to be easily refuted – and then attempt to counter these strawmen, thereby diverting attention from the basic legal issues.

---

[1] The titles of plaintiffs' briefs are incorrect. Plaintiffs' briefs are "oppositions" to defendant's cross motion for summary judgment. This brief is our final brief in "reply" on the dispositive motions.

[2] There are three plaintiffs. GHS Health Maintenance Organization (Bluelincs) joined in the brief filed by Scott & White and Texas Health Choice (Texas Health). Thus, when we refer to arguments made by "plaintiffs" (Plaintiffs' Brief (Pl.Br.)), we include all three plaintiffs. Plaintiffs' arguments are essentially the same, the only difference being that Bluelincs raised a "forfeiture" argument in its brief, whereas the other two plaintiffs (Scott & White, and Texas Health) did not make the "forfeiture" argument.

Ultimately, their logic is circular. They argue that OPM's **calculation** of a reconciliation amount should result in an OPM **obligation** to pay that amount, when, in fact, pursuant to the regulation and/or the contract, OPM does not owe any amount calculated pursuant to the reconciliation process if a community rated carrier (prepaid plan) later informs OPM that the carrier will exit the program for the following insurance year. At times, plaintiffs take inconsistent positions: they criticize OPM, the agency with expertise, for making assumptions about financial incentives or disincentives of carriers, and then make their own assumptions, albeit erroneous, about those very same issues. They assume that the regulation is invalid, and never address our argument that, **even if** the Court invalidates the regulation, the contract provision, section 3.2, should be enforced as written, without the contract being reformed.

Plaintiffs rely upon facts not supported by the record. They claim, without support, that the rate reconciliation process is "often" already completed by the time a plan announces its withdrawal from the program. They make assumptions without any evidence in the record, or, that lack common sense.

Plaintiffs fail to acknowledge that this case is governed not only by the Administrative Procedure Act (APA) standard of review for their challenges, but is governed also by the *de novo* standard of review applied by this Court to the Contract Disputes Act (CDA) disputes relating to their contracts, including the contract reformation issue. 41 U.S.C. §§601 et seq.

Finally, with our reply brief, we file a separate opposition to plaintiffs' motion to strike the declaration of Ms. Nancy Kichak, the Director of the Office of Personnel Management (OPM) Office of the Actuaries (Office of Actuaries), a component of OPM that is charged with administering the FEHBA, and with promulgating the nonreconciliation regulation.

2. The FEHBA Rate Reconciliation Process As It Applies To Community Rated Carriers That Provide Prepaid Plans

Plaintiffs' arguments are fatally flawed because the premise upon which their arguments rests is flawed. The FEHBA requires rates reasonably and equitably to reflect the cost of the benefits provided. 5 U.S.C. § 8902(i). The statute **does not require rate reconciliation** for community rated carriers in their final year of participation in the FEHB program.

Plaintiffs mischaracterize the FEHBA statute and rating process as it applies to community rated carriers, otherwise known as health maintenance organizations (HMOs) - those that operate on a prepaid basis. Plaintiffs imply that there exists a concrete and ascertainable accurate dollar rate, that reasonably and equitably reflects the cost of benefits actually provided, that OPM in fact knows what this rate is, and that OPM is avoiding, intentionally, a responsibility to pay it. This is simply not the case.

The statute requires community rated carriers, such as the three plaintiffs, to contract with OPM under the FEHBA "on a prepaid basis." 5 U.S.C. § 8903(4)(emphasis added).[3] Thus,

[3] 5 USC 8903(4) defines comprehensive medical plans, also referred to as HMOs as follows:

(4) Comprehensive Medical Plans. -
(A) Group-practice prepayment plans. - Group-practice prepayment plans which offer health benefits of the types referred to by section 8904(4)of this title, in whole or in substantial part on a prepaid basis, with professional services thereunder provided by physicians practicing as a group in a common center or centers. The group shall include at least 3 physicians who receive all or a substantial part of their professional income from the prepaid funds and who represent 1 or more medical specialties appropriate and necessary for the population proposed to be served by the plan.
(B) Individual-practice prepayment plans. - Individual-practice prepayment plans which offer health services in whole or substantial part on a prepaid basis, with professional services thereunder provided by individual physicians who agree, under certain conditions approved by the Office, to accept the payments provided by the plans as full payment for covered services given by them including, in addition to in-hospital services,

in advance of the contract year, it cannot be known what the "actual" cost of benefits to be provided will be. The actual cost of benefits cannot be determined until after the utilization of services by the Federal subscribers is known. Thus, the notion, asserted cavalierly by plaintiffs, to the effect that the carrier is necessarily either underpaid or overpaid by the Government, is a notion that inheres in the essence of insurance risk, and is a natural result of the **statutory, prepaid** nature of these contracts. The "risk" of underpayment or overpayment is not affected by whether rates are reconciled or not reconciled in the final year of participation in the FEHB program.

The unreconciled rates are developed before information as to what the carrier will charge its comparable private sector and/or other non-Federal groups is available. The unreconciled rates are based upon the carriers' **estimates** of what the carrier believes it will require to cover its costs of providing the anticipated benefits, and the revenues it will require, in order to generate a profit, for that insurance year. 48 C.F.R. 1652-216.70. The unreconciled rates are based upon data that the carrier maintains and presents to OPM, subject to benefit adjustments requested by OPM. The parties negotiate in good faith to establish the unreconciled rates for each contract year. Therefore, unreconciled rates represent the best and most reasonable **actuarial projection** of the cost of benefits that is available to the carrier and OPM,

---

> general care given in their offices and the patients' homes, out-of-hospital diagnostic procedures, and preventive care, and which plans are offered by organizations which have successfully operated similar plans before approval by the Office of the plan in which employees may enroll.
> (C) Mixed model prepayment plans. - Mixed model prepayment plans which are a combination of the type of plans described in subparagraph (A) and the type of plans described in subparagraph (B).

(emphasis added).

on a prepaid basis, and are in complete harmony with the statute.

As initially negotiated for a contract year, the unreconciled rates are legally binding. They are published in the carrier's benefit brochure. Federal enrollees and the Government pay those rates, and premiums based upon those rates, throughout the contract year. Once the carrier and OPM negotiate and agree on rates, OPM's statutory obligation to develop a rate is fulfilled.

Plaintiffs ignore that fact that there is a significant difference between community rated carriers, that function on a prepaid basis, and experience rated carriers, that do not function on a prepaid basis. Community rated carriers expressly do not receive any adjustment in rates based upon the cost of actual benefits provided. See 48 C.F.R.1652.216-70(b)(5)(1991, 1998).[4] To the extent that reconciliation is calculated, and paid in years when the community rated contract is renewed, **the reconciliation is used to adjust the following year's rate – not to adjust the rate for the year at issue, or, for actual costs**.

Finally, plaintiffs ignore the purpose of the reconciliation. The purpose is for the benefit of the Government, to ensure that the Government receives a rate that is derived in a manner consistent with the rate that the carrier charges its other, non-Federal groups of a similar size (similarly sized subscriber groups, SSSG). The purpose is to ensure that OPM receives "the same discounts for the FEHB Program that are enjoyed by the SSSGs . . ." 62 Fed. Reg. 47569, 47570; Kichak Decl. para. 8.

[4] We quoted this regulation in our moving brief, at page 7. Defendant's Brief (Deft.Br.).

ARGUMENT

I. The Court's Review Of Plaintiffs' Challenge To The Non-Reconciliation Regulation, As Inconsistent With The Statute, Is Limited

We established in our motion that OPM is entitled to substantial deference in interpreting the FEHB Act that Congress charged it with administering, and in promulgating the non-reconciliation regulation to implement that statute. The regulation is a valid and proper exercise of OPM's very broad authority to administer the FEHBA in accordance with OPM's statutory mission. Nothing in plaintiffs' brief establishes otherwise.

The statutory provision upon which plaintiffs rely is 5 U.S.C. §8902(i):

> Rates charged under health benefits plans described by 8903 or 8903a of this title shall reasonably and equitably reflect the cost of the benefits provided. Rates under health benefits plans described by section 8903(1) and (2) of this title shall be determined on a basis which, in the judgment of the Office, is consistent with the lowest schedule of basic rates generally charged for new group health benefit plans issued to large employers. The rates determined for the first contract term shall be continued for later contract terms, except that they may be readjusted for any later term, based on past experience and benefit adjustments under the later contract. **Any readjustment in rates shall be made in advance of the contract term in which they will apply** and on a basis which, in the judgment of the Office, is consistent with the general practice of carriers which issue group health benefit plans to large employers.

(emphases added).

The specific "non-reconciliation" regulation at issue, subsection 6, of 48 C. F. R. §1652.216-70(b)(6), that implements the statutory provision quoted above, provides, in the context of community rated HMOs (described by 5 U.S.C. 8903(4), in pertinent part:

> In the event this contract is not renewed, **neither the Government nor the Carrier shall be entitled to any adjustment** or claim for the difference between the subscription rates prior to rate reconciliation and the actual subscription rates.

(emphasis added). See 54 FR 43089, App. 3-31; 55 FR 27406, App. 48.

Plaintiffs do not dispute that the two-step Chevron analysis applies to the determination of the validity of this regulation. Chevron U.S.A. Inc., v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984).[5]

---

[5] The cases upon which plaintiffs rely are distinguishable. In Arizona v. Thompson, 281 F.3d 248 (D.C. Cir. 2002), the court did not grant Chevron deference to the agency's statutory interpretation because the agency did not exercise its own judgment, but believed that the interpretation it espoused was compelled by Congress. In Association of Civilian Technicians v. Federal Labor Relations Authority, 269 F.3d 1112 (D.C. Cir. 2001), the court recognized that it owed great deference to the expertise of the agency administering the particular program at issue, but the agency had interpreted a statute that was not committed to its administration.

Here, neither situation is present. OPM clearly exercised its own judgment in promulgating the non-reconciliation regulation. OPM interpreted the FEHBA, a statute that Congress had charged it with administering.

Further, one case upon which plaintiffs rely is inapposite. While the Court in Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985), stated the general proposition of APA record review, the Court remanded to the agency so that the agency would consider all relevant factors and provide additional explanation for the regulation. The Court recognized that it could not reach its own conclusion based upon its own investigation. See Camp v. Pitt, 411 U.S. 138, 142-43 (1973) (if rationale for agency action is not sustainable on administrative record, court should vacate decision and remand to agency for further consideration).

Nothing of the kind is present here. In 1990 when it promulgated the regulation, OPM considered all the relevant factors and provided its explanation for the regulation. And, as we establish, OPM's rationales make ultimate sense.

## II. The Non-Reconciliation Regulation Is Not Inconsistent With The Statute

### A. The Language In The Statute, Requiring Rates That "Reasonably and Equitably Reflect" The "Cost of Benefits" Provided, Is Very Broad

#### 1. Reasonable and Equitable

While plaintiffs complain that OPM attempts to avoid the "plain language" of the statute, it is plaintiffs which fail to recognize that the plain language of the terms of the statute are expansive in scope and leave much to OPM's discretion. On its face, the statute does not specify the rates that are to be considered "reasonable and equitable." Thus, the first step in the Chevron analysis is satisfied. The statute does not define the relevant terms. Thus, the statute provides wide discretion to OPM to fashion an administrative scheme, relevant to carriers that provide pre-paid, community rate programs, to account for any adjustments to the rates when a carrier continues in the program, and to provide the necessary mechanism for rates when a carrier elects to exit the program. In fact, plaintiffs recognize that it is OPM's "permissible objective" to obtain rates which are "reasonable and equitable for the FEHBP group." (Pl. Br. p. 14, citing 55 Fed. Reg. 27406, 27409 col. 1 (1990).

