Nos. 01-517C, 05-371C, 05-963C
(Judge Horn)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

GHS HEALTH MAINTENANCE ORGANIZATION, INC.,
d/b/a BLUELINCS HMO,
Plaintiff,

TEXAS HEALTH CHOICE, L.C.,
Plaintiff,

SCOTT & WHITE HEALTH PLAN
Plaintiff,

v.

THE UNITED STATES,
Defendant.

---

# DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE DECLARATION OF NANCY H. KICHAK

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JANE W. VANNEMAN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, NW, 8th Floor
Washington, D.C. 20530
Telephone: (202) 307-1011
Facsimile: (202) 514-8624
Attorneys for Defendant

SUSAN WHITMAN, Esq.
JILL GERSTENFIELD, Esq.
U.S. Office of Personnel Management
Washington, D.C. 20415

May 19, 2006

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE DECLARATION OF NANCY H. KICHAK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1. Plaintiffs Waived Any Possible Objection To The Inclusion of the Declaration of Ms. Nancy H. Kichak In the Record . . . . . . . . . . . . . . . . . . 2

2. In Any Event, The Court Should Permit Supplementation Of The Administrative Record For Purposes Of Its APA Review . . . . . . . . . . . . 4

   A. Courts Permit Supplementation In APA-Record Review Cases . . . . . . . 4

   B. A Declarant May Include Knowledge Of Involved Entities and Experiences In the Declarant's Official Capacity . . . . . . . . . . . . . . . 6

3. Ms. Kichak's Statements Rebut Plaintiffs' Challenges To the Regulation . . . . . 7

   A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

   B. OPM Review of Carriers' Distribution of Charges To Federal Enrollees And To The Carriers' Other Non-Federal Groups Of A Similar Size . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

   C. OPM Reviews Carriers' Estimated Rates For Pre-Paid Programs To Gauge Whether The Rates Are Consistent With The Rates The Carriers Charge To Other Non-Federal Groups Of A Similar Size; OPM Does Not Attempt To Determine "The Actual Costs Of Benefits Provided" For Carriers With Prepaid Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

D. OPM's Office of Actuaries Performs Calculations For Reconciliation of Rates; OPM's Office of the Inspector General (OIG) Audits Carriers For Defective Pricing And Other Audit Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

E. OPM's Rationales In 1990 When Promulgating The Regulation . . . . . . 14

3. Ms. Kichak's Declaration Relates To The Contract Disputes Act (CDA) Issues, Which Are Governed By A *De Novo* Review Standard . . . . . . . . . . . . . 16

A. This Court Applies The *De Novo* Standard of Review To CDA Disputes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

B. Many of Ms. Kichak's Statements Embody Common Sense Principles And Constitute Reasonable Predictions Made By the Agency Charged With Administering the FEHBP . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

AT & T Information Systems, Inc. v. General Services Admin.,
810 F.2d 1233 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Boston Edison Co. v. United States.,
64 Fed. Cl. 167 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Camp v. Pitt,
411 U.S. 138 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Corel Corp v. United States,
165 F.Supp.2d 12 (D.D. C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Cubic Applications v. United States,
37 Fed. Cl. 339 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Esch v. Yeutter,
876 F.2d 976 (D.C.Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Graphic Data, LLC v. United States,
37 Fed. Cl. 771 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Kansas City Power & Light Co. v. Ford Motor Credit Co.,
995 F.2d 1422 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Ragsdale v. Wolverine World Wide, Inc.,
535 U.S. 81 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Scott & White Health Plan v. United States Office of Personnel Management,
No. 01 CV 1824 (JGP) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Wilner Construction v. United States,
24 F.3d 1397 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