Accordingly, the ultimate dollar amount of the rates for these prepaid carriers, for their final year, need not necessarily reflect actual costs, and, indeed, likely will not reflect actual costs because they are determined in advance of known utilization of health care services. Rather, the ultimate rates that the community rated carriers charge to OPM and the Federal enrollees must only be "reasonable and equitable" when compared to the appropriate SSSGs in the carrier's relevant area,. See Deft. Br. 17-20, and adjustments are only to be made to future contract rates.

2. Cost of Benefits

It is also reasonable for OPM to construe liberally the term "**cost of benefits provided**," depending upon whether the carrier is a community rated carrier that functions on a prepaid basis, in contrast to an experience rated carrier that does not function on a prepaid basis. Because community rated carriers do not charge upon the basis of actual costs and experience, and because OPM and the community rated carriers **negotiate** and agree upon an estimated rate at the beginning of each contract year, the "cost of benefits provided" for a community rated carrier is not, as plaintiffs suggest, based upon actual costs. Because community rated carriers do not operate in the commercial world upon the basis of the actual "cost" of benefits provided, it is a permissible construction for OPM to rely upon, and ultimately pay, the rate that the carrier estimated, negotiated, and agreed to accept at the beginning of the contract year, in the final year when the carrier elects to exit the program.

Plaintiffs' arguments about the "cost of benefits," and that the amounts that OPM calculated for plaintiffs as a "reconciliation" amount is an amount that somehow OPM owes to plaintiffs, lack merit. Plaintiffs assert that OPM's claims of "administrability" are not credible based upon their assertion that "OPM itself has already determined the amount that reasonably and equitably reflected the cost of the benefits" that Scott & White and Texas Health Choice provided in their final years of their contracts - $3,625,782 and $622,279, respectively (and $364,127 for Bluelincs) - which amounts are less than the amount the carriers were paid. Their argument demonstrates precisely the misunderstandings that underlie the premise of plaintiffs' argument. **OPM did not determine that these amounts** that were calculated reasonably and

equitably reflected the cost of the benefits provided by these carriers. Rather, OPM determined that these amounts were the amounts that OPM **would pay as an adjustment to future rates, but only if** the carriers determined their Federal rates using the same methodology that the carriers determined for their SSSG rates, and only if the carriers chose to renew their FEHB contracts for the following year, to which any rate adjustments could be made. Whether the amounts represent "cost of benefits" was not, and could not be known, because community rated carriers do not track costs when care is provided by their managed care network; rather, they depend upon their various business relationships with providers, often based upon capitation.[6]

Even if community rated carriers were somehow able to track the cost of benefits actually provided for a prior contract year, it would be impossible for the Federal population of enrollees to utilize precisely the same benefits as the carriers' SSSG lines of business. Federal enrollees would utilize either more, or less benefits, and the actual cost of their benefits incurred would be either higher or lower than the SSSGs' costs, with the result that the rate should in fact be higher or lower, and the amounts calculated for reconciliation are necessarily wrong.

Further, the figures presented by plaintiffs as the amounts that they are allegedly "owed," are derived from data that plaintiffs represented to OPM as appropriate for purposes of undertaking the calculation in the reconciliation process. It is undisputed that OPM did not audit or test this data. Nor was the data even subject to audit, because it is excluded from the data

---

[6] "Capitation fees" are a set charge per member per month. See e.g., 48 C.F.R. 1602-170.2. See section 3, below.

required to be maintained in OPM's records retention provisions.[7] Further, it is common knowledge in the Government contracts arena that the auditing process, for a contract that is terminated, generally presents to the administering agency the potential for difficulty in obtaining all necessary records and relevant data from the contractor, required to verify rate calculations.[8]

This case and its litigation posture is somewhat unique, as it has allowed plaintiffs to assert their claim that data is available for this purpose. However, no one can know, much less ensure, that these three plaintiffs, or any community rated carriers, would have been so careful and cooperative in the event the data resulted in a reconciliation calculation for which the carriers owed money to the Government in the final year. Although the plaintiffs would contend otherwise, this case demonstrates *precisely* the difficulties in administering the FEHB program that OPM predicted in its rulemaking approximately sixteen years ago, in 1990.

---

[7] Pursuant to 48 C.F.R. 1652, the records to be retained are those relevant to the annual accounting statement, which includes charges and/or costs. The final year's reconciliation is not a charge or a cost and is not represented in the annual accounting statement, and therefore, is not covered by the records retention regulation.

This is a point that plaintiffs stubbornly refuse to accept. Their arguments rely heavily upon assertions that reconciliation has been performed, that data is available, and that money is supposedly owed, without addressing at all that the data submitted in the reconciliation process is not audited and cannot be compelled pursuant to the records retention clause.

[8] Specifically here, although plaintiffs argue that they have preserved all relevant data, we still do not know whether the amounts they represent as "owed" are derived from accurate and verifiable data.

3. OPM's Interpretation Of The Statute Is Consistent With Other Federal Law Governing **Prepaid** Health Plans

OPM's interpretation is consistent with other Federal law. In the Health Maintenance Organization Amendments of 1988,[9] enacted before promulgation of the nonreconciliation regulation, Congress provided a definition of "Community Rating," that included:

> **predictions** of the **differences in the use of health services** by individuals or families in each class; and,
>
> **revenue requirements** of the HMO, upon the basis of a composite of the organization's revenue requirements for providing services.

42 U.S.C. §300e-1(8)(C)(emphasis added). Clearly, a community rated carrier's operations are not based upon actual "costs," as plaintiffs suggest. Rather, their operations are based upon **predictions of the use of health services, by class of enrollees, combined with the community rated carrier's own internal estimates of its revenue requirements, viewed on a "composite" basis,** in the context of its entire business and corporate structure. Therefore, the statutory term – "cost of benefit" provided – can have a variety of permissible meanings. There is no one dollar amount that is the only possible amount to satisfy the statute.

The definition of "community rates" also includes the concept of a rate of payment based upon a per member per month "capitation" rate. The rate may include an "adjusted community rate" (ACR), one that adjusts the community rate for the "expected use" of medical resources of the FEHBP group; the ACR is a **prospective rate,** which cannot be retroactively revised to reflect actual experience, actual utilization of services, or actual costs of the FEHBP. Whether the amounts represent "cost of benefits" was not, and could not be known, because community

[9] P.L. 100-517, 1988 HR 3235, 102 Stat 2578, 42 U.S.C. 201 note.

rated carriers do not track costs when care is provided by their managed care network; rather, they depend upon their various business relationships with providers, often based upon capitation. See 55 FR 27414, July 2, 1990; 62 FR 47573, Sept. 10, 1997.[10] Therefore, as we demonstrated in our motion, rates that "reasonably and equitably reflect the cost of benefits" provided may permissibly fall within a **range of rates**.[11]

Plaintiffs suggest that their community rated contract entitles them, effectively, to the benefit of the treatment that OPM provides to experience rated carriers. Pl.Br. 14. Plaintiffs' suggestion that community rated carriers are entitled to compensation at a rate that reflects the

---

[10] Because the "actual costs" are not the relevant reference point, plaintiffs' reliance upon OPM's record retention requirements for its arguments is misplaced. Further, the declarations that they submit, that assert that they continued to maintain all the records that OPM could possibly require for any rate reconciliation, or for any audit, are not relevant for purposes of this dispute. See Part II D, below.

Community rated carriers operate upon a much different basis than experience rated carriers, for which cost or pricing data, required by the Federal Acquisition Regulations (FAR), is much more significant. E.g., 48 C.F.R. 1602.170-5. For community rated carriers, OPM considers, among other things, trend data, actuarial data, factors that predict utilization, demographics such as family size, and adjustment factors for capitation. A community rated carrier may use any rating method other than retrospective experience rating. 48 C.F.R. 1602.170-13.

In contrast, for experience rated carriers, OPM considers claims data, actual payments made, cost data, utilization data, and administrative expenses and retentions; see 62 FR 47574, Sept. 10, 1997; 70 FR 31378, June 1, 2005.

[11] By incorrectly attributing inexactly excerpted pieces of OPM's motion, plaintiffs attempt to make it appear that OPM has somehow suggested that neither estimated nor reconciled rates provide a truly "reasonable and equitable" measure of costs of providing benefits. See Deft. Br. p.16 n.2. In fact, OPM neither said nor suggested any such thing. What OPM established is that the reconciled rates do not necessarily represent the actual costs of benefits for community rated carriers. Because a **range of rates**, based on reasonable assumptions, can be acceptable, both reconciled and unreconciled rates can satisfy the statute.

cost of benefits "*actually provided*" (rather than benefits "*to be provided*"), in essence, would eviscerate the **prepaid nature** of their contracts, pursuant to which they are defined, by statute. The statute defines them as "**prepayment plans**" which offer health benefits "**in whole or in substantial part on a prepaid basis**," and whose provider group receives income from prepaid funds or agrees to accept payment from the plan as full payment for covered services, for the population "**proposed to be served**" by the plan. 5 U.S.C. §8903(4). Plaintiffs' arguments makes no sense, because it is directly at odds with the FEHBA's comprehensive statutory and regulatory scheme established for community rated carriers.

Therefore, the reconciliation provision does not exist for community rated carriers, as plaintiffs assert (Pl.Br. 14), for the purpose of obtaining a rate that represents the cost of benefits *actually* provided – as is statutorily provided for experience rated carriers at 8903(1) and (2).

Finally, the adjustments that plaintiffs seek is expressly prohibited at section 1652.216-70(b)(5), which provides:

> No upward adjustment in the rate established for this contract will be allowed or considered by the Government or will be made by the Carrier in this or in any other contract period on the basis of actual costs incurred, actual benefits provided, or actual size of composition of the FEHBP group during this contract period.

(emphasis added). Plaintiffs do not challenge this part of the regulation.

Accordingly, OPM's interpretation of the statute is consistent with other Federal law governing prepaid health plans.

4. Equitable Rates For The FEHBP Group Requires A Comparison Of "Rates" To The **Appropriate Similarly Sized Subscriber Group (SSSG)** Of The Carrier, Not A Comparison To The Carrier's **Non-SSSG** Group

Plaintiffs mischaracterize OPM's statements associated with issuing the regulation in 1990 when plaintiffs refer, erroneously, to a "new" and/or inconsistent rationale allegedly

presented in this litigation. Pl.Br. 14. Plaintiffs suggest that reconciliation is required even in the final year in order to establish a statutorily acceptable rate. They are wrong. They fail to recognize the very important difference between an SSSG (similarly sized subscriber group) and a non-SSSG.