## STATUTES, RULES AND REGULATIONS

5 U.S.C. §8903(4) . . . . . . . . . . 11

55 Fed. Reg. 27406, 27410 (1990) . . . . . . . . . . 5

Fed.R.Evid. 601, 702 . . . . . . . . . . 6

Fed.R.Evid. 602 . . . . . . . . . . 6

Rule 1 . . . . . . . . . . 4, 5

Rule 7.1 . . . . . . . . . . 2

Rule 7.1 (a) . . . . . . . . . . 3

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| GHS HEALTH MAINTENANCE ORGANIZATION, INC., d/b/a BLUELINCS HMO, Plaintiff, | ) | |
| TEXAS HEALTH CHOICE, L.C., Plaintiff, | ) | |
| SCOTT & WHITE HEALTH PLAN Plaintiff, | ) | |
| v. | ) | Nos. 01-517C, 05-371C, 05-963C (Judge Horn) |
| UNITED STATES, Defendant. | ) | |

DEFENDANT'S OPPOSITION TO PLAINTIFFS'
MOTION TO STRIKE DECLARATION OF NANCY H. KICHAK

## INTRODUCTION

Defendant opposes plaintiffs' motion to strike the declaration of Ms. Nancy H. Kichak. Ms. Kichak is the Director of the Office of Actuaries (Office of Actuaries) at the Office of Personnel Management (OPM). On December 6, 2005, we submitted an unopposed motion to include her declaration as part of the record in this case. With their brief in opposition to our motion for summary judgment, filed March 31, 2006, plaintiffs filed a motion to strike the declaration.

1. Plaintiffs Waived Any Possible Objection To The Inclusion Of the Declaration of Ms. Nancy H. Kichak In the Record

Plaintiffs waived any opposition to the Kichak Declaration by consenting to our motion, filed on December 6, 2005, to include the declaration in the record. See Rule 7.1. Alternatively, they waived any objection by waiting until a very late stage in the briefing process to file their motion to strike. It is in the interest of justice that we be permitted to file our reply brief, in partial reliance upon her declaration.

At a status conference held on September 16, 2005, the Court and the parties addressed the nature of the briefing process and the schedule for it. By order dated September 19, 2005, the Court established the briefing schedule, which reflected the parties' agreement. Between September 16, 2005, and March 31, 2006 – for more than six months – when plaintiffs filed their briefs in opposition to our dispositive motion, plaintiffs never mentioned, or filed any pleading, opposing the inclusion of Ms. Kichak's declaration in the record before this Court.

When, in December 2005, we filed our motion to include Ms. Kichak's declaration in the record, none of the three plaintiffs in this consolidated action opposed our motion. If they had, we would have explained at that time, the basis for including the declaration in the administrative record, as well as in the appendix to our motion for summary judgment and opposition to plaintiffs' motion for summary judgment.[1]

[1] Counsel for defendant recalls that counsel for Scott & White and Texas Health specifically requested that Ms. Kichak's declaration be included in the administrative record in this Court, because it had been included in the record before the United States District Court for the District of Columbia in Scott & White Health Plan v. United States Office of Personnel Management, No. 01 CV 1824 (JGP).

Ms. Kichak signed her declaration in May 2002 and it was filed in the United States District Court for the District of Columbia in Scott & White Health Plan v. United States Office of Personnel Management, No. 01 CV 1824 (JGP). In 2002, Ms. Kichak served as Director of the Office of the Actuaries in the Office of Retirement and Insurance Services at OPM. She had occupied that position since 1987. Prior to that time, she was the Supervisory Actuary for Insurance. In her capacity as Director, she had oversight responsibilities for the rate negotiations with all carriers in the Federal Employees Health Benefits Program (FEHBP), which, at the time, were approximately 180 in number. As she stated in her declaration, OPM had negotiated with carriers participating in the FEHBP since 1959, the inception of the program. OPM had experience, knowledge and expertise in setting rates under the FEHBP and in rate negotiations. Ms. Kichak addressed, among other things, the bases for OPM's promulgation of the regulation in 1990.

Plaintiffs consented to our motion. Plaintiffs then filed their dispositive motions, without any argument that they believed that Ms. Kichak's declaration should be stricken from the record. We relied upon the Kichak declaration in preparing our summary judgment briefs.