What OPM discussed, in the context of the snippet of the text cited by plaintiffs, addressed solely the determination of the appropriate SSSG - as the point of comparison to determine the **equitability** issue for Federal enrollees. OPM's discussion focused upon its judgment that reconciliation is necessary to achieve **equitable rates**, **for the FEHB group**. See 55 Fed Reg 27406, 27409 (emphasis added), referenced at Pl.Br. 14. One commenter had inquired whether OPM's proposed regulation would prohibit HMOs (referred to in the statute and regulations as "comprehensive medical plans" or "CMPs") from using discounting and other methods of rating with groups *other than a plan's SSSGs.* OPM's response stated that OPM's

> primary objective is to obtain rates which are reasonable and equitable for the FEHBP group. In determining the FEHBP plans' rating, OPM will examine only the rating of the plans' SSSGs.

55 FS 27406, 27409 (1990).

The text cited by plaintiffs was issued to assuage fears that community rated carriers might have regarding discounts they might provide to their non-SSSG lines of business. The regulation provided basically that a community rated carrier may conduct its business with non-SSSG lines of business, without regard to the FEHBP requirements -- such as by employing a more favorable rating methodology for a non-SSSG group resulting in a lower cost benefit package for a non-SSSG than for OPM -- and OPM would not insist upon also obtaining that favorable methodology. In promulgating the regulation, OPM insisted only that, in order for the

FEHB plan to be treated "reasonably and equitably" in terms of receiving a rate that is calculated using an appropriate methodology, OPM must receive the benefit of discounts that carriers provide to their SSSGs, but not necessarily to their **non**-SSSGs.

Therefore, when read in context, the text cited by plaintiffs does not establish, as they suggest, that reconciliation is required by statute. Rather, the text establishes that carriers wanted to charge certain lines of their businesses differently than they charge their Federal business, and, carriers did not want to be penalized for affording a subscriber group a discount that it did not provide to the FEHB group. In response, OPM recognized that the **FEHBP group may not receive all the discounts** that the community rated carrier might make available to a non-SSSG group. In that circumstance, OPM would not consider that type of rate unreasonable, so long as the rate that OPM receives is consistent with the carriers' SSSG group rates.[12]

Accordingly, nothing in the cited text suggests, as plaintiffs assert, that "only" through the reconciliation process can a statutorily acceptable rate be obtained.

B. The Non-Reconciliation Regulation Is Not Arbitrary Or Capricious

We established above, based upon statutory provisions, regulations, and common sense, that the non reconciliation regulation is not arbitrary or capricious. As further support for our arguments, we included in our supplemental appendix the declaration of Ms. Nancy Kichak, the Director of the Office of Actuaries at OPM (Office of Actuaries).

[12] Plaintiffs' argument, to the effect that the OPM guidelines that OPM distributed for community rated carriers somehow condemn OPM, is similarly misleading. Pl.Br. 15. Rate instructions and carrier letters regarding SSSGs are part of the complex program by which OPM attempts to ensure that the Government does not pay more for its health benefits than the carrier's other non-governmental groups. Plaintiffs' discussion about OPM's guidelines has no bearing on whether an unreconciled rate satisfies FEHBA's statutory requirement.

1. The Regulation Is Valid Because It Is Based Upon Sound Rationales

In December 2005, we filed an unopposed motion for leave to supplement the appendix with the declaration of Ms. Nancy Kichak, the OPM Director of the Office of Actuaries. With their opposition briefs filed on March 31, 2006, plaintiffs moved to strike the declaration of Ms. Kichak.[13] Contemporaneously with this brief, we file our opposition to plaintiffs' motion to strike, to establish that the Court may consider her declaration.[14] As we explain, Ms. Kichak's declaration is supported by statutes, regulations, OPM publications, and common sense.

Ms. Kichak states, among other things, that OPM, in reviewing the rates proposed by community rated carriers, "does not analyze the appropriateness of the underlying rate." Para. 6. Rather, OPM "reviews the proposed rate to establish that the amount the plan determines it will charge are distributed appropriately to the FEHBP and the carrier's other covered, non-Federal groups of a similar size. OPM does not question what judgment the carrier has applied in its **projections**." Para. 6 (emphases added). Thus, when OPM reviewed the rates **proposed** by Scott & White, Texas Health, and Bluelincs at the start of what later became their final years of

---

[13] Ms. Kichak's declaration is part of the supplemental appendix, filed on December 6, 2005.

[14] Plaintiffs waived their objection to the inclusion of Ms. Kichak's declaration in the record when they consented to our December 2005 motion to include it in the record, and they failed to express any objection until only very recently in the briefing schedule.

This Court should permit supplementation of the record because her declaration will assist the Court in this complex case, and it is in the interests of justice to do so. Ms. Kichak's declaration relates to plaintiffs' facial challenge to the validity of the regulation, as well as to their as-applied challenge. Further, Ms. Kichak's declaration is relevant to these disputes as they relate to the CDA issues, including plaintiffs' claim for contract reformation. Ms. Kichak attested to non-controversial matters, those to which plaintiffs submitted no evidence to contradict.

participation, OPM was not reviewing the reasonableness of the actual dollar amounts charged. The "FEHBP rate negotiation is premised on an **estimate** or **projection** of what a carrier's community rates will be for the ensuing contract year." Para 10.

These statements are indisputably true. Thus, when OPM later requested limited reconciliation information from each of the carriers in what became their final year, OPM reviewed the carriers' estimated rates to the rates of the carriers other non-Federal groups of a similar size. OPM reviewed "the methodology and discounts used [by the carriers] to derive the rates charged to other similarly sized subscriber groups [SSSG]." Para 11.

Ms. Kichak also stated that, at the time of reconciliation – assuming that there would be an adjustment to the following year's rates – OPM's Office of the Actuaries

> limits its review to the data the carrier makes available for reconciliation. The Office of the Actuaries does not obtain all detailed records that may be maintained at the carrier's place of business. The Office of the Actuaries does not have the resources, and it is not that Office's operational function, to look behind these data or to verify that they are correct and appropriate to use for purposes of negotiation and reconciliation.

Para. 14. Rather, "OPM relies upon the audit feature of the FEHBP to provide an incentive for the carriers to accurately represent the data that drives their rates in the first instance." Para. 15. These statements are also true, and not rebutted by plaintiffs.

Ms. Kichak explained OPM's judgment as of 1990, based upon its experience and predictions for the program, that a carrier which chooses to exit the program and which might find itself owing funds to the FEHBP on reconciliation "would have a financial disincentive to provide access to data, particularly in view of its inability to look to future reserves [from the OPM earmarked reserves] to offset the improper prior rate." Para. 21. Indeed, as of 1990, OPM had "found that it was unable to obtain adequate data to reconcile the rates for a variety of

plans," and thus, contrary to plaintiffs' arguments in their opposition briefs, OPM's non-reconciliation regulation was not based on only two instances. Para. 21. These statements are true, based upon specific experiences of OPM, and not rebutted by plaintiffs.

Accordingly, as we explain more fully in our opposition to plaintiffs' motion to strike Ms. Kichak's declaration, there is no reason not to consider Ms. Kichak's declaration.

2. OPM's Rationales For The Non-Reconciliation Regulation Are Supported And Make Sense

a. Financial Disincentive

OPM (or its predecessor agency) has administered the FEHB program since 1959, when the FEHB statute was first enacted. OPM has been the expert in this area for decades. OPM has had the experience of negotiating rates with carriers for years, including those who provide for pre-paid, community rated plans -- first based upon a market price theory, and later based upon the negotiated premise. Deft. Br. 14-20. Plaintiffs' contention -- relating to OPM's rationale based upon the financial disincentives that a carrier which chooses to exit the program might face – lacks merit.

OPM's experience, stated on the record in the rule-making process, was that OPM had found it difficult to obtain data required for rate reconciliation in the final year when a carrier chose to exit the FEHB program. OPM cited two major examples of these difficulties, which, contrary to plaintiffs' suggestion, are more than sufficient to support OPM's decision to promulgate the non-reconciliation regulation. Plaintiffs cite to no case law that OPM was required to undertake a wide-ranging review or survey of the hundreds of carriers at the time in order to promulgate the regulation. While it may be true, as plaintiffs argue, that each carrier that knows that it has overcharged OPM would have a financial disincentive to cooperate in any

final year review of rates, that does not invalidate OPM's logic here.

Plaintiffs' argument, that OPM has presented a "new" rationale, not present in the administrative record, is disingenuous. Pl.Br. 10-13. In 1990, OPM did state as one of its rationales that OPM had found, based upon its experience, that adequate data was difficult to obtain from carriers who exited the program.[15] OPM's position, based upon the financial disincentive for departing carriers, merely posits additional, predicted, sources of difficulties, based upon OPM's real-world experience in requesting adequate data from departing carriers. The argument based upon the financial disincentives is merely a subset of the varied anticipated difficulties encompassed within OPM's previously articulated rationales, and is not a "new" argument, as plaintiffs contend.

b. Estimated Rates

Plaintiffs argue that OPM's rationale based upon "estimated" rates is a new one, that does not appear in the rulemaking record. They claim that the rationale is inconsistent with OPM's formal determinations in the rulemaking process because OPM stated that its primary objective was to obtain rates which are reasonable and equitable "for the FEHBP group," and would examine only the rates in comparison to the SSSGs.[16] Plaintiffs argue that the relevant SSSGs are not identified and their rates are unknown at the time that the carriers estimate their rates. They contend that it is only the reconciled rate that reflects the cost of benefits "actually provided" during the contract year, and that the purpose of the reconciliation process is to

[15] The reasons for the difficulties in obtaining adequate data are varied, and the Kichak declaration provides insight and background information concerning them.

[16] See Part II A 4, regarding 55 Fed. Reg. 27406, 27409.

"compensate" the carriers for the cost of the benefits provided.

None of these arguments has merit. Plaintiffs' arguments are based upon a mischaracterization of the fundamental procedures that OPM utilizes to negotiate rates with community rated carriers and the purpose of the rate reconciliation process.

It is the responsibility of the carrier to **propose estimated** rates for the next contract year. The community rated carrier, running its business, is in the best position to know, or provide the best estimate - or, it should be in the best position to know or estimate – the projected rates for the FEHB group, as well as for the comparable SSSGs, to identify the most comparable SSSGs in the area, to project and estimate the rates for each group for the following insurance year, and to estimate its projected revenue requirements for that year. It is also in the carrier's best interest to be in this position, because, after evolving from the market-based or cost approach, OPM began to **negotiate** rates with the community rated carriers. Deft.Br. 12-19.

The estimated rates to which the parties agree are rates that are negotiated, based upon the carriers' actuarial projections of services that would be utilized, its revenue requirements for those services, and its competitive position in whatever market area it serves. These rates are binding; they are published in the benefits brochures, and they determine premiums that are paid throughout the contract year by the enrollees and the Government.

Thus, the fact that community rated carriers provide estimated rates does not support their arguments here that they should be compensated later, in their final year, based upon actual costs.

c. Costs To The Government

Plaintiffs contend, in effect, that OPM cannot consider its own administrative convenience and costs to run the program. However, courts routinely sustain agency regulations when they are based upon administrative efficiency and/or convenience.