Plaintiffs' motion to strike this declaration comes far too late in this litigation. See Rule 7.1 (a) (objections to written motions shall be filed within 14 days after service of the motion). Plaintiffs waived any possible objection to the Kichak declaration by waiting months, until March 31, 2006, a late stage in the briefing, to raise their objections to the Kichak declaration.

Plaintiffs' delay in moving to strike this declaration has caused prejudice to defendant. Assuming no objection, we relied upon the Kichak declaration in filing, on February 17, 2006, our summary judgment briefs.

In any event, plaintiffs do not present any evidence to dispute any of the statements made by Ms. Kichak in her declaration. It appears that plaintiffs simply dispute her logic.

Rule 1 of this Court provides that the rules "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." According to the rules of this Court, and fundamental notions of fairness, plaintiffs waived any possible objection to the inclusion of the Kichak declaration in the administrative record and/or in the appendix to the summary judgment briefs.

2. In Any Event, The Court Should Permit Supplementation Of The Administrative Record For Purposes Of Its APA Review

A. Courts Permit Supplementation In APA-Record Review Cases

The United States Court of Federal Claims, as well as the United States Court of Appeals for the District of Columbia Circuit, have allowed the administrative record to be supplemented in certain situations. Supplementation is permitted, for example, when a case is so complex that a court requires more evidence to enable it to understand clearly and fully the issues. These principles were established in Esch v. Yeutter, 876 F.2d 976, 991 (D.C.Cir. 1989); see also e.g., Cubic Applications v. United States, 37 Fed. Cl. 339, 342 (1997). In these and in other cases, courts have allowed affidavit testimony to supplement the administrative record because the interests of justice are best served with a full record. See AT & T Information Systems, Inc. v. General Services Admin., 810 F.2d 1233, 1236 (D.C. Cir. 1987) (record may be supplemented to provide explanatory background information); see also Graphic Data, LLC v. United States, 37 Fed. Cl. 771, 778-80 (1997)(1996 amendment to Tucker Act provided for APA, record review of bid protests; record may be supplemented in appropriate circumstances). See generally Camp v. Pitt, 411 U.S. 138, 142-43 (1973)(contemporaneous explanation by agency, although "curt,"

indicated determinative reason for the final action taken).

As we explain below, Ms. Kichak's declaration meets the standards for supplementation. To the extent that plaintiffs complain that there is not adequate explanation in the record relating to promulgation of the nonreconciliation regulation, Ms. Kichak is uniquely qualified to explain and clarify OPM's rationales at the time, the assumptions upon which the regulation was based, and, the predictions that OPM made in promulgating the regulation.

Further, as we established in our moving brief, the Federal Employee Health Benefits Program (FEHBP) is a highly complex one, that changes over time. Ms. Kichak's declaration will assist the Court in understanding clearly and fully the issues. The interests of justice are best served with the record, made complete with Ms. Kichak's declaration.

Finally, even plaintiffs concede, in effect, that Ms. Kichak's declaration "mirrors" OPM's comments in promulgating the regulation. Plaintiffs' Brief (Pl.Br.) 5, citing 55 Fed. Reg. 27406, 27410 (1990).[2]

---

[2] We do not oppose plaintiffs' attempts to supplement the record, even though the document proffered recently by plaintiffs is dated eight years after the promulgation of the regulation. If there are materials that will assist this Court to reach a "just, speedy and inexpensive" resolution of these cases (see Rule 1), the Court should consider what is necessary to do so.

Thus, notwithstanding that plaintiffs' failed to file a motion for leave to file additional "record" materials, in their opposition brief, plaintiffs Scott & White and Texas Health Choice attached an April 19, 1998 Letter from OPM, the FEHBP Program Carrier Letter, Letter No. 1998-016-A. Pl.Br. at 15. This letter actually supports the Government's position in several respects, because OPM instructed the carriers as to the reason that OPM initiated the SSSG "concept" (similarly sized subscriber groups); the "purpose of the SSSG concept is to ensure that the Federal group receives an equitable and reasonable rate."