In Consolidated Edison Company of New York v. Abraham, 314 F.3d 1299, 1303 (Fed. Cir. 2002), the court of appeals sustained the validity of an agency presumption, stating:

> DOE's end-user presumption has a reasonable and rational basis, namely the **administrative convenience** of the government. While some claimants under the presumption may get a benefit they might not otherwise deserve, the agency has discretion under the circumstances of this complex program to set forth reasonable rules to facilitate the efficient administration of refund claims. The end-user presumption afforded by the 1992 eligibility rule is just such a reasonable rule.

(emphases added).

So, too here, the non-reconciliation regulation has a reasonable and rational basis, including the administrative efficiency of OPM. OPM chose to address the complicated rate reconciliation process in the final year in which the community rated carrier elects to exit the program, by providing for no rate adjustments, or reconciliation, because there would be no rates for the following insurance year to which any adjustment could be made. Some carriers might secure a benefit they might not otherwise deserve, and conversely, some carriers, such as plaintiffs, might not secure a "benefit," in the form of a rate adjustment. The same is true for OPM, because there are undoubtedly cases in which a carrier exits the program and, had they remained in the program, OPM would have secured the benefit of a positive adjustment to the

rates.[17]

However, OPM clearly possesses "discretion" under the complex FEHB program "to set forth reasonable rules to facilitate the efficient administration" of the rate reconciliation process for community rated carriers in their final year. OPM's balancing of the factors – the administrative costs and risks to OPM and the carriers — is "just such a reasonable rule." See Consolidated Edison Company of New York, 314 F.3d at 1303. Accord Reno v. Flores, 507 U.S. 292, 312 (1993) ("administrative efficiency" of Federal agency is well-recognized valid consideration).

OPM's rationale makes ultimate sense, from the point of view of the agency charged with administering the FEHBA, which is all that is required under the APA review standard.

4. The Risk Imposed By The Non-Reconciliation Regulation Is Spread Equally Between The Government And The Health Plans

Plaintiffs contend that the risk of nonreconciliation is not shared equally between the prepaid carriers and OPM. Plaintiffs are wrong.[18]

OPM determined that it would not require a rate reconciliation in the year the contract for a community rated carrier is not renewed. This regulation places the burden of properly projecting, estimating, and negotiated the community rates equally upon OPM and the carrier. It

---

[17] This is the point that the OIG at OPM made during the notice and comment period for the regulation, and the point that the OPM Office of Actuaries rejected, for the reasons set forth in the latter's response. App. 28-29.

[18] Plaintiffs argue that the regulation may lead to inconsistent results, depending on when a carrier notifies OPM that it will exit the program, either before or after OPM performs the reconciliation calculation. However, the timing of any carrier's notice to OPM that it will exit the program is without import, as no adjustment is permitted for that year in either instance. In fact, Texas Health notified OPM that it would terminate its contract after it had already received the reconciliation adjustment, and OPM subsequently withheld funds to offset that payment.

relieves the carrier of the requirement to continue to maintain data sufficient for rate reconciliation once the contract is terminated. As OPM noted, in effect, during the process of promulgating the regulation, it relieves OPM from the administrative burden of identifying and accessing the appropriate data at a time when the carrier no longer participates in the FEHBP. Kichak Decl. ¶25, Supp. App. 6. The parties share equally the risk of inaccurate rates negotiated in the year of nonrenewal. Kichak Decl. ¶26, Supp. App 6. This is simply common sense. See also Part II E, below.

C. Plaintiffs' Reliance Upon *Amfac Resorts* Is Misplaced

Plaintiffs cite Amfac Resorts, L.L.C. v. United States Dept of Interior, 282 F.3d 818, 826-28 (D.C. Cir. 2002), rev'd on other grounds sub nom. Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803 (2003), for the proposition that they should be permitted to demonstrate why their particular circumstances render the regulation unlawful. Plaintiffs' reliance upon Amfac is misplaced, because it is readily distinguishable.

In Amfac, the court acknowledged the holding in Reno v. Flores, 507 U.S. at 292, that adopted a "no set of circumstances" test as the standard to measure a challenge to a regulation, but noted potential problems in that test. Amfac, 282 F.3d at 826; but cf., Mineral Policy Center v. Norton, 229 F.Supp. 2d 30, 37-39. (D.C. D.C. 2003) (noting confusion in wake of Reno decision). Thus, there is some Supreme Court law that there is a heavy burden imposed upon a claimant, plaintiffs, which claim that a regulation is inconsistent with a statute, to establish that there are "no set of circumstances" under which the regulation would be valid. Reno v. Flores, 507 U.S. at 292; see United States v. Salerno, 481 U.S. 739 (1987)(facial challenge to a legislative act is the most difficult challenge to mount successfully because the challenger must

establish that "no set of circumstances" exists under which the Act would be valid).

Plaintiffs contend that the nonreconciliation regulation is invalid because it would not apply to those carriers, such as plaintiffs, for which OPM had performed the **calculation** for the reconciliation, before the carrier informed OPM that it would exit the FEHB program.[19]

Plaintiffs, however, turn the standard for evaluating the validity of the regulation on its head, by claiming that OPM, in promulgating the regulation, cited only two instances in which OPM had experienced difficulty in obtaining records, and by claiming that they have all the records that OPM would require for a rate reconciliation in their final year. In fact, the test - "no set of circumstances" – discussed in Amfac and Reno v. Flores – would mean that OPM would require only one instance **to justify the nonreconciliation regulation** – a standard

[19] The court of appeals in Amfac noted that, notwithstanding some differences of opinion, the court of appeals had invoked Salerno's "no set of circumstances" test to reject facial constitutional challenges. Amfac, 282 F.3d at 826. The court also noted, however, that in a case in which the claim was that regulation conflicted with a statute, the court declined to adopt the Salerno test, stating that the Supreme Court had never adopted a 'no set of circumstances' test to assess the validity of a regulation challenged as facially incompatible with governing statutory law. Id., citing National Mining Ass'n v. Army Corps of Engineers, 145 F.3d 1399, 1407 (D.C. Cir. 1998). The court also noted that it had apparently overlooked Reno in deciding National Mining. Amfac, 282 F.3d at 826-27.

Further, the court noted that the Supreme Court had announced a less strict standard when a challenge was brought that a regulation was inconsistent with a statute. INS v. National Center for Immigrant' Rights, 502 U.S. 183, 188 (1991)[NCIR]. The NCIR test is based upon the principle that, **even if** a regulation may be invalid as applied in some cases, does not mean that the regulation is facially invalid because it is without statutory authority. Amfac, 282 F.3d at 827, citing NCIR.

Under either formulation of the test, the court held that the regulation at issue was not facially invalid (even if there might be one or two invalid applications); a few possible invalid applications is far from enough to make the regulation unlawful under any of the standards that the court of appeals had mentioned. Amfac, 228 F.3d at 828. Accordingly, plaintiffs' challenge to the regulation lacks merit.

undisputably met here.[20]

Accordingly, plaintiffs' reliance upon Amfac Resorts is misplaced.

D. Plaintiffs' Arguments Relating To Record Retention Are Fatally Flawed

Plaintiffs submitted declarations with their briefs, attempting to establish that they have maintained all the possible records that OPM might require to conduct a rate reconciliation. The declarations purport to establish that the plaintiffs maintained their records in accordance with OPM regulations, and that OPM could therefore have gathered the necessary data to audit their records relating to rate reconciliation.

However, the declarations are conclusory and, in any event, establish nothing for purposes of this case. Without a thorough factual investigation into the nature and extent of the records, and a review of the records more extensive in scope than the review that OPM would undertake in the rate reconciliation process, and/or a full-blown OIG audit, there is no way to determine whether plaintiffs' records were, or are, maintained in accordance with OPM regulations.[21]

---

[20] Courts have since recognized some confusion created by this test. See Mineral Policy Center v. Norton, 292 F.Supp. 2d 30, 37-39 (D.C. D.C. 2003). However, even under a test less stringent than the "no set of circumstances" test, the nonreconciliation regulation is valid. There is clearly a rational relationship between the rule requiring no reconciliation in the final year, and, OPM's concerns about the administrative costs, and risks, in attempting to secure sufficient data after the final year, from carriers that have chosen to exit the FEHB program. OPM struck a reasonable balance between these concerns.

[21] At this time, we do not submit a Rule 56 affidavit of counsel, requesting discovery into these matters. We believe that, given the dispositive motions filed by both parties, the Court may decide the issues as matters of law. Further, any discovery into these matters would defeat the purpose of the non-reconciliation regulation, by which OPM determined that it would not be an efficient use of its limited resources to compel the records and audit them. Even if the Court were to assume that the statements are true, they are irrelevant.

We respectfully request that the Court ignore the declarations on these points.

E That OPM Might Have Chosen Alternative Means To Address Rates In The Year In Which A Community Rated Carrier Elects To Exit The Program Does Not Invalidate The Means That OPM Chose

Plaintiffs devote substantial text, through their brief, to their arguments that there were alternative means available to OPM to address the "reasonable and equitable rate" standard in the year in which the carrier elects to exit the program. Plaintiffs argue that OPM could have either disallowed all costs not documented, or, employed methods available to OPM to compel the carrier to provide adequate documentation. Plaintiffs suggest that OPM continues to have recourse to debt collection agencies, and retains audit rights wholly independent of the reconciliation process. Pl.Br. 18. It appears that the essence of plaintiffs' argument is to suggest that OPM's decision to spread nonreconciliation risk evenly, through the nonreconciliation regulation, somehow falls short.

Plaintiffs ignore the axiom in administrative law that an agency's choice of procedures will not be invalidated pursuant to an APA deferential review simply because there may have been alternative means. E.g., WorldCom, Inc. v. F.CC., 238 F.3d 449, 459 (D.C. Cir. 2001). Moreover, whether the nonreconciliation regulation ultimately is effective at accomplishing the agency's intended goals is not relevant to its validity as a regulation or its compatibility with its statute. See e.g., Illinois Commerce Comm'n v. Interstate Commerce Comm'n, 776 F.2d 355, 359 (D.C. Cir. 1985).

Plaintiffs rely upon the fact that OPM's OIG objected to the promulgation of the

nonreconciliation regulation, upon the ground that OPM might forego an adjustment, or rate reconciliation in its favor, to which it might be entitled. However, it was OPM's Office of Actuaries within the Office of Insurance Programs that was responsible for administering the complex FEHB programs at issue, and allocating OPM's resources to administer the FEHB programs. The Office of Insurance Programs considered, and rejected, the OIG recommendation with respect to the proposed regulation, and for the legitimate reasons discussed above.[22] While a Government Inspector General typically is charged with responsibilities relating to auditing, and undertaking a careful and thorough review of a contractor's financial books and records, the OPM Office of Actuaries has different programmatic missions and is charged, among other things, with fashioning processes, with its limited resources, to administer its programs. The nonreconciliation regulation was the balance that OPM ultimately selected.