This OPM letter demonstrates that there is a range of options that OPM has chosen, over time, to administer this large, complex and evolving program in which community rated carriers

Accordingly, there is every reason to permit supplementation of the record with the Kichak declaration. There is every reason to deny plaintiff's motion to strike the declaration.

B. A Declarant May Include Knowledge Of Involved Entities and Experiences In the Declarant's Official Capacity

It is in the interest of justice to supplement the record, because, contrary to plaintiffs' contentions, Ms. Kichak possessed knowledge sufficient to support all the statements in her declaration.

It is not required that a declarant be involved, personally, in all matters at issue. Rather, a declarant may include personal observations and knowledge of actions of involved entities, perceptions and experiences in the declarant's official capacity. Boston Edison Co. v. United States., 64 Fed. Cl. 167, 180-82 (2005)(citing Fed.R.Evid. 601, 702). For example, in Kansas City Power & Light Co. v. Ford Motor Credit Co., 995 F.2d 1422, 1432 (8th Cir. 1993), the Eighth Circuit allowed testimony regarding the likely action that two utility employees believed the public service commission would take in light of the utility's redemption of stock. Although Fed.R.Evid. 602 requires testimony to be the product of a witness' personal knowledge, and not speculation, the testimony regarding the likely reaction of the commission was based upon the

---

(prepaid programs) participate. Among other things, small carriers do not submit the detailed documentation that large carriers do. (page 3). OPM's Office of the Inspector General (OIG) performs special audits of carriers' rate reconciliations "on a selected basis . . ." which may include rate information for previous years. (page 3). OPM defines an SSSG (similarly sized subscriber group), and groups to be excluded from the definition of an SSSG. (page 4-5). OPM announced its rules on "multiple rating areas" (page 5-6), consistency of rating methods (page 8), circumstances in which OPM might consider the rates of non-SSSG groups (to verify the equivalence of the Federal group and SSSG rates), and, any market advantages provided to an SSSG (page 8).

See discussion below, and Part II A 3 of our reply brief.

employees' experience.

Similarly, here, Ms. Kichak was the Director in charge of the OPM Office of Actuaries, the OPM component responsible for promulgating the regulation at issue, and for the rate negotiation and reconciliation process. She is uniquely qualified, by virtue of her knowledge of the program, her experience, and her responsibilities, to attest to OPM's interpretation of the statute, and its rationale at the time for promulgating the non-reconciliation regulation, and to rebut plaintiffs' challenges (facial, and as applied) to the validity of the regulation.[3]

3. Ms. Kichak's Statements Rebut Plaintiffs' Challenges To the Regulation

A. Introduction

Plaintiffs' challenges to the regulation are unsupported in law or fact. Because Ms. Kichak's statements rebut plaintiffs' "as-applied" arguments, as well as their facial challenge, her statements should be part of the administrative record and the record in this case.

Plaintiffs contend, among other things, that OPM's rationale for the nonreconciliation regulation is not logical and that is OPM's "laziness" that drives the agency. According to plaintiffs, OPM is "unwilling to press its contractors for records that OPM's own regulations require them to retain. (Brief of Scott & White, and Texas Health Choice ((Pl.Br). at p. 3). Plaintiffs mischaracterize OPM's position, as they claim that OPM "never disputes that the rationales for the Final Year Regulation do not apply to" plaintiffs. Pl.Br. 19. They also contend that OPM does not deny that OPM had adequate documentation for Scott & White and

[3] Plaintiffs' reliance upon Corel Corp v. United States, 165 F.Supp.2d 12, 30-31 (D.D. C. 2001), is misplaced. That case involved an economist retained by the private party suing the Government. Here, in contrast, Ms. Kichak is the agency official in charge of the office within the agency responsible for the program at issue; she is not a person outside the agency, retained for purposes of the litigation.

Texas Health, that OPM performed the reconciliation for the final year, and that "OPM calculated the exact rates that, but for the Final Year Regulation, "reasonably and equitably reflect the cost of benefits provided." Pl.Br. 20. Their logic is circular because, here, as throughout their brief, they assume that the regulation is inconsistent with the statute. Id. They never address our demonstration that, **even if** the Court were to declare the regulation invalid, the terms of the nonreconciliation regulation would apply as a contract matter.