In any event, if a prepaid plan goes out of business, there are no rates in the following year to reconcile or adjust. In OPM's judgment, the most reasonable solution was for both the Government and the carrier to bear the risk of a carrier's termination, in terms of foregoing any possible "adjustment" or reconciliation in the final year. Of course, OPM recognizes that it continues to have recourse to debt collection agencies and the courts – if the situation, *in OPM's judgment*, warrants that recourse, with the associated expenditures of resources, in light of whatever net recovery, if any, would be anticipated. Pl.Br. at 18. Thus, the OPM program office determined that, to initiate formal adversarial administrative and/or judicial processes, to

[22] Plaintiffs's argument on this point is inherently inconsistent: while arguing that OPM ignored the OIG recommendation, plaintiffs quote from OPM's response to the OIG during the rulemaking process.

compel the production of records, and then, essentially, to engage in a full-scale audit of the records,[23] and then, possibly, be required to engage debt collection agencies, to attempt to collect the debt, would waste OPM's scarce administrative resources and not further the goals of administrative efficiency.[24] Rather, OPM put all the carriers on notice, with the 1990 regulation, that OPM would share equally in the risk of nonreconciliation in the final year.

Plaintiffs' proposed alternatives do not make sense. While they cite to the "extensive audit rights" that OPM possesses under the FEHBA, it was precisely that extensive type of audit that OPM's Office of Actuaries does not undertake, nor does it wish to undertake, for each of the numerous carriers which might elect to exit the FEHBP in any particular program year. See Pl.Br. at 18. Anyone familiar with the Government audit process as it involves Government contracts, administered by almost any agency, knows or should know that the audit process can be extensive, time-consuming, expensive, and sometimes involve great effort and expense by the Government to secure data from uncooperative contractors. A cursory review of the rate reconciliation guidelines, with the types of information that OPM requests, and the audit of Scott

[23] OPM's decision whether to audit a carrier is analogous to tax matters — it is common knowledge that the Internal Revenue Service (IRS) does not audit every taxpayer, every year, nor could it possibly do so. Similarly, it should be obvious that OPM would not have the resources to conduct a full-blown audit, every year, of each of the possibly hundreds of carriers who participate in the FEHB which might decide to exit the program in any given year.

[24] Plaintiffs' claim that they have no "similar recourse." Pl.Br. at 18. They are wrong. Plaintiffs are always in the better position than OPM, given their own records, to know whether the rates that they charge to OPM for Federal enrollees are reasonable and equitable in comparison to rates that they charge to SSSGs – and particularly in the period **after** they have negotiated the rates with OPM, reviewed the utilization of services and revenues received, and **before** the rate reconciliation process is initiated or they make the decision to exit the FEHB program. Thus, plaintiffs do have at least a comparable level of "recourse" as does OPM in the final year.

& White in the appendix, demonstrates the very difficult nature of these procedures, and the types of resources that would be required for OPM to complete them. Compare Supp.App. 532–645 (rate reconciliation guidelines) with App. 381-492 (OPM audit report and Bluelincs response).

Moreover, a reasonable person could conclude that, in many instances, the cost to OPM of conducting an audit could exceed the amount at issue. For example, on occasion, the amount disputed by a carrier might not be an insubstantial sum, but it might be within the range of dollars for which it might not be worth it for OPM to undertake the administrative and judicial procedures described above, to attempt to collect.[25] And, for smaller carriers, the sums at issue and the cost and resources required to audit could easily lead OPM to forego the efforts.

In the final year in particular, any OPM audit, even a cursory one to determine whether the documentation offered by the carrier was adequate, would necessarily involve an in-depth review of documentation to ensure that it is complete and accurate, and verification of the contractor's numbers. It would also involve a fairly comprehensive review of the actuarial assumptions and projections made. Therefore, contrary to plaintiffs' arguments, that the

---

[25] For example, in the FEHB Program Carrier Letter, Community Rated Carriers, attached to the brief filed by Scott & White and Texas Health Choice, OPM differentiates between large and small carriers. Small carriers are defined as those having less than 1500 FEBHP contracts at the time of the rate proposal. (page 2). Small carriers had choices as to the nature and extent of the documentation that they would be required to submit to OPM. If their 1998 income from the Federal group would be less than $500,000, the carrier submitted far less detailed documentation to OPM, and OPM would evaluate the proposed rates by the reasonableness test, with further OPM review only for rates failing the reasonableness test (page 3). Further, OPM determined that its OIG would perform special audits on a selected basis.

While this level of detail was not in the record relating to the promulgation of the record, but only recently submitted by plaintiffs, it all makes ultimate sense.

Government "**may eventually recover** any overpayment" is not the point. (emphasis added). In any event, that the Government might possibly recover an overpayment would be small comfort to the Government, if the efforts and cost to recover outweighed the dollar recovery. This is a principle that OPM reasonably considered, and rejected, in promulgating the regulation in 1990. See Pl.Br. 18.[26]

Accordingly, as we established in our moving brief, whether there exists an alternative, or possibly even a better way, to regulate community rates under 5 U.S.C. §8902(i) when a community rated carrier exits the program, does not mean that the non-reconciliation regulation is arbitrary or capricious. E.g., WorldCom, Inc. v. F.CC., 238 F.3d 449, 459 (D.C. Cir. 2001) (even an admittedly "imperfect" use of collocation as a proxy for market power resulted in just and reasonable rates; agency made reasonable policy determination and sufficiently explained basis for its decision); Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC, 737 F.2d 1095, 1116 (D.C.Cir. 1984).

---

[26] Further, the parties would be in an unequal position. A carrier is in the best position to know what its costs, actuarial assumptions and revenues are, and can submit a claim to the contracting officer on any dispute, with the associated CDA interest to run from the date the contracting officer receives the claim. 41 U.S.C. §605. In contrast, OPM is in a less advantageous position, because OPM would be able to issue a final contracting officer's decision, with CDA interest to run in favor of the Government (section 5.34 of the contract), only after a thorough audit and analysis of the contractor's books and records. To the extent that a contractor delayed the production of documents or otherwise failed to cooperate in this process, the delay would further disadvantage OPM.

F. The Regulation "As Applied" To Plaintiffs Is Consistent With The Statute

1. OPM May Reason From The Particular To The General, And Promulgate A Rule Of Uniform Application For The FEHB Program

Plaintiffs' "as-applied" arguments lack merit. They contend that, as applied to them, the regulation is not rational because OPM had already performed the reconciliation calculation, before plaintiffs notified OPM that they would exit the FEHB program. Their reasoning is fundamentally flawed.

Decades ago, the Supreme Court concluded that in promulgating regulations, Government agencies are not required to determine and account for the actual effect of the proposed rule on each and every person that would be subject to the rule. Assigned Car Cases, 274 U.S. 564 (1927). This is an established principle, followed over the years. Accord e.g. United States v. Florida East Coast Ry, 410 U.S. 224, 246 (1973); United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 749 (1972); Permian Basin Area Rate Cases, 390 U.S. 747, 768-774 (1968). The authority to establish reasonable rules includes the power to prescribe a rule of universal application. Assigned Car Cases, 274 U.S. at 580. Thus, it is not for courts to weigh the evidence reviewed by the agency, Western Paper Makers' Chemical Co. v. United States, 271 U. S. 268, 271 (1926), or, to inquire into the soundness of the reasoning by which the agency's conclusions are reached, Interstate Commerce Commission v. Illinois Central R. R. Co., 215 U. S. 452, 471 (1910); Skinner & Eddy Corporation v. United States, 249 U. S. 557, 562 (1919), or to question the wisdom of the regulations which it prescribes. United States v. New River Co., 265 U. S. 533, 542 (1924). Rather, these are matters left by Congress to the administrative "tribunal appointed by law and informed by experience." Illinois Central R. R.

Co. v. Interstate Commerce Commission, 206 U.S. 441, 454 (1907). In Assigned Car Cases, 274 U.S. at 580, 583, the Court concluded that the object of the rule was not to equalize fortunes, but to prevent an unjust discrimination in the use of transportation facilities and to improve the service. The plaintiffs had claimed that the evidence of discrimination by common carriers, that gave rise to a uniform rule, related only to a few carriers, and that the general finding was without support because the evidence introduced was not shown to be "typical." The Court nevertheless concluded that, so long as the agency relied upon relevant evidence, it was permitted to proscribe a rule of general application and uniform application to all carriers, regardless of whether the plaintiffs, in fact, had discriminated.

So, too, here, OPM was entitled to fashion a rule of general application. The nonreconciliation regulation was based upon relevant evidence – including OPM's difficulties that it had experienced in attempting to secure data, in the final year, from carriers that exited the program. This is so even if the three particular plaintiffs here had, in fact, been willing at the time to produce all of their pertinent reconciliation data to OPM. Just as the agency in Assigned Car Cases reasoned from the particular to the general, so too, did OPM reason from the particular to the general. Id.

The cases cited by plaintiffs are inapposite. In Lomont v. O'Neill, 285 F.3d 9, 17-18 (D.C. Cir 2002), the court of appeals expressly did not decide any as-applied challenge to the regulation. The regulation in Lamont provided discretion for local officials to determine whether to certify that an applicant for a firearm should receive it. The regulation was valid on its face because it assumed the discretion would be exercised reasonably; the court merely indicated that the potential for an unreasonable exercise of discretion could render the regulation

invalid as applied. In sharp contrast here, pursuant to the nonreconciliation regulation, there is no room for OPM discretion in the final year, and there is no justification for reviewing whether the regulation as applied to these particular three plaintiffs is arbitrary. Where there is no difference in the application of the regulation to all regulated entities – all community rated carriers that contract with OPM pursuant to the FEHBA on a prepaid basis - the individual application is not properly subject to scrutiny.

The court in Lamont concluded that, as to the facial challenge to the regulation, "General rules need not work perfectly in all their applications." Id. at 17-18, citing Illinois Commerce Comm'n v. Interstate Commerce Comm'n, 776 F.2d 355, 359 (D.C. Cir. 1985). Similarly here, one of OPM's multiple purposes clearly was to establish a uniform rule of national application, to govern the FEHB program as a whole, including community rated carriers when they chose to exit the program, even if OPM had already performed the reconciliation calculation in what became the final year.[27]

---

[27] The logic of plaintiffs' as-applied arguments would lead to an absurd result, particularly from OPMs perspective and interests. In effect, plaintiffs propose a system in which OPM would pay the amount calculated in the rate reconciliation process in the final year, to those carriers for whom OPM might have calculated the reconciliation amount, before the carriers announced their exit from the program, and which were also not out of business, or which had not announced any intent to go out of business, at that time.

Pursuant to plaintiffs' proposed system, however, OPM would not pay a carrier for which OPM might not have yet calculated the reconciliation amount, at the time the carrier announced its exit from the program, and/or if the carrier had not produced the necessary records for the rate reconciliation, and/or if the carrier had gone out of business and/or announced an intent to go out of business at the time.

It is apparent that, at least from OPM's view, OPM would have been required to attempt to calculate the reconciliation amount, but whether OPM would pay the carrier that amount would depend upon a variety of factors outside OPM's control. Thus, there are many uncertainties, and inequities, inherent in the structure that plaintiffs propose. All three plaintiffs

Thus, OPM's reasoning from the particular to the general, and promulgation of a rule of uniform application for the FEHB program, should be sustained.