Plaintiffs' assertions and arguments lack merit and are without foundation in the record.[4] Their arguments ignore the very nature of the rate reconciliation process for prepaid plans - performed in the context of community rated carriers continuing from year to year in the FEHB program - and the different process that OPM requires in the year in which the community rated carrier elects to exit the program. Contrary to plaintiffs' arguments, **both the regulation and the contract** provide that, because there is "**no adjustment"** to rates in the final year, there is **no rate reconciliation**. See Pl.Br. 20-21. That is what a rate reconciliation is– an **adjustment to the following year's rates**. Thus, it is because there is no adjustment – no rate reconciliation -

[4] Because plaintiffs interject several merits arguments into their motion to strike, we respond to those arguments.

Plaintiffs also assert that "OPM was able to obtain adequate data" from them to complete the reconciliation process. Pl.Br. at p. 8. They argue that it is only in the "most exceptional cases" that the generalizations upon which OPM relies in promulgating the regulation could be true. Id. They assert that each of the three carriers "retained that data, pursuant to OPM's own document retention regulations and guidelines. Id. They argue that it is plaintiffs' situations, rather than "OPM's generalizations," that "reflects the typical case." Id. They assert further that "the reconciliation process is already complete by the time a plan announces its withdrawal from the program." Pl.Br. at p. 9.

There is no evidence in the record to support any of these statements. We address these arguments in full in our reply brief.

that there is no payment to a carrier in the final year (or, no adjustment to the following year's rates). While OPM performed the **calculation** for the rate reconciliation for the three plaintiffs – assuming at the time that the carriers would continue in the program and that there would be rates to adjust for the following year - there was no rate reconciliation payment because plaintiffs chose to exit the program.

Ms. Kichak's declaration explains some of these background details of the program, OPMs responsibilities, and sets forth fundamental principles of how a prepaid, community rated carrier functions. Her declaration is based upon statutes and regulations governing community rated carriers (health maintenance organizations), and common sense. Her declaration rebuts plaintiff's arguments, whether they address the facial challenge, and/or the as-applied challenge, to the nonreconciliation regulation. This is because all of Ms. Kichak's statements are based upon OPM's experience, over years, in administering the FEHB program and the rate reconciliation process, and OPM's predictions for the future in administering the program, in general, and as applied to any particular carrier. All of Ms. Kichak's statements simply clarify and explain some of the purposes and functions of the participants in the process. Her statements make perfect sense. Plaintiffs rebut none of Ms. Kichak's statements with any evidence or facts.

Moreover, the statements contained in Ms. Kichak's declaration relate to plaintiffs' "as-applied" arguments, in addition to plaintiffs' facial challenge to the regulation as inconsistent with the statute. As such, to the extent, if any, that Ms. Kichak's statements are deemed to be "outside the administrative record" for purposes of the Court's APA review of the facial validity of the regulation, her statements should be part of the record for purposes of the "as-applied"

analysis.

Accordingly, the Court should permit supplementation of the record and include her declaration in the record. We address below some of her statements.

B. OPM Review of Carriers' Distribution of Charges To Federal Enrollees And To The Carriers' Other Non-Federal Groups Of A Similar Size

Ms. Kichak states, among other things, that OPM, in reviewing a carrier's **proposed** rates, "does not analyze the appropriateness of the underlying rate." Para. 6. Rather, OPM "reviews the proposed rate to establish that the amount the plan determines it will charge are distributed appropriately to the FEHBP and the carrier's other covered, non-Federal groups of a similar size. OPM does not question what judgment the carrier has applied in its projections." Para. 6 (emphasis added). Thus, when OPM reviewed the rates **proposed** by Scott & White, Texas Health, and Bluelincs, at the start of what turned out to be their final years of participation, OPM did not review the actual reasonableness of the dollar amounts charged to the Government and to the Federal enrollees and/or to the carriers' non-Federal groups.