2. Even If OPM Performs A **Calculation** Of The Reconciliation, In Anticipation Of A Rate Reconciliation Or Adjustment, **No Rate Adjustment** Is Required If The Carrier Chooses To Exit The FEHB Program

Plaintiffs fail to address our demonstration that, although OPM performed a reconciliation calculation, the result of the calculation is not audited, not verified, and not verifiable. Plaintiff also mischaracterize OPM's position, because OPM's position is that the nonreconciliation regulation does apply to plaintiffs' situation. Pl.Br. 19-20. While OPM agrees that a rate was documented, initially, for each plaintiff in what became their final year, OPM strenuously denies the adequacy of the rate, because the rate was not tested on audit. The rates presented by the carriers, and the data upon which they rely, do not, absent audit, represent reliable figures upon which to bind the Government. Thus, the rationale for the regulation, sharing evenly the risk of nonreconciliation, and abandoning its otherwise desirable reconciliation process when rates can be adjusted for the following contract year, does indeed apply in this case.[28]

OPM disputes plaintiffs' assertion to the effect that, if there is a reconciliation calculation, OPM must make a payment in that amount. Pl.Br. 21. This is because there is no

---

were participants in the FEHB program and in contract with OPM at the time the regulation was issued in its proposed form, and none of them brought these suggestions to OPM for consideration at that time.

[28] Plaintiffs portray the rate reconciliation process as including – always – three steps, the final step being reconciliation. This logic is seriously flawed, as there is no reconciliation in the final year because there are no future rates to adjust, or, reconcile.

"reconciliation" if there can be no future adjustments to the rates for a continuing contractual relationship and program. Thus, while OPM undertook to perform a reconciliation calculation, in anticipation of a rate reconciliation, no "reconciliation" was accomplished because plaintiffs chose to exit the program. No monies changed hands, the rates that were estimated and negotiated remained what they were, and the parties did not reconcile. That a calculation may have been performed in anticipation of a reconciliation does not require the reconciliation actually to occur, nor does it bind the carrier to retain or produce records for a reconciliation in the final year, for which there will be no adjustment or claim, and with respect to which there will be no audit.

Thus, a rate may be statutorily acceptable in that it is a community rated carrier's best estimate of the cost of benefits to be provided, and revenues to be expected, on a prepaid basis -- without rates ever being reconciled. Reconciliation was originally intended, and has continuously been used by OPM, to ensure that a carrier calculates its rate using the same methodology for its FEHB group as it does for its other groups, so that the rate it charges its FEHB group is reasonable and equitable as compared to its other SSSG groups. The statute requires a rate that reasonably and equitably represents the cost of benefits provided for community rated carriers on a prepaid basis. The statute does not require that the rate established for a community rated carrier for the FEHB group be calculated using the same methodology that the carrier uses for all its other groups, in the context of its overall business. OPM has determined, for reasons articulated in its properly promulgated regulations, that in years of nonrenewal of the contract, the reconciliation requirement will not be imposed. OPM's decision and rationales are reasonable and consistent with the statute, and should not be

disturbed.

Accordingly, even though OPM performed a **calculation** of the reconciliation for each of the three plaintiffs, **in anticipation of a rate reconciliation**, no rate adjustment is required if the carrier exits the program

G. Even If This Court Strikes The Kichak Declaration, The Regulation Is Consistent With The Statute

Even if this Court were to strike Ms. Kichak's declaration, the regulation is not arbitrary or capricious or invalid as a matter of law, or, as applied. There is abundant support in the applicable statutes, Code of Federal Regulations, Federal Register notices, and the documentary record involved in the promulgation of the regulation, as well as in common sense, to support its validity - its facial validity and as applied.[29]

III. Plaintiffs Are Bound By The Terms Of Their Contracts, Section 3.2; Reformation Of The Contract Is Not Warranted

A. Plaintiffs Waived Any Challenge To The Contract Terms

1. This Court's CDA Review Is De Novo; Plaintiffs Might Have Been Able To Initiate The CDA Disputes Process Years Ago

Plaintiffs contend that they could not have challenged the regulation until 1999 and 2000, the years in which they exited the program. They err.

Plaintiffs overlook one of the principles of the CDA disputes process. Early in the 1990s, Congress amended 28 U.S.C. §1491(a)(2) to provide that a CDA contractor may submit a claim to the contracting officer, request a final decision on the interpretation and/or application of a contract provision, and pursue that dispute through the CDA process to this Court. The 1992

[29] In our motion, we cited to these authorities.

amendment to the Tucker Act provides:

> The Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including a dispute concerning . . . other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act.

(emphasis added).

Thus, plaintiffs might have had opportunities, years before they chose to exit the FEHB program, to challenge the validity of the regulation. They could have submitted a claim to the contracting officer, even if, at the time, OPM had not performed any reconciliation calculation, to attempt to secure a determination of the challenges they raise now. Instead, they continued to sign their annual contracts, all of which included section 3.2 – the terms of the non-reconciliation regulation and perform, and secure the benefits of the contract. If plaintiffs had submitted a timely CDA claim, and it was denied or deemed denied, they might have been able to file in this Court, raising the challenges they do now. However, they never provided that opportunity to the contracting officer, or this Court, until they later filed their claims here.

Therefore, by executing the contracts, year afer year, without protest, and without attempting to challenge the regulation through the CDA dispute process, plaintiffs waived their challenge to the contract nonreconciliation term.

2. None of The Three Plaintiffs Submitted Any Comments Upon The Proposed Regulation, And Waived Their Right To Challenge It Later

Plaintiffs concede, as they must, that they did not submit any comments on the proposed regulation at the time, in 1989-90. Nor did they file any action in any Federal district court for any judicial review of the regulation.[30]

The only argument appears to be that the law firm, Epstein Becker & Green, that now represents one of the plaintiffs in this litigation, Bluelincs, submitted a comment on the proposed regulation. However, plaintiffs do not contend, nor do they produce any evidence, that this law firm represented Bluelincs in 1989-90 in the rule-making proceeding.

Therefore, contrary to plaintiffs' "fairness" argument, it would be unfair to permit them to challenge the regulation now, when they failed to submit any comments upon the proposed regulation at the time.

B. Congress Intended The Statute To Benefit The Government And Federal Enrollees, Not To Benefit Health Plans

1. Governing Law In This Circuit Provides That, If A Statute Is Intended To Benefit The Government, A Contract Provision That May Be Inconsistent With A Statute Nevertheless Is Enforceable

Plaintiffs' opposition to our contract argument is that OPM cannot do by contract what it cannot do by regulation. Plaintiffs attempt to discount the cases upon which we rely regarding waiver, on the erroneous notion that the FEHBA is intended to benefit the health plans. Pl.Br.

[30] They contend that such an action would have been futile. However, without having attempted at the time to seek a declaratory judgment with respect to the validity of the regulation, they cannot now assert futility.

26. However, as we explain below, the statute was intended to benefit the Government and Federal enrollees, not the health plans, and, therefore, the contract provision containing the nonreconciliation terms is proper and binding.

First, even if the general rule of contract law provides that OPM cannot do by contract what it cannot do by regulation, plaintiffs concede that there are exceptions to this general rule – they fail to acknowledge that these exceptions apply here.

We demonstrated in our motion that the nonreconciliation regulation fits squarely within the parameters established by Whittaker Electronic Systems v. Dalton, 124 F.3d 1443 (Fed. Cir. 1997), AT&T v. United States, 48 Fed. Cl. 156 (2000), and Promac, Inc. v. West, 203 F.3d 786, 789 (Fed. Cir. 2000). See Deft. Br. 35-36. Plaintiffs seek to evade the precedent established in AT&T by claiming to be the "principal beneficiary of the statutory obligation for compensation." Pl. Br. 35. This claim makes no sense. The statute requires rates to reasonably and equitably reflect the cost of benefits provided. Under the statute, regulations, and contract provisions, rating procedures are intended **to protect the Government and Federal enrollees** against artificial and unreasonable inflation of costs for health benefits that would be borne by the Government and Federal enrollees. Accord Rough Diamond Co. v. United States, 173 Ct. Cl. 15 cert. denied, 383 U.S. 957 (1966)(claimant may not bring suit against Government for violation of statute or regulation unless regulation exists for benefit of contractor; purpose of statute is to benefit cotton farmers, not commodity exporters); Cessna Aircraft Co. v. Dalton, 126 F.3d 1442, 1451-52 (Fed. Cir. 1997)(and cases cited therein).

Therefore, section 3.2 of the contract, benefits the Government, and is enforceable.

2. Legislative History Of The FEHBA Makes Clear That The Nonreconciliation Regulation Is For The Benefit Of The Government And Federal Enrollees, Not The Carriers

The legislative history of the FEHBA supports the principle that the regulation is for the benefit of the Government, not the contractors. The primary goal of the legislation is to enable OPM to procure good insurance coverage, at the lowest possible cost, to the Government and Federal enrollees. H. Rept. No. 957, 86th Cong 1st Sess., *reprinted at* 1959 U.S. Code Cong. &Admin. News, 2913, 2916. While the statute creates a tension between the quality or extent of coverage provided under the benefits package, and, the cost that the Government should allocate toward obtaining attractive benefit packages, the statutory provision at issue clearly is not intended (and is most certainly not "primarily," intended, Pl.Br. 35) to make health plans a "beneficiary" of an "obligation for compensation." Therefore, plaintiffs may not take advantage of any "beneficiary" argument under the AT&T line of cases.

The legislative history of the original FEHBA, in 1959, establishes this principle. The legislative history of 5 U.S.C. § 8902(i) is directed specifically to the Government-wide service benefit plan and the indemnity benefit plan, which are set forth at 5 U.S.C. § 8903(1) and (2). The legislative history is not directed at the payment provisions that the agency should consider with respect to community rated carriers, described at 5 U.S.C. § 8903(4). Regarding the service benefit plan and the indemnity plan, Congress determined that the agency's contracts with these entities should

> call for premium rates that are competitive with those generally charged for a *new* group health insurance sold to large employers. For the premiums agreed upon, the [agency] is charged with negotiating the best possible basic health and major medical benefits. **These provisions are designed to assure maximum health benefits for employees at**

> **the lowest possible cost to themselves and to the Government.**

(emphasis supplied.) 1959 USCCAN at 2916. Further, the legislative history provides that

> premiums to be charged by the carriers for approved health benefits plans shall reasonably and equitably reflect the cost of the benefits provided. The subsection requires that the premiums for the service benefit plan and the indemnity benefit plan be determined on a basis which, **in the judgment of the [agency] is consistent with** the lowest schedule of basic rates generally charged for **new** group health benefits plan issued to large employers. This subsection further requires that premium rates determined for the first contract term shall be continued for subsequent contract terms **except that they may be readjusted for any subsequent term** based on past experience and benefit adjustments under the subsequent contract. Any readjustment in rates is required to be made **in advance of the contract term in which the new rates will apply** and on a basis which, **in the judgment of the [agency] is consistent with** the general practice of carriers which issue group health benefits plans to large employers. . . . **The effect of [the subsection] is to make certain that the premiums which the Government will have to pay for the service benefit plan and the indemnity benefit plan will not be more costly than those charged by the industry to other large employers.**

(emphases supplied.) 1959 USCCAN at 2923.