As we explain in our reply brief, the parties ultimately negotiated the rate for the final year, based upon the carriers' estimates, actuarial assumptions and projections, and the carriers' own determination of its revenue requirements. And, as we explain below, OPM reviews the carriers' rates to determine whether they are distributed appropriately to the Federal enrollees as compared to the carriers' other non-Federal groups of a similar size.

C. OPM Reviews Carriers' Estimated Rates For Pre-Paid Programs To Gauge Whether The Rates Are Consistent With The Rates The Carriers Charge To Other Non-Federal Groups Of A Similar Size; OPM Does Not Attempt To Determine "The Actual Costs Of Benefits Provided" For Carriers With Prepaid Programs

Ms. Kichak states that when OPM "negotiates with a community rated carrier, its objective is to receive a rate that is derived in a manner consistent with the rate that carriers charges its other, non-Federal groups of a similar size." Para. 8. As Ms. Kichak states, "OPM recognizes that the actual community rates, and methodologies for determining them, for the following contract year may not be available at the time of the carrier's rate submission." Para 9. Therefore, the "FEHBP rate negotiation is premised on an **estimate,** or **projection,** of what a carrier's community rates **will be for the ensuing contract year**." Para 10 (emphasis added).

When OPM later requests, in the rate reconciliation process, limited information from each of the carriers, OPM compared the carriers' estimated rates to the rates of the carriers' other non-Federal groups of a similar size, and, OPM reviewed "the methodology and discounts used [by the carriers] to derive the rates charged to other similarly sized subscriber groups [SSSG]." Para 11. OPM was not, as plaintiffs attempt to suggest, attempting to determine the exact dollar cost of the benefits actually provided – for the simple reason that these carriers operate as health maintenance organizations, which, pursuant to statute, are **prepaid** plans (in contrast to experience-rated plans). 5 U.S.C. §8903(4). See Deft. Br. Introduction (part 2), II A 3.

Thus, to perform a rate reconciliation for prepaid plans in a year in which adjustments would be made to the rates for the following year, OPM requests, in its reconciliation instructions, limited data to support the future adjustments. Para 13. Specifically, at the time of

reconciliation – assuming that there would be an adjustment to the following year's rates – OPM's Office of the Actuaries

> limits its review to the data the carrier makes available for reconciliation. The Office of the Actuaries does not obtain all detailed records that may be maintained at the carrier's place of business. The Office of the Actuaries does not have the resources, and it is not that Office's operational function, to look behind these data or to verify that they are correct and appropriate to use for purposes of negotiation and reconciliation.

Para. 14. Rather, "OPM relies upon the audit feature of the FEHBP to provide an incentive for the carriers to accurately represent the data that drives their rates in the first instance." Para. 15.

Ms. Kichak's statements are hardly controversial. Plaintiffs do not rebut them with any facts. Thus, there are practical reasons, for purposes of administrative efficiency, that OPM does not complete the rate reconciliation process in the final year, in which the carrier elects to exit the FEHB program.

D. OPM's Office of Actuaries Performs Calculations For Reconciliation of Rates; OPM's Office of the Inspector General (OIG) Audits <u>Carriers For Defective Pricing And Other Audit Issues</u>

Ms. Kichak related the types of findings that OPM auditors from the Office of Inspector General (OIG) made after a complete audit of Scott and White for certain program years.[5] Para. 17-27. The details relate to audit issues to which Scott and White had agreed.[6] The OIG audit

---

[5] The difference in function between the Office of Actuaries and the OIG is a matter of public record, as well as common sense. OPM's web site provides information on the organizational structure of OPM. The OPM Office of Actuaries (under the Assistant Director for Insurance Services Programs) is within the OPM Human Resources Products & Services Division. This Division is completely separate from the OPM Office of the Inspector General (OIG). <u>See</u> www.opm.gov/opmorgchart. This separation of functions and responsibilities is typical of many Government departments, with the OIG having authority and functions independent of other divisions within the same agency.