This legislative history establishes that the beneficiaries of this statute and the rating provisions are the Federal enrollees and the Government. Enrollees, for example, pay the same premium rate during the contract year, with no adjustment in any future years, no matter whether a carrier remains in the FEHB program or exits it. Thus, in a case in which a carrier exits the program, it makes sense that there is no reconciliation, because the enrollee would never receive the benefit of any reconciliation, were it to happen, because the carrier is no longer providing the service and the enrollee would, by necessity, be enrolled in another program. Thus, the provision is not intended for the protection or benefit of the carriers.

Moreover, the basis upon which rates are determined is expressly reserved for the discretion of the agency. By its choice of language, it is also clear that Congress intended the agency to determine rates using a basis or methodology that is "consistent with the general

practice" of carriers insuring large employer groups. There is no mandate that rates necessarily equal other group rates, or, that they are determined in a manner that is identical to the manner in which other group rates are determined.

By contrasting Congress's treatment of experience rated carriers as compared to community rated carriers, it is apparent that Congress intended the rates for the experience rated plans described in 8903(1) and (2) (the only plans for which the rating system is addressed) to be those of "new" large group employers. In other words, the statutorily acceptable rate is one that commences in the absence of experience or adjustment. According to the legislative history of the FEHBA, the negotiated and agreed rate at the inception of the plan, and, in advance of the plan year, is the binding rate, and it is not changed or adjusted. It is only the rate for the following year that may be adjusted in light of known experience and utilization.

That the nonreconciliation regulation is intended to benefit the Government is also supported by the equal sharing of the risk. While the risk of foregoing entitlement to an adjustment is equally apportioned between the carrier and the Government, it is the Government that benefits primarily, by saving resources and providing for more efficient administration of the FEHB program as a result of the nonreconciliation regulation.

As the United States District Court for the District of Columbia stated, "it is difficult to imagine anyone other than federal employees suing to enforce [5 U.S.C. § 8902(i).] Certainly health insurance providers have little incentive to do so. If they believe that rates offered by the Commission are too low, their recourse is not to sign the contract, and it is unlikely that they will assert the rates are too high." NTEU v. Campbell, 589 F.2d 669, 674 (D.C. Cir. 1978).

Accordingly, Congress intended the statute to benefit the Government and Federal

enrollees, not to benefit the health plans.

C. **Even If** The Court Concludes That The Nonreconciliation Regulation Is Invalid, Plaintiffs Remain Bound By Section 3.2 Of The Contract To Nonreconciliation In The Final Year

Even if the Court were to determine that the nonreconciliation regulation is invalid, the carriers agreed to section 3.2 of the contract containing the terms of the regulation, and are bound by the terms. The cases upon which plaintiffs rely to support their argument for reformation are inapposite because plaintiffs assume that 5 U.S.C. § 8902(i), the rate-setting provision of the FEHBA, was enacted for the benefit of the carrier. They are wrong. See Parts III B.

The cases cited by plaintiffs hold that the equitable principle of contract reformation is appropriate in a situation in which a contract has been written in violation of a law or regulation that was "enacted for the benefit of prospective contractors." LaBarge Products Inc. v. West, 46 F.3d 1547, 1552 (Fed. Cir. 1995); Chris Berg, Inc. v. United States, 426 F.2d 314, 317-318 (Ct. Cl. 1970). Similarly, Beta Systems v. United States, 838 F.2d 1179 (Fed. Cir. 1997), cited by plaintiffs, involves a contractor which is among the class of persons intended to benefit by a regulation.[31]

Here, however, plaintiffs misconstrue the FEHBA, by characterizing it as a statute with payment provisions for the benefit of insurance carriers. It was not. Rather, this case is governed by Rough Diamond Co. v. United States, 351 F.2d 636, 639-643 (1965), cert. denied,

[31] In Beta Systems, the relevant acquisition regulation required the Government to use a cost index that bore a logical relationship to the type of costs being measured, and the cost index used ultimately did not bear satisfy that criterion. The parties were found to have made a mutual mistake by relying on that index, and the contract was reformed. There is nothing comparable in this case.

383 U.S. 957 (1966), cited both by LaBarge and Chris Berg as the seminal case on the differences as to contractor's rights under contracts made in violation of law, when the law violated was or was not made for the benefit of the contracting party.

In Rough Diamond v. United States, 351 F.2d at 642, the Court of Claims concluded that, under a statute authorizing the Secretary of Agriculture to barter or exchange for export excess American cotton at prevailing world prices, the driving force behind the statute was to give benefit to farmers through increase in exports, rather than any direct concern with prices paid by cotton exporters or barterers. The fact that the plaintiffs paid more, under their contracts with the Government, than the then-prevailing world market price for surplus cotton, did not authorize recovery of the difference from the Federal government, because the statute did not contemplate such a recovery. Rather, the sole purpose of the statute was to protect local producers and to insure to them a fair share in the world cotton market. The Court of Claims concluded that the exporters were fully aware at the time they signed the contract that the price exceeded world prices; however, they were so anxious to obtain the benefit of their bargain that they signed the contract nonetheless and were bound by it, even if the clause departed from the statute. Accord United States v. Edmondston, 181 U.S. 500 (1901)

In Rough Diamond, the court found that the exporters, as persons outside the circle of beneficiaries Congress drew with regard to the statute, were bound by the traditional rules precluding recovery of monies voluntarily paid to the Government under mistake of law. The court held the exporters to the prices they had agreed to pay for Federal merchandise.

> To allow these plaintiffs to recover the excess over the world price (assuming that the Agriculture Department departed from the statute by insisting on a higher minimum) would not be to give them the price Congress wanted them to pay but, rather, would permit the purchasers to reap a benefit which Congress gave no indication of wanting

them to have for themselves.

Id., 351 F.2d at 636, 642.

So, too, here, plaintiffs understood and accepted the terms of the FEHB Program and the contract they signed with OPM (and/or should have understood the terms when they accepted them), which included the non-reconciliation provision in the final year of the contract. They accepted the benefit of their bargain in order to do business with the Government during the many years of their participation in the FEHB Program. As we established above, particularly with respect to the legislative history, the statute is concerned primarily with the ability of the Government to obtain good benefits at low premium cost, and does not focus upon the carrier as "a principal beneficiary of the statutory obligation for compensation," as plaintiffs advance in their brief. Pl.Br. 25. See, e.g. Precision Pine & Timber, Inc. v. United States., 50 Fed. Cl. 35 (2001) (Endangered Species Act, section 7, does not exist for the benefit of the plaintiff timber purchaser, but is designed to preserve ecosystems upon which endangered and threatened species depend, and to achieve the purposes of various international treaties).

Here, plaintiffs are "bound by the traditional rules precluding recovery of monies voluntarily paid to the Government under mistake of law." Rough Diamond, 351 F.2d at 640. The basic test in deciding whether a purchaser can recover is the particular Congressional intent reflected in the particular piece of legislation under scrutiny, and, the Court should give effect to the Congressional purpose. Rough Diamond, 351 F.2d at 640. Here, the Congressional purpose is to benefit the Government and the Federal enrollees – the rate that the carrier is paid is not the policy focus of the legislation.

As a result, the voluntary agreement into which they entered, including non-

reconciliation of rates in the final year of their FEHB Program participation, is valid and binding, **even if** the Court were to determine that OPM did not properly interpret the statute by promulgating its non-reconciliation regulation.

D There Was No Mutual Mistake

Plaintiffs voluntarily renewed their contracts containing the contested provision, each year, for almost a decade. Having fully performed, the carriers only seek to challenge the provision now that it is not in their financial interest. Camouflaging their own commercial, pecuniary interest as "public interest," plaintiffs accuse OPM of having violated the statute or the regulation. Pl.Br. 26 n. 29.

This is purely plaintiffs' self-interested legal conclusion. Even if the regulation violated its governing statute (which it does not), neither party knew, or even alleged that violation as a possibility at the time the annual contracts were executed, and later performed. This case, therefore, is analogous to Ling-Temco-Vought v. United States, 475 F.2d 630 (Ct. Cl. 1973), in which a contractor was precluded from challenging a fully-performed contract upon the ground of mutual mistake.

Plaintiffs rely upon Beta Systems v. United States, 838 F.2d 1179 (Fed. Cir. 1988), for the proposition that, if the Government contract clause violates a regulation, the clause is not controlling. The Beta Systems rationale is not applicable here. OPM's contract clause did not violate a regulation, rather, it simply incorporated the terms of the regulation into the contract. In Beta Systems, the contractor prevailed because a regulation was disregarded and the contractor and Government agreed to a known, illegal clause. However, as in AT&T and Ling-Temco-Vought, because neither party asserted, knew, or could have known, at the time the

contracts were executed or performed, of this perceived "illegality," they waived any ability now to contest the contract provisions.

Because there was no mutual mistake, there can be no contract reformation.

E. There Is No Unjust Enrichment In Favor Of OPM

Plaintiffs' argument, to the effect that OPM would be unjustly enriched, is also wrong. Pl.Br. 28-29. It rings commercial, as if OPM, an executive agency of the Federal Government, would stand to "profit" from enforcement of the nonreconciliation provision.

However, OPM's "benefit" is not personal or commercial enrichment. OPM seeks uniformity and certainty in administration of its FEHBA contracts. It seeks to operate in reliance upon its regulation, uncontested for sixteen years, that was regularly and properly promulgated under the Administrative Procedure Act, upon notice and comment. It seeks to compel accountability on the part of its contractors to the extent that it reasonably can, and where it reasonably cannot, OPM seeks to protect its inviolate right and responsibility to allocate its scarce resources as it sees fit to accomplish its statutory mission, without incurring Government waste.

For these reasons, the terms of OPM's regulation, expressly incorporated into the contract, should be upheld.

F. Contract Reformation Is Not Warranted

Plaintiffs argue that the Court should reform the contract, even if the parties made no mistake in entering into the contract. While there is case law that provides for contract reformation in the absence of mistake, this case is not one in which contract reformation is warranted.

Plaintiffs rely primarily upon three cases, Beta Systems v. United States, 838 F2d 1179 (Fed. Cir.1988), LaBarge Prods, Inc. v. West, 46 F.3d 1547 (Fed. Cir. 1997), and Chris Berg v. United States, 192 Ct. Cl. 176 (1970). All, however, are distinguishable or inapposite. In Beta Systems, the court remanded, concluding that reformation was appropriate because the contractor had not assumed the risk that the economic price adjustment clause would not fairly measure actual economic situation. Here, however, as established in Part IIB4, the plaintiffs assumed the risk of the non-reconciliation clause by their agreement to it. They knew, as early as 1990 when the regulation was promulgated, and each year when they signed their annual contracts, that the terms of non-reconciliation regulation were expressly incorporated into the contracts. They were on notice that, even if OPM were to calculate the reconciliation amount, they would not be paid that amount if they chose to exit the program – as there would be no contract in the future to which rate adjustments could be made.

Similarly, as the court explained in Mexican Intermodal Equipment v. United States, 61 Fed. Cl. 55, 61-63 (2004), plaintiffs err in attempting to rely upon LaBarge Prods, Inc. v. West, 46 F.3d at 1547, and Chris Berg v. United States, 192 Ct. Cl. at 176, cases that are distinguishable. In LaBarge and Chris Berg, the contractors raised their concerns about the procurement process **before** contract award, not as here, **after** having signed multiple annual contracts which included section 3.2 and **after** contract completion, in the final year when they exercised their right to choose to exit the program.