[6] These issues include mental health loading and premium tax credits; miscalculations of a mental health loading item; inadvertent omissions of a transplant loading from the FEHBP

findings also involved details relating to items which Scott and White disputed.[7] These audit findings involved details, almost all of which are unrelated to the reconciliation process.

Therefore, these types of audit findings are clearly not of the same character as the types of information and data that carriers submit in the rate reconciliation process. A review of the types of information and data that the OPM Office of Actuaries requests of the carriers upon rate reconciliation establishes, on their face, the fundamental differences between the audit process and purpose, and the rate reconciliation process and purpose. For example, the OPM Office of Actuaries, in the rate reconciliation process, requests materials such as data on comparable SSSGs, the rating process utilized, and current enrollment data (including group-specific demographic assumptions (family size, self-family enrollment mix), carrier-wide enrollment mix, or other demographic assumptions)). See Defendant's Brief (Deft.Br.) 19-21, e.g., Supp. App. 541.[8] In rate reconciliations, the Office of Actuaries does not request typical cost and pricing data, governed by the Federal Acquisition Regulations (FAR), of the sort reviewed by the OIG office.

---

rates; providing an SSSG a more favorable premium tax percentage; charging the FEHBP the same copay as one of the SSSGs without a reduction in the rates; an overcharge for mental health benefits; and, overcharges for mental health benefits. Id.

[7] These include failure to give the FEHBP the same reduction in renewal rates given to SSSGs, and providing the FEHBP a credit loading instead of the four per cent reduction for the office visit copayment that an SSSG received. Id. The audit report for Scott and White are contained in the administrative record, at Appendix (App.)

[8] Similarly, the audit disputes between Texas Health Choice and Bluelincs involved details of the carriers' plans relating to matters such as defective pricing issues, matters that were not encompassed within the types of data that the OPM Office of Actuaries requested in the recent reconciliation process.

Ms. Kichak's declaration simply summarizes, explains, and clarifies, these undisputed facts.

E. OPM's Rationales In 1990 When Promulgating The Regulation

Ms. Kichak explained and clarified the rationales upon which OPM relied in 1990, at the time it promulgated the non-reconciliation regulation. Paras. 18-27. She made a clear distinction between the OPM program office that negotiates rates with carriers, as compared to the OPM office of the OIG that, in limited circumstances, conducts full-blown audits of carriers. Id. She explained and clarified the "logistical challenge" that OPM might face in the year in which a carrier elects to exit the FEHBP in terms of access to the business records of the carrier. Para. 20. For example, OPM's records retention requirements are typically greater than are requirements for a carrrier's other lines of business, and, once the carrier exits the FEHB program, the carrier "finds itself with a greater recordkeeping requirement for a contract that is ended than for its ongoing business, the latter of which represents the carriers's priorities and focus of interest." Id. This is simply a "prediction," of the type permitted by agency officials, in promulgating a regulation.

Ms. Kichak also expressed OPM's opinion, based upon her experience and predictions, that a carrier which chooses to exit the program and which might find itself owing funds to the FEHBP on reconciliation "would have a financial disincentive to provide access to data, particularly in view of its inability to look to future reserves [from the OPM earmarked reserves] to offset the improper prior rate." Para. 21. Indeed, as of 1990, OPM had "found that it was unable to obtain adequate data to reconcile the rates for a *variety of plans.*" Id. (emphasis added). Thus, contrary to plaintiffs' arguments in their opposition briefs, OPM's non-reconciliation

regulation was not based upon “only” two instances. Para. 21.

Again, this is simply a clarification of OPM’s experience and predictions at the time, and is permissible supplementation.