Accordingly, no contract reformation is warranted.

## IV. Laches Bars Plaintiffs' Claims

### A. The Government Has Not Been Required To File An Answer In This Court; That No Affirmative Defense Of Laches Has Yet Been Pled Does Not Bar Our Laches Defense

We established in our motion that the doctrine of laches bars plaintiffs' claims. Plaintiffs contend that we cannot raise laches as a defense, because we did not plead it as an affirmative defense in an answer. They are wrong.

At the September 2005 status conference in this case, we requested, and the Court granted us permission, to file our motion for summary judgment without having to file an answer. See Transcript (Tr.) 29-30. Because there was no requirement to file the answer, there was no vehicle in which to plead an affirmative defense of laches in this Court. See Rule12(a)(2); RCFC 56 (alters time for filing answer, as does an order of the Court; if Court denies dispositive motion, Government-defendant required to file its answer within ten days after notice of Court's action).

Plaintiffs also rely upon the Federal Rules of Civil Procedure, not applicable in this Court. In this Court, the Rules of the United States Court of Federal Claims govern. Further, for years, the practice before this Court has contemplated that, if a dispositive motion is filed, there is no need for defendant to file an answer. If the Court later denies the defendant's dispositive motion, the United States then has ten days in which to file its answer, with any affirmative defenses.[32]

---

[32] Even if the Court determines that we should have asserted laches as an affirmative defense in an answer, this Court's rules contemplate the liberal amendment of pleadings, R 15. E.g., Foman v. Davis, 371 U.S. 178 (1962). If need be, we could, and would, file a motion for

Plaintiffs rely upon the fact that the Government did not assert laches as an affirmative defense in Scott & White Health Plan v. Office of Personnel Management, No. 01-1824 (JGP) (D.C. D.C.), but their reliance is misplaced. Neither that district court, nor the United States District Court for the Eastern District of Texas, in which Texas Health Choice filed its complaint, possessed jurisdiction to entertain the case. Texas Health Choice v. United States Office of Personnel Management, No. 9:03-CV-14 (E.D. Texas). Therefore, any proceedings in any Federal district courts were essentially of no effect. See Christopher Village, LP v. United States, 360 F.3d 1319 (Fed. Cir. 2004).

Plaintiffs cited to cases decided by the United States Court of Appeals for the District of Columbia Circuit, and cases decided by the circuit courts of appeals in the circuits in which plaintiffs Scott & White and Texas Health Choice filed, erroneously, their initial lawsuits, (District of Columbia and Eastern District of Texas, respectively). However, case law from these circuits does not control cases within the United States Court of Appeals for the Federal Circuit. In any event, Harris v. Secretary, 126 F.3d 339, 343 (D.C. Cir. 1997), the case upon which plaintiffs rely principally, is distinguishable.[33] While the court of appeals discussed the general rule that a defendant must plead an affirmative defense, the court also concluded that courts allow for the liberal amendment of pleadings. This Court has done so. See e.g., First Fed. Sav. Bank of Hegewisch, 52 Fed. Cl. 774, 789 (2002). Plaintiffs do not contend, nor could they establish, that our laches defense was an unfair surprise, as they have had a full opportunity to

---

leave to file an answer asserting laches as an affirmative defense.

[33] Moreover, there have been many cases decided after Harris which distinguish it and/or disagree with it. Thus, Harris is not good support for plaintiffs' arguments.

brief it.

Even if defendant is charged with failing to plead laches as an affirmative defense, there are exceptions to the general rule that such defenses are waived when not pled in the answer. The purpose of the rule is to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that a party is prepared to litigate it properly. E.g.. Hassan v. United States Postal Serv., 824 F.2d 260, 263 (11th Cir. 1988), citing Blonder-Tongue Lab., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 350 (1971)(discussing Fed.R.Civ.P. 8(c)). There are exceptions when the plaintiffs have responded thoroughly to the Government's arguments, showing no prejudice from the injection of the issue at whatever stage in the litigation. Cities Serv. Helex Inc. v. United States, 542 F.2d 1306, 1313 n.14 (Ct. Cl. 1976). In such a case, the court will consider the defense on the merits. See Stockton East Water District et al. v. United States, 2006 WL 932374, *15 (2006).

Because plaintiffs here have responded thoroughly to our defense, and because the parties are at dispositive briefing stage, plaintiffs are unable to establish any prejudice by our arguably late invocation of the defense of laches. Therefore, the court may consider the defense on the merits.

B. Any Delays In This Case Were Caused By Plaintiffs, Who Either Filed In The Wrong Court And/Or Did Not Pursue Diligently The Case Filed In This Court

While plaintiffs complain that the delays were caused by the Government, they are wrong. The bulk of the delay in these cases was caused by the decision of Scott & White, and Texas Health Choice, to file their actions initially in a Federal district court, even though their contracts are indisputably contracts governed by the Contract Disputes Act, which provides for exclusive jurisdiction in this Court. While Bluelincs filed initially in this Court, Bluelincs did

not pursue diligently its case, and contributed to the delays.

Because the burden of establishing jurisdiction falls upon plaintiffs, the delay in filing in the wrong courts, and persisting in their errors for the time required to pursue their appeal to the United States Court of Appeals for the Federal Circuit, Texas Health Choice v. Office of Personnel Management, 400 F.3d 895 (Fed. Cir. 2005), should be charged to them. With respect to Bluelincs, which filed in initially in this Court, the delay should also be charged to Bluelincs, because, several times it requested this Court to stay proceedings pending the resolution of the jurisdictional and other issues in the cases filed by Scott & White and Texas Health Choice in the district courts.

C. The Time To Evaluate Laches Should Be Measured From 1990, The Year In Which OPM Promulgated The Nonreconciliation Regulation

Plaintiffs attempt to set up yet another strawman with respect to laches. They focus upon incorrect years, 1999 and 2000, those in which they chose to exit the FEHB program. We agree that they submitted timely claims to the contracting officer.

In our motion, however, we based our laches argument upon 1990 – approximately ten years before the 1999 and 2000 program years -- the year in which the regulation was promulgated.

Plaintiffs' arguments on this point, therefore, are irrelevant.

D. Fairness Requires That The Court Enforce The Contract To Which The Parties Agreed

In our brief, we cited numerous cases for the proposition that the only fair result in this case would be rule in the Government's favor. Plaintiffs' discussion of the some of the cases upon which we relied does not counter, or distinguish, the legal principles of those cases.

Plaintiffs do not dispute that each of them was silent regarding the non-reconciliation clause in the regulation and the annual contracts - beginning in 1990 – through 1999 and 2000 when they chose to exit the FEHB program. Their silence - for years -- constitutes a waiver of their claims. See Becho, Inc. v. United States, 47 Fed. Cl. 595, 604 (2000)(contractors often purposefully decline to mention what they perceive to be wrongful Government conduct, to attempt to obtain the benefits of a contract to maintain a valuable customer relationship). Here, plaintiffs carriers each submitted a proposal and estimated rates, were awarded annual contracts for years, performed the contracts, and OPM paid to them the full contract price each year (subject to disputes that were resolved). Plaintiffs' attempt to rewrite the contracts, years after full performance, should be rejected.

Accordingly, fairness requires that the Court enforce the contracts to which the parties agreed. It would be plaintiffs that would receive an "unjust windfall," not the Government, if the Court were to declare the 1990 non-reconciliation regulation invalid.

## IV. Bluelincs Raised The "Forfeiture" Argument Too Late In The Briefing; In Any Event, There Was No Forfeiture

### A. Bluelincs' Belated Attempt To Argue Forfeiture As A Merits Issue Should Be Rejected

In its claim and supplemental claim to the contracting officer, Bluelincs raised the legal theory of an unlawful "forfeiture," as somehow connected to its theory that it was improper for OPM to withhold, or "offset," Bluelincs' alleged "right" to a reconciliation balance from the contingency reserve fund. App. 510-12, 522. At the status conference in September 2005, however, Bluelincs agreed that it would defer any argument on the offset issue until after the Court ruled on the pending cross motions for summary judgment. Bluelincs' offset issue is, thus,

connected to its "forfeiture" issue, which was deferred.[34]

Bluelincs also chose not to include its forfeiture theory in the parties' Joint Statement of Issues of Law, filed in late 2005. Nor did Bluelincs raise this theory in its moving brief, filed in December, 2005. In preparing our dispositive motion, we assumed that Bluelincs had abandoned that theory, or at least, deferred it, as its counsel represented at the status conference. In its opposition brief, however, Bluelincs peppers its brief with references to "forfeiture," without actually briefing it, or providing any legal authority to support it.

It is too late for Bluelincs to raise a forfeiture theory now, having chosen not to do so in its opening brief.

In any event, Bluelincs offers absolutely no case law in support of this theory. For these reasons, we respectfully request that the Court decline to consider the "forfeiture" theory that Bluelincs raises.[35]

B. There Was No "Forfeiture"

If the Court considers the forfeiture issue, it lacks merit.

In its claim to the contracting officer, Bluelincs cited two very old cases, Knickerbocker Life Ins. Co. v. Norton, 96 U.S, (6 Otto) 234, 242 (1885), and Tobin v. United States, 59 F.Supp. 410 (Ct. Cl. 1945). App. 510-12, 522. Bluelincs argued that OPM's refusal to pay to Bluelincs the $369,127 that OPM had calculated in the reconciliation process – before Bluelincs notified OPM that Bluelincs would exit the program – was an improper "offset," because it was

[34] If the Court determines that the regulation is valid, Bluelincs would have no offset issue, and, no forfeiture issue. See Tr. 13-16.

[35] Neither of the other two plaintiffs in this consolidated case raise the forfeiture theory.

somehow an illegal "forfeiture."

Neither case even remotely supports any claim to an "illegal forfeiture." Knickerbocker clearly is inapposite, as the case involved the forfeiture of insurance policy proceeds, according to the terms of the insurance contract, when the payment of the premium was not accomplished by the due date in the contract. In Tobin, the Court of Claims simply stated that it would construe a liquidated damages contractual provision narrowly. Because the liquidated damages provision in Tobin did not expressly cover the period at issue, the court ruled in favor of the contractor. There is nothing remotely analogous here.

There was clearly no "illegal forfeiture" here. Rather, Bluelincs is simply not entitled to any rate reconciliation or adjustment to rates, because Bluelincs chose to exit the FEHB program.

## CONCLUSION

For the foregoing reasons, and those presented in our moving brief, defendant respectfully requests that the Court grant summary judgment in its favor, and deny plaintiffs' motion for summary judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/David M. Cohen
DAVID M. COHEN
Director

SUSAN WHITMAN, Esq.
JILL GERSTENFIELD, Esq.
U.S. Office of Personnel Management
Washington D.C.

s/Jane W. Vanneman
JANE W. VANNEMAN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., NW
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Phone: (202) 307-1011
Fax: (202) 514-8624

May 19, 2006

.

CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of May 2006, a copy of the foregoing "DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.