Ms. Kichak also provided examples of the difficulties that OPM had experienced, in one case with Coordinated Health Care, and in “fourteen cases” involving Maxicare Plans in terms of obtaining necessary records for a rate reconciliation. Para. 22-23. As a direct result of the problems that the OPM Office of Actuaries had already encountered, OPM “determined that it would not require a rate reconciliation in the year the contract is not renewed.” Para. 24. She explained that the rationale for the non-reconciliation regulation “places the burden of properly projecting estimated community rates equally on OPM and the carrier.” Para. 25. The burden is roughly equivalent because the regulation

> relieves the carrier of the requirement to continue to maintain data sufficient for rate reconciliation once the contract is terminated, and it relieves OPM from the administrative burden of identifying and accessing the appropriate data at a time when the carrier no longer participates in the FEHBP.

Para. 25-26.

Finally, she explained that during negotiations, the carriers and OPM, in good faith, make the best possible estimates of the subscription rates for the following year, to determine the employee premium (paid by OPM and the Federal employee). “[D]uring years when the contract is renewed, the incentive exists for the parties to use accurate and appropriate data because underestimating the rate could, upon reconciliation, raise the carrier’s rate for the following year, adversely affecting the carrier’s ability to attract enrollees.” Para. 27.

As with her other statements, this one also simply clarifies the dynamics of the rate reconciliation process, for prepaid plans. To the extent that she expresses an opinion

predicting a carrier's incentive, her prediction is simply a subset of the overall OPM rationale involving OPM's view that it can be difficult to obtain the requisite reconciliation documentation from carriers that choose to exit the program in any given year, thereby precluding any future rate adjustments.

3. Ms. Kichak's Declaration Relates To The Contract Disputes Act (CDA) Issues, Which Are Governed By A *De Novo* Review Standard

A. This Court Applies The *De Novo* Standard of Review To CDA Disputes

Many of the facts to which Ms. Kichak attests relate to issues involved in the CDA contract dispute in this case. As we explain in our reply brief, the CDA issues involve issues relating to whether Congress intended the statute to benefit the Government and Federal enrollees, or, to benefit the health plans. Also at issue in the CDA aspect of the case, in which plaintiffs seek contract reformation, is whether there was any mutual mistake, and whether there would be any unjust enrichment in favor of OPM if the Court sustains the validity of the regulation. Another CDA issue is, **even if** the Court were to invalidate the regulation, whether section 3.2 of the contract still governs, precluding any contract reformation, because section 3.2 of the contract contains the terms of the nonreconciliation regulation.

It is axiomatic, and undisputed by plaintiffs, that CDA disputes are governed by the de novo review standard, not by the APA record review standard. E.g., Wilner Construction v. United States, 24 F.3d 1397 (Fed. Cir. 1994)(en banc). Therefore, as we explain in our reply brief, and in part below, Ms. Kichak's declaration should remain as part of the appendix to our summary judgment briefs.

B. Many of Ms. Kichak's Statements Embody Common Sense Principles And Constitute Reasonable Predictions Made By the Agency Charged With Administering the FEHBP

The statements, opinions, predictions, and conclusions provided by Ms. Kichak reflect clear common sense principles, based upon the experience of the agency charged with administering the FEHB program. Her statements are supported by statutes, regulations, OPM publications, and materials in the administrative record and/or the appendix to our brief involving the promulgation of the regulation and the contract dispute. Contrary to plaintiffs' contention, the presumptions made by OPM in promulgating the regulation were based upon empirical and logical bases. See e.g., Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 90 (2002).

This Court should defer to OPM's permissible construction of the statute, which, for community-rated carriers, which employ prepaid rates, requires that rates reasonably and equitably reflect the cost of benefits provided to the Federal enrollees, when compared to the carriers' similarly sized subscriber groups.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Court deny plaintiffs' motion to strike the declaration of Ms. Nancy Kichak.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

s/David M. Cohen
DAVID M. COHEN
Director

SUSAN WHITMAN, Esq.
JILL GERSTENFIELD, Esq.
U.S. Office of Personnel Management
Washington D.C.

s/Jane W. Vanneman
JANE W. VANNEMAN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L St., NW
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Phone: (202) 307-1011
Fax: (202) 514-8624

May 19, 2006

.

CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of May, 2006, a copy of the foregoing "DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE DECLARATION OF NANCY H. KICHAK" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